UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
SONORAN SCANNERS, INC. and              )
JOSEPH P. DONAHUE,                      )
          *Plaintiffs,*                 )
                                        )        Civil Action No. 06-12090-RCL
                                        )
     v.                                 )
                                        )
                                        )
PERKINELMER, INC.,                      )
          *Defendant.*                  )
_____ )


**PERKINELMER, INC.'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Jonathan I. Handler (BBO #561475)
Jillian B. Hirsch (BBO #659531)
DAY PITNEY LLP
One International Place
Boston, MA 02110
(617) 345-4600

*Counsel for Defendant PerkinElmer, Inc.*

**TABLE OF CONTENTS**

INTRODUCTION ......................................................................................................... 1

SUMMARY OF UNDISPUTED MATERIAL FACTS ............................................... 2

ARGUMENT ............................................................................................................... 7

I.  PLAINTIFFS CANNOT MEET THEIR BURDEN OF PROOF ON THEIR
    CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH
    AND FAIR DEALING ......................................................................................... 7

  A.  The summary judgment standard ............................................................ 7

  B.  The implied covenant of good faith and fair dealing ............................. 8

  C.  Courts frequently grant summary judgment in cases like this one where
      bad faith and causation are lacking and Plaintiffs' claims make no
      economic sense. ..................................................................................... 10

      1.  There is no evidence or even an allegation that PerkinElmer acted
          in bad faith or was motivated by a desire to deprive Plaintiffs of
          earnout payments. ...................................................................... 11

      2.  Plaintiffs' claims are economically illogical ............................. 14

      3.  Plaintiffs cannot use the implied covenant of good faith to create
          new contractual duties to which PerkinElmer never agreed ..... 16

      4.  Plaintiffs cannot carry their burden of proving that PerkinElmer's
          actions caused Plaintiffs to incur damages in some reasonably
          ascertainable amount ................................................................. 18

II. PLAINTIFFS' CHAPTER 93A CLAIM FAILS FOR TWO REASONS ..................... 23

  A.  The Chapter 93A claim cannot stand when the implied covenant claim
      fails .......................................................................................................... 23

  B.  The alleged conduct that purportedly violates Chapter 93A did not occur
      primarily and substantially in Massachusetts. ..................................... 24

CONCLUSION ........................................................................................................... 26

## INTRODUCTION

Proof that PerkinElmer, Inc. ("PerkinElmer") acted *for the purpose* of harming the plaintiffs in this action, and that such bad faith conduct caused them an ascertainable injury, is essential to the plaintiffs' primary claim: that PerkinElmer breached the implied covenant of good faith and fair dealing. Yet not only are plaintiffs Joseph Donahue ("Donahue") and Sonoran Scanners, Inc. ("Sonoran") unable to meet this burden of proof, they fail even to *allege* that PerkinElmer's purported conduct was designed to prevent them from receiving the contingent earnout payments that form the basis for their allegations. Because the plaintiffs cannot prove each of the three essential elements of their claim for breach of the implied covenant -- bad faith, causation, and damages -- and because the other two counts in the Complaint are dependent on the success of the implied covenant claim, PerkinElmer is entitled to summary judgment on all counts in the Complaint.

The case at hand is one of many "earnout" cases in which an aggrieved seller sues the buyer of its business claiming that the business did not prosper (and consequently no earnout payments were made to the seller) because the buyer failed to operate the business in the way the seller desired. In this particular case, Donahue sold the assets of his start-up business, Sonoran, to PerkinElmer in 2001. The greater part of the consideration for the purchase of Sonoran's assets was contingent, *i.e.*, payable via "earnouts" under which Donahue and Sonoran (collectively "Plaintiffs") would receive potentially significant payments over time *if and only if* the new venture was successful. As is not uncommon for new ventures involving untested technology in a competitive market, this one did not succeed. Looking for someone to blame, Plaintiffs filed this suit against PerkinElmer.

There is no issue here as to whether PerkinElmer violated an express contractual requirement to support or operate the new venture to a certain level or in a certain way. Indeed,

as Plaintiffs recognize, the contracts they entered into with PerkinElmer included no such requirements. Foreclosed from bringing a breach of contract claim, Plaintiffs have resorted to claiming that PerkinElmer breached the implied covenant of good faith and fair dealing. To support this claim, Plaintiffs make a series of conclusory allegations that, during the more than three years when PerkinElmer was funding the Sonoran business, PerkinElmer could have made better decisions, could have hired better people, could have invested more money -- in short, that PerkinElmer could have done a better job. But that is *not* the legal standard. Rather, to succeed on their claim for breach of the implied covenant, Plaintiffs will need to prove that PerkinElmer intentionally deprived itself of $200 million in revenues *for the purpose of* depriving Plaintiffs of a tiny fraction of that amount (representing the potential earnout payments). Plaintiffs' "evidence" does not come close to satisfying this burden.

Now presented with this motion for summary judgment, and after engaging in extensive discovery, Plaintiffs must finally come forward with creditable evidence of each essential element as to which they have the burden of proof. They will not be able to do so.

## SUMMARY OF UNDISPUTED MATERIAL FACTS[1]

### A. Introduction.

In 1997, Donahue formed Sonoran in Tucson, Arizona to develop, manufacture, and market ultraviolet computer-to-plate ("CTP") machinery primarily to major metropolitan newspapers. (Statement of Undisputed Material Facts ¶ 1.)[2] Running very low on cash and no

---

[1] PerkinElmer's Statement of Undisputed Material Facts is set forth in a separate document filed herewith.

[2] With CTP technology, a newspaper business can directly expose images onto offset and flexographic plates. The goal of the technology is to allow newspapers to optimize production time and thus save money. (*Id*. ¶ 2.)

longer able to pay many of its employees, Sonoran sought out a company that could fund the continued development and marketing of Sonoran's technology. (*Id. ¶* 3.)

In late 2000, Donahue approached PerkinElmer's Lithography Systems Business Unit ("Lithography") in Azusa, California about buying his business. (*Id.* ¶ 4.) At that time, Sonoran had developed a prototype machine but had not made (or obtained customer commitments for) any sales. (*Id.*) PerkinElmer had no experience in the newspaper market; however, relying on Donahue's numerous representations about the promising prospects of the CTP machinery as well as its own due diligence about the technology and the market, PerkinElmer agreed to purchase the assets of Sonoran. (*Id.* ¶ 5.) Donahue held 50% of the stock of Sonoran when PerkinElmer purchased the company. (*Id.* ¶ 6.)

## B. The transaction.

On May 2, 2001, Plaintiffs and PerkinElmer entered into an Asset Purchase Agreement whereby PerkinElmer purchased substantially all of Sonoran's assets (the business to be based upon the same, the "CTP Business") for an up front payment of $3.5 million. (*Id. ¶* 8.) PerkinElmer also entered into a separate Employment Agreement with Donahue under which Donahue would remain salaried at $150,000 and serve as General Manager and Site Leader of the CTP Business. (*Id.*) Donahue and Gary Fletcher, the attorney for Donahue and Sonoran, were actively involved in negotiating the terms of the Asset Purchase Agreement and the Employment Agreement. (*Id.* ¶ 9.) Neither the Asset Purchase Agreement nor the Employment Agreement includes any provision requiring PerkinElmer to continue operating the CTP Business for any period of time or to develop, market, or sell the CTP machinery in any particular way. (*Id.* ¶ 10.)

Both agreements included "earnout" provisions that were again heavily negotiated by Plaintiffs. (*Id. ¶* 11.) Under these provisions, Sonoran and Donahue would receive additional

payments if the newly established business achieved certain sales thresholds within particular periods of time. (*Id.*) For Sonoran and Donahue to receive the maximum earnout payments, PerkinElmer would have had to sell 400 machines in under five years. (*Id.* ¶ 19.) In fact, the CTP Business had no sales in Year 1, no sales in Year 2, no sales in Year 3, and one (1) sale in Year 4 before closing its doors in the last quarter of that year.[3] (*Id.*)

### C. Geographic and organizational location of the CTP Business.

Following PerkinElmer's acquisition of Sonoran's assets, the CTP Business became a division of Lithography, which was based in Azusa, California. (*Id.* ¶ 20.) Lithography itself was a sub-unit of PerkinElmer's Optoelectronics Division ("Optoelectronics"), which is and was at all relevant times based in Fremont, California. (*Id.* ¶ 21.) The CTP Business continued to be based in Tucson, Arizona. (*Id.* ¶ 22.) Donahue initially reported to Greg Baxter ("Baxter"), the General Manager of Lithography, who worked in Azusa, California. (*Id.* ¶ 23.) Beginning in early 2003, Donahue reported to Jerry Jurkiewicz ("Jurkiewicz"), the Vice President of Operations for Optoelectronics, who worked in Fremont, California. (*Id.*)

### D. PerkinElmer's investment in Sonoran.

Over a period of more than three years, PerkinElmer invested millions of dollars in the CTP Business. (*Id.* ¶ 24.) PerkinElmer's financial support enabled the CTP Business not only to continue development of Sonoran's prototype, the CactusSetter (which PerkinElmer renamed the ProForm Metro), but also to develop a new product, the ProForm Flexo.[4] (*Id.*) The ProForm Flexo allowed the CTP Business to pursue a broader market in the United States and in Europe.

---

[3] The sole sale in Year 4 was to MacDermid, Inc. ("MacDermid"), a plate manufacturer that had been exploring an agreement with PerkinElmer to co-market one version of PerkinElmer's CTP machine. (*Id.* ¶ 19.)

[4] The ProForm Metro utilized offset plates; the ProForm Flexo utilized flexographic plates.

(*Id.*)  In fact, the ProForm Flexo was the only product that was actually sold by the CTP Business.  (*Id.* ¶ 40.)  Moreover, after the CTP Business was shuttered, PerkinElmer was still able to license the ProForm Flexo technology and design to MacDermid, a manufacturer of flexographic plates.  (*Id.* ¶ 46.)

To lead the sales and marketing effort for the CTP Business, PerkinElmer assigned Guy Antley ("Antley"), a California-based PerkinElmer employee with 20 years of business-to-business selling experience, including 13 years of experience selling capital equipment with long sales cycles.  (*Id.* ¶ 26.)  Among other things, Antley conducted meetings with 110 newspapers, met with numerous vendors of complementary products with whom PerkinElmer could co-market and sell the CTP machinery, prepared trip reports that detailed his sales efforts and summarized prospective customers' reactions to the CTP machinery, and participated in trade shows and industry symposiums.  (*Id.* ¶¶ 28-32.)   Managers from both Lithography and Optoelectronics attended many of Antley's meetings with prospective customers and potential business partners.  (*Id.* ¶ 33.)

PerkinElmer also assigned an experienced salesperson, Caroline Winn ("Winn"), located in Europe, to actively market the ProForm Flexo in Europe.  (*Id.* ¶ 39.)  Donahue himself remained deeply involved in the ProForm Flexo sales process and was in continuous communication with management of Lithography and Optoelectronics about the progress of the CTP Business generally.  (*Id.*)

**E.    Lack of sales by the CTP Business.**

From the outset, potential customers in the newspaper market expressed concern about the ProForm Metro's size (approximately 6 feet by 12 feet), weight (10,000 pounds, which would have required strengthening floor structures at some newspaper sites), and cost ($495,000).  (*Id.* ¶ 34.)  A number of customers were also wary of being the first adopter of new

technology, and/or of purchasing from a vendor that did not also sell the software necessary for the operation of its machine.  (*Id.* ¶ 35.)  Still others voiced broader industry-related concerns about the negative impact of the internet on newspaper revenues and their resulting reluctance to make a significant investment in unproven technology.  (*Id.* ¶ 36.)  There is no evidence that PerkinElmer's manner of promoting and marketing the product brought about a lack of sales.[5]

In addition to its own direct sales efforts, PerkinElmer sought new channels of distribution for the CTP products in order to increase sales and market penetration.  (*Id.* ¶ 38.)  In 2004, PerkinElmer engaged in serious discussions with MacDermid with the goal of entering into an agreement whereby MacDermid would sell its plates and PerkinElmer's ProForm Flexo machines as a "bundled solution" to MacDermid's existing customers.  (*Id.*)  No final agreement was reached; however, MacDermid did account for PerkinElmer's lone sale in 2004.  (*Id.* ¶¶ 19, 38.)

## F.     Shut down of the CTP Business.

In July 2004, after funding the CTP Business for more than three years of steady losses and no revenues, PerkinElmer executives in California decided to close the CTP Business.  (*Id.* ¶ 40.)  In October 2004, PerkinElmer shut down the Tucson site (*id.* ¶ 44) and, in November 2004, licensed the flexographic technology to MacDermid (*id.* ¶ 46).  Since that time, MacDermid has been manufacturing and selling a flexographic CTP machine that is "virtually identical" to the ProForm Flexo, together with flexographic plates.  (*Id.* ¶ 47.)  However, almost four years into that licensing agreement, MacDermid has only sold approximately 15 of these flexographic CTP machines to newspapers (at least some of which were its existing customers)

---

[5] In fact, PerkinElmer's marketing efforts raised the profile of the CTP Business sufficiently to garner it a cover story in one of the industry's leading magazines.  (*Id.* at ¶ 32.)

and, in each case, the sales were in conjunction with MacDermid's own flexographic plates.
(*Id.*)

## ARGUMENT

### I.    Plaintiffs cannot meet their burden of proof on their claim for breach of the implied covenant of good faith and fair dealing[6]

#### A.    The summary judgment standard.

Summary judgment purports "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Podiatrist Ass'n v. La Cruz Azul de P.R., Inc.*, 332 F.3d 6, 12 (1st Cir. 2003) (citation omitted). In deciding whether a factual dispute is "genuine," the Court must determine whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute that is neither "genuine" nor "material" will not survive a motion for summary judgment. *Id.* Furthermore, a genuine issue of material fact cannot merely rest upon "spongy rhetoric" but rather requires substantive proof. *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003) (citing *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (explaining that "[g]enuine issues of material fact are not the stuff of an opposing party's dreams")).

---

[6] Count I of the Complaint is for breach of an implied term of the contract and is entirely redundant of Count II. (*Compare* ¶ 35 of the Complaint ("It was an implied term of both contracts … that the defendant would make good faith, reasonably competent and diligent efforts to develop, market and sell Sonoran's CTP technology products so that the plaintiffs should not be denied the fruits of the contracts") *with* ¶ 38 ("It was implied by the covenant of good faith and fair dealing in the contracts … that the defendant would make every good faith and reasonably competent and diligent efforts [*sic*] to develop, market, and sell Sonoran's CTP products so that the plaintiffs were not deprived of the fruits of the contracts"). (The Complaint is Exhibit 1A to the accompanying Declaration of Jillian B. Hirsch ("Hirsch Decl."). References hereinafter to "Ex. ___" are to exhibits to the Hirsch Decl.) Count I should be dismissed as superfluous. *See Lamke v. Sunstate Equip. Co.*, 387 F. Supp. 2d 1044, 1048 (N.D. Cal. 2004). Count I should also be dismissed because Massachusetts courts have long recognized "the general rule that an express contract excludes an implied one covering the same subject." *Burke v. Coyne*, 188 Mass. 401, 404 (1905).

The party objecting to summary judgment may not merely rest upon the statements in its own pleadings. *See Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 26 (1st Cir. 2002) (citing *Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4-5 (1st Cir. 1994)). Instead, Rule 56(c)

> mandates the entry of summary judgment … against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which the party will bear the burden of proof at trial.
>
> …
>
> If the nonmoving party cannot muster sufficient evidence to make out its claim, a trial would be useless and the moving party is entitled to summary judgment as a matter of law.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322 and 331 (1986) (citing *Anderson,* 477 U.S. at 249).

### B.   <u>The implied covenant of good faith and fair dealing.</u>

A claim that a party to a contract breached the implied covenant of good faith and fair dealing "requires '*conduct taken in bad faith* either to deprive a party of the fruits of labor *already substantially earned* or *unfair leveraging of the contract terms to secure undue economic advantage*.'" *Blue Hills Office Park LLC v. J.P. Morgan Chase Bank*, 477 F. Supp. 2d 366, 374-75 (D. Mass. 2007) (emphasis added) (citing *Christensen v. Kingston Sch. Comm.*, 360 F. Supp. 2d 212, 226 (D. Mass. 2005) and *Anthony's Pier Four, Inc., v. HBC Assoc.,* 411 Mass. at 451, 471 (1991)).[7] *See also Winchester Gables, Inc. v. Host Marriott Corp.*, 70 Mass. App. Ct. 585, 598 (2007) (breach of implied covenant of good faith implicates "a dishonest purpose,

---

[7] *Anthony's Pier 4* is the prototypical example of a breach of the implied duty of good faith case in the business context. There, the defendant was found to have used a discretionary right under the applicable contract as a pretext for extracting financial concessions from the other party to the contract. 411 Mass. at 473. Here, in contrast, there is no evidence that PerkinElmer's actions were taken for anything other than legitimate business purposes, let alone for this sort of unethical purpose.

consciousness of wrong, or ill will in the nature of fraud") (citation omitted); *Equip. & Sys. for Indus. v. Northmeadows Constr. Co., Inc.,* 59 Mass. App. Ct. 931, 932-33 (2003) (same). Plaintiffs will be unable to meet this burden of proof on either bad faith conduct or unfair leveraging; indeed, they have not even *alleged* that PerkinElmer engaged in such conduct. Specifically, Plaintiffs allege only that PerkinElmer breached this implied covenant by failing to "make every good faith and reasonably competent and diligent efforts *[sic]* to develop, market, and sell Sonoran Scanners's CTP products so that the plaintiffs were not deprived of the fruits of the contracts." (Compl. ¶ 38 (Ex. 1A).) In other words, Plaintiffs are *not* claiming that PerkinElmer acted in bad faith (as required to meet their burden of proof), but rather that because the CTP Business did not succeed, PerkinElmer's efforts must not have been good enough.[8]

Moreover, to carry its burden of proof at trial, a plaintiff alleging breach of the implied covenant must also demonstrate that the bad faith conduct *caused* plaintiff's injury and that the resulting damages are *reasonably ascertainable*. "Without causation, there can be no claim for … a breach of the implied covenant of good faith and fair dealing." *Medical Air Tech. Corp. v. Marwan Inv., Inc.*, 303 F.3d 11, 22 (1st Cir. 2002) (citations omitted). *See also Cherick Distributors, Inc. v. Polar Corp.*, 41 Mass. App. Ct. 125, 129 (1996). Here, Plaintiffs' allegations with respect to both causation and injury are purely conclusory (*see* Compl. ¶ 39 (Ex. 1A); Plaintiffs' Answers to Interrogatories, Answer No. 11 (Ex. 45).) and, as discussed further below, have no reliable factual basis to support them.

In short, under the standard of summary judgment to be applied by this Court, Plaintiffs will have the burden of proving by a preponderance of the evidence not only that PerkinElmer (1) acted in bad faith for the purpose of depriving Plaintiffs of potential additional payments, but

---

[8] Aside from the circular logic in Plaintiffs' argument, they offer no evidence of the bad

also that (2) the conduct complained of caused Plaintiffs' injury and (3) the injury itself is reasonably quantifiable. Since Plaintiffs do not have evidence to support even one of the elements essential to their claim, let alone all three, the Court should enter judgment against Plaintiffs on all counts.

### C. Courts frequently grant summary judgment in cases like this one where bad faith and causation are lacking and Plaintiffs' claims make no economic sense.

Courts have often granted summary judgment to the defendants in cases where the seller of a business claims the buyer breached the implied covenant of good faith and fair dealing because the business did not prosper as the seller expected and therefore the seller did not receive earnout payments that were tied to the business's success. In each case, the court's decision in favor of the defendant was for one or more of the following reasons:

> (1) there was insufficient evidence offered of bad faith or an intent to do harm (*see, e.g., Rumis v. Brady Worldwide, Inc.,* Civ. No. 04-805-DRH, 2007 U.S. Dist. LEXIS 37150, at *27 (S.D. Cal. May 21, 2007));[9]
>
> (2) the plaintiff improperly attempted to use the implied covenant to introduce a wholly new term to the contract (*see, e.g., Terra Venture, Inc. v. JDN Real Estate*, 340 F. Supp. 2d 1189, 1201 (D. Kan. 2004));[10]
>
> (3) the plaintiff's argument required the trier of fact to conclude that the defendant acted contrary to its own economic self-interest and with no other motive which would justify such self-injury (s*ee, e.g., Keene Corp. v. Bogan*, No. 88 Civ. 0217, 1990 WL 1864, at *15 (S.D.N.Y. Jan. 11, 1990));[11] and

faith necessary for Plaintiffs to state their claim.

[9] ("Plaintiffs fail to establish a genuine issue of fact … as there is no evidence upon which a rational trier of fact may base an inference of bad faith.")

[10] ("If [Plaintiff] desired a guaranteed payment [as opposed to a potential earnout], it should have contracted for it.")

[11] ("None of the evidence that [Plaintiff] presents about [Defendant's] alleged mismanagement raises the implication that [Defendant] intended to lose money, or ever acted in reckless disregard of obtaining profits.") *See also Interpublic Group of Cos., Inc. v.*

(4) the plaintiff offered insufficient evidence to prove that the defendant's actions caused him any injury (*see, e.g., Rubin Squared, Inc. F/K/A BioScience Contract Prod. Corp. v. Cambrex Corp.*, 03 Civ. 10138 (PAC), 2007 U.S. Dist. LEXIS 62861, at \*34 (S.D.N.Y. Aug. 24, 2007)).[12]

In this case, Plaintiffs' claims fail for all four of the foregoing reasons.

> 1.    There is no evidence or even an allegation that PerkinElmer acted in bad faith or was motivated by a desire to deprive Plaintiffs of earnout payments.

To survive PerkinElmer's summary judgment motion, Plaintiffs must present sufficient evidence to support a finding that PerkinElmer took or failed to take various actions *for the purpose of* depriving them of earnout payments. *See Rumis*, 2007 U.S. Dist. LEXIS 37190, at \*28 ("Plaintiffs offer no facts suggesting that Defendant undertook the reorganization *to prevent Plaintiffs from receiving earn-out consideration*.") (emphasis added); *Shaw v. MRO Software, Inc.,* No. 04-75062, 2006 U.S. Dist. LEXIS 78456, at \*15-16 (E.D. Mich. Oct. 27, 2006) (applying Massachusetts law and rejecting the plaintiff's claim of breach of the implied duty) ("Plaintiff does not present any evidence that Defendant's decision not to recognize the revenue was *motivated* by a desire to prevent Plaintiff from obtaining commissions" (emphasis in original)). Plaintiffs will be unable to present *any* evidence, let alone prove at trial by a preponderance of evidence, that PerkinElmer engaged in anything resembling such deceit, subterfuge, or bad intent. Indeed, Plaintiffs have not even *alleged* such conduct. Plaintiffs'

---

*Fratarcangelo*, No. 00 Civ. 3323 (SHS) 2002 U.S. Dist. LEXIS 22989, at \*46-47 (S.D.N.Y. Nov. 26, 2002) (where economic interests are generally aligned, claim that Defendant acted against its self-interest to deprive Plaintiff of earnout makes no sense); *DeKellis v. Microbilt Corp.*, 131 F.3d 146, 1997 U.S. App. LEXIS 34868, at \*6 (9th Cir. 1997) ("Standing alone, these decisions [to allocate resources] do not show that [Defendant] made the decisions for the purpose of minimizing revenues" and therefore additional contingent consideration to be paid to Plaintiff).

[12] ("None of these practices appear intended or likely to frustrate Plaintiff's achievement of the earn-out and indeed were foreseeable of consequences of [Plaintiff's company's] acquisition by a larger corporation.")

position is essentially that because PerkinElmer did not run the CTP Business the way Plaintiffs wanted it to, then PerkinElmer must have acted in bad faith. This is not the law, however. *See Keene*, 1990 WL 1864, at *15 ("[W]ithout a showing that [Defendant] adopted these policies with the purpose of or with reckless disregard for losing money, the mere failure to adopt the opinions of veteran employees does not prompt a rational inference that [Defendant] intended to deprive [Plaintiff] of the fruits of the contract.").

Donahue's own testimony demonstrates that Plaintiffs cannot prove at trial that PerkinElmer acted or failed to act for the purpose of depriving them of their earnouts. When asked what evidence he had that anyone at PerkinElmer took steps to purposely deprive him of his earnout, Donahue pointed only to PerkinElmer's failure to "devot[e] sufficient resources to sell and market the product" and to "pursue the full product road map." He offered no evidence, however, of any bad faith but simply assumed its existence based on his belief that PerkinElmer did not make the effort he thinks it should have made. (Donahue Dep. at 470:4-13, 472:10-19 (Ex. 54).)

Likewise, when asked what he understood to be PerkinElmer's motivation in pursuing various steps with which he disagreed, Donahue could only point to legitimate business purposes, *e.g.,* cost reduction, and never once pointed to any evidence that PerkinElmer's decisions were motivated by bad faith. For example, Donahue testified that he believed:

- PerkinElmer chose not to provide funding in support of his product "road map" because PerkinElmer "did not want to expend the funds on the program when . . . the Lithography group ran into serious trouble." (*Id*. at 473:10-474:7.) "[T]he Lithography business was in deep trouble, and that convinced me that that was a rationale for them not wanting to invest." (*Id.* at 497:18-498:2.)

- PerkinElmer decided not to offer Norman Bogen, Sonoran's former head of sales and marketing, an increased salary because PerkinElmer thought "his salary was too expensive" and, likewise, did not hire additional salespeople because "they did not want to or were unwilling to spend the resources after the -- once the Lithography business tanked." (*Id.* at 503:8-504:1.)

-12-

- PerkinElmer chose not to bring a machine to the 2003 and 2004 NEXPO shows because "[t]hey didn't want to spend the money." (*Id.* at 504:15-21.)

- PerkinElmer proposed certain design modifications to the ProForm Metro because it would result in a "significant cost reduction." (*Id.* at 504:15-21.)

Plaintiffs can adduce no evidence that these "decisions were unreasonable, that is, that they were not rational business decisions." *DeKellis*, 1997 U.S. App. LEXIS 34686, at *6. [13] Under these circumstances, "no reasonable trier of fact could conclude that [Defendants] violated the … implied covenant of good faith and fair dealing." *Fratarcangelo*, 2002 U.S. Dist. LEXIS 22989, at *47. *See also Jones*, 2006 U.S. Dist. LEXIS 80340, at *22 (citing *Fratarcangelo*).

In addition, where, as here, both parties stood to profit from the success of the CTP Business, it would require overt and flagrant behavior to reach a finding of bad faith. "[U]nless the interests of the party exercising discretion pursuant to the contract diverge from the interests of the contractual venture, courts *need not scrutinize the motivation behind that party's exercise of business judgment*." *Fratarcangelo*, 2002 U.S. Dist. LEXIS 22989, at *44-45 (citation omitted) (emphasis added). "Self-interest ensures that the goal of profit maximization for the venture, not bad faith, guides that party's decision." *Id.* (citations omitted).

As yet another example, in *Rumis v. Brady Worldwide*, the court rejected an argument very similar to the one Plaintiffs offer here. In *Rumis,* Plaintiffs were the senior officers and sole stockholders of a company called TISCOR. In 2003, Brady Worldwide ("Brady") purchased all

---

[13] When asked via interrogatory to state the basis for the allegation in the Complaint that PerkinElmer "fail[ed] to make good faith, reasonable, competent efforts to develop, market and sell Sonoran's CTP products," Sonoran responded with three pages of factual allegations about various business decisions made by PerkinElmer. (*See* Plaintiffs' Answers to Interrogatories, Answer No. 3 (Ex. 45).) Conspicuously absent, however, are any factual allegations sufficient to support a claim for breach of implied covenant. *See Jones v. Wright Travel Agency, Inc.*, No. 2:04-CV-724-DB, 2006 U.S. Dist. LEXIS 80340, at *20 (D. Utah Oct. 20, 2006) (because the parties did not agree to minimum guaranteed payment or to restrict Defendant's exercise of business judgment regarding management and operation of new venture, breach of implied covenant claim failed).

of TISCOR's stock for $13 million. If TISCOR had reached certain revenue thresholds during the first two years after the transaction, then the plaintiffs would have been entitled to up to $3 million in earnout payments. The plaintiffs later filed suit, claiming that after Brady underwent a corporate reorganization, it began to "focus its efforts on its core businesses" to the detriment of TISCOR's products which made it impossible for TISCOR to reach the benchmarks called for by the earnout. 2007 U.S. Dist. LEXIS 37190, at *6. In particular, the TISCOR plaintiffs claimed that the failure to meet revenue thresholds was "attributable to the lack of integration, focus and direction" from defendant after the acquisition. *Id*. at *7. The plaintiffs claimed that these actions, as well as a failure properly to market the TISCOR products, violated the implied covenant of good faith. The court concluded, however, that "there is no evidence upon which a rational trier of fact may base an inference of bad faith. Plaintiffs do not point to any allegedly 'oppressive or underhanded tactics' employed by Defendant to thwart the spirit of the agreement." *Id*. at *27 (citation omitted). In particular, "Plaintiffs offer no facts suggesting that the Defendant undertook the reorganization to prevent Plaintiffs from receiving earn-out consideration." *Id*. at *28. The parallels between this case and *Rumis* are obvious. In neither instance are plaintiffs' claims sufficient to survive summary judgment.

### 2. Plaintiffs' claims are economically illogical.

Leaving aside that Plaintiffs cannot point to any evidence -- *and do not even allege* -- that PerkinElmer acted for the purpose of depriving Plaintiffs of earnout payments, Plaintiffs' position is also fundamentally illogical. If the CTP Business had met the benchmarks for earnout payments, it would necessarily have meant that PerkinElmer would have realized a significant profit from the CTP Business. Put another way, Plaintiffs would have this Court believe that PerkinElmer was willing to forfeit hundreds of millions of dollars in revenue in order to deprive Plaintiffs of a small fraction of that amount in earnouts. (*See, e.g.*, Donahue Dep. at 140:14-

141:7 (Ex. 52).)  In fact, Donahue conceded on a number of occasions that the interests of the parties were completely aligned. [14]

There is no shortage of cases in which courts emphasize the economic irrationality of the position Plaintiffs have taken here.  For example, in *Interpublic Group of Companies, Inc. v. Fratarcangelo*, 2002 U.S. Dist. LEXIS 22989, the defendant claimed (in a counterclaim) that the plaintiff had purchased his company but then starved it of capital.  The court there stated that the allegation that the buyer breached the duty of good faith and fair dealing by failing to sustain the capital and management of the new venture "fails not only for lack of evidence . . . but also *because it defies common sense and economic reality*."  *Id.* at *46-47 (citation omitted) (emphasis added).  As the *Fratarcangelo* court found -- and Donahue here acknowledges -- the buyer's and seller's "economic interests were generally aligned . . . the more money [one] made, the more money [the other] made."  *Id*. at *47.  Therefore, reasoned the court, "[T]here is no reason to accept the implausible notion that [Defendant] decided that ruining . . . its own subsidiary" would make economic sense.  *Id*.[15]

_____

[14] As Donahue acknowledged at his deposition, if PerkinElmer had sold 400 machines -- the number of machines it would have had to have sold for Plaintiffs to make the maximum earnout -- CTP would have been "very profitable."  (Donahue Dep. at 500:13-502:4 (Ex. 54).)  In fact, based on the price point at which Donahue believed the machines should have been sold (*i.e.*, just under $500,000 each), the sale of 400 machines would have generated approximately $200 million in revenues for PerkinElmer.  (*Id*. at 222:18-223:20.)

[15] *See also Rumis*, 2007 U.S. Dist. LEXIS 37190, at *30 (Plaintiffs "fail to provide a logical reason why [Defendant], which stood to make money if [the venture] was profitable, would want to prevent one of its acquisitions from succeeding.").

-15-

Judge Mukasey perhaps stated the principle most clearly in *Keene*:

> That [defendant's] policies were misguided or ignorant or even merely negligent does not show a breach of the implied covenant of good faith. *In order for a jury to return a verdict for [plaintiff] on this claim, it would have to find that [plaintiff] acted contrary to its apparent self-interest such that it would lose more money by its alleged misconduct than it saved in payments to [plaintiff]*. There is no evidence to support this bizarre scenario.

*Keene*, 1990 WL 1864, at *16 (emphasis added).  The same is true here.

> 3.   Plaintiffs cannot use the implied covenant of good faith to create new contractual duties to which PerkinElmer never agreed.

Under Massachusetts law, a plaintiff may not use the implied covenant of good faith and fair dealing to "create rights and duties not otherwise provided for in the existing contractual relationship," or to "*supply contractual terms that the parties are free to negotiate*" but did not. *Uno Rests., Inc. v. Boston Kenmore Realty Corp.*, 441 Mass, 376, 385, 388 (2004) (emphasis added).[16]

By now seeking to enforce a purported "obligation" of PerkinElmer to support the CTP Business to the level they desired, Plaintiffs are asking the Court to do precisely what Massachusetts law forbids, *i.e.*, to rewrite the contract between the parties to add a substantive term that the parties themselves chose not to include.  Donahue is a sophisticated businessman who claims to have started a number of successful business ventures.  (Donahue Dep. at 19:19-23:6, 61:8-62:6 (Ex. 52).)  He was heavily involved in the negotiation of the Asset Purchase Agreement and his own Employment Agreement, particularly the earnout provisions in both contracts.  (*Id*. at 88:3-90:13, 132:16-134:7.)  Donahue and Sonoran were also represented by experienced counsel throughout the negotiations.  (*Id*. at 72:1-73:3.)  The earnout provisions that

---

[16] The implied covenant only concerns "the manner of performance" *of already existing contractual duties."*  *Ayash v. Dana-Farber Cancer Inst.*, 443 Mass. 367, 385 (2005) (emphasis added); *see also Eigerman v. Putnam Invs., Inc.*, 450 Mass. 281, 289 (2007) (same).

resulted are clear and unambiguous. (*See* Asset Purchase Agreement ¶¶ 1.6, 6.2 (Ex. 2); Employment Agreement Exhibit 1 (Ex. 3).)

While the parties could have chosen to include specific provisions that limited PerkinElmer's exercise of its business judgment, or imposed defined requirements governing the amount and timing of PerkinElmer's support for its CTP business, they chose not to do so.[17] "[W]here sophisticated parties choose to embody their agreement in a carefully crafted document, they are entitled to and should be held to the language they chose." *Blue Hills Office Park LLC*, 477 F. Supp. 2d at 377 (quoting *Anderson St. Assocs. v. City of Boston*, 442 Mass. 812, 819 (2004)). "It is no appropriate part of judicial business to rewrite contracts freely entered into between sophisticated business entities." *Id.* (quoting *Mathewson Corp. v. Allied Marine Indus., Inc.*, 827 F.2d 850, 856 (1st Cir. 1987) (citation omitted)). *See also Rumis*, 2007 U.S. Dist. LEXIS 37190, at *23 ("Because the earn-out provisions are silent as to Defendant's role in the sales of [the Plaintiff's company's] products, no reasonable finder of fact could conclude that these provisions clearly indicate that the parties expected that Defendant would be obligated to market the products.").

In a case similar in a number of ways to this one, *Terra Venture, Inc. v. JDN Real Estate*, plaintiff claimed that defendant had breached the implied duty of good faith by failing to develop a piece of property, thereby depriving plaintiff of earnout payments. In rejecting that claim, the court focused both on the contingent nature of the earnout payments at issue and on the absence of any contractual provision violated by the defendant. "[Plaintiff] argues that requiring Defendants to timely develop the property was necessary to protect their expectation of an earnout fee. But *the earnout fee was not a guaranteed payment*. If [Plaintiff] desired a

guaranteed payment, it should have contracted for it." 340 F. Supp. 2d at 1201 (emphasis

added). *See also Rumis,* 2007 U.S. Dist. LEXIS 37190, at *22 (stating in a similar dispute over

earnouts that "the Court cannot rewrite the parties' agreement '*just because one party failed to*

*extract as complete a range of protections as it, after the fact, claims to have desired during the*

*negotiation process.*'") (citation omitted) (emphasis added). Plaintiffs should not be permitted to

use the implied covenant of fair dealing to rewrite the contract they negotiated over many weeks

more than eight years ago. (Compl. ¶ 13 (Ex. 1A).)

> 4. Plaintiffs cannot carry their burden of proving that PerkinElmer's actions caused Plaintiffs to incur damages in some reasonably ascertainable amount.

> a. Plaintiffs have no plausible evidence of causation.

In order to survive PerkinElmer's summary judgment motion, Plaintiffs also bear the

burden of proving that the acts and omissions complained of *caused* them to lose their hoped-for

earnout payments. *See generally Rubin Squared, Inc.*, 2007 U.S. Dist. LEXIS 62861, at *19.[18]

Simply put, "[w]ithout causation, there can be no claim . . . for a breach of the implied covenant

of good faith and fair dealing." *Medical Air Tech. Corp. v. Marwan Inv., Inc.,* 303 F.3d 11, 22-

23 (1st Cir. 2002) (citing cases) Plaintiffs cannot satisfy this burden. Given all the other possible

explanations for the lack of sales, "the chain of causation here between [PerkinElmer's alleged

actions and the inability of the CTP Business to sell any machines] is simply too attenuated."

*M/A-COM Sec. Corp. v. Galesi,* 904 F.2d 134, 137 (2d Cir. 1990).

---

[17] *See Uno Rests., Inc.*, 441 Mass. at 389 ("The covenant of good faith and fair dealing shall not substitute for [Plaintiff's] failure to negotiate [the desired] terms" (citation omitted)).

[18] "To prevail on its claim, Plaintiff 'must show that there is a reasonable probability or reasonable certainty that the act complained of caused the injury suffered. Mere possibility is not enough.'" *Id.* (citation omitted).

Plaintiffs have not even designated an outside expert to testify that PerkinElmer's inability to sell any CTP units was caused by the acts and omissions Plaintiffs allege. Instead, they apparently intend to rely on the testimony of Donahue to establish this point. (*See* April 10, 2008 Letter from E. Dangel to J. Hirsch (Ex. 46).)[19] But Donahue offers *no* factual basis to support the allegations in the Complaint on causation -- "he merely parrots them." *Rubin Squared*, 2007 U.S. Dist. LEXIS 62861, at *24. "This conclusory statement … is only a belief and adds nothing to the Complaint's allegations. It is totally insufficient to raise any genuine issue of fact." *Id*. at *28. As the *Rubin Squared* court stated under analogous circumstances, and even where the plaintiffs had introduced expert testimony on the issue:

> Plaintiff's argument, that a shortfall following unkept promises, standing alone, shows a reasonable probability that the broken promises were the cause, is a pure example of *post hoc ergo propter hoc*.[20] Moreover, it ignores all of the myriad interacting factors that could have conceivably determined the success or failure of the [business unit].

*Id*. at *29. "A reasonable jury could not find that it was reasonably probable, let alone reasonably certain, that Defendant's failure to fulfill its alleged pre-contractual promises caused Plaintiff's failure to achieve the earn-out . . . ." *Id.* at *29-30.[21]

---

[19] Leaving aside that his "expert" testimony lacks the indicia of reliability necessary to make it admissible at trial, Donahue's opinion is largely based on outdated market reports and his personal impression of the size of the newspaper market and of the penetration of that market by established competitors with cheaper products. *Id.* (*See* pp. 21-22, *infra*.)

[20] "Latin for 'after this, therefore because (on account of) this,' is a logical fallacy … which states, 'Since that event *followed* this one, that event must have been *caused* by this one.'" Post hoc ergo propter hoc, in Wikipedia, http://en.wikipedia.org/wiki/Post_hoc_ergo_propter_hoc (last modified on 20 June 2008, at 04:58) (emphasis in original).

[21] *See also id.* at *26 (Plaintiff's expert's "analysis assumes causation, and relies on the truth of Plaintiff's assertions to 'collectively' demonstrate that the shortfall was the result of Defendant's misrepresentations."). *See also LaPoint v. AmerisourceBergen Corp.,* No. 327-CC, 2007 Del. Ch. LEXIS 131, at *31-32 (holding that even where plaintiff proved a breach of the

It is undisputed that (1) Sonoran never sold a single machine before PerkinElmer acquired its assets, and (2) PerkinElmer's CTP Business never sold a single machine into its target market thereafter. (*See* Statement of Undisputed Material Facts ¶¶ 7, 19.) Without more than outdated industry data and Donahue's uninformed speculation, it is wholly impossible that Plaintiffs could reasonably adduce any admissible evidence at trial that more CTP units would have been sold -- let alone the 400+ units necessary to have met the maximum earnout payment -- if PerkinElmer had taken the steps that Plaintiffs now claim it should have taken. (Donahue Dep. at 492:7-494:4 (Ex. 54).)

Finally, to prove causation Plaintiffs would also have to explain away all of the other plausible reasons as to why PerkinElmer sold no machines, including the significant disruptions in the newspaper industry caused by a major decrease in advertising revenue as well as the rising price of newsprint, and declining sales.[22] (*See* Statement of Undisputed Material Facts ¶¶ 34-36, 38 (documenting potential customers' concerns that contributed to lack of sales).) Plaintiffs can do neither. In sum, Plaintiffs have not -- and cannot -- offer sufficient evidence to prove that PerkinElmer's conduct formed "an essential link in the chain of events causing" Plaintiffs not to achieve their earnout targets. *M/A-COM Sec. Corp.*, 904 F.2d at 136-37.

b. <u>Plaintiffs have no reasonable basis for proving their damages.</u>

To prove their claimed damages, Plaintiffs must demonstrate that (1) PerkinElmer would have sold some number of machines -- 400 according to Donahue -- and (2) the CTP Business

---

implied duty of good faith, plaintiff nonetheless failed to demonstrate that it would have been any more successful in meeting its earnout; court awarded nominal damages of six cents), *aff'd, AmerisourceBergen Corp. v. LaPoint*, 2008 Del. LEXIS 165 (Del. Apr. 8, 2008).

[22] *See, e.g.*, "Papers Facing Worst Year for Ad Revenue," N.Y. Times, June 23, 2008, p. 3 (describing continuing downward trends for the newspaper industry and identifying "the Internet's siphoning away of ad revenue," which began over a decade ago, as the "primary long-term threat to newspapers") (Ex. 47).

would have achieved a particular gross margin (*i.e.*, sales less material cost less direct labor cost less direct overhead cost) for each year of the relevant time period, had PerkinElmer supported it in the manner in which Plaintiffs now claim it should have. Without this evidence -- essentially evidence of lost profits -- a jury would have no reasonable basis for determining appropriate damages under the various earnout provisions. (*See* Asset Purchase Agreement ¶ 1.6, 6.2 (Ex. 2); Employment Agreement, Exhibit 1 (Ex. 3).)

It is well-established that "Massachusetts law does not permit an award for lost profits to be based on 'conjecture, surmise, or hypothesis.'" *Computer Systems Engineering, Inc. v. Qantel Corp.*, 740 F.2d 59, 67 (1st Cir. 1984) (citation omitted). Damages for lost profits "need not be proved with mathematical certainty, *provided an award has a rational basis in the evidence*." *Id.* (citing cases) (emphasis added). Plaintiffs' burden is even heavier, however, because an estimation of damages is necessarily speculative since, at the time PerkinElmer acquired Sonoran's assets, Sonoran had no historic sales figures, no customer experience, and no track record of success. Moreover, the CTP Business was competing in a rapidly evolving industry in which customers were slow to accept new technology. In other words, as the Supreme Judicial Court stated long ago:

> When the elements, upon which the claim for prospective profits rests, are numerous and shifting contingencies whose relation to the wrong complained of is problematical, and such profits are not provable with assurance as a trustworthy result of the alleged cause, then there can be no recovery.[23]

*Lowrie v. Castle*, 225 Mass. 37, 51 (1916).

---

[23] For example, while Sonoran has pointed to sales of machines by a competitor called Creo, Donahue testified that he cannot identify any of the major metropolitan newspapers to whom Creo reportedly sold its machines, nor can he identify the capabilities and sales prices of these machines (both of which would be essential to even begin to understand if they were comparable to the units PerkinElmer was trying to sell). (Donahue Dep. at 417:2-418:9 (Ex. 54).)

In short, Plaintiffs have no reliable factual basis on which to project how many machines the CTP Business would have sold had PerkinElmer taken the steps Plaintiffs now say it should have. Donahue acknowledged at deposition that he has undertaken no investigation or survey of market conditions for the sale of CTP technology since 2000, let alone since he filed the lawsuit. (Donahue Dep. at 492:7-494:4, 502:5-502:24 (Ex. 54).) The only data he purports to rely upon to determine lost sales were generated nearly eight years ago and were developed solely to convince prospective buyers that Sonoran had a promising future. (*Id*. at 69:2-70:7, 493:4-12; Bogen Dep. at 145:8-25 (Ex. 52).) Donahue also admitted that he has no information on overall sales activity in the United States or Europe in the CTP market. (Donahue Dep. at 361:9-362:3 (Ex. 53).) Donahue's out-of-date sales projections did not account for -- and indeed could not have accounted for -- the changes in the market over the past seven plus years, including that growth in the CTP industry has been much slower than earlier, rosy projections might have suggested, and therefore cannot be used to establish either the existence or the amount of the damages that Plaintiffs now claim.[24]

Perhaps the most compelling evidence that Plaintiffs cannot prove their damages is that MacDermid, the company to which PerkinElmer licensed its CTP intellectual property in 2004 and which has subsequently been marketing and selling an almost identical CTP machine, has sold no more than 15 machines since then, even with the benefit of its existing customer base in the newspaper market. (Shaver Dep. at 165:16-171:10 (Ex. 52).)[25]

---

[24] *See, e.g.*, Tara McMeekin, <u>Star Tribune Bids Adieu to Film Era</u>, *Newspapers and Technology,* June 2008 (quoting the director of printing operations for the (Minneapolis) Star Tribune to the effect that his newspaper's "somewhat late adoption of CTP [*i.e.*, not until summer 2008] is the result of waiting for the technology to become more dependable and until enough papers had deployed the technology to ensure it was fully supported") (Ex. 48).

[25] MacDermid manufactures not only CTP machines but also the accompanying plates, which PerkinElmer did not.

## II.    Plaintiffs' Chapter 93A Claim Fails for Two Reasons.

PerkinElmer is entitled to summary judgment on Plaintiffs' Chapter 93A claim for two reasons.[26] First, the claim is entirely derivative of Plaintiffs' claims for breach of implied contract and breach of the implied covenant of good faith and fair dealing, both of which fail for the reasons previously stated. Second, Plaintiffs' Chapter 93A claim is barred because the acts and practices complained of did not occur primarily and substantially in the Commonwealth of Massachusetts.

### A.    The Chapter 93A claim cannot stand when the implied covenant claim fails.

Chapter 93A claims that are derivative of common law claims cannot stand if those common law claims are dismissed. *See, e.g., Egan v. Athol Mem. Hosp.*, 971 F. Supp. 37, 47 (D. Mass. 1997) (where there was no evidence to support plaintiff's antitrust, monopolization, and tortious interference claims, and where plaintiff made "no unique arguments related to his Chapter 93A claim," defendant was entitled to summary judgment on plaintiff's Chapter 93A claim); *see also Bolen v. Paragon Plastics, Inc.*, 747 F. Supp. 103, 108 (D. Mass. 1990) (where plaintiff failed to state a claim for unjust enrichment, court held that complaint likewise failed to state a claim under Chapter 93A); *McCartin v. Westlake*, 36 Mass. App. Ct. 221, 234 (1994) (where Chapter 93A claim was based upon same factual allegations as deceit claim, and plaintiff failed to prove deceit, Chapter 93A claim likewise failed). Because Plaintiffs' Chapter 93A claim rests on the same conduct that forms the basis of their common law claims (*compare* Compl. ¶¶ 37-39 *to* ¶¶ 40-41 (Ex. 1A)), the 93A claim falls with the failure of the common law claims.[27]

---

[26] Only Sonoran, not Donahue, has asserted a Chapter 93A claim against PerkinElmer.

[27] Plaintiffs' Chapter 93A claim fails for the additional reason that Sonoran cannot bring to bear any evidence of acts by PerkinElmer that meet the threshold for "unfair and deceptive"

**B.     The alleged conduct that purportedly violates Chapter 93A did not occur primarily and substantially in Massachusetts.**

Even if Plaintiffs' Chapter 93A claim did not fail for the reason stated above, it should nonetheless be dismissed because the purported conduct that forms the basis of the Chapter 93A claim did not occur primarily and substantially in Massachusetts as required by the statute. *See* M.G. L. c. 93A, § 11.  In particular, Section 11 of Chapter 93A provides as follows:

> No action shall be brought or maintained under this section unless *the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth.*  (Emphasis added.)

Courts must look to "whether the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth."  *Kuwaiti Danish Computer Co. v. Digital Equip. Co.*, 438 Mass. 459, 473 (2003); *see also Kenda Corp. v. Pot O'Gold Money Leagues, Inc.*, 329 F. 3d 216, 234-35 (1st Cir. 2003).  Here, the purported unfair and deceptive acts alleged by Plaintiffs did not occur in Massachusetts at all; rather, the "center of gravity" of the circumstances underlying those claims is either California or Arizona.

In their Complaint, Plaintiffs state that PerkinElmer's conduct violated Chapter 93A in the following ways:

> a.  In bad faith, PerkinElmer made almost no effort to develop, market, and sell Sonoran's CTP products as it had promised and was bound to do, thereby willfully depriving the plaintiff Sonoran of the benefits of its contract;
>
> b.  In bad faith and with no intention of following through by promising to amend the earnout and other incentive payment clauses in the

---

behavior.  *See Devine & Devine Food Brokers, Inc. v. Wampler Foods, Inc.*, 313 F.3d 616, 619-20 (1st Cir. 2002) (citations omitted) (affirming grant of summary judgment on Chapter 93A claim where plaintiffs below made no showing that defendant's acts fell "within the penumbra of some common-law, statutory, or other established concept of unfairness; is immoral, unethical or unscrupulous ….").

contract to reflect its failure to market and sell Sonoran's CTP products and then failing to do so;

c.  In bad faith, PerkinElmer continued through the end of 2003 to string Sonoran along by telling Sonoran that it intended to develop a strong marketing and sales program for the sale of Sonoran's CTP products, when it had no intention to do so and had decided not to make a substantial effort to do so.

(Compl. ¶ 41 (a-c) (Ex. 1A).)

Plaintiffs' Chapter 93A allegations focus on two acts or omissions:  (1) the alleged lack of effort to develop, market, and sell the product, including a purported attempt through 2003 to "string along" Plaintiffs about those efforts; and, (2) a purported promise to amend the contractual earnout provision.  Plaintiffs do not, however, allege that *any* conduct in violation of Chapter 93A took place in Massachusetts, let alone that the "center of gravity" of such conduct was there; in fact, it was not.

First, there is no dispute that PerkinElmer's efforts to develop, market, and sell CTP products for the entire period at issue were made by: (1) Antley, who worked out of his home and office in California, and (2) other PerkinElmer employees who worked out of the Fremont or Azusa, California PerkinElmer offices, the Tucson, Arizona site, and other non-Massachusetts locations, including New Jersey and Europe.  (Antley Dep. at 6:12-22, 18:2-9 (Ex. 49); Falcone Dep. at 69:5-22, 146:17-24, 159:2-10 (Ex. 55); Statement of Undisputed Material Facts ¶¶ 26, 28-33, 38-39.)  Second, any purported effort to mislead Plaintiffs about PerkinElmer's intentions with respect to developing its marketing and sales program -- for which there is no evidence -- also would have occurred in either or both of California or Arizona.  And third, any purported promise PerkinElmer made to modify the earnout provisions in the asset purchase agreement -- for which there is likewise no evidence -- would have been made in California and/or Arizona. (*See, e.g.*, Plaintiffs' Answers to Interrogatories, Answer No. 10 (Ex. 45) (describing purported

-25-

communications in California and/or Arizona with John Murphy of Optoelectronics on this topic); Donahue Dep. at 141:11-146:10 (Ex. 52)).

Moreover, *even* if Plaintiffs could point to any particular decisions that was were made in Massachusetts and *even* if those acts were unfair or deceptive, the Chapter 93A claim would *still* fail because those acts would be vastly outweighed under a "center of gravity" analysis by the volume and weight of continuous interactions regarding the CTP Business among the key actors in California and Arizona over the period of its operation. (Donahue Dep. at 233:1-21 (Ex. 52).) Contact with Massachusetts, let alone contact potentially giving rise to a Chapter 93A violation, was essentially non-existent.[28]

## **CONCLUSION**

For the above stated reasons, the Court should grant PerkinElmer's motion for summary judgment and dismiss all counts of the Plaintiffs' Complaint.

---

[28] Even under the pre-*Kuwaiti Danish* approach that the First Circuit had previously adopted, the Chapter 93A claim would fail. Under that view, outlined in *Roche v. Royal Bank of Canada*, 109 F.3d 820 (1st Cir. 1997) and *Clinton Hospital Association v. Corson Group, Inc.*, 907 F.2d 1260 (1st Cir. 1990), the three factors relevant to the "primarily and substantially" analysis were: (1) where the defendant committed the deception; (2) where the plaintiff was deceived and acted upon the deception; and, (3) the situs of plaintiff's losses due to the deception. *Roche*, 109 F.3d at 829 (citation omitted). Here, the purported deceptive acts overwhelmingly took place at Optoelectronics or Lithography in California or at the CTP Business site in Arizona; Sonoran received and relied on those communications solely in Arizona and likewise suffered its purported losses there as well.

Respectfully submitted,

PERKINELMER, INC.

By its attorneys,

/s/ Jonathan I. Handler
Jonathan I. Handler (BBO #561475)
Jillian B. Hirsch (BBO #659531)
DAY PITNEY LLP
One International Place
Boston, MA 02110
(617) 345-4600

Dated: July 7, 2008

## CERTIFICATE OF SERVICE

I, Jonathan I. Handler, hereby certify that on this 7th day of July, 2008, I electronically filed the foregoing *PerkinElmer, Inc.'s Memorandum in Support of Its Motion for Summary Judgment* with the Clerk of Court using the CM/ECF system, which will send notification of such filing(s) to all counsel of record.

/s/ Jonathan I. Handler

Jonathan I. Handler
