UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| SONORAN SCANNERS, INC. and<br>JOSEPH P. DONAHUE,<br>　　　　　*Plaintiffs,*<br><br>　　v.<br><br>PERKINELMER, INC.,<br>　　　　　*Defendant.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 06-12090-RCL |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF ITS OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Edward T. Dangel, III (BBO # 113580)
Dangel & Mattchen, LLP
10 Derne St.
Boston, MA 02114
(617) 557-4800

*Counsel for Plaintiffs Sonoran Scanners, Inc.,*
　*and Joseph P. Donahue*

Defendant PerkinElmer argues that the contracts at issue allocated to the plaintiffs all risk of failure to make downstream payments. To the contrary, the contracts provided that the parties would "cooperate fully" in bringing the opportunity to fruition. Although PerkinElmer expressly promised that Joseph Donahue would have profit and loss responsibility with his own management team in place after the closing, its true plan, which it executed almost immediately after the closing, was to strip Donahue of his role, deny him his crucial role as chief of sales and marketing, and market the product on the cheap. As set forth below, once the CactusSetter[1] opportunity belonged to it exclusively, defendant breached its express and implied contractual obligations, and, further, acted in bad faith and in violation of C. 93A.

I. The Contracts At Issue

A. Background Facts[2] Joseph Donahue formed Sonoran Scanners in 1997 to develop and market high speed computer-to-plate technology ("CTP") to large metropolitan newspapers and other graphic arts publishers. Donahue Aff. ¶2. At the time Donahue developed the CactusSetter, the market for computerized CTP machinery was expanding rapidly. Pl Ex. 25, 27.

---

[1] The CactusSetter was a "250 plate per hour computer to ultraviolet plate machine." Schedule 1.1(a)(v) of the Asset Purchase Agreement (the "APA" , Pl. Ex. 1A). It was not unlike an office laser printer, albeit much larger, faster, and more powerful. Ex. C, p. 158. Laser direct imaging technology was in use in many products by 2000-2001, including some competitors' CTP machines, although PerkinElmer lacked the technology to employ it. See, Pl. Ex. 1, pp. SS02172. Greg Baxter, PerkinElmer's Lithography Division chief, would not have represented to PerkinElmer Corporate that he expected to sell eight CactusSetter's in the first year after purchase, if the equipment was "experimental," as defendant asserts in its memorandum. See Pl. Ex. 1, SS 02173. Rather, the machine prototype had been built and successfully demonstrated. It was fully functional. Pl. Ex. A, p. (Plaintiffs have numbered their documentary exhibits and given letter designations to deposition references).

[2] Plaintiffs submit evidence of pre-contract circumstances to assist in interpretation of the obligations, express and implied. *Fleet Nat'l Bank v. H&D Entertainment, Inc.,*96 F.3d 532(1st Cir. 1996); to allow the commercial realities and other indicia of intent to aid in interpretation, *Blue Hills Office Park, LLC v. J.P. Morgan Chase Bank,* 477 F. Supp2d 366, 377-81(D.Mass. 2005); and to support plaintiffs' allegations of bad faith and violations of C.93A. *Tufrankjian v. Rockland Trust Co.,* 57 Mass. App. Ct. 173, 178 (2003).

The first target, large American dailies, require at least two and often several more CTP machines to accommodate the demand for many plates in a short period of time, a function called "redundancy." Ex. C, pp. 176-77. Sonoran's product was designed to be a high-speed machine which operated much more quickly than the competitors' CTP equipment – saving labor costs – and utilized ultra-violet plates, ("UV plates") which were considerably less expensive than visible and thermal plates utilized by most of its competitors. Further, Sonoran's equipment also eliminated the costly and time-consuming film process required by older conventional plate exposure technology. Donahue Aff. ¶ 2.

The prototype was demonstrated successfully at the 2000 NEXPO show. Sonoran was ready to place the first "Beta"[3] machine, but Norm Bogen, an experienced sales engineer and manager and 9% owner of the company, reported that some potential purchasers expressed concern over whether Sonoran was too small to assure that it could provide long-term support. Further, Sonoran was running low on cash. It was self-funded by Donahue, who had invested $3.5 million, taking back a first security interest.[4] Donahue Aff. ¶3.

---

[3] A "Beta Machine" is a prototype, customarily sold at a dramatically reduced price and other favorable terms to allow first purchasers to view the machines in real-time operation. No one in this case denies that reducing the price of "Beta Machines" is a well-recognized strategy in the introduction of new products, Pl. Ex. A, pp. 140-41; Pl. Ex. 12.

[4] Presumably because Donahue had the wherewithal to self-fund Sonoran, defendant has referred to him as a "sophisticated businessman." In fact, Donahue, an engineer, had been a partner in a direct imaging business which had been swapped for stock in a company that ultimately went public. He was a relatively small stockholder in it. The lawyer who represented the plaintiffs in this transaction was a partner in a three lawyer firm. In contrast to the plaintiffs, the purchase of companies was a regular course of business for PerkinElmer. Pl Ex. 5; Pl Ex. 31. Donahue wasn't in PerkinElmer's league when it came to this type of transaction.

Donahue decided to seek a strategic partner or purchaser.[5] *Id.* In October, 2000, Bogen contacted Greg Baxter, the head of PerkinElmer's Lithography business, to see whether he was interested in purchasing Sonoran. Pl. Ex. C, pp. 43-44. PerkinElmer's business growth had been fueled since 1996 by its aggressive strategy of purchasing compatible businesses and then discarding them quickly if they did not pan out, a fact unknown to Donahue. See Pl. Ex. 5, pp. 151-52. As the head of Lithography, Baxter's division manufactured and sold printed circuit board primary exposure equipment, which had limited potential because it relied on analog technology. Pl. Ex.3, SS 02172. Baxter knew that Donahue was creating digital imaging printing applications, and he knew that his Lithography division needed to move to digital technology in order to compete successfully in the marketplace. *Id*; at SS002173; Pl. Ex. B, p. 16.

In November, 2000, Baxter presented the idea of purchasing Sonoran to PerkinElmer Corporate.[6] The business rationale, stated at Pl. Ex. 3, SS 02172, included "Provide PKI (PerkinElmer's NYSE stock ticker symbol) with quick entry into the UV Laser Direct Imaging market," and "Obtain technology to begin transition from analog to digital imaging," with a "(F)irst year accretive with move into newspapers." The succeeding page referred to Sonoran's executives' technical capabilities and its "marketing expertise to assist in penetrating the Graphic Arts market." The next page referenced Sonoran's "High Potential for penetrating this market with next steps…" and included a revenue estimate of $4 million dollars, which represented the

---

[5] The company was not "put up for sale" because it was "broke," as defendant suggests. The employees were not asked to take half-pay until after Sonoran was well into discussion with strategic partners and potential purchasers. Other companies showed considerable interest in purchasing or partnering with Sonoran. However, plaintiffs do not deny that PerkinElmer had far superior leverage, particularly once PerkinElmer provided a demand loan to the company of $100,000 on a secured basis in March, 2001. See Pl. Ex 4; Pl. Ex. H, pp. 32-33.

[6] PerkinElmer's corporate level, which actually ran the company, was at all times relevant to this case located in Wellesley, Massachusetts. PerkinElmer Corporate decided to purchase Sonoran in 2001 and to close it in 2004. <u>All</u> negotiations to purchase Sonoran, all drafting, and decisions about the structure of the deal, were conducted on PerkinElmer's end in Massachusetts.

sale of eight machines at full retail price. Pl Ex. 3, SS02174; Ex. B, p. 35.  A few pages later, Sonoran's "Key Leaders" were listed, and included Norm Bogen, head of Sales and Marketing for Sonoran. Pl. Ex. 3, SS 002178.

In April, 2001, PerkinElmer executives visited Tucson to interview Sonoran's engineers and executives. John Letcher, head of Human Resources for PerkinElmer Optoelectronics, met with Joe Donahue to discuss what each of the eight personnel to be retained after the purchase should be offered. Pl. Ex. G, p.120.  Previously, Donahue and Bogen had met with Baxter to tell him what Bogen needed to be offered, Pl. Ex. 2, p. 6.  Donahue described the retention of Bogen as "key" to Baxter and later to Letcher because Bogen had spent two years "seeding" the market and developing relationships with potential purchasers and because he was an engineer – which meant that a technical representative need not be assigned to the sales effort. Donahue Aff. ¶ 4; Pl. Ex. G, p 140.   Although Donahue told Letcher that Bogen needed his compensation level raised and his expenses relating to his commute from his home in Phoenix to Tucson paid and a fair commission, Letcher made no note of it. Pl. Ex. D, pp.110-116; Pl. Ex. 4.

Later in April, 2001, PerkinElmer made written offers of employment to the eight people. Seven accepted. See, APA, Schedule 6.1. Bogen was offered employment at his current salary – no expenses, no commission – and was required to be in Tucson full-time. Pl. Ex. 6. Bogen was given until April 23rd (from Friday to Monday) to respond. *Id*.  He relayed his rejection in a conversation with an assistant to Letcher, whom he tried to reach to discuss a counter-offer. Pl. Ex. C, pp 66.  Bogen, who was looking for a modest raise of $25,000, Pl. Ex. C pp. 74-75,87, was willing to compromise and even to move to Tucson, if his expenses were paid. Pl. Ex. C, pp. 66-67.

After learning from Baxter and Letcher of Bogen's rejection in a conference call on April 24th, Donahue reminded them that Bogen was key to sales and marketing and asked that

PerkinElmer improve its offer to him. Pl. Ex. 2, p. 6. In the succeeding days, Baxter assured

Donahue that, while he was having some trouble with Corporate over the issue, PerkinElmer

would come up with a better offer to Bogen after the closing. Pl. Ex. 2, pp. 4 and 6. Donahue

went forward with the closing, expecting Bogen to receive an increased offer and to be employed

by the company. Ex. D, pp. 114-16; Defendant's Answer ¶ 20; Pl. Ex. 6, Schedule 6.1.

All negotiations, drafting, and decision-making connected with the purchase of Sonoran

were conducted by PerkinElmer Corporate located in Wellesley, and by Hale and Dorr, now

Wilmer Hale, in Boston. Pl. Ex. H, pp. 17, 22-24: Donahue Aff. ¶6. The contracts are governed

by Massachusetts law, where the closing occurred. Pl. Ex. 6, Sections 1.5 and 8.9.

B. The Asset Purchase Agreement, Plaintiffs' Exhibit 6

1. The Duty to Make Bogen An Offer After the Closing. Section 6.1 provided,

"The Buyer or a subsidiary of the Buyer shall offer employment to those employees identified on

Schedule 6.1 attached hereto… (emphasis added as to "shall"). Section 6.1 required PerkinElmer

to make Bogan an offer within two weeks of the closing. Only Norm Bogen was identified on

Schedule 6.1 as having not yet been hired. Although PerkinElmer has admitted that the

obligation was clear, Pl Ex. H, p.158-59, it made no offer of employment after the closing. Pl.

Ex. G, pp 186-187. Further, PerkinElmer was duty bound to make an offer better than that which

had been offered, which defendant has admitted it agreed, but failed, to do. Defendant's Answer

¶ 20; see, *Damiano v. Nat'l Grange Mutual Ins. Co.*, 316 Mass. 626, 627 (1942) (C.J. Lummus).

2. The Duty to Pay Sonoran Consideration. The sale price provision referred to three

types of payment: up-front payment of $3.5 million was not the primary consideration in

Sonoran shareholders' view because it did not go to Sonoran – it was paid directly to unsecured

creditors, Pl Ex. H, p. 143, and Donahue, even though he was the first security holder of Sonoran

and therefore owed more than $3.5 million, was required to step aside (Pl. Ex. 1A, Sections 1.4

and 2.4). Donahue did receive payment of his back due wages and an interest payment. As a purchaser of substantially all of Sonoran's assets, PerkinElmer, wishing to purchase a going concern, (Pl. Ex. H, p. 152) was open to bulk sales, fraudulent conveyance, and successorship claims by unpaid creditors. Sonoran was required to list all of its creditors and to agree to allow PerkinElmer to pay them directly, which exhausted the $3.5 million. Pl Ex. 1A, Section 1.9. Donahue was required to guarantee personally that the list was complete. Pl. Ex. 1A, Sections 1.3(a) and (b), 2.11, Schedule 1.8. The more important consideration to the plaintiffs was, as follows:

   a. <u>Section 1.6</u> of the APA, an important provision not mentioned in defendant's memorandum, required payment of $750,000 in the first year from the first 3 machines sold, and $1.5 million overall from the sale of the first 10 machines sold in the first two years after the Sonoran purchase. The provision required the payments, regardless of profitability.

   b. <u>Section 6.2</u> provided for profit-sharing payments with a cap of $2.0 million[7]. Plaintiffs believed that PerkinElmer had an incentive to make sales and profits. As such, plaintiffs quite properly anticipated that defendant would make reasonably diligent efforts to obtain sales and profits during the term of the payout. Pl. Ex. D, pp, 128-129, 139. Justice Cardozo's famous formulation of the duty implied in this situation is hornbook law:

"The implication of a promise here finds support in many circumstances. The defendant (who was a designer and creator of original dresses and fabrics) gave an exclusive privilege… The acceptance of the exclusive agency (to manufacture and market defendant's designs) was an acceptance of its duties… We are not to suppose that one party was to be placed at the mercy of the other… (The) promise to pay the defendant one-half of the profits and revenues resulting from the exclusive agency and to render accounts on a monthly basis was a promise to use reasonable efforts to bring profits and revenues into existence."
*Wood v. Lucy, Lady Duff-Gordon,* 222 N.Y. 88, 91, 118 N.E. 214 (N.Y. 1917)

---

[7] Donahue's Employment Agreement provided for additional earnout payments up to $6.6 million over the same time period. Pl. Ex. 5, Section 1 and Exhibit 1.

The Massachusetts formulation of this duty is stated in *Eno Systems, Inc. v. Eno,* 311 Mass. 334 (1942), as discussed *infra* at pages 18-21.

3. <u>The Duty to Cooperate Fully In the Operation of the Acquired Assets.</u> Section 6.3 (b) of the APA provides, "The Parties agree from and after the Closing Date (May 2, 2001) they shall cooperate fully with each other to facilitate the transfer of the Acquired Assets from the Seller to the Buyer and the operation thereof by the Buyer." While Section 6.3's title mentions Data, titles do not count (Section 8.4), and Section 6.3 (b) makes no reference to Data. It refers to operation of the Acquired Assets "from and after the closing", which, if there was any doubt, implies that the assets will be put into operation. As Greg Baxter testified, both sides stated both before <u>and</u> after the closing that they were going to use joint efforts to bring the opportunity to fruition. Pl Ex. B, pp. 85-86; Pl. Ex. 2, p. 3.

4. <u>The Duty to Continue in the Business During the Contract Term.</u> The provisions of Section 6.2 of the APA provided for payments over a five year period. Section 6.4 provided that neither Sonoran nor Donahue could solicit any employee or sub-contractor of Sonoran or PerkinElmer to take up employment in any other enterprise for that period. Section 6.5 provided that neither Sonoran nor Donahue could compete with PerkinElmer during that period. Still, the defendant claims that it had no duty to stay in the CTP business throughout that period. But, see *Speakman v. Allmerica Financial Life Ins. Co.,* 367 F.Supp.2d 122, 125 (D.Mass. 2005) (defendant "could *not* voluntarily abandon a line of business at the expense of its agents, with whom it had express and implied contractual obligations. Simply put, if AFLIAC decided to get out of the business, it had to pay the price." *Id.* at 137).

C. <u>Joseph Donahue's Employment Agreement</u>

As defendant has stipulated, it entered into an agreement by which Joseph Donahue would "remain salaried at $150,000 and serve as General Manager and Site Leader of the CTP

business." Def. Mem., p.3. His authority and duties entailed those "inherent" in the position of General Manager and Site Leader, which PerkinElmer has admitted included management control and profit/loss responsibility for CTP. Pl. Ex. 1B, Section 2; Pl. Ex. G, pp. 231, 233, 236, 238; Pl. Ex. I, p. 47. Exhibit 1 of the Employment Agreement set forth the same type of earnout payments as those included in APA Section 6.2, and ends with, "You shall have the right to consult with the company regarding the pricing of product sales." Further, Donahue was to be awarded an additional "stretch" bonus if annual sales targets were reached. Pl. Ex. 1B, Exhibit 1, pp. 2-3. This meant that if all targets were hit – including the products sold at the margins in APA Section 6.2 and Employment Agreement Exhibit 1 – the plaintiffs would receive $25,000 per machine sold.

## II. PerkinElmer's Conduct After The Closing

### A. PerkinElmer's Failure to Allow Donahue and His Team to Operate the Business

To Donahue's surprise and chagrin, soon after the closing PerkinElmer showed its true colors: it failed to make an offer to Bogen, and Baxter took over control of sales, marketing, budgeting and manufacturing. Donahue Aff. ¶¶ 6 and 7. Then PerkinElmer made less than a half-hearted effort to market and sell the product.[8] Pl. Ex. 2, pp. 3-10.

### B. The Sales "Effort"

About a month before the closing, Baxter assigned Guy Antley to start learning the CTP and newspaper businesses. Pl. Ex. A, pp. 18-19.[9] This was more than two weeks before the "offer" was made to Norm Bogen. Pl. Ex. 6. Antley used the internet and trade journals and read Sonoran's "preliminary presentation" to PerkinElmer to learn about CTP

---

[8] The successor was called the ProForm Metro. ProForm was the name of the printed circuit board line of equipment the Lithography division offered. Metro was meant to refer to metropolitan daily newspapers, the initial target for the CTP product.

[9] Defendant admits that Antley was assigned to the CTP sales and marketing effort as of this instruction. See Def.'s Statement of "Undisputed Material Facts," ¶ 28; Ex. A, p. 18-20.

equipment and the newspaper business. Pl. Ex. A, at pp. 21-22.  He did not call or meet with anyone at Sonoran to discuss his assignment.

Antley was already on the payroll for $85,000 a year. Pl. Ex. A, p. 27. Far from requiring him to move to Tucson, it moved the sales operation, such as it was, to Lithography's offices in Azusa, California, near Antley's home, and under Baxter's control.  Antley's new assignment to CTP was not exclusive – he continued to have his duties to Lithography's PCB product line. Pl. Ex. A, pp. 15, 29.  No one was hired to replace him, creating a net savings to Lithography (over having hired Bogen).

Bogen provided his customer list and met with Antley once. They had lunch – during which Antley expressed that "he was happy to be selling something other than what he had been selling." Pl. Ex. C., p. 164. They discussed the Cost of Ownership model, the important sales tool by which Sonoran and later PerkinElmer tried to convince buyers that their model was more cost effective than the competitors', and reviewed the top four or five accounts. Pl.  Ex. C, p. 161. Antley asked who the top prospects were, but "didn't really seem that eager" to get information from Bogen.  P. Ex. C. p. 165.  Bogen told Antley that the top prospect was Pennysaver, but to make the sale "they really needed to lower the price." Pl. Ex. C, p.163.[10]

After the June, 2001 NEXPO show, Baxter ordered a year-long cosmetic re-design of the product. Donahue was told that the CactusSetter would be marketed in the meantime, which did not occur. Donahue Aff. ¶ 8. When the product emerged in time for the June 2002 NEXPO, the re-designed machine was heavier, bulkier and more expensive to manufacture than the CactusSetter. Donahue, meanwhile, was urging the company to allow him to develop the lighter

---

[10] PerkinElmer lost the Pennysaver sale in early 2002 to a competitor because of the refusal to lower the price and because Pennysaver was not convinced that PerkinElmer was really committed to CTP. Bogen testified that he was close to a sale to Pennysaver at the time of the closing.

and less expensive product, using digital micromirror technology as described in the technology roadmap mutually agreed to by Donahue and Baxter prior to and after the closing. Donahue Aff. ¶ 8. PerkinElmer refused to fund the project and indicated it wished to market the heavier, more expensive product—even though it was getting feedback from the market that this was not the direction to go. Because Baxter chose to re-design the machine, 2001 was useless in terms of sales; because he was unwilling to Beta price the new machine, 2002 and 2003 were as well.

Guy Antley was not a competent salesman of CTP equipment, because he never took the time to master either the technical functions of the machine or the Cost of Ownership model, critical to educating potential customers to the cost savings of the product over the competitors – in spite of the higher retail price – and made a half-hearted effort.[11] Pl. Exs. 18, 19, and 20; Donahue Aff. ¶ 9 . His abilities stood in stark contrast to those of Norm Bogen, who had several irons in the fire when he was not retained, had an engineering degree (which helped enormously when talking to the technical people at newspapers) and an MBA from the Anderson School at UCLA (which helped when he was speaking to the financial people). Pl. Ex. C, p. 17. It was important that Antley master technical aspects because PerkinElmer did not assign a sales engineer to the project, meaning that Antley was the technical interface between the newspapers and Tucson. Time and again Antley made misstatements, turned over wrong information, and showed the technical, operational and financial people at newspapers that he did not know what

---

[11] Defendant has greatly exaggerated the extent of Guy Antley's effort. Over the three years he was officially assigned to sell CTP machines, he saw 35 newspapers – not 110 as defendant represented in its moving papers – and 5 plate manufacturers, attended 4 NEXPO shows, a few other shows, and never wrote a purchase order or offer of sale. He made visits to newspapers – 50 in all, many only once – sporadically. After Mr. Watkins' scathing e-mail in October 2002, he made no visits until new sales management was assigned in early 2003. There are no trip reports after October, 2003. He continued to sell Lithography equipment, with some sales in 2002 and 2003. Pl. Ex. A, p. 29-30; Pl. Ex. I, p. 160.

he was talking about. Donahue Aff. ¶ 9. Donahue and others at Tucson complained about Antley's failings to management. Pl. Ex. B, p.125; Pl. Ex. I, pp. 64-65; Pl. Ex. 20.

Even, however, if Antley had taken the time to train himself to be a competent salesman of CTP equipment, it would not have been enough in all likelihood, because senior management never supported his effort and because it was never willing to set the price for the first few machines realistically. As the plaintiffs' expert opined, the standard operating procedure in new product introduction is for the very top of the company to join in making sales calls and phone calls to reassure first buyers that the company will stand behind them. Pl. Ex. 12: "To reduce the risk for early customers, price and other concessions are often made….Very few prospects expect to pay full or near full price for a first product, as they know inevitably there will be problems" ¶ 9; "One benefit is a strong demonstration of company commitment from senior management down to post sales customer service. This typically involves getting senior management involved with the early prospects….as (p)rospects are quite well aware that sales reps usually 'disappear' after a sale is made" ¶ 7; "it is common for the sales team to involve two people….It is common for the acquiring firm to retain one or more of the reps from the acquired firm and to make joint sales calls (often 20-40 calls)…. From my experience, the retention and motivation of the top sales rep is vital for any acquisition, ¶ 10. As plaintiffs' expert testified, it is common for the CEO or other high company executives to interface with the chief executives of first purchasers (called "early adopters") to re-assure them and to show the seller's commitment to seeing the customers through and to the project as a whole, especially where "mission critical" capital equipment is involved. Pl. Ex. K, p. 143. Not only did Corporate not do that, the less senior executives were hesitant as well. Jerry Jurkiewicz went on four visits; Greg Baxter, one; Dan Iadonisi, a salesman and Antley's boss (located in Massachusetts) went on four total. Def. Statement of "Undisputed Material Facts" ¶ 33.

The commitment level was so low that Tucson's chief of operations termed the effort "entirely in bad faith" and forwarded an e-mail to PerkinElmer's CEO in October, 2002, writing "The company's grossly incompetent decision to stick you with a re-tread sales guy and severely underfund the sales and marketing effort (a part of one incompetent person!) is costing the company dozens of sales, costing you several million dollars, and costing the rest of us our share of the pool…." Pl. Ex. 16. Baxter's response was to give Tucson the silent treatment. Donahue Aff. ¶ 10. By the end of 2002, PerkinElmer Optoelectronics characterized the new product introduction priority as "Urgency, low." Pl. Ex. 14, and Baxter had written the project off as a "dog." Pl. Ex. 15; Pl. Ex. B, p. 178.

PerkinElmer's Lithography division's morale had sunk so low that in 2003 a higher-up termed the Lithography operation's problems "code red." Pl. Ex. 13. Plaintiff's expert concluded that, while the market clearly existed for the product, PerkinElmer's efforts to market and sell it represented an irresponsible disregard for the opportunity.

C. <u>PerkinElmer's Failure to Commit Financial Resources.</u> The plaintiffs disagree with defendant's claim that it "invested millions" into CTP after May 2, 2001. Indeed, PerkinElmer refused to purchase capital equipment or fully invest in the R& D necessary to develop the CTP machine to make it lighter and less expensive, refused to spend anything at all on advertising and public relations, or even to print up-to-date product brochures after 2001. It refused to invest in the product by discounting the price of the first few machines and assuring free parts and a strong warranty, necessary steps in the introduction of most new capital products. Pl. Ex. C, p. 135; Pl. Ex. 12, ¶¶ 6 and 9.

PerkinElmer, which had explicitly agreed to allow Donahue to consult on the selling price of the machine, refused to listen to him or to the customers. Pl. Ex. 1B, Exhibit 1, p. 3; PerkinElmer's refusal to discount Beta sales was fixed from the beginning. Bogen's opinion,

which he expressed to Baxter and Antley after the purchase in May: "I said I believe that they needed to offer it at a very low price to get the machine – the first machine in production, and they didn't seem to agree with that." Ex. C, p. 135. The particular customer at issue in the conversation ended up buying a competitor's product. The reasons it gave were price (which it referred to as "redundancy") and PerkinElmer's apparent lack of support for the project. Pl. Ex. A, pp. 145-146; Donahue Aff. ¶ 11.

During the time period of the contract, PerkinElmer invested most of its R&D money into its Life and Analytical Sciences Division. Pl. Ex 30, p. 9; Pl. Ex. H, pp.170-172. For the most part, PerkinElmer's overall business was strong. Pl. Ex. 30, p. 6. However, by the time of the purchase of Sonoran, Lithography's business had fallen from a little under $30 million in sales in 2000 to less than $10 million in 2001. Pl. Ex. B, p. 28; Pl. Ex. 7. Under PerkinElmer's business model, this meant that funding for Lithography would be dramatically reduced. Pl. Ex. F, p 217; PerkinElmer knew that Lithography's results were off before the closing, Pl. Ex. B, p. 107, but withheld that information from Joseph Donahue until August 2001, when Baxter finally told Donahue that PerkinElmer would not commit the funds needed to develop the smaller, less expensive product according to the technology roadmap he and had Donahue had agreed to in April, 2001. Pl. Ex. B, p. 111, Donahue Aff. ¶ 7; Pl. Ex. 10. Baxter suggested that Donahue should try to attract investment from PerkinElmer's Life Sciences unit into development of CTP products by showing that unit ways Donahue's technology could be useful to them. Pl. Ex. 11. In his view, PerkinElmer had essentially become a life sciences company. Pl. Ex. B, pp. 25-27, 30, 136.[12]

---

[12] The assignment on the spreadsheet defendant put together for this litigation, Pl. Ex. 7, of R&D in the millions is arbitrary and wrong – it actually simply reflects the combined salaries of Tucson and Lithography employees who didn't have the funds to do either "R" or "D".

Plaintiffs' expert stated that he would have expected to see 30% or more of the projected first year sales of $4 million to be invested in sales and marketing, including product inducements. Pl. Ex. 8 ¶ 12. However, throughout the time period that the Tucson operation was funded, PerkinElmer committed $80,000 a year or less to CTP sales and marketing – representing principally that portion of Guy Antley's salary allocated to CTP. Pl. Ex. 7. The trade show budget was cut so drastically that PerkinElmer was unwilling to pay to transport a CTP machine for demonstration after 2002. Pl. Ex. 8 and 9. In 2004, Antley did not even attend the NEXPO show. Pl. Ex. A pp. 28-29; Pl. Ex. I pp. 97-99. No money was allotted for public relations; almost nothing was spent on advertising; and the CTP division was denied funding for computers and other equipment and materials to undertake the development of a lighter, less expensive CTP machine which had been part of the development plan from the beginning. Donahue Aff. ¶14.

D. <u>The MacDermid Effort.</u> Some publishers in the United States and around the world use a process known as "flexo," short for flexographic. Def. Mem. p. 4. MacDermid, Inc. is the world's only substantial supplier of plates to newspapers utilizing the flexographic process. In early 2002, it approached Joseph Donahue, knowing his technical abilities, seeking to form an exclusive relationship to purchase approximately 150 "flexo" machines in the next few years to resell to existing customers. Pl. Ex. 20 and 21. In early 2002, MacDermid requested a quote for the first 24 machines, Ex. 22, and asked PerkinElmer to show that it was willing to invest the funds necessary to make a Flexo prototype and commit to a manufacturing program[13], as well as to agree to discounts once units were being produced and sold in bulk. Pl Ex. F, p. 183-84.

---

[13] MacDermid reported that it knew "something wasn't right" at PerkinElmer but "it had no other options" Pl. Ex. E, p. 178-79. See, also, Jurkiewicz's comments to Norm Shaver about the situation. Pl. Ex. E, pp. 180-82.

PerkinElmer would not even fund development of the prototype until MacDermid agreed to split the development costs. Pl. Ex. J, p 242. Finally, after MacDermid wrote a check, PerkinElmer executives gave the go ahead. *Id.* It was the middle of 2003 before project development could be completed, and Sonoran's opportunity to receive $150,000 per machine for the sale of the first ten machines under APA ¶ 1.6 had expired. Finally, in early 2004, the prototype was sold to MacDermid for $475,000 and then later resold by MacDermid to the Manchester Union Leader for $200,000. Pl. Ex. F p. 21. MacDermid sought PerkinElmer's continued commitment to the project, but Jurkiewicz of PerkinElmer refused to give Donahue permission to give it. Pl. Ex. E, pp. 183-84; Donahue Aff. ¶ 12.

By then, Jurkiewicz had commissioned a review of the CTP project, which led to an "exit strategy," Pl. Ex. F p. 72, Pl. Ex. 23, by which the operation's assets would be valued and sold. In July, Jurkiewicz obtained the head of Optoelectronics' permission to shut the business and Jurkiewicz presented the recommendation to PerkinElmer's corporate senior management at a meeting in late July for approval. Pl. Ex. 24. Donahue was informed of Corporate's decision to close the business in August. Donahue Aff. ¶ 12.

In September, PerkinElmer agreed to sell the CTP operation to MacDermid. Jurkiewicz admitted that he consciously kept Donahue away from MacDermid while the sale was in negotiation, which effectively shut Donahue out of any opportunity to become part of the sale and recoup his lost opportunity until after the deal was made. Pl. Ex. F pp. 52-53. Unfair, perhaps, but colorable because of the non-compete. Pl. Ex. F, p. 53.

E. The Lost Opportunity. Norm Shaver, formerly an engineer with Sonoran and PerkinElmer, now with MacDermid's Flexo CTP unit, put it well: "My view is there was a substantial market. Our closest competitor would be the Basys machine. They sold well over 300 machines in probably a three-year time frame… CTP business really started taking off the

end of the century. 1998, '99, it started coming in. It became extremely – extremely strong around 2001, to, say, 2004 – 2005, that was a – that was CTP time frame when everybody was scrambling to have CTP units out there." Pl. Ex. E, 194-195, 198.

Mr. Shaver's opinion is well-supported by other witnesses and the record. The market grew exponentially from 2001-2006, and PerkinElmer's competitors had a field day. Pl. Ex. 25; Pl. Ex. 27 (PerkinElmer's analysis of the market). Far from a moribund industry stunted by the internet, newspapers purchased more than 1000 units worldwide from 2001-2005. Pl. Ex. 25. "Clearly, a blown opportunity." Pl. Ex. 12 ¶ 11.

Since MacDermid's production facility has been up and running, (early 2006), Pl. Ex. 26, it has been unable to keep up with the demand. Pl. Ex. F, pp. 161-66.[14] In this part of the country, the Manchester Union Leader has purchased new machines, as has the Providence Journal. Pl. Ex. F, p. 166. Most of the units have been sold to Rupert Murdoch's operation in England, and to large newspaper publishers in Europe. Pl. Ex. F, pp. 188-89.

III. Breach of Contract – Count I

Defendant has not argued in support of summary judgment for Count I, which pleads breach of express and implied obligations in the same count. *Cohen v. Johnson,* 8 F.R.D. 37, 38 (D.C.Pa. 1948); 5 Wright & Miller, Federal Practice and Procedure, § 1235, p. 793(2005). Plaintiffs have alleged the existence of the contracts – in fact, have attached them – breaches arising from them, and damages as is required. *Blue Hills Office Park, LLC v. J.P. Morgan Chase Bank,* 477 F. Supp2d 366, 377(D.Mass. 2005); *Leet v. Cellco Partnership*, 480 F.Supp2d

---

[14] In its moving papers, the defendant misspoke when trying to portray the current market as sluggish and wrote that that "only" 15 flexo machines had been sold by MacDermid to date. This is inaccurate. MacDermid has sold 15 machines purchased from Basysprint plus the 23 machines it has been able to make, with several orders left to be filled, as MacDermid "tap-danced" to keep up with the demand.Pl. Ex. F, pp. 169-74.

422, 431 (D. Mass. 2007). Paragraphs 4-8 refer specifically to the earn-out provisions and state that no payments were made. Paragraph 20 contains factual allegations relating to Bogen and refers to 6.1 of the APA. Other paragraphs plead the factual basis for inferring that PerkinElmer owed the plaintiffs express and implied duties. The first paragraph of Count I, Paragraph 34, re-pleads and incorporates preceding paragraphs, including those paragraphs which incorporate the contracts. Additional language concerning obligations implied by the contract is pleaded in ¶¶35 and 36. All of the claims in Count I arise from the language of the APA and Employment Agreement, which were attached as exhibits. *Hoffa Engineering LLC v. Craney*, 2007 WL 831820*8 (S.D. Ind. 2007); *ADP, Inc. v. Trinity Tri-State,* 2006 WL 3373081 (N.D. Okla. 2006); *American Realty Trust, Inc. v. Travelers Cas. & Surety Co.* 344 F.Supp. 2d (N.D. Tex. 2005). As such, the defendant never moved for a more specific complaint, nor did it move to dismiss under Rule 12(b)(6).

Defendant argues incorrectly that Count I is superfluous – which is nonsense. To the contrary, Massachusetts Courts have long accepted that "'(i)f the instrument as a whole produces a conviction that a particular result is fixedly desired although not expressed by formal words, that defect may be supplied by implication and the underlying intention…may be effectuated, provided it is sufficiently declared by the entire instrument.'" *Spaulding v. Morse,* 322 Mass. 149, 152-53 (1947) (quoting *Dittemore v. Dickey*, 249 Mass. 95 (1924)). The Supreme Judicial Court has implied the obligation to remain in business in several cases, and one of them was relied upon in *Speakman v. Allmerica Financial Life Ins. Co.,* 367 F.Supp.2d 122 (D.Mass. 2005) cited above and relied upon by the plaintiffs in this case. In *Eastern Massachusetts St. Ry. Co. v. Union St. Ry. Co.,* 269 Mass. 329, in which the Supreme Judicial court ruled that there was an implied provision in the contract to remain in business where the parties, railways, had agreed to share freight facilities for five years. In *Proctor v. Union Coal Co.*, 243 Mass. 428 (1923) the

Court found an implied promise to retain (and not resell) the land defendant purchased from plaintiff and promising to provide him lifetime access to ice houses located on the land. The First Circuit has implied obligations from the language of contracts a number of times, including *Gestetner v. Case Equipment Co.,* 815 F.2d 806, 811 (1st cir. 1987),[15] in which the court inferred that the parties intended exclusivity in an oral distribution agreement. See, *Brightwater Paper Co. v. Monadonock Paper Mills,* 68 F. Supp. 714, 721, affirmed 161 F.2d.(1st Cir. 1946)(express promises not to sell direct and to pay commissions if plaintiff's customers ordered paper implied duty to use reasonable efforts to solicit business from the customers and to turn over all the business secured).

The obligation to use reasonable, diligent efforts in situations involving earnouts was established in *Eno Systems, Inc. v. Eno,* 311 Mass. 334, 339 (1942) in which the licensor of a patent for making innersoles for welt shoes was allowed to cancel the license where the licensee had not used reasonable efforts to use the patent and had not paid the royalties licensor reasonably anticipated: "The predominating purpose of both parties was the utilization of the patent process for their material advantage, and the grant of the license carried with it an implied obligation on the part of the plaintiff to exert reasonable efforts to promote sales of the process and to establish, if reasonably possible, an extensive use of the invention in the manufacture of welt shoes." The Court cited *Eastern St. Railway, supra, Proctor, supra,* and *Wood v. Lucy, Lady*

_____

[15] Defendant mistakenly relies upon *Allied Communications Corp. v. Continental Cellular Communications Corp.,* 821 F.2d 69 (1st Cir. 1987), a case in which a supplier of telecommunications equipment, sued a cellular communications service company which promised to send its customers the plaintiff's way. The service company decided, after contracting to do business with the plaintiff in Boston, not to proceed. The contract had not yet begun, there was no grant of exclusivity nor showing that plaintiff could not recover from defendant's decision not to go into the business. The court declined under the circumstances to find an implied obligation that required the defendant to enter the Boston market. That is radically different from the case at bar in which plaintiffs sold their entire business and technology to defendant who had the exclusive opportunity to use it on the promise to split the profits.

*Duff-Gordon, supra,* with favor. See *Nautica Realty Co., Inc v. Nantucket Shipyard, Inc.*, 28 Mass. App. Ct. 902 (Mass. App. 1989).

The thread which runs through these cases is that where most of the compensation is not paid up-front or guaranteed, and where the exclusive opportunity to earn profits from the licensing or sale is transferred exclusively to the purchaser, "there will nearly always be found an implied promise of diligent and careful performance in good faith and of forbearance to make performance impossible by going out of business or otherwise." Corbin on Contracts, § 568, Interim Ed., p. 49 (1979). Here, the parties agreed to cooperate fully in the operation of the transferred assets, but PerkinElmer owned the exclusive right to produce and took over the project almost completely and when it did, it undertook the duty to use reasonable, diligent efforts to make the project a success. Breach of contract occurred when the defendant failed to live up to its promises, and when it asserted undue control over the project and failed to use reasonable, diligent efforts to try to maximize the product's potential.

That the breaches were material can hardly be doubted. Norm Bogen was a key employee, the key to the sales and marketing effort, which, in turn was key to the project's success. He knew the technical side of the business and had spent two years developing customer relationships. It would have been extremely difficult to replace him, and Guy Antley was not up to the task. The result of failing to hire Bogen and sliding Antley into his job, with little training and no long term access to Bogen, ruined any chance of success over the first two years of the project. Further, the failure to finance the project properly, costing plaintiffs the MacDermid project as well as the opportunity to manufacture the machine more cheaply, and the failure to appropriately price the first few machines and pursue the sales effort with reasonable diligence were material breaches of the contract *DiBella v. Fiumara,* 63 Mass. App. Ct. 640, 644 (2007),

citing *Eno Systems*, *supra,* 311 Mass. at 340; *Tufankjian v. Rockland Trust Co.*, 57 Mass. 173, 178 (2003)(materiality is in most instances a question of fact for the jury).

IV. <u>Breach of the Covenant of Good Faith and Fair Dealing – Count II</u>

"Every contract implies good faith and fair dealing between the parties to it.'… (and) provides that' neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the rights of the contract….'" *Anthony's Pier Four, Inc v. HBC Associates,* 411 Mass. 451, 471 (1991)(quoting *Druker v. Wm. Jutras Assocs.,* 370 Mass. 383, 385 (1976)). Bad faith <u>or</u> the use of unfair economic leverage is sufficient. *Blue Hills Office Park, LLC v. J.P. Morgan Chase Bank,* 477 F. Supp2d 366, 377(D.Mass. 2005).

 *Speakman v. Allmerica Financial Life Ins. Co.,* 367 F.Supp.2d 122, 125 (D.Mass. 2005) was a case in which the Court found a violation without bad faith where plaintiff's agents, in reliance upon defendant insurer's new, announced annuity insurance program, borrowed from the company to pay back past commissions, but then the company cut the program short for business reasons, leaving the agents with no possibility to make new commissions to pay back the past commissions. What underlies *Speakman* is unfair dealing which denied plaintiffs the fruits of the contract.

In *O'Tool v. Genmar Holdings, Inc.,* 387 F.3d 1188 (10th Cir. 2004),  a case on all fours with this case, the Court upheld jury verdict for plaintiffs where the sales contract and employment agreement provided $2.6 million upfront with earnouts over five years of a maximum of $5.2 million. The contracts contemplated plaintiff would run the division and have profit and loss control. Instead, the company ran the show, changed the name of the product, the manufacturing priorities, failed to market the products (speed boats) properly and then when it had suffered losses, cut the program short.  The implied covenant of good faith and fair dealing required that plaintiff "be given a fair opportunity to operate the company in such a fashion as to

maximize the earn-out consideration…."*Id.* at 1197. The Court of Appeals held that fraud, deceit, misrepresentation or malice was not required to be shown. *Id.* at 1198. "The overarching theme of the breach of implied covenant theory is 'that Genmar's entire course of conduct frustrated and impaired (their) realization of the earnout.'" *Id.* at 1195.

Further, in the case at bar, there is the added element of bad faith—almost fraud—in the defendant's charade. As stated above, defendant induced plaintiffs to go forward with the closing on the promise that Bogen would be made a better offer, meanwhile knowing it was going to breach 6.1 of the APA by not making him an offer after the closing at all. This foreshadowed PerkinElmer's post-contract actions by which it took control of budget, manufacturing, and sales and marketing – all contrary to its understanding with Donahue. PerkinElmer's true motivation for purchasing Sonoran and hiring Donahue and the engineers was to get its hands on Sonoran's digital technology, which it succeeded in doing without properly funding the development, sale and marketing of CTP. Pl. Ex. 32. This violated the implied covenant. *Hodges v. MedAssets Net Revenue Systems LLC,* 2008 WL 2655799*6 (N.D.Ga. 2008).

The cases defendant cites are easily distinguished from *O'Tool* and the case at bar. In *RubinSquared,Inc.v. Cambrex Corporation,* 2007 WL 2428485 (S.D.N.Y.) the plaintiffs received $120 million up-front with an additional earn-out of up to $25 million. Plaintiffs' complaint was that Jacques Rubin, plaintiffs' principal, was hired to run the division from which earnouts could be generated but was actually put in charge of two divisions which did not allow him to concentrate fully on the earnouts. Rubin remained in charge but said it was unfair. The Court in *RubinSquared* distinguished the case before it from *O'Tool.* Where the economic alignment of the parties continues during the performance of the contract, as Judge Mukasey found in *Keene Corporation v. Bogan*, 1990 WL 1864 (S.D.N.Y. 1990), it might not make much sense to argue bad faith and unfair dealing. Here, however, there is evidence that plaintiffs were

in a much weaker position than the defendant, Pl. Ex. 1B, Section 5, the parties struggled to stay in alignment throughout the first year of the contract, Pl. Ex. 10, and then fell out. Pl. Ex. 16.  In another Judge Mukasey decision, *MDC Corp., Inc v. John H. Harland Co.,* 228 F. Supp. 2d 387, 394 (S. D. N.Y. 2002), the Court found a violation of the best efforts standard in requirements contracts under Article 2, Section 306(2) of the UCC and stated, "The common thread linking *Wood,* the territorial exclusivity cases, and *Tigg* is that these courts have… focused on the hold that one commercial party has over another in a particular market."

   In *Keene Corporation*, and the other cases defendant has cited, the sellers received much more of their consideration up-front, they were not at-will employees, and they retained management control well into the contract period. As such, the leverage of those defendants was far less PerkinElmer's "hold."[16]  PerkinElmer's corporate culture was roughly akin to venture capital, in which businesses were viewed as investments to be increased or spun-off at will. Pl. Ex. J, p. 252; Pl. Ex. 5, pp. 151-152; Pl. Ex. Pp 123-124.

   PerkinElmer would have this Court dismiss the Count for Bad Faith and Unfair Dealing because it says, in essence, "It was our nickel…" However, consistent with the holdings in *Speakman* and *O'Tool*, what the parties really had was a shared "dime", and it was incumbent on defendant, which had the value in its hands, to "spend it" in a reasonable, fair, and diligent way to attempt to maximize plaintiffs' payout provisions.

   V. <u>Violation of Chapter 93A</u>

---

[16] Compare *Stop & Shop v. Ganem,* 347 Mass 697 (1947) in which the Court allowed the supermarket to leave its location after it agreed to make the lease payments remaining on the term, relieving Stop & Shop only of the duty to make overage payments. During the time the store had been open the overage payments had amounted to $700. The SJC cited *Wood v. Lucy, Lady-Duff Gordon* favorably. The *Speakman* Court distinguished *Stop & Shop* on the basis that the overages were trivial compared to the base rent and for other reasons. *Speakman, supra,* at 133, fn 24. See, also, *Neofotistos v. Harvard Brewing Co.,*341 Mass. 684 (1961) cited by the defendant—although it is a supply contract case, not a sale of a business – the Court noted the parties' equivalent leverage, at 688, as did  the Court, in *Allied Communications Corp.,* 821 F. 2d at  71-72.

PerkinElmer failed to disclose material information which bore on plaintiffs' decision to sell to it and, if so, on what terms. The failure to offer Bogen a package reasonably calculated to bring him on board, indeed the failure to make any offer, after agreeing to do so and assuring Donahue that it would, meanwhile, having assigned a far less capable person to the job, was a C.93A violation. The knowing non-disclosure that Lithography was cratering and that this would affect funding for CTP was bad faith. *Speakman v. Allmerica Financial Life Ins. & Annuity Co.*, 367 F.Supp. 2d 122, 141 (D.Mass 2005); *Winter Panel Corp. v. Reichhold Chemicals, Inc.,* 823 F. supp. 963, 974 (D. Mass. 1993). The actions by which the defendant closed the CTP division in utter disregard of the earnout provisions represent 93A violations. *Anthony's Pier Four, Inc., supra,* at 474; *Tufrankjian v. Rockland Trust Co.,* 57 Mass. App. Ct. 173, 178 (2003). The violations largely arise from its desire to keep a lid on the CTP effort while it integrated Sonoran's technology into its other product lines and divisions.

Defendant argues that it has proved that the alleged Chapter 93A violations arose primarily and substantially in Massachusetts. To the contrary, all of PerkinElmer's contract negotiations, and therefore, the failure to disclose the Bogen ruse and the true situation at Lithography, occurred through PerkinElmer corporate (by Kenneth Horton) in Wellesley. Pl. Ex. H, pp. 14, 25-26; Pl. Ex. G p. 59. Horton was involved with every business and legal aspect of the purchase, including discussions about what to do about Bogen. *Id.* He was in touch with PerkinElmer executives here and in California, and conducted all of the negotiations and drafting. *Id.,* Pl. Ex. H pp. 14, 25-26. Baxter told Donahue that the problem he was having getting a better offer for Bogen was with "Corporate," and there is no reason to doubt him. The decision to write off CTP two years early impacted the balance sheet of the buyer in Massachusetts as well as the seller in Arizona, but the "buck stopped" in Massachusetts. Pl. Ex. 31 and 32.

The defendant argues that the decisions made by employees in California should be divorced from a final approval given by the CEO or general counsel in Massachusetts. This is a questionable proposition. But, the evidence is that the actions of PerkinElmer executives inside and outside of Massachusetts were enmeshed and defendant has not produced any memos or communications concerning the decision to buy Sonoran or to sell it, or to provide or withhold information to plaintiffs with the exception of Pl. Ex. 3 and Pl. Exs. 23 and 24 which were prepared by executives at Optoelectronics to present to PerkinElmer Corporate. Pl Ex. 3 and 24. According to Defendant's 30(b)(6) witness, its acting general counsel, none of the lawyers who negotiated the contracts are available, he was not personally involved in the decisions to purchase and close Sonoran, and the CEO has no memory. Pl Ex. H, p. 14-19. In *Kuwaiti Danish Computer Co. v. Digital Equipment Corp.,* 438 Mass. 459, 472-73 (2003) the Court stated:

> Whether the 'actions and transactions…occurred primarily and substantially within the commonwealth' is not a determination that can be reduced to a precise formula… Any determination necessarily will be fact intensive and unique to each case.

In *Kuwaiti Danish Computer Co.,* the lower court ruled that DEC's internal policies which impacted on its sales representatives acting and making representations to a potential customer in Kuwait were sufficient to demonstrate that the actions were based in Massachusetts. The SJC reversed because the lower court did not find that there was any impropriety in any of those policies. *Id.* at 474.

There is little doubt that Baxter wanted the project to succeed. Resistance came from above. In its moving papers, defendant suggests that the resistance was based in Fremont, California, at the headquarters of Optoelectronics. But, the situation is much more complex than defendant lets on. The head of Optoelectronics was based in California until 2004, at which time he became a corporate officer based in Wellesley. The number two person at Optoelectronics

was based at all times in Salem, Massachusetts. The sales manager for Lithography assigned to oversee CTP's sales and marketing in 2003 was headquartered in Salem. While the parties' choice of Massachusetts law and of exclusive jurisdiction in Massachusetts is not controlling, it is a strong indication that the parties viewed the "transaction" as primarily and substantially based in Massachusetts. Pl. Ex. 1A, Section 8.9; Pl. Ex. 1B, p. 6.

That PerkinElmer has been unwilling or unable to turn over any documents from Corporate is hardly a point in its favor, where it bears the burden of proof, and the Court is required to make findings of fact. *RGJ Associates, Inc v. Stainsafe, Inc.,* 338 F. Supp. 2d 215, 235-36  (D. Mass. 2004)   Where the record is not fully enough established, denial of summary judgment is appropriate "where factual records are 'disturbingly thin', 'contain gaps', and require judgment calls which depend on evidence not in the record but readily obtainable." *Spratt v. Rhode Island Department of Corrections,* 482 F. 3d 33, 43 (1st Cir. 2007),

VI. <u>Causation and Damages</u>

The jury should find that defendant's breaches of contract and violations of C. 93A caused plaintiffs to lose the benefits of  the earnout provisions in the contracts. *Jay Edwards, Inc. v. New England Toyota Distributor, Inc.,* 708 F. 2d 814, 818 (1st Cir. 1983).  The defendant has not argued that the product was unmerchantable, and there was a clear market opportunity.  None of PerkinElmer's competitors had a lock on that opportunity, while PerkinElmer had a substantial niche to itself. Pl. Ex. 12; Pl. Ex. 25, 27, 29. See, pages 16-17 above.

Norm Bogen's opinion is that he was close to the sale of several units in 2001 and 2002, and that 20 or so units would be sold through the end of 2002. Pl. Ex. 29[17] ; Pl. Ex. C pp.145-

_____

[17] Bogen gave a lengthy explanation of the opinions stated in his sales forecast. Pl Ex. C. Boiled down, it was his opinion that he could predict sales to particular customers with a high probability of success for the next six months and could forecast the total number of units sold, but not the particular

149. Under Paragraph 1.6 of the APA, this would have earned Sonoran $1.5 million. Even if PerkinElmer had transitioned carefully over the first year after the sale and filled Bogen's job with an equivalent, it was likely that at least 10 sales would have been made from May 2001-May 2003. *Id.* True, PerkinElmer needed to cut the price of the first few machines to get going in the offset market, but Bogen and Donahue saw the need for this, Pl. Ex. 135, while Baxter and Antley did not (though Antley admitted that price was the problem with the first customer, Pl. Ex. A, p. 146). Most tellingly, the defendant's 30(b)(6) witness admitted that had PerkinElmer been willing to cut the price to $300,000 – which as shown below was above cost—there would have been lots of customers. Pl. Ex. I, p. 69. Antley admitted a reduction in price and a few sweeter terms would have brought in Pennysaver, Pl Ex. A, p. 146, and in likelihood other early adopters of the offset product., Pl. Ex. C, p. 135 Further, if MacDermid's sense of its business was reasonable, and Baxter agreed that it was, Pl. Ex. B, p. 166, it would have purchased at least 7 machines during the Section 1.6 time period, by its own estimate. Pl Ex. C, pp.145-153; Pl Ex. 29.

Defendant argues that plaintiff must prove damages under Section 6.2 and Exhibit 1 of the Employment Agreement by expert testimony. While it is true that in the case it cites, *Computer Systems Engineering, Inc. v. Qantel Corp.,* 740 F. 2d 59, 67 (1st Cir. 1984), the Court approved of the use of the plaintiffs' accountant, a retained expert, to provide a lost profits calculation, the plaintiffs in the case the Court relied upon, however, *Providence Granite Co. v. Joseph Rugo, Inc.,* 362 Mass. 888(1972)(rescript), provided the testimony of one of plaintiff's corporate officers There is no magic under F.R.Evid 702 and 703. Indeed, once the likely selling

---

customer sold to, with a high degree of probability for the next two years. He has extensive experience in sales, sales management, and sales consulting. His forecast did not include the MacDermid opportunity.

price, quantity of machines sold, and the cost of production are provided, the calculation does not require an accountant. It is arithmetic. Pl. Ex. 1A, Section 6.2; Pl. Ex. 1B, Exhibit 1.

Under 6.2 and Exhibit 1 the plaintiffs were entitled to $18,000 per machine if the production costs were at target, and $25,000 per machine if the sales targets were met. Donahue Aff. ¶12; Pl. Ex. 1A, Section 6.2; Pl. Ex. 1B, Exhibit 1. The formula is fixed in stone. Further, the parties agree that the retail price of the ProForm Metro (the offset machine) at $495,000 was reasonable, except for the first ten machines. The price of the Flexo was established by PerkinElmer and MacDermid at $409,000, plus laser. Donahue Aff. ¶12. So, the open questions at trial will be whether plaintiffs can prove the cost of production and the number of units likely to be sold. For summary judgment purposes, it does not matter whether one machine was likely to be sold or four hundred in the first two years, and after that the only question is production cost. See, Pl. Ex. I, p. 69.

The parties negotiated the gross margin requirements in the contracts and presumably did so fairly. Baxter and Donahue were experienced engineers who knew their costs and who agreed on how the machine was to be built. Baxter's views of production costs were well known: his gross margin at Lithography ran at 50-53 percent. Pl. Ex. B, p 28. The gross margin required to trigger the payouts was set at 50% or less. Pl. Ex. D, pp. 224, 231. PerkinElmer is unlikely to take the position at trial that it set the bar high to assure itself that plaintiffs would not be paid.

According to Donahue, the cost to produce the CactusSetter was less than $250,000, and he anticipated that the costs could be reduced over time at PerkinElmer. Donahue Aff. ¶12. The largest material outlay was the laser, which cost less than $70,000. Pl. Ex. D, p.411. Neither Lithography nor Tucson were union shops. Labor costs, totally burdened, were $50 per hour. Donahue, who is an expert on this, is of the opinion that it took 400 hours, $20,000, to assemble

the machine. The remainder of materials and general overhead explain the balance – with Azusa's overhead being higher than Tucson's. Donahue Aff. ¶13.

For the Flexo, the costing was different. MacDermid agreed to pay $409,000 per automatic machine, not including the laser which was more powerful and expensive than offset, but which MacDermid agreed to supply on its own, and less for a manual machine (which is 40% less to make and sells for 40% less). Pl Ex. D, pp 340- 344. The higher overall price with laser, $535,000, was reached acceptable to MacDermid because it made its profits from plates – and flexo users run through a lot of plates. Pl. Ex. E, pp. 171-73; Donahue Aff. ¶ 13. Less the laser, the cost to build the Flexo machine, which had a more elaborate plate handling system than the offset version, was $200,000. Donahue Aff. ¶ 13.

Joseph Donahue testified that he went into the deal with PerkinElmer confident that at least 300 machines and as many as 400 machines would be sold in the time period of the earnout. Pl. Ex. D, p 492. His opinions are based on the competitors' 10-Ks, on reports in well-respected trade journals, such as the Seybold Report, and his personal observations. Further, they are supported by the testimony of Shaver, Bogen, and plaintiffs' expert. No one questions that once the machine had been placed with early adopters, the program would have gotten off the ground. The question is not whether, it is how many. At the end of 2001, PerkinElmer indicated that it was likely that more than 10,000 units would be sold. This represented all CTP sales, not just newspapers. Pl. Ex. 27. With the benefit of hindsight, 3,000 were placed from 2001-2004 in the newspaper industry, with a strong growth rate noted for 2005. Pl. Ex. 25. In addition, thirty-eight flexo machines have been sold by MacDermid from demand existing before 2006. 400 machines represents a small percentage of the market.

"The plaintiff is not required to prove its lost profits with mathematical precision. Under our cases, an element of uncertainty is permitted in calculating damages and damages can stand

on less than substantial evidence." *Ricky Smith Pontiac, Inc. v. Subaru of New England, Inc,*, 14 Mass. App. Ct. 396, 426, rev. denied, 387 Mass. 1103(1982). In *Augat, Inc. v. Aegis, Inc.*, 417 Mass. 484, 486-88 (Augat II), the Court ruled that plaintiff could recover "generalized" lost profits where defendant unlawfully solicited and obtained the services of three of plaintiff's key employees. Here, the effect of the failure to retain Bogen and other breaches outlined above were felt through the entire time period of the earnouts. "Where the defendant's wrongdoing created the risk of uncertainty, the defendant cannot complain about the imprecision." *Jay Edwards, Inc. v. New England Toyota Distributor, Inc.*, 708 F. 2d 814, 821 (1st Cir.).

Conclusion

For all of the above-stated reasons, defendant's motion for summary judgment should be denied as to all counts.

Respectfully submitted,

/s/ Edward T. Dangel, III
Edward T. Dangel, III, BBO # 113580
Dangel & Mattchen, LLP
10 Derne St.
Boston, MA 02114
(617) 557-4800

**CERTIFICATE OF SERVICE**

I, Edward T. Dangel III, hereby certify that on this 7th day of August 2008, I electronically filed the foregoing **Plaintiff's Opposition and Response To PerkinElmer, Inc.'s Motion for Summary Judgment** with the Clerk of Court using the CM/ECF system, which will send notification of such filing(s) to all counsel of record.

/s/ Edward T. Dangel III
Edward T. Dangel III