UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
SONORAN SCANNERS, INC. and     )
JOSEPH P. DONAHUE,             )
             Plaintiffs        )
                               )
v.                             )     CIVIL ACTION
                               )     NO.  06-12090-RCL
PERKINELMER, INC.              )
             Defendant         )
```

MEMORANDUM OF DECISION

YOUNG, D.J.                                    December 22, 2008

**I. INTRODUCTION**

Co-plaintiffs Sonoran Scanners, Inc. and Joseph P. Donahue
("Sonoran" and "Donahue" respectively and "Plaintiffs"
collectively) sued defendant PerkinElmer, Inc. ("PerkinElmer") on
November 26, 2006 for breach of contract, breach of the implied
covenant of good faith and fair dealing, and violation of
Massachusetts General Laws Chapter 93A.  In May 2001, PerkinElmer
purchased Sonoran, an unproven but promising start up company
founded by Donahue in 1997, that developed and marketed high
speed computer-to-plate ("CTP") printing technology to the
newspaper industry.  Pursuant to the terms of the agreements
between the Plaintiffs and PerkinElmer, PerkinElmer received all
of Sonoran's intellectual and physical property, and the
Plaintiffs, based on their belief that the CTP Business[1] would

---

[1]  For the sake of clarity, the term Sonoran refers to the
corporate entity that existed prior to the purchase of Sonoran by

1

succeed and due to their relatively weak bargaining position, agreed to accept deferred, speculative compensation in the form of "earnout" payments.  The earnouts would be triggered only if the CTP Business met various sales thresholds during the first five years after the purchase.

Unfortunately for the Plaintiffs, the CTP Business was a spectacular failure under PerkinElmer's control.  In the nearly three and a half years before PerkinElmer ultimately decided to shutter the CTP Business, PerkinElmer sold a total of one CTP unit.  The single sale did not satisfy any of the earnout provisions, and consequently the Plaintiffs received no payment in any form from their the sale of Sonoran.  The Plaintiffs allege that PerkinElmer's bad faith management of the CTP Business resulted in its poor performance and prevented the Plaintiffs from receiving benefits from earnout provisions.

PerkinElmer moved for summary judgment on all counts, averring that the Plaintiffs have not produced sufficient evidence to support a finding that PerkinElmer (1) violated any express or implied provisions of the contractual agreements, (2) acted in bad faith in order to deprive the Plaintiffs of earnouts payments under the agreements, or (3) engaged in any unfair business practices punishable under Massachusetts General Laws

_____

PerkinElmer, and the term CTP Business refers to the wholly PerkinElmer-owned operation previously known as Sonoran.

2

Chapter 93A.  For the reasons set forth below, the Court GRANTS PerkinElmer's motion for summary judgment on all three counts.

## II.  FACTUAL RECORD

### A.  Procedural Posture

On November 20, 2006, the Plaintiffs filed a complaint in this Court against PerkinElmer.  Docket ("Doc.") No. 1.  The complaint alleged three counts: (1) breach of contract (brought by both Plaintiffs), (2) breach of the implied covenant of good faith and fair dealing (by both Plaintiffs), and (3) violation of Massachusetts General Law Chapter 93A section 11 (by Sonoran only).  Id.  PerkinElmer filed its Answer on February 20, 2007. Doc. No. 7.

PerkinElmer filed its motion for summary judgment ("PerkinElmer's Mot. Sum. J.") currently before the Court on July 7, 2008, attaching numerous exhibits.  Doc. No. 27-30.  the Plaintiffs filed their Opposition ("Pls.' Opp.") to PerkinElmer's Motion on August 7, 2008, also attaching numerous exhibits.  Doc. No. 32-35.


### B.  Relevant Factual Background

Pursuant to the summary judgment standard, the facts below are depicted in the light most favorable to the non-movants, the Plaintiffs Donahue and Sonoran.

3

This litigation arises out of the sale of co-plaintiff Sonoran, a start-up company incorporated and headquartered in Tucson, Arizona, to PerkinElmer, a Massachusetts corporation headquartered in Wellesley, Massachusetts. Defendant PerkinElmer, Inc.'s Statement of Undisputed Material Facts ("DSOF") [Doc. No. 29] ¶¶ 1, 2, 4.[2] Co-plaintiff Donahue founded Sonoran in 1997 to develop and market high speed computer-to-plate technology ("CTP") to large metropolitan newspapers and other graphic arts publishers. Id. ¶ 1. For purposes of this motion, it is necessary only to understand that the CTP product line being developed by Sonoran, a digital alternative to traditional analog printing methods, would require a relatively greater initial capital investment from customers (approximately $500,000), but would allegedly result in significant cost savings over the mid- to long-term. Plaintiffs' Counter-Statement of Material Facts ("PSOF") [Doc. No. 33] ¶ 2. Donahue invested $3,500,000 of his own resources into Sonoran, which by 2000 had produced a prototype product that it demonstrated at the printing industry's premier exposition. Id. ¶¶ 3, 5. Although Sonoran had not yet sold any CTP units, Sonoran employees, namely Norm Bogen ("Bogen"), Sonoran's head of sales and marketing, had made

---

[2] Where possible, the Court cites to either the Defendant's Statement of Undisputed Material Facts or the Plaintiffs' Counter-Statement of Material Facts.

4

some progress developing relationships with potential buyers in the publishing and graphic arts industries.  Id. ¶ 4.

In mid-2000, in response to concerns expressed by potential customers about committing long-term to an untested company and product, and in the face of liquidity issues, Donahue and Bogen began searching for an entity to purchase Sonoran.  Id. ¶¶ 4, 5. Donahue and Bogen entered into negotiations with Greg Baxter ("Baxter"), the head of PerkinElmer's Lithography Division, that ultimately led to the sale of Sonoran to PerkinElmer.  Id.  ¶¶ 6- 8.  The terms of the sale of Sonoran, representations made or omitted during negotiations, and PerkinElmer's conduct after the sale are the subject of this lawsuit.

**1.    The Terms of the Sale of Sonoran to PerkinElmer**

Two documents –- the Asset Purchase Agreement and the Employment Agreement –- governed the terms of the May 2, 2001 sale.  In exchange for all of Sonoran's physical and intellectual property, PerkinElmer agreed to pay $3,500,000 to satisfy Sonoran's debts to unsecured creditors.  DSOF ¶ 8.  Neither Donahue nor any of Sonoran's other shareholders received any of the $3,500,000 lump payment.  PSOF ¶ 13.  The parties also agreed to a number of "earnout" provisions whereby Sonoran's shareholders would receive additional compensation dependent on the success of the CTP Business during the first five years after the sale.  DSOF ¶ 12, 13.  Section 1.6 of the Asset Purchase

5

Agreement provided for payments of $150,000 for each of the first
ten CTP units sold in the two years after the closing, regardless
of the sale price or profit generated.  Id. ¶ 12.  Section 6.2 of
the Asset Purchase Agreement provided for "Additional Earnout
Payments" of up to $2,000,000 over four years if various profit
thresholds from the sale of CTP units were met.  Id. ¶ 13.  No
provision of the Asset Purchase Agreement limited the manner in
which PerkinElmer could operate the CTP Business.[3]  After the
sale, the CTP Business, which remained in Tucson, became a part
of PerkinElmer's Lithography Division, which was located in
Azusa, California.  PSOF ¶ 22.

Donahue, as the primary shareholder and president of
Sonoran, entered into a separate Employment Agreement with
PerkinElmer.  Under the terms of the agreement, Donahue would
receive a yearly salary of $150,000 and serve as General Manager
and Site Leader of the CTP Business, with "responsibilities
inherent to [his] position," DSOF ¶ 8, including management
control, integrated within PerkinElmer's management structure,

---

[3]  The Plaintiffs argue that section 6.3 of the Asset
Purchase Agreement, concerning the "Sharing of Data," constrained
PerkinElmer's ability to operate the CTP Business as it saw fit.
Although the bulk of the provision, laid out in section 6.3(a)
relates to the "Sharing of Data," the Plaintiffs point to section
6.3(b), which states that "[t]he parties agree that from and
after the Closing Date, they shall cooperate fully with each
other to facilitate the transfer of the Acquired Assets from the
Seller to the Buyer and the operation thereof by the Buyer."
This provision is discussed in Part III.B, infra.

and profit/loss responsibility.  PSOF ¶ 18.  Like the contract

for the sale of Sonoran, Donahue's contract contained detailed

earnout provisions whereby Donahue could earn as much as $25,000

per CTP unit sold if the CTP Business met sales thresholds during

the first five years under PerkinElmer.  DSOF ¶ 16; PSOF ¶ 19.

In order for Sonoran and Donahue to earn the maximum payout

under the earnout provisions, the CTP business would have to sell

approximately 400 CTP units during the first five years of the

contract.  Id. ¶ 19.

> ### 2.  PerkinElmer's Conduct During Negotiations and
> ### After Closing

The CTP Business, as operated by PerkinElmer, was a near-

total failure.  Between May 2001, when PerkinElmer purchased

Sonoran, and October 2004, when Sonoran sold the intellectual

property of the CTP Business to another corporation, MacDermid,

Inc., the CTP Business sold only one CTP unit.  DSOF ¶ 40.  In

their pleadings and documents filed in conjunction with the

instant motion, the Plaintiffs list a litany of complaints about

PerkinElmer's decisionmaking and conduct as it relates to the

operation of the CTP Business.

> ### a.  Offer of Employment to Norm Bogen

One of the sticking points of Sonoran and PerkinElmer's

negotiations related to the hiring of Sonoran's existing

workforce, specifically Bogen, Sonoran's principal salesperson,

by PerkinElmer.  During negotiations, Donahue expressed to
PerkinElmer representatives, on at least two occasions, that
Bogen was critical to future success of the CTP Business, as
Bogen had spent two years developing relationships with potential
customers and possessed a unique combination of sales skills,
engineering background, and technical knowledge of the CTP
Business and industry.  Affidavit of Joseph P. Donahue ("Donahue
Aff.") ¶ 4, attached to Pls.' Opp.  Donahue and Bogen emphasized
to PerkinElmer representatives that in order for Bogen to remain
with the CTP Business, Bogen "needed his compensation level
raised [from $100,000 a year to $125,000 a year] and his expenses
. . . paid and a fair commission."  Id..

    Pursuant to the terms of the sale, PerkinElmer agreed to
offer employment to eight current Sonoran employees, including
Bogen.  PSOF ¶ 12.   On April 20, 2001, twelve days before
finalizing the Asset Purchase Agreement, PerkinElmer offered
Bogen a position with the CTP Business at his existing salary of
$100,000.  DSOF ¶ 27.  Bogen rejected that offer.  Id. 27.
Donahue asked Baxter and John Lechter, PerkinElmer's Director of
Human Resources, to increase their offer to Bogan.  Donahue Aff.
¶ 5.  Baxter explained that he was having trouble gaining
authorization for a better offer from PerkinElmer's corporate
headquarters, but that the parties should proceed with the sale
and Bogen would get a better offer after closing.  Id. ¶5; PSOF ¶

10.   PerkinElmer never made another offer to Bogen, and Bogen never joined the CTP Business.  Donahue Aff. ¶ 5; PSOF ¶ 12.

> **b.   The Performance of Bogen's Replacement, Guy Antley**

A month before purchasing Sonoran, Baxter assigned Guy Antley, a PerkinElmer's in-house salesperson with no experience in marketing within the publishing field, to begin learning about CTP technology and the publishing industry.  PSOF ¶ 21.  When Bogen rejected PerkinElmer's offer of employment, Baxter assigned Antley to head the CTP Business' sales efforts part-time.  Id. ¶ 21.  According to the Plaintiffs, Antley made little or no effort to learn about the CTP Business' existing sales leads or critical proprietary sales tools necessary for effectively marketing the CTP units to potential purchasers.  Id. ¶ 23, 26 (especially Exhibit 18, attached to Pls.' Opp.).  According to Donahue, Antley was incompetent, frequently providing potential customers with incorrect information, and PerkinElmer executives, namely Baxter, were aware of Antley's poor performance.  Id. ¶ 26.  PerkinElmer, however, did nothing to provide the CTP Business with a more capable salesperson.  Id. ¶ 28.[4]

---

[4]   The Plaintiffs place great emphasis on an email from one of the employees who worked for Donahue at both Sonoran and PerkinElmer.  The email classifies PerkinElmer's conduct as "entirely in bad faith", and continues to say "[PerkinElmer's] grossly incompetent decision to stick you with a re-tread sales guy and severely underfund the sales and marketing effort (a part of one incompetent person!) is costing the company dozens of

Despite the Plaintiffs' qualitative complaints about Antley, the undisputed record also shows that Antley placed large quantities of phone calls to and conducted site visits with more than one hundred potential customers.  DSOF ¶ 29.[5]  Antley attended nine industry meetings and trade shows during his more than three years managing the CTP Business' sales and marketing. Id. ¶ 30.  Antley also helped obtain an interview and discussion of PerkinElmer's CTP product in a cover article of Editor & Publisher, a leading industry magazine.  Id. ¶ 32.

   **c. PerkinElmer's Failure to Disclose the Financial Problems in the Lithography Division Responsible for Managing and Funding the CTP Business**

The Plaintiffs contend that during and after negotiations to sell Sonoran, PerkinElmer misrepresented the health of its Lithography Division which assumed control over the CTP Business. PSOF ¶ 33.  Before the closing, PerkinElmer knew that the Lithography Division was experiencing financial difficulties, but

---

sales, costing [Donahue] several million dollars and costing the rest of us our share of the pool . . . ."  PSOF ¶ 28.

  [5]  In their Statement of Facts, the Defendant claims that Antley contacted 77 metropolitan newspapers in the first two months working for the CTP Business and met, often on-site, with 110 newspapers over the life of the CTP Business.  DSOF ¶ 29. The Plaintiffs dispute PerkinElmer's factual description of Antley's involvement in contacting potential customers, but cite to nothing in the record to contradict PerkinElmer's characterization.

failed to disclose this information until after the sale of Sonoran. Donahue Aff. ¶ 6. After the closing, PerkinElmer immediately abandoned the mutually agreed-upon "technology roadmap" that was produced during negotiations between PerkinElmer and Sonoran. Id. Instead, in June 2001, Baxter ordered a costly redesign of the CTP Business' original CTP unit, resulting in a heavier, bulkier and more expensive model. Donahue Aff. ¶ 6, 7. Still, the record shows that PerkinElmer invested approximately $2,500,000 per year in developing the CTP Business. DSOF ¶ 24.[6]

### d. Other Alleged Problems with PerkinElmer's Management of the CTP Business

The Plaintiffs complain that upper level PerkinElmer executives did not support the CTP Business' sales and marketing efforts, rarely joining sales calls with Donahue or accompanying Antley or Donahue to on-site visits with potential customers. Id. ¶ 33; PSOF ¶ 27. The Plaintiffs contend that PerkinElmer

---

[6] In deposition testimony, Jerry Jurkiewicz, an executive at PerkinElmer, stated that PerkinElmer invested approximately $2,500,000 per year in the CTP Business. Deposition of Jerry Jurkiewicz at 172:1-4, attached as Ex. 57 to PerkinElmer's Mot. Sum. J. In the Plaintiffs Response to Defendant's Statement of Undisputed Material Facts, the Plaintiffs deny that such funds were expended on the CTP Business, but fail to cite to any evidence in the record to contradict Jurkiewicz testimony. A budget spreadsheet attached as a Exhibit 7 to the Plaintiffs' Opposition indicates that in fact PerkinElmer invested and lost more than $2,000,000 per year on the CTP Business from in 2003 and 2004.

underfunded sales and marketing efforts by as much as $1,000,000 per year. PSOF ¶ 34.

The Plaintiffs allege that PerkinElmer refused to discount the price of the first CTP units sold or to assure free parts and a strong warranty, common practices in the publishing industry in order to establish a track-record and customer base. Donahue Aff. ¶¶ 10-11. As a result, prospective customers chose not to invest in CTP units produced by the CTP Business. PSOF ¶¶ 30, 31. At least three customers expressed explicit concern about being a first adopter of new technology and purchasing a CTP units that were not bundled with necessary operating software. DSOF ¶ 35.

The Plaintiffs assert that although Donahue's employment agreement explicitly stated that he would have the right to consult on the price at which PerkinElmer sold CTP units, PerkinElmer never followed any of Donahue's advice.

The Plaintiffs contend that PerkinElmer grossly mishandled a potentially lucrative sale of as many as 150 CTP units over seven or eight years to MacDermid, Inc., a producer of flexographic printing plates that were compatible with PerkinElmer's CTP product. PSOF ¶ 35. In late 2002, MacDermid requested a quote from the CTP Business of the cost for 24 CTP units. Id. ¶ 35. Over the course of the next few months, MacDermid and PerkinElmer haggled over the division of development costs. Id. ¶ 35. The

12

Plaintiffs allege that because of the bargaining delays, it was not until early 2004, after the Plaintiffs could receive a $150,000 earnout under the Asset Purchase Agreement for each CTP unit sold, that a CTP unit was finally shipped to MacDermid. Id. ¶ 35. The Plaintiffs contend that because PerkinElmer executives refused to support the CTP Business, no other CTP units were sold to MacDermid.

The Plaintiffs also suggest, based on both their own opinion and expert testimony, that given the strong market for CTP units that developed between 2000 and the present, had PerkinElmer managed the CTP Business in a different manner, the Plaintiffs would have received substantially all of the earnouts available under the Asset Purchase Agreement and the employment agreement. Id. ¶ 38-40, 43-45.

### 3. PerkinElmer Shuts Down the CTP Business

In early 2004, PerkinElmer executives began developing an "exit strategy" for closing the CTP Business. PSOF ¶ 35-36. By July, PerkinElmer had approved the sale of the CTP Business, and in September, PerkinElmer sold all of the CTP Business' assets to MacDermid. Id. ¶ 36. Finally, on October 15, 2004, PerkinElmer shut down the CTP Business and laid off all of its personnel, including Donahue. DSOF ¶ 43-44.

### III. ANALYSIS

13

### A.    Standard of Review

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party "bears the initial burden of demonstrating that there are no genuine issues of material fact for trial."  Hinchey v. Nynex Corp., 144 F.3d 134, 140 (1st Cir. 1998).  "[T]he nonmovant may defeat a summary judgment motion by demonstrating, through submissions of evidentiary quality, that a trialworthy issue persists. . . . Doing so, however, requires more than the frenzied brandishing of a cardboard sword. . . . [A] conglomeration of 'conclusory allegations, improbable inferences, and unsupported speculation' is insufficient to discharge the nonmovant's burden."  Calvi v. Knox County, 470 F.3d 422, 426 (1st Cir. 2006) (citations omitted).

### B.    Count I: Breach of Contract

PerkinElmer attacks Count I for breach of contract in a rather opaque and indirect manner, arguing solely in the Introduction to its motion for summary judgment that "[t]here is no issue here as to whether PerkinElmer violated an express contractual requirement to support or operate the new venture to a certain level or in a certain way."  PerkinElmer's Mot. Sum. J.

at 1.  PerkinElmer devotes few other sentences and no legal argument in its motion toward persuading the Court that it ought have judgment on Count I.[7]  The Plaintiffs assert that their breach of contract claim ought survive summary judgment both because PerkinElmer failed adequately to present it to the Court and because the record can support a finding that PerkinElmer violated an implied contractual obligation of " 'diligent and careful performance in good faith and of forebearance to make performance impossible by going out of business or otherwise.' " Pls.' Opp. at 20 (quoting Corbin on Contracts, § 568, p. 49 (Interim Ed. 1979)).

This Court would be well within its discretion to deny PerkinElmer's Motion on Count I on grounds that PerkinElmer, by failing to adequately brief this issue, did not meet its burden under the summary judgment standard.  As the First Circuit has repeatedly held, "[i]t is not enough merely to mention a possible

---

[7]  The entirety of PerkinElmer's briefing on this issue consists of the following passage:

> There is no issue here as to whether PerkinElmer violated an express contractual requirement to support or operate the new venture to a certain level or in a certain way.  Indeed, as Plaintiffs recognize, the contracts they entered into with PerkinElmer included no such requirements.  Foreclosed from bringing a breach of contract claim, Plaintiffs have resorted to claiming that PerkinElmer breached the implied covenant of good faith and fair dealing.

PerkinElmer's Mot. Sum. J. at 1-2.

argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." <u>United States</u> v. <u>Zannino</u>, 895 F.2d 1, 17 (1st Cir. 1990). Here, PerkinElmer has done nothing more than to suggest, without argumentation, that Count I cannot be supported by the record. In contrast, the Plaintiffs devote four pages of their thirteen page discussion to opposing summary judgment on Count I.

The primary factor counseling in favor of reaching Count I, however, is that the Plaintiffs had a full opportunity to brief the issue and identify for the Court any evidence to support their breach of contract claim. The Plaintiffs have presumably provided the Court with their best arguments, oral and written, for why Count I should survive.[8] Consequently, the Plaintiffs would not appear to be prejudiced by PerkinElmer's limited briefing on the matter, and the Court has before it the information necessary to adjudicate the issue.

The Court holds that PerkinElmer is entitled to summary judgment on Count I. Under Massachusetts law, which the parties agree applies to this action, to prevail on a breach of contract claim, a party must show that the defendant materially breached the terms of a valid contract. <u>Singarella</u> v. <u>City of Boston</u>, 342

---

[8] In fact, both the Plaintiffs and PerkinElmer submitted post-argument letter briefs to the Court further addressing the breach of contract issue.

Mass. 385, 387 (1961).  "A material breach of an agreement occurs
when there is a breach of 'an essential and inducing feature of
the contract[].' "  Lease-It, Inc. v. Massachusetts Port Auth.,
33 Mass. App. Ct. 391, 396 (1992) (quoting Bucholz v. Green Bros.
Co., 272 Mass. 49, 52 (1930)).  Here, the Plaintiffs have neither
alleged nor presented evidence that PerkinElmer violated any of
the express provisions of the Asset Purchase Agreement or the
Employment Agreement.  The Plaintiffs' argument that this Court
should insert an implied term into the contract requiring
PerkinElmer to operate the CTP Business for five years,
regardless of any losses the CTP Business suffered, simply has no
basis in law, fact, or logic.

Count I of the Plaintiffs Complaint states only that
"[PerkinElmer] breached the implied term of the [Asset Purchase
Agreement and the Employment Agreement], and as a result, the
plaintiffs were deprived of all of the bonus, earnout, and
additional pool payouts described in the contracts."  Compl. ¶ 36
(emphasis added).  In their opposition to the motion for summary
judgment, the Plaintiffs suggest that PerkinElmer violated the
express terms of the earnout provisions because no earnout
payments were ever made.  Pls.' Opp. at 18.  The record, however,
demonstrates beyond peradventure that PerkinElmer never had a
duty to pay the Plaintiffs any money under the earnout provisions
of the agreements.  In the period that PerkinElmer controlled the

17

CTP Business, PerkinElmer only sold one CTP unit, to MacDermid in 2004. Because PerkinElmer realized no profits from this sale and the sale took place outside the initial period covered by section 1.6 of the Asset Purchase Agreement (providing a $150,000 bonus to the Plaintiffs for each CTP unit, up to ten, sold within the first two years), PerkinElmer had no obligation to pay the Plaintiffs any compensation. Even when viewing the record in the light most favorable to Plaintiffs, no jury could find that PerkinElmer violated any of the express earnout provisions of the contracts at issue.

The Plaintiffs suggest that PerkinElmer breached section 6.1 of the Asset Purchase Agreement by failing to make an offer to Norm Bogen after the closing. Section 6.1 provided that PerkinElmer "shall offer employment to" certain Sonoran employees identified in Schedule 6.1 attached to the agreement. At oral argument and in post-argument submissions, the Plaintiffs' counsel indicated the use of the word "shall" "means the future," explaining that PerkinElmer could only satisfy section 6.1 by making Bogen an offer after the date of the sale, which was May 2, 2001.

The schedule attached to the Asset Purchase Agreement, however, plainly contradicts the Plaintiffs' reading of the contract. The schedule lists eight Sonoran employees, including Bogen and Donahue, and after each name indicates whether or not

18

that employee had been offered and accepted employment by
PerkinElmer.  As of April 23, 2001, PerkinElmer had offered
employment to all eight employees; everyone except Bogen had
already accepted employment.  The schedule shows that an "offer
from PerkinElmer [was] NOT accepted" by Bogen.  Under the
Plaintiffs' interpretation, PerkinElmer would have breached the
contract with respect to all eight of the identified employees
because the schedule indicates that all had been offered
employment before, not after, May 2, 2001.  A more consistent
reading of the contract documents is that the schedule is
incorporated into the contract by reference, and that PerkinElmer
had already discharged its duty under section 6.1 to make offers
to the eight identified employees.  Because PerkinElmer made an
offer of employment to Bogen, it did not breach section 6.1 of
the Asset Purchase Agreement.

     The Plaintiffs contention that PerkinElmer breached section
6.3(b) of the Asset Purchase Agreement is no more availing.  That
provision, a subsection of section 6.3 which governed "Sharing of
Data," states that "[t]he Parties agree that from and after the
Closing Date they shall cooperate fully with each other to
facilitate . . . the operation [of the Acquired Assets] by the
Buyer."  To read this provision as creating a broad duty on the
part of PerkinElmer to "cooperate" with the Plaintiffs on all
matters of operation regarding the CTP Business would (1) simply

reiterate the covenant of good faith and fair dealing, (2) reach beyond the scope of the subject of "Sharing of Data," (3) and provide the Plaintiffs with seemingly unfettered ability to restrict the manner in which PerkinElmer chose to operate the CTP Business it purchased.  The Court refuses thus to read section 6.3(a), and rejects the Plaintiffs' contention that PerkinElmer breached that provision.

The Plaintiffs argument that this Court should find an implied obligation requiring PerkinElmer to continue to operate the CTP Business also falls short of creating a triable issue of fact.  Plaintiffs quote Spaulding v. Morse for the proposition that "[i]f the instrument as a whole produces a conviction that a particular result was fixedly desired although not expressed by formal words, that defect may be supplied by implication and the underlying intention . . . may be effectuated provided it is sufficiently declared by the entire instrument."  322 Mass. 149, 152-53 (1947) (quotation marks and citations omitted).

Here, none of the evidence before the Court "produces a conviction that a particular result" -- the continued operation of the CTP Business for at least five years -- "[was] fixedly desired although not expressed by formal words . . . ."  Beyond the durations of the earnout provisions of the agreements -- section 6.2 of the Asset Purchase Agreement (four years) and the bonus provisions of the Employment Agreement (five years) -- the

Plaintiffs point to nothing in the text of the contracts or the parties' dealings that would indicate an obligation for PerkinElmer to operate the CTP Business for any period of time. In fact, the express terms of the contracts, which predicated bonuses and earnouts on the success of the CTP Business, contemplated that the CTP Business might not succeed.  If any contractual provision ought be implied, it is that PerkinElmer, as the purchaser of essentially all of Sonoran's assets, retained the right, subject to the covenant of good faith and fair dealing, to shutter the CTP Business should it fail to succeed.

To imply an obligation to continue operations in a case such as this, where a large corporation agrees to purchase and manage a small, unproven startup company would defy the logic behind the startup business model.  Investments in startup corporations are inherently risky endeavors.  If every purchase of a startup company contained an implied contractual obligation for the purchaser to continue operating the startup for the time period in which the startup company's shareholders could earn bonuses, no purchaser would enter into such transactions.

Finally, the specific factual circumstances of this case distinguish it from all of the precedents cited by the Plaintiffs.  In Eastern Mass. St. Ry. Co. v. Union St. Ry. Co., 269 Mass. 329 (1929) (railroads sharing the expense of operating freight terminals) and  Proctor v. Union Coal Co., 243 Mass. 428

(1923) (landlord-lessee), the litigating parties contracted in materially different circumstances. In Eno Systems, Inc. v. Eno, 311 Mass. 334, 339 (1942), the Massachusetts Supreme Judicial Court implied an obligation on the holder of a patent license "to exert reasonable efforts to promote sales of the process and to establish, if reasonably possible, an extensive use of the invention" in manufacturing where the licensee had done nothing to promote the use of the patent. In contrast, as is discussed more fully below, PerkinElmer invested and lost millions of dollars attempting to manufacture and market CTP units. The Plaintiffs identify no case to support their position that PerkinElmer had an obligation to continue operating the CTP Business. Because the Plaintiffs have not identified any express or implied contractual provisions that PerkinElmer breached, the Court GRANTS PerkinElmer's motion for summary judgment on Count I.

### C. Count II: Breach of the Implied Covenant of Good Faith and Fair Dealing

PerkinElmer asserts that the Plaintiffs cannot create a genuine issue of material fact regarding whether PerkinElmer acted in bad faith or caused any measurably certain injury to the Plaintiffs, both necessary elements of any good faith and fair dealing claim. PerkinElmer's Mot. Sum. J. at 10-11. In response, the Plaintiffs argue that PerkinElmer acted in bad faith in at least two ways that violated the implied covenant to

22

deny the Plaintiffs the opportunity to realize the benefits of the earnout provisions in the Asset Purchase Agreement and Employment Agreement.  First, the Plaintiffs contend that PerkinElmer "induced plaintiffs to go forward with the closing [of the sale of Sonoran to PerkinElmer] on the promise that Bogen[, one of Sonoran's key employees,] would be made a better offer, knowing [PerkinElmer] was not [going to make] him an offer after the closing at all."  Pls.' Opp. at 22. Second, the Plaintiffs assert that PerkinElmer "took control of budget manufacturing, and sales and marketing - all contrary to [PerkinElmer's] understanding with Donahue . . . [- in order] to get its hands on Sonoran's digital technology, which it succeeded in doing without properly funding the development, sale and marketing of CTP."  Id.

### 1.   The Implied Covenant of Good Faith and Fair Dealing

The covenant of good faith and fair dealing, which is implied in every contract governed by Massachusetts law, requires " 'that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.' "  Druker v. Roland Wm. Jutras Assocs., 370 Mass. 383, 385 (1976) (quoting Uproar Co. v. National Broad. Co., 81 F.2d 373, 377 (1st Cir.1936)); see also Anthony's Pier Four, Inc. v. HBC Associates, 411 Mass. 451, 471

23

(1991).  On a number of occasions, this Court has explained that "while every breach of contract has the 'effect of destroying or injuring the rights of the other party to receive [its] fruits,' not every breach of contract is a breach of the implied covenant of good faith and fair dealing."  Christensen v. Kingston Sch. Comm., 360 F. Supp. 2d 212, 226 (D. Mass. 2005) (quoting Anthony's Pier Four, 411 Mass. at 471); see also, Blue Hills Office Park LLC v. J.P. Morgan Chase Bank, 477 F. Supp. 2d 366, 374-75 (D. Mass. 2007).  A party only breaches the covenant when it engages in bad faith conduct with the "specific intent," Birbiglia v. Saint Vincent Hosp., Inc., 427 Mass. 80, 87 n.5 (1998), "either to deprive a party of the fruits of labor already substantially earned or unfair leveraging of the contract terms to secure undue economic advantage."  Christensen, 360 F. Supp. 2d at 226.  "The covenant may not, however, be invoked to create rights and duties not otherwise provided for in the existing contractual relationship, as the purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance."  Uno Rests., Inc. v. Boston Kenmore Realty Corp., 441 Mass. 376, 385 (2004)."

>      **2.    PerkinElmer Engaged in Two Instances of Bad Faith**
>             **Conduct.**

The existence of conduct taken in bad faith is central to any analysis of the implied covenant of good faith and fair dealing.  There is no particular test for determining when a party has acted in bad faith, and courts have expressed a variety of formulations to describe bad faith conduct.  See McAdams v. Massachusetts Mut. Life Ins. Co., 391 F.3d 287, 301 (1st Cir. 2004) (quoting Nile v. Nile, 432 Mass. 390,  (2000) ("lack of good faith can be inferred from 'unreasonable[ness] under all the circumstances.' "); Schultz v. Rhode Island Hosp. Trust Nat. Bank, N.A., 94 F.3d 721, 730 (1st Cir. 1996) (citing Anthony's Pier Four, 411 Mass. at 471-72) ("dishonest purpose or conscious wrongdoing necessary for a finding of bad faith or unfair dealing"); Hartford Accident & Indemn. Co v. Millis Roofing and Sheet Metal Inc., 11 Mass App. Ct. 998, 998 (1981) ("Want of good faith involves more than bad judgment, negligence or insufficient zeal. It carries an implication of a dishonest purpose, conscious doing of wrong, or breach of duty through motive of self-interest or ill will."); Christenson, 360 F. Supp. 2d at 226 ("[Bad faith] generally involve[s] deceit or 'unfair subterfuge' and usually [is] 'compounded by deceptive or unfair behavior that prevented-or at a minimum diverted-the injured parties from seeking immediate redress.'" (citations omitted)).  At core, a showing of bad faith requires some indicia of dishonesty or

unfairness other than simply failing to abide by the terms of a contract.

In this case, the Plaintiffs have produced sufficient evidence to support a finding that PerkinElmer acted in bad faith in two instances. First, viewing the record in the light most favorable to the Plaintiffs, a jury could find that PerkinElmer executives misrepresented their intention to offer Bogen a better employment contract in order to induce Sonoran and Donahue to proceed with the sale. Donahue's affidavit states that Baxter, one of PerkinElmer's primary negotiators, promised Donahue that Bogen would be made a better offer sometime after the sale. That offer was never made and, as a result, Bogen, whom Donahue described as irreplaceable, never became a part of the CTP Business. PerkinElmer's representations regarding Bogen are exactly the type of "deceit" and dishonesty that the implied covenant is denied to deter.

Similarly, the record could support a finding that, by not informing the Plaintiffs that the Lithography Division at PerkinElmer was struggling financially and therefore the CTP Business might receive limited financial support, PerkinElmer dealt in bad faith with the Plaintiffs. The Plaintiffs initially sought out a parent company for the CTP Business in order to assuage concerns of customers potentially interested in purchasing CTP units. Those customers worried that Sonoran, as a

small, untested startup, might not have the longevity to support
the longterm investment required to benefit from purchasing a CTP
unit.  A jury might conclude that, had PerkinElmer fully
disclosed the Lithography Division's financial health, the
Plaintiffs would not have agreed to sell the CTP Business to
PerkinElmer and would have sought out a different partner.

Contrary to the Plaintiffs' assertions, however, there is no
evidence that a number of PerkinElmer's other decisions regarding
the CTP Business were made in bad faith.  Strong undisputed
evidence exists that the other conduct about which the Plaintiffs
complain -- PerkinElmer's unwillingness to discount the price or
provide full warranties of initial CTP units, to expend
significant funds on the sale and marketing of the CTP Business,
to allow Donahue to control the manner in which the CTP Business
conducted its sales and marketing, and to move quickly on the
proposed deal with MacDermid -- was all undertaken in good faith
and motivated solely by legitimate financial considerations.

That PerkinElmer acted in good faith in the negotiations for
the sale of CTP units to MacDermid is of primary importance
because that particular transaction represents the prototypical
situation in which the implied covenant could be violated.
Pursuant to section 1.6 of the Asset Purchase Agreement, for each
of the first ten CTP unit sold prior to May 2, 2003, the
Plaintiffs would receive $150,000, regardless of whether

27

PerkinElmer realized a profit on the transaction.  PerkinElmer
could avoid paying that earnout if all sales of CTP units
occurred after May 2, 2003.  The record shows that MacDermid
requested a quote for 24 CTP units in December 2002, six months
prior to the end of the earnout adjustment period.  PerkinElmer
and MacDermid negotiated the terms of the sale of CTP units,
ultimately agreeing that MacDermid would pay for one half of the
development costs.  PerkinElmer completed the sale of a single
CTP unit sometime after section 1.6 lapsed.  The Plaintiffs
realized no benefit from that sale.

     Had the Plaintiffs introduced any evidence that PerkinElmer
intentionally delayed the sale in order to deny them their
earnouts under section 1.6, the Plaintiffs easily would have
satisfied their burden on summary judgment.  But other than the
circumstantial fact that the negotiations began while section 1.6
was still in effect and completed after section 1.6 had lapsed,
the Plaintiffs identify nothing in the record to support an
inference of bad faith.  That PerkinElmer was able to strike a
better deal in which MacDermid bore half of the development
costs, indicates that PerkinElmer delayed consummating the
agreement for a legitimate, good faith reason -- to obtain better
terms.

     In challenging these good faith actions, the Plaintiffs
essentially attempt to insert new terms in the contract

constraining the manner in which PerkinElmer could operate the
CTP Business.  Massachusetts courts have made it abundantly clear
that the implied covenant of good faith and fair dealing "shall
not substitute for [a party's] failure to negotiate [the] terms"
it desires.  Uno Rests., Inc., 441 Mass. at 389; see also Blue
Hills, 477 F. Supp. 2d at 377 ("[W]here sophisticated parties
choose to embody their agreement in a carefully crafted document,
they are entitled to and should be held to the language they
chose. . . . It is no appropriate part of judicial business to
rewrite contacts freely entered into between sophisticated
business entities." (quotation marks and citations omitted)).
Had the Plaintiffs desired to limit PerkinElmer's control over
the operation of the CTP Business, they could have attempted to
extract such promises from PerkinElmer during negotiations of the
sale of Sonoran.  The implied covenant does not, however, provide
a mechanism for introducing new terms after the fact.

The Plaintiffs complaints about the financial support the
CTP Business received from PerkinElmer and Guy Antley's
performance as sales manager for the CTP Business also cannot
support a finding of bad faith.  The record shows that in 2003
and 2004 PerkinElmer invested more than $2,250,000 per year in
the CTP Business, all of which constituted losses.[9]  PSOF ¶ 34;

---

[9]  The Court was unable to identify any exhibits that spoke
to the funding of the CTP Business for the last two quarters of
2001 and all of Fiscal 2002.

Financial Spreadsheet, attached as Ex. 7 to Pls.' Opp.  Guy
Antley, made tens if not more than one hundred on-site visits to
potential customers.  DSOF ¶ 29.  The Plaintiffs do not identify
any other evidence upon which a jury could support a finding of
bad faith.  Incompetence, poor management, and a business
opportunity squandered, perhaps, but not bad faith.

Thus, on the record before the Court, the only two instances
upon which a jury could find that PerkinElmer acted in bad faith
are PerkinElmer's failure to offer Bogen a better employment
contract after the closing and PerkinElmer's failure to disclose
to Plaintiffs the financial problems being experienced by the
Lithography Division.

3.    **PerkinElmer Did Not Act with the Intent to Deny
Plaintiffs the Benefit of the Agreements.**

The record does not support an inference that PerkinElmer
engaged in the bad faith conduct with the "specific intent" to
deprive the Plaintiffs of the fruits of the contract.  The only
evidence in the record -- from Donahue's deposition testimony --
addressing why PerkinElmer did not ultimately make a better offer
to Bogen shows that PerkinElmer believed that "his salary was too
expensive."  PerkinElmer's Mot. Sum. J. at 12; Deposition of
Joseph P. Donahue ("Donahue Dep."), at 503:8-504:1, attached as
Ex. 54 to PerkinElmer's Mot. Sum. J.).  The Plaintiffs point to
no evidence connecting PerkinElmer's failure to make a better

30

offer to Bogen with an intent to frustrate the Plaintiffs'
ability to benefit from the earnouts in the agreements.
Similarly, the Plaintiffs have submitted nothing to indicate that
PerkinElmer omitted information about future funding for the CTP
Business in order to deprive the Plaintiffs of the deal's
benefits.

    The most powerful evidence regarding PerkinElmer's intent --
the parties' synchronized economic interests -- supports a
conclusion that PerkinElmer's bad faith conduct was not intended
to deprive the Plaintiffs of their potential earnout payments.
When economic interests are closely aligned, "courts need not
scrutinize the motivation behind [a] party's exercise of business
judgment.  Self-interest ensures that the goal of profit
maximization for the venture, not bad faith, guides that party's
decisions."  Interpublic Group of Cos., Inc. v. Fratarcangelo,
No. 00 Civ.3323 SHS, 2002 WL 31682389, at *14 (S.D.N.Y. Nov. 26,
2002) (citations omitted).  With the exception of section 1.6 of
the Asset Purchase Agreement (discussed above in the context of
the MacDermid negotiations), the Plaintiffs and PerkinElmer's
economic interests were identical.  The Plaintiffs  stood to
benefit from the earnout or bonus provisions only if the CTP
Business succeeded, and if the CTP Business succeeded,
PerkinElmer would have realized a substantial profit.  According
to the parties, if the CTP Business succeeded such that the

31

Plaintiffs received the maximum payments under the earnout provisions, PerkinElmer would have generated $200,000,000 in revenue. Donahue Dep. at 222:18-223:20, 500:13-502:4. The parallel economic interests of the parties compels a conclusion that PerkinElmer did not intend to deny Plaintiffs the fruits of the contract.

    **4.    Even If PerkinElmer Intended to Deny Plaintiffs the Earnout Payments, Plaintiffs Cannot Establish with the Requisite Certainty that PerkinElmer's Conduct Caused Plaintiffs' Alleged Injuries.**

Even were this Court to find that PerkinElmer intended to deny the Plaintiffs the benefit of the contractual earnouts, on the record before the Court, the Plaintiffs would have great difficulty establishing that PerkinElmer's conduct caused the injuries the Plaintiffs allege. "Without causation, there can be no claim for . . . breach of the implied covenant of good faith and fair dealing." Medical Air Techn. Corp. v. Marwan Inv., Inc., 303 F.3d 11, 22 (1st Cir. 2002). The causal link between the only two instances where the Plaintiffs have adequately supported an inference of bad faith -- PerkinElmer's failure to offer Bogen a contract and to disclose the Lithography Division's financial problems -- and the CTP Business' collapse are tenuous at best. In their brief, the Plaintiffs generally emphasize that had Bogen been retained, the CTP Business would have been

considerably more successful.  Pls.' Opp. at 26-27.  They also stress that the financial limitations of the Lithography Division prevented PerkinElmer from appropriately and effectively marketing the CTP Business.  The Plaintiffs, however, fail to identify a single lost sale that resulted from this bad faith conduct.  Every negotiation between the CTP Business and potential customers failed for reasons other than PerkinElmer's bad faith conduct, namely PerkinElmer's unwillingness to discount the "beta" versions of the CTP units and concerns by customers about the size and weight of the units.  These legitimate reasons for the CTP Business' failure, not PerkinElmer's bad faith conduct, caused the injuries to the Plaintiffs.

Finally, even if the Plaintiffs  were able to surmount the causation problem, they have not presented evidence sufficient to establish their damages with the necessary certainty.  "While it is true that a plaintiff need not prove damages with mathematical certainty, 'damages cannot be recovered when they are remote, speculative, hypothetical, and not within the realm of reasonable certainty.'" Kitner v. CTW Transport, Inc., 53 Mass. App. Ct. 741, 748 (2002) (quoting Lowrie v. Castle, 225 Mass. 37, 51 (1916)).  All of the Plaintiffs' damage claims emanate from alleged lost sales of CTP units, which in turn resulted in the alleged inability of the Plaintiffs to benefit from earnout provisions in both the Asset Purchase Agreement and the

Employment Agreement.  In order to determine damages with some degree of certainty, Plaintiffs  would have to establish (1) the approximate number of sales lost as a result of PerkinElmer's bad faith conduct, and (2) the amount of profit generated by each sale.

With respect to the second factor, the Plaintiffs argue persuasively, citing undisputed figures regarding the production costs and the potential price of CTP units, that the profit from each sale could be established with the requisite certainty. Pls.' Opp. at 27-29.  The Plaintiffs fail, however, to identify the quantity of sales lost as a result of PerkinElmer's alleged bad faith conduct.  The evidence the Plaintiffs rely upon -- Guy Antley's deposition testimony that Pennysaver probably would have purchased at least one CTP unit had the price been lower, a December 2000 email (prior to the sale of Sonoran) from Bogen to Donahue forecasting the sale of 24 CTP units in 2002, a projection by a MacDermid executive for the sale of 115 units by some undisclosed date, Donahue's deposition testimony that he expected to sell 400 machines within the earnout period, and sales statistics for the CTP industry as a whole -- are simply too speculative to form any reasonably certain conclusion about the number of CTP units the CTP Business would have sold within the various earnout periods.  On the record before the Court, the Plaintiffs would be unable to establish with reasonable certainty

34

the amount of damages suffered as a result of PerkinElmer's alleged bad faith conduct.

For the reasons discussed above, this Court GRANTS PerkinElmer's motion for summary judgment for Count II for breach of the implied covenant of god faith and fair dealing.

**D.    Count III: Violation of Chapter 93A**

PerkinElmer contends that the Plaintiffs' Chapter 93A claim must fail because (1) the Chapter 93A claim relies exclusively on the same set of operative facts as the Plaintiffs' failed common law claims for breach of contract and breach of the implied covenant of good faith and fair dealing, and (2) the conduct that allegedly violated Chapter 93A did not take place primarily and substantially in Massachusetts, as required by the statute. Plaintiffs  contest both of PerkinElmer's arguments.

> Pursuant to section 11 of Chapter 93A, a business may recover if it suffers "any loss of money or property, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice. . . ." Mass. Gen. Laws ch. 93A, § 11. "A practice is unfair if it is 'within . . . the penumbra of some common-law, statutory, or other established concept of unfairness; . . . is immoral, unethical, oppressive, or unscrupulous . . . .' "

Blue Hills, 477 F. Supp. 2d at 376 (quoting Linkage Corp. v. Trustees of Boston Univ., 425 Mass. 1, 27 (1997)). A prevailing party is entitled to attorneys' fees and costs and from double to treble damages if the violator willfully or knowingly violated the Chapter 93A. Mass. Gen. Laws. ch. 93, § 11.

35

"To the extent a party's Chapter 93A claims are based only on failed common law or statutory grounds, several courts have refused to find Chapter 93A liability." <u>Professional Servs. Group, Inc.</u> v. <u>Town of Rockland</u>, 515 F. Supp. 2d 179, 194 (D. Mass. 2007) (Saris, J.) (citing <u>Waylow</u> v. <u>Glock, Inc.</u>, 975 F. Supp. 370, 382 (D. Mass. 1996) (Woodlock, J.) and <u>Macoviak</u> v. <u>Chase Home Mortg. Corp.</u>, 40 Mass. App. Ct. 755, 760 (1996)); <u>see also</u> <u>Pimental</u> v. <u>Wachovia Mortg. Corp.</u>, 411 F. Supp. 2d 32, 40 (D. Mass. 2006); <u>Egan</u> v. <u>Athol Mem. Hosp.</u>, 971 F. Supp. 37, 47 (D. Mass. 1997) (Gorton, J.).  Here, the Plaintiffs claims derive entirely from the same set of operative facts as their failed common law grounds.  In their opposition, the Plaintiffs do not identify a single fact critical to their Chapter 93A claim that is not also central to their two common law claims. Consequently, viewing the record in the light most favorable to the Plaintiffs, PerkinElmer is entitled to judgment as matter of law on the Plaintiffs' Chapter 93A claim.

Accordingly, the Court GRANTS PerkinElmer's motion for summary judgment on Count III of the Plaintiffs ' Complaint.

**IV.  Conclusion**

For the reasons discussed above, the Court GRANTS PerkinElmer's motion for summary judgment on all three counts. Judgment shall enter for the defendant PerkinElmer. SO ORDERED.

/s/ William G. Young
U.S. District Judge