UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SONORAN SCANNERS, INC. and JOSEPH P. DONAHUE, *Plaintiffs* <br><br> v. <br><br> PERKINELMER, INC., *Defendant.* | ) ) ) ) ) Civil Action No. 06-12090-WGY ) ) ) ) ) |

## DEFENDANT PERKINELMER, INC.'S STATEMENT OF UNDISPUTED FACTS

Pursuant to Local Rule 56.1, defendant PerkinElmer, Inc. ("PerkinElmer") submits this concise statement of material facts that plaintiff Sonoran Scanners, Inc. ("Sonoran") cannot dispute.[1]

## SONORAN SCANNERS

1.      Sonoran was founded in 1997 by Joseph Donahue ("Donahue") to develop and market high speed computer-to-plate ("CTP") technology to large metropolitan newspapers and other graphic arts publishers.  Donahue Decl. ¶ 2 (Docket No. 34).

2.      Donahue funded Sonoran initially through an investment of $1 million of his personal funds.  Donahue Dep. 33:23-34:9.[2]  Donahue later invested an additional $2.5 million of his personal funds, bringing his total investment to $3.5 million.  Donahue Dep. 34:10-13.

---

[1]   This Court previously granted summary judgment dismissing all claims by Sonoran and Joseph P. Donahue.  The First Circuit affirmed in all respects as to Donahue.  The First Circuit affirmed in all respects except one as to Sonoran.  The only remaining claim in this case is Sonoran's claim that PerkinElmer breached an implied obligation to make reasonable efforts to conduct the CTP business.

[2]   "Donahue Dep." refers to the three-volume transcript of Donahue's deposition.  Because all three volumes are consecutively paginated, this statement of facts will cite to the page number only, without reference to the volume number.  Cited pages are included in the record as Exh. 7 to the Declaration of Adam B. Ziegler, counsel for PerkinElmer.  Exhibits to the Ziegler Declaration will be cited herein as "Ziegler Exh."

Donahue also persuaded associates and some employees to loan money to Sonoran.  Donahue

Dep. 65:9-66:2.  He granted equity interests to many employees.  Donahue Dep. 24:15-25:4.

     3.       By late 1998, its first year of operation, Sonoran knew it could not be successful

on its own.  Donahue Dep. 55:24-56:6.  Sonoran knew that potential customers, such as

newspapers, would not be comfortable buying a machine from a small company with few

employees.  Donahue Dep. 56:7-16.   Sonoran started looking for an "industrial partner" in late

1998.  Donahue Dep. 55:19-56:6.

     4.       By June 2000, Sonoran had developed the first prototype of a machine called the

CactusSetter.  Donahue Dep. 55:10-18.   According to Donahue, the prototype was not complete

and not yet ready for sale.  Donahue Email – SS00404 (Ziegler Exh. 46); Donahue Email -

SS04722 (Ziegler Exh. 76).[3]

     5.       By June 2000, Sonoran had "r[u]n very low on cash" and "needed operating

capital."  Donahue Dep. 57:4-9; 64:16-21.  Donahue personally had reached the "threshold of the

amount of money that [he] wanted to put in the company."  Donahue Dep. 57:13-17.  He was

unwilling to invest any more of his own funds in Sonoran.  Donahue Dep. 57:18-20.  He decided

to "cap [his] investment in Sonoran and sell the company."  Donahue Email – SS04722 (Ziegler

Exh. 76).  Because Sonoran was "running low on funds," Donahue and all of the other

executives ceased trying to sell machines and focused instead on trying to sell Sonoran.

Donahue Dep. 50:3-7, 51:5-7, 52:12-14.

     6.       As of June 30, 2000, Sonoran reported liabilities exceeding assets by

approximately $5.1 million, and net losses of $1.7 million.  Sonoran Business Plan (July 2000) –

SS03328 (Ziegler Exh. 13).

---

[3]  The prefixes "SS____" and "PE____" refer to Bates numbers used, respectively, by Sonoran Scanners and
PerkinElmer to mark their document productions.

7.      By the winter of 2000, many of Sonoran's employees were "working for free" or for "deferred wages" due to Sonoran's financial problems.  Donahue Dep. 60:16-61:3.  Sonoran had allowed its workers' compensation and medical coverage plans to lapse for non-payment.  APA, Disclosure Schedule § 2.28; Bogen Dep. 48:5-14.[4]  Sonoran's inability to pay its employees continued from winter of 2000 to May 2001, when the sale to PerkinElmer closed.  Donahue Dep. 60:22-61:3.  Sonoran lost some employees during this time because it could not afford to pay them.  Donahue Dep. 61:4-7.  One former employee had a pending suit against Sonoran for back wages and undistributed equity, and Sonoran feared that others would follow the same course.  Sonoran Pre-Acquisition Disclosures - SS01545-1546 (Ziegler Exh. 14).

8.      Sonoran had "no receivables or work-in-process."  Donahue Email – SS00238 (Ziegler Exh. 15).  It reported liabilities exceeding assets by approximately $5.9 million, and net losses of $2.6 million.  Sonoran Financials – SS00334-338 (Ziegler Exh. 66).

9.      Sonoran could not pay its lenders.  APA, Disclosure Schedule 1.9(a).  Sonoran could not keep up with its trade payables.  Donahue Dep. 106:6-13; Donahue Email - SS02815 (Ziegler Exh. 16); APA, Disclosure Schedule 1.9(a).

## POTENTIAL SALE TO PERKINELMER

10.      Sonoran first reached out to PerkinElmer about a possible transaction in October 2000.  Donahue Dep. 66:5-11.  Initial discussions involved various possible transactions, including an investment by PerkinElmer, a cooperative OEM relationship between the two companies, and a purchase of Sonoran by PerkinElmer.  Donahue Dep. 67:13-68:6.

11.      The CTP technology, according to Sonoran's proposal, complemented PerkinElmer's existing technology and would introduce PerkinElmer to a new market segment.  Donahue Email – SS01359 (Ziegler Exh. 17); Sonoran Presentation to PerkinElmer (November

---

[4]  "Bogen Dep." refers to the transcript of Norm Bogen's deposition, and the cited pages are at Ziegler Exh. 6.

2000) – SS00152-202 (Ziegler Exh. 18).  Sonoran's proposals forecasted large and lucrative

sales and revenues, based on per-unit list price of $495,000 that had been set by Sonoran and

Donahue.  Sonoran Business Plan (July 2000) – SS03327 (Ziegler Exh. 13)

      12.     Sonoran's lead salesperson, Norm Bogen, stated in December 2000 that:

"Forecasting close percentages more than six months out is B.S."  Bogen Email and Forecast –

SS02204-2205 (Ziegler Exh. 19).  The sales forecast attached to his email include forecasted

close percentages through the fourth quarter of 2002.  Bogen Email and Forecast – SS02204-

2205 (Ziegler Exh. 19).  Donahue used Bogen's forecast in his response to PerkinElmer's due

diligence requests.  Sonoran Pre-Acquisition Disclosures – SS01538 (Ziegler Exh. 14).  Donahue

did not disclose that Bogen believed the forecasted close percentages for more than six months

out were baseless.  Sonoran Pre-Acquisition Disclosures – SS01538 (Ziegler Exh. 14).

      13.     PerkinElmer expressed reservations about the product market and about

PerkinElmer's ability to successfully bring the product to that market.  Donahue Email –

SS03580 (Ziegler Exh. 20); Donahue Email – SS01359 (Ziegler Exh. 17); PerkinElmer Email –

SS02164 (Ziegler Exh. 21); PerkinElmer Email – SS00240 (Ziegler Exh. 22); PerkinElmer Email

– SS02161 (Ziegler Exh. 23); Sonoran Pre-Acquisition Disclosures – SS01539 (Ziegler Exh. 14).

      14.     The prototype was not complete, as Donahue acknowledged.  Donahue Email –

SS00404 (Ziegler Exh. 46); PerkinElmer Email – SS00240 (Ziegler Exh. 22).  Just to complete

the prototype, technical issues needed to be addressed and resolved in many areas, including

electronics, software, platen, the front-end opto/mechanical system, the material handling

system, the optic box, UL and laser certification, manuals and packaging.  Sonoran Pre-

Acquisition Disclosures - SS01539 (Ziegler Exh. 14); Sonoran Business Plan – SS03321 (Ziegler

Exh. 13).

15.     Sonoran had made no product offers, received no purchase orders, achieved no sales and acquired no customers.  Donahue Dep. 52:15-16; APA, Disclosure Schedule §§ 2.13(f), 2.17.[5]  Sonoran had no patents.  APA, Disclosure Schedule §§ 2.13(c)-(d).

16.     The target market for the CTP product – major newspapers – was new to PerkinElmer and competition within that market was active and mature.  Sonoran Business Plan (July 2000) – SS03308-3310 (Ziegler Exh. 13); Sonoran Pre-Acquisition Disclosures – SS01544 (Ziegler Exh. 14).  By nature, major newspapers are conservative, risk averse and budget conscious enterprises.  Antley Decl. ¶ 28; Antley Dep. 86:4-13;[6] Iadonisi Dep. 119:2-18.[7]  In addition, the economy was entering a downturn.  Donahue Emails – SS0424 (Ziegler Exh. 77), SS04035 (Ziegler Exh. 24).

17.     All of the potential deal structures proposed by Donahue included contingent payments based on the achievement of specified timing, margin and sales milestones.  Donahue Email – SS03589-3591 (Ziegler Exh. 25).

18.     In November 2000, the dialogue between Sonoran and PerkinElmer began to focus on a potential purchase of Sonoran by PerkinElmer.  Donahue Dep. 68:7-15.

19.     Sonoran's financial situation became increasingly dire in late 2000 and into early 2001.  Donahue Email – SS03580 (Ziegler Exh. 20); Donahue Email – SS01359 (Ziegler Exh. 17); PerkinElmer Email – SS02164 (Ziegler Exh. 21).  Its lease was set to expire, remaining employees were actively seeking other employment, and suppliers were refusing to make shipments.  Donahue Email – SS03580 (Ziegler Exh. 20); Donahue Email – SS00402 (Ziegler Exh. 26).

---

[5]   A copy of the APA is in the record as Ziegler Exh. 1, and the Bill of Sale is included as part of the APA.

[6]   "Antley Dep." refers to the transcript of Guy Antley's deposition, and cited pages are at Ziegler Exh. 4.

[7]   "Iadonisi Dep." refers to the transcript of Daniel Iadonisi's deposition, and cited pages are at Ziegler Exh. 12.

20.     In January 2001, Sonoran asked PerkinElmer for a loan so that Sonoran could pay some of its expenses.  Donahue Email - SS03580 (Ziegler Exh. 20).  Donahue referred to this loan as "keep alive" money in an email he sent to PerkinElmer, which stressed the urgency of Sonoran's situation:  "I also mentioned the need to get 'keep alive' money to us very fast – 'yesterday is not soon enough'."  Donahue Email - SS03580 (Ziegler Exh. 20)

21.     In February 2001, PerkinElmer loaned Sonoran $100,000 so that Sonoran could continue to operate and make limited payments of employee salaries.  Donahue Dep. 70:8-19; Donahue Email – SS03602 (Ziegler Exh. 27); Security Agreements and Promissory Note – PE005842-5854 (Ziegler Exh. 28).

22.     In March 2001, Donahue asked PerkinElmer to contact a Sonoran vendor that was owed $138,000 to inform the vendor that payment would be forthcoming once the acquisition closed.  Donahue Email – SS02815 (Ziegler Exh. 16).  PerkinElmer contacted the vendor, as requested.  Donahue Email – SS02815 (Ziegler Exh. 16).

23.     Sonoran, Donahue and PerkinElmer all were represented by experienced counsel throughout the negotiation of the potential purchase of Sonoran's assets by PerkinElmer. Donahue Email – SS03592 (Ziegler Exh. 78).  During negotiations, Sonoran made no effort to include in the APA any specific provision obligating PerkinElmer to market or sell CTP products.  Donahue Dep. 128:11-129:6.  Sonoran believed that because PerkinElmer was buying the company, it would want to sell the product.  Donahue Dep. 129:4-6.

24.     Sonoran accepted the proposed purchase by PerkinElmer because that was the most "timely" transaction in light of Sonoran's "difficult financial situation."  Donahue Dep. 60:10-15.  Because Sonoran had such limited financial resources, Sonoran gave no consideration

to not going through with the sale, even after learning that not all of its desired former employees had accepted the employment offers made to them by PerkinElmer.  Donahue Dep. 125:5-17.

### SALE OF THE BUSINESS TO PERKINELMER

25.     On May 2, 2001, PerkinElmer purchased sole control and ownership of the assets and business of Sonoran through the APA, a Bill of Sale and other legal documents.  APA. [8]  At the same time, Donahue signed an Employment Agreement (the "EA").  EA.[9]

26.     The APA stated that PerkinElmer would acquire "substantially all of the assets and business associated with the operations of [Sonoran]."  APA, Preliminary Statement.  The APA provided that Sonoran sold, and Perkin Elmer bought, "all right, title and interest in and to all of the assets, properties and rights, whether real, personal, tangible or intangible, of every kind, nature and description" that constituted Sonoran's business.  APA § 1.1(a).  The APA stated that Sonoran relinquished and PerkinElmer acquired, among many other things:  all "right, title and interest in and to all intangible property rights used or useful in conducting the Business," APA § 1.1(a)(iii); all books and records "relating to the Acquired Assets or to the operation of the Business," APA § 1.1(a)(iv); all rights to products and products under development, APA § 1.1(a)(v); and all equipment "used or useful in conducting the Business, APA § 1.1(a)(vi).

27.     The APA required Sonoran to do everything PerkinElmer reasonably requested in order "to more effectively transfer, convey and assign to [PerkinElmer], and to confirm [PerkinElmer's] rights to, title in and ownership of, the Business and all of the Acquired Assets, to put [PerkinElmer] (through its ownership of the Acquired Assets) in actual possession and

---

[8]  A copy of the APA is in the record as Ziegler Exh. 1, and the Bill of Sale is part of the APA.

[9]  A copy of the EA is in the record as Ziegler Exh. 2.

operating control therefore, to assist [PerkinElmer] in exercising all rights with respect thereto and to carry out the purpose and intent of this Agreement." APA § 1.2.

28.     Sonoran represented by executing the APA that from December 31, 2000 to the May 2001 closing date there were no material adverse changes in the business, it had continued to operate the business as it had in the past, and it had not taken any material actions, such as make any loans, incur any debt, enter into any written agreements involving more than $5,000, or make capital expenditures in excess of $10,000 total. APA § 2.6. Sonoran also represented that none of the following types of arrangements had been made: arrangements for the receipt of services or products; arrangements for the performance of any services or delivery of any products; partnership or joint venture arrangements; and arrangements requiring the business to perform services at a loss. APA § 2.9. Sonoran represented that the assets being sold "are, when utilized by a labor force substantially similar to that employed by [Sonoran] on the date hereof, adequate to conduct the Business as currently conducted by [Sonoran]." APA § 2.19.

29.     PerkinElmer's purchase obligations were made subject to several conditions, including the condition that there be no pending or threatened government enforcement action that would "affect adversely the right of [PerkinElmer] to own, operate or control the Acquired Assets or the Business." APA § 5.1(d)(iii). PerkinElmer's purchase obligations also were contingent upon Donahue's execution of a mutually agreed employment agreement and the execution of employment letters by at least seven (or 85%) of the eight identified Sonoran employees. APA § 5.1(i)-(iii).

30.     The parties' post-closing covenants included a covenant giving Sonoran reasonable access to various business records so that Sonoran could verify PerkinElmer's calculation of any earnout payments, and so that Sonoran could "conclude[] its involvement in

the Business prior to the Closing Date."  APA § 6.3(a)(ii).  The parties also agreed to "cooperate

fully with each other to facilitate the transfer of the Acquired Assets from [Sonoran] to

[PerkinElmer] and the operation thereof by [PerkinElmer]."  APA § 6.3(b).

     31.     The APA stated that it "constitutes the entire agreement between the Parties and

supersedes any prior understandings, agreements, or representations."  APA § 8.4.  The APA

prohibited amendments, except in writing and signed by both parties, and stated:  "The language

used in this Agreement shall be deemed to be the language chosen by the Parties hereto to

express their mutual intent, and no rule of strict construction shall be applied against any Party."

APA §§ 8.13.  The APA specified that it would be governed and construed according to

Massachusetts law.  APA § 8.9.

     32.     In exchange for relinquishing all of its assets and its entire CTP business, Sonoran

received an up-front purchase price of $3.5 million and contingent payment rights ("earnouts")

which, if triggered at all, could yield no more than $3.5 million.  APA §§ 1.4, 6.2.

     33.     The $3.5 million purchase price consisted of three components:  (1) a cash

payment directly to Sonoran of $2,788,562.56; (2) debt cancellation of $101,600; and (3)

payments to certain Sonoran creditors totaling $609,837.44.  APA § 1.4.  Sonoran used its cash

payment to pay other creditors and lenders, as well as employees to whom Sonoran owed back

wages.  APA § 1.9, Disclosure Schedule 1.9(a).  Donahue himself received approximately

$700,000 in unpaid compensation and interest.  APA § 1.9, Disclosure Schedule 1.9(a).

     34.     The contingent earnouts were to be determined according to a specific formula in

the APA, with defined triggers.  APA §§ 1.6, 6.2.  That formula had two components.  APA §§

1.6, 6.2.

35.     Under the first component of the formula, if PerkinElmer completed at least ten

sales by May 12, 2003, then Sonoron would receive $1.5 million.  APA § 1.6(a)(ii).  Sonoran

could receive half of this amount – $750,000 – if PerkinElmer completed at least three of the ten

sales by May 12, 2002.  APA § 1.6(a)(i).  Only "Qualifying Product Sales" counted toward these

thresholds, and the APA defined that term as a product sale by PerkinElmer "all of the revenues

for which have been recognized by [PerkinElmer] in accordance with GAAP applied consistently

with the past practice of PerkinElmer."  APA § 1.6.

36.     If PerkinElmer made less than three sales by May 12, 2002 and less than ten sales

by May 12, 2003, then Sonoran was entitled to none of the $1.5 million provided for in APA §

1.6.  APA § 1.6.

37.     Under the second component of the formula, if PerkinElmer achieved specified

gross margins during specified periods, Sonoran would receive a specified percentage of product

revenues, as follows:

- Fiscal 2001 – 0.2% to 1.0% of product revenues if PerkinElmer achieved gross margins of at least 26%;

- Fiscal 2002 – 0.2% to 1.0% of product revenues if PerkinElmer achieved gross margins of at least 36%;

- Fiscal 2003 – 0.2% to 1.0% of product revenues if PerkinElmer achieved gross margins of at least 42%;

- Fiscal 2004 through Q1 2005 – 0.2% to 1.0% of product revenues if PerkinElmer achieved gross margins of at least 44%;

- Q2 2005 through Q1 2006 – 0.2% to 0.6% of product revenues if PerkinElmer achieved gross margins of at least 48%.

APA § 6.2(c).  The APA defined "Product Revenues" as "revenues which are recognized by

[PerkinElmer] in accordance with GAAP…."  APA § 6.2(c)(iv).  Under this component of the

earnout formula, Sonoran was entitled to no payments unless PerkinElmer achieved the minimum gross margin levels specified for each year.  APA § 6.2(c).

38.     The maximum Sonoran could receive under the second component of the formula, if all timing and margin triggers were met, was $2 million.  APA § 6.2(d).  Donahue estimated that reaching the maximum earnout level under this component of the formula would require 400 unit sales and $200 million in revenues within five years.  Donahue Dep. 97:18-98:17.

39.     The maximum Sonoran could receive under both earnout components, if all contingencies were met, was $3.5 million.  APA §§ 1.6(a)(ii), 6.2(d).

40.     The Bill of Sale effected Sonoran's transfer of all of its assets and business to PerkinElmer and reaffirmed Sonoran's covenant and agreement to "take such other action, as may reasonably be necessary to effectively sell, transfer, convey, assign and deliver to, and vest in [PerkinElmer], good, clear and marketable title to the Acquired Assets, and to put [PerkinElmer] in actual possession and operating control thereof, to assist [PerkinElmer] in exercising all rights with respect thereto and to carry out the purpose and intent of the [APA]." Bill of Sale ¶ 2 (APA Exhibit).

41.     As condition to PerkinElmer's purchase of the business, Donahue executed the EA.  APA § 5.1(i)(ii).  The EA specified, among other things, that PerkinElmer could terminate Donahue's employment with or without cause at any time.  EA§ 5(a).  It required Donahue to acknowledge that he "understood that all employees may be subject to transfer or reassignment from time to time, as [PerkinElmer] determines appropriate," although it gave Donahue certain rights if PerkinElmer forced him to relocate away from Tucson.  EA § 2.  It required Donahue to "devote [his] full business time and [his] best professional efforts to the performance of [his] duties and responsibilities…."  EA § 2.  It stated that it was "currently [PerkinElmer's] intention

to establish a Tuscon, AZ based direct laser imaging design center with certain Sonoran Scanner, Inc. personnel." EA § 2. It stated that Donahue's duties would "include those inherent to [his] position and such other duties as may be assigned to [him] from time to time." EA § 2. The EA required Donahue to "devote [his] best efforts to promote the interests and business of PerkinElmer." EA, Exh. 2 ("Employee Patent and Proprietary Information Utilization Agreement").

42.     The EA did not commit PerkinElmer to establish any design center in Tucson, Arizona, or to run any such design center in any particular way, with any specific employees or for any particular period. EA.

## PERKINELMER'S EFFORTS TO CONDUCT THE BUSINESS

43.     After closing, PerkinElmer established a CTP design center in Tucson, Arizona and staffed it initially with former Sonoran employees. PerkinElmer operated its CTP business from May 2001 to October 2004. APA; Donahue Termination Letter - SS00917-925 (Ziegler Exh. 29).

44.     After the acquisition, Sonoran had no role in the development, marketing, or selling of any of the products of PerkinElmer's CTP business. Plaintiff's Interrogatory Response No. 9 (Ziegler Exh. 30).

45.     PerkinElmer made the CTP business part of its Lithography Systems division ("Lithography"), which in turn was part was part of PerkinElmer's Optoelectronics Divison. Plaintiff's Counter-Statement of Facts, Response to ¶¶ 20-21 (Docket No. 33).

46.     Between May 2001 and October 2004, PerkinElmer experienced operating losses of approximately $6.9 million on the CTP business, as follows: (1) losses from operations in 2001 of $891,000; (2) losses from operations in 2002 of $1.2 million; (3) losses from operations

in 2003 of $2.557 million; and (4) losses from operations in 2004 of $2.248 million.  Beeh Decl.

¶ 4;[10] Audit Committee Presentation - PE005869 (Ziegler Exh. 32).  Including the up-front

purchase price of $3.5 million, PerkinElmer's total investment in the CTP business was

approximately $10.4 million.

47.     Just prior to closing, PerkinElmer offered employment to eight of Sonoran's

former employees:  Allen Bahr; Norm Bogen; Donahue; Timothy Ellis; William Hart; Norman

Shaver; Terri Varese; and John Watkins.  APA, Disclosure Schedule § 6.1.  All of the offers

included salaries commensurate with what Sonoran had paid them, together with benefits such as

health insurance.  APA, Disclosure Schedule § 2.24.  All of the employees except for Bogen

accepted their offers from PerkinElmer.  APA, Disclosure Schedule § 6.1.

48.     Bogen's salary at Sonoran had been $100,000, and he expected PerkinElmer to

pay him at least $125,000 based on promises made by Donahue.  Bogen Dep. 74:16-77:1.

PerkinElmer did not accept Bogen's counteroffer demanding both a higher salary and certain

perks, but PerkinElmer did enter into a two-month, $25,000 consulting agreement with Bogen to

assist the transfer of knowledge from Bogen to PerkinElmer.  Consulting Agreement –

PE005823 (Ziegler Exh. 33); Bogen Dep. 74:16-77:1.

49.     Bogen testified that he was not "irreplaceable."  Bogen Dep. 162:17-20.

50.     Donahue declined to offer some of his own incentive compensation to Bogen.

Donahue Dep. 159:6-16; Donahue Email - SS00423 (Ziegler Exh. 34).

51.     In May 2001, PerkinElmer assigned Guy Antley, Lithography's Director of North

American Sales, to lead the CTP sales effort.  Antley Decl. ¶ 2;[11] Antley Dep. 16:1-16:5, 20:13-

---

[10]   "Beeh Decl." refers to the Declaration of Adam Beeh, filed herewith.

[11]   "Antley Decl." refers to the Declaration of Guy Antley, filed herewith.

23.   Antley was a seasoned sales professional with relevant experience selling capital equipment. Antley Dep. 8:7-9:15, 16:22-17:18, 20:13-23; Bogen Dep. 129:16-130:10.   Neither Bogen nor Joseph Barrett (another Sonoran sales representative) had specific newspaper or publishing experience before joining Sonoran.   Bogen Dep. 163:14-16; Barrett Dep. 46:21-25.[12]

52.   On May 15, 2001 Antley, Greg Baxter (General Manager, Lithography), Thomas Keddy (Director of Sales and Marketing, Lithography) and Bill Huseman (Quality Director, Lithography) hosted executives from a potential CTP customer (Harte-Hanks, distributor of The PennySaver) at its Azusa, California facility.   Antley Decl. ¶ 3; Antley Email - SS03040 (Ziegler Exh. 35).   On May 29, 2001, PerkinElmer hosted PennySaver executives a second time at PerkinElmer's Azusa facility.   PennySaver Email – SS02525 (Ziegler Exh. 36).

53.   On May 22 and 23, 2001, Antley visited the Tucson site.   Antley Decl. ¶ 4; Antley Trip Report – PE001239-1246 (Ziegler Exh. 3); Antley Email – SS03073-3074 (Exh. 69). While in Tuscon, Antley saw a product demonstration and met with Donahue, Bogen and others. Antley Decl. ¶ 4; Antley Trip Report - PE001239-1246  (Ziegler Exh. 3).   Antley obtained information about PennySaver ("PennySaver").   Antley Decl. ¶ 4; Antley Trip Report - PE001239-1246 (Ziegler Exh. 3).   Antley obtained technical information about the prototype unit and the modifications that would be necessary to meet PennySaver's requirements.   Antley Decl. ¶ 4; Antley Trip Report - PE001239-1246  (Ziegler Exh. 3).   Antley obtained information about other potential customers, including *The Cleveland Plain Dealer*, *The Washington Post*, *Chicago Tribune*, *Los Angeles Times, St. Petersburg Times, Sun Sentinel,* and a Brazilian newspaper. Antley Decl. ¶ 4; Antley Trip Report - PE001239-1246 (Ziegler Exh. 3).   Antley also obtained contact information for potential customers.   Antley Decl. ¶ 4; Antley Trip Report - PE001239-1246 (Ziegler Exh. 3).   Bogen provided Antley with all of the contact information he had for

---

[12]   "Barrett Dep." refers to the transcript of Joseph Barrett deposition, and cited pages are at Ziegler Exh. 5.

potential customers.  Bogen Dep. 85:2-19, 166:2-4.  Antley also obtained industry information, including information about plate manufacturers, customer sales cycles, industry trade magazines and organizations, and competition.  Antley Decl. ¶ 4; Antley Trip Report - PE001239-1246 (Ziegler Exh. 3).  Antley also obtained information about the "cost of ownership model" that had been used by Sonoran with potential customers.  Antley Decl. ¶ 4; Antley Trip Report - PE001239-1246  (Ziegler Exh. 3).  In addition, Antley and Bogen visited at least two potential customers together.  Bogen Dep. 83:2-85:1.

54.     By the end of June 2001, PerkinElmer signed a lease on a new 8,000 square foot facility and moved the CTP business there.  Donahue Dep. 33:7-11; Donahue Email – SS01953-1957, SS01964 (Ziegler Exhs. 37-38).  The new facility was more expensive than Sonoran's previous facility and had been Donahue's preferred choice among possible new facilities. Donahue Email - SS03909-3910 (Ziegler Exh. 39).  PerkinElmer, in addition to investing in new facilities and the buildout of those facilities, purchased a valuable inventory of parts, including high-priced lasers.  Sonoran Pre-Acquisition Disclosures - SS00292 (Ziegler Exh. 40).

55.     PerkinElmer's marketing and communications groups also shifted into gear shortly after the acquisition, issuing press releases about the acquisition, developing and printing marketing materials, and arranging for a booth, transportation and installation of a demonstration prototype, and attendance at the major industry exposition – the NEXPO – in June 2001. PerkinElmer Email – SS02984 (Ziegler Exh. 41); PerkinElmer email and press release – SS02514 (Ziegler Exh. 42).  PerkinElmer also set up a website for the CTP business.  Antley Dep. 165:14-23; Antley Email – SS04341-4342 (Ziegler Exh. 70).

56.     Donahue stated that he was impressed by the professionalism, enthusiasm and energy of the PerkinElmer marketing and communication team.  Donahue Email – SS03072, SS01929, SS01916  (Ziegler Exhs. 43-45).

57.     According to Donahue, "[t]he contacts made at NEXPO would take at least three months to visit" and "[t]his first impression will be a much stronger statement than a salesman can make without a machine."  Donahue Email - SS00404 (Ziegler Exh. 46).

58.     In June 2001, PerkinElmer attended NEXPO in New Orleans.  Antley Decl. ¶ 5; Antley Trip Report - SS02578-02582 (Ziegler Exh. 3).  PerkinElmer sent at least six employees to the show, including Antley, Baxter, Keddy, Norm Shaver (Product Specialist), Dean Stapleton (Product Specialist), Bill Hart (Senior Electrical Engineer), as well as Bogen, who was under a consulting agreement.  Bogen Dep. 84:18-85:1; Antley Decl. ¶ 5; Antley Trip Report - SS02578-02582 (Ziegler Exh. 3).  At the show, PerkinElmer performed demonstrations of the then-current prototype, which was to be marketed under the name ProForm Metro.  Antley Trip Report - SS02578-02582 (Ziegler Exh. 3).  PerkinElmer also met with representatives from at least six publications or publishing groups, including *The Los Angeles Times, The Milwaukee Journal, The Providence Journal, The Flyer, The Journal Newspapers,* and *La Nacion*, as well as with representatives from at least three plate manufacturers, including American Lithographic, Citiplate, and NAPP (MacDermid).  Antley Decl. ¶ 5; Antley Trip Report - SS02578-02582 (Ziegler Exh. 3).  PerkinElmer also met during the NEXPO with representatives from three significant trade publications:  *Editor and Publisher*, *Newspapers and Technology*, and *The Seybold Report*.  Antley Decl. ¶ 5; Antley Trip Report - SS02578-02582 (Ziegler Exh. 3).

59.     Donahue declined to attend the NEXPO, recognizing that there were budgetary constraints and that PerkinElmer would have sufficient personnel there to represent the product and business.  Donahue Email - SS03901 (Ziegler Exh. 47).

60.     PerkinElmer assigned additional engineering staff from its Azusa facility and hired additional engineering personnel to support the development effort in Tucson.  Donahue Email – SS02124, SS02135, SS02139, SS02143 (Ziegler Exh. 48).

61.     In June 2001, Donahue reported that the original prototype machine was operable "by Tucson engineers only" and that "mod[ifications] need to be made to make [the] machine operable by customer and to resolve outstanding issue[s]."  Donahue Email and Spreadsheet of Tasks – SS02007 (Ziegler Exh. 49).  He provided a detailed list of all of the engineering work that he and his team needed to do to make the prototype customer-ready.  Donahue Email and Spreadsheet of Tasks – SS02005-2019 (Ziegler Exh. 49).  He targeted completion of the prototype by September 2001.  Donahue Email and Spreadsheet of Tasks – SS02005-2019 (Ziegler Exh. 49).

62.     By July 2001, PerkinElmer's Lithography division was not doing well financially. Donahue testified that he learned within three months of the May 2001 closing that the "Lithography business was in deep trouble."  Donahue Dep. 485:8-11.

63.     In July 2001, PerkinElmer continued discussions with PennySaver.  Antley Decl. ¶ 6; Antley Trip Report - SS04137-4140 (Ziegler Exh. 3).  In addition, during the week of July 30, 2001, PerkinElmer met with several potential customers or strategic partners, including *St. Louis Post-Dispatch*, *Milwaukee Journal Sentinel*, American Litho, and *The Cleveland Plain Dealer*.  Antley Decl. ¶ 6; Antley Trip Report – SS04137-4140 (Ziegler Exh. 3).

64.     In July 2001, Donahue disagreed with a plate manufacturer's suggestion that PerkinElmer consider discounting the price of the machine in order to place a machine with the PennySaver: "Please do not be too chummy with American Litho. Their only goal is to sell plates, and if our machine price comes down, their plate prices can stay high." Donahue Email – SS04041 (Ziegler Exh. 50)

65.     By August 2001, PerkinElmer had contacted at least 77 potential customers. Antley Decl. ¶¶ 6-7; Antley Email – SS04165 (Ziegler Exh. 51). These included the following, among others: *LA Times, Dallas Morning News, Washington Post, Newsday, Philadelphia Enquirer, Toronto Star, Houston Chronicle, Orange County Register, St. Petersburg Times, USA Today, Cleveland Plain Dealer, Arizona Republic, Boston Globe, Detroit Free Press, Sun-Sentinel, Miami Herald, Baltimore Sun, San Jose Mercury News, Forth Worth Star-Telegram, San Francisco Chronicle, Denver Rocky Mountain News, Star Tribune, New York Times, Atlanta Journal Constitution, Chicago Sun Times, Milwaukee Journal Sentinel, Hartford Courant, Kansas City Star, St. Louis Post Dispatch, Tampa Tribune, Cincinnati Enquirer, Charlotte Observer, Boston Herald, Virginian Pilot, Sacramento Bee, Palm Beach Post, Richmond Times-Dispatch, Vancouver Sun, Star Ledger, Florida Times-Union,* Gannett Supply Corporation, *Denver Post, Indianapolis Star News, Columbus Dispatch, San Diego Union Tribune,* PennySaver, Upper Vally Printing, *Knoxville News Sentinel, Nashville Tennessean, Chicago Tribune, Savannah Morning News, Grand Rapids Press, Seattle Times, Austin American Statements,* and *The State*. Antley Decl. ¶¶ 6-7; Antley Email – SS04166 (Ziegler Exh. 51); Antley Email – SS02680-2682 (Ziegler Exh. 81).

66.     In September 2001, Donahue reported that the prototype machine was not yet customer-ready. Donahue Email – SS04181-4184 (Ziegler Exh. 52). This first unit, called the

ProForm Metro, was intended for customers that used offset plate technology. Donahue Email – SS04181-4184 (Ziegler Exh. 52). Donahue provided a list of over one hundred open items that represented the "bare minimum for a 'complete machine.'" Donahue Email – SS04181-4184 (Ziegler Exh. 52). He estimated an end date in December 2001 for completion of all the items needed to make the ProForm Metro ready for the first customer. Donahue Email – SS04181-4184 (Ziegler Exh. 52).

67.    In October 2001, during the week of October 10 to October 19, PerkinElmer met with representatives of at least eight potential customers or strategic partners, including *Milwaukee Journal Sentinel, Gary Post Tribune*, American Litho, *Grand Rapids Press, The Washington Post, The Baltimore Sun*, Gannett Newspapers, and Philadelphia Newspapers. Antley Decl. ¶ 8; Antley Trip Report – PE001222-1227 (Ziegler Exh. 3). Meetings with *The Washington Post, The Baltimore Sun*, Gannett Newspapers, and Philadelphia Newspapers included both Antley and Keddy. Antley Decl. ¶ 8; Antley Trip Report - PE001222-1227 (Ziegler Exh. 3).

68.    In late October 2001, the *Milwaukee Journal Sentinel* reported to PerkinElmer that it chose a competitor because PerkinElmer did not offer an "end to end solution" including, for example, plate setters, RIPs, and front-end software. Antley Email – PE001540 (Ziegler Exh. 60).

69.    In November 2001, PerkinElmer met with representatives of Tucson Newspaper, Inc., which ran operations for the *Tucson Citizen* and the *Arizona Daily Star*, and with *News-Press*, *Miami Herald*, *Knoxville News Sentinel*, and the *Arkansas Democrat Gazette*. Antley Decl. ¶ 9; Antley Trip Reports – PE001219-1221, PE001215-1218 (Ziegler Exh. 3).

70.     In December 2001, Antley and Baxter met with PennySaver.  Antley Decl. ¶ 10;

Antley Trip Report – PE001213-1214 (Ziegler Exh. 3).  In addition, in December 2001,

PerkinElmer performed a product demonstration for representatives of the *Philadelphia*

*Enquirer*.  Antley Decl. ¶ 10.

71.     By February 2002, PerkinElmer had assigned Caroline Winn, Optoelectronics'

European Sales Manager, to lead the European sales efforts.  Donahue Email - PE000726-728

(Ziegler Exh. 53).  Donahue testified that Winn seemed like a "capable person."  Donahue Dep.

333:7-334:5.  After his first meeting with Winn and Erick Walker, Optoelectronics' Asia Sales

Manager, Donahue reported:  "I came away with a very, very positive impression of our sales

staff."  Donahue Email - SS04297 (Ziegler Exh. 54).  In February 2002, Donahue also stated:

"[Antley] still has a way to go to get up to speed on graphic arts, but regarding his level of effort,

I give him an A+."  Donahue Email - SS04313 (Ziegler Exh. 55).

72.     By February 2002, Donahue and his Tucson team had not yet completed

development of the first product, the offset plate unit called the ProForm Metro.  Donahue Email

– SS04308 (Ziegler Exh. 56).  Donahue estimated that development of the ProForm Metro would

be complete by April 2002.  Donahue Email – SS04308 (Ziegler Exh. 56).  The CTP business

also was working on development of a second product, designed to work with users of

flexographic plates, which was called the ProForm Flexo.  Donahue Email – SS04308 (Ziegler

Exh. 56).  Donahue estimated in February 2002 that development of the ProForm Flexo could be

completed by September 2002.  Donahue Email – SS04308 (Ziegler Exh. 56).

73.     In February 2002, PerkinElmer also attended the Great Lakes News Conference

and the IFRA Conference and met with at least five potential customers and strategic partners.

Antley Decl. ¶ 11; Antley Trip Reports – SS04295-4296, SS04315-4319 (Ziegler Exh. 3).

PerkinElmer met with representatives of NAPP Systems, Inc. (later known as MacDermid), a significant supplier of flexographic plates.  Antley Decl. ¶ 11; Antley Trip Report – SS04295-4296 (Ziegler Exh. 3).  PerkinElmer also met with representatives of Tucson Newspapers, Inc., Wholesale Printing, Inc., *Dallas Morning News*, and American Color Graphics.  Antley Decl. ¶ 11; Antley Trip Report – SS04315-4319 (Ziegler Exh. 3).  During February, Antley also visited the Tucson site again. Antley Decl. ¶ 11; Antley Trip Report – SS04315-4319 (Ziegler Exh. 3).

74.     In February 2002, a representative of PennySaver informed PerkinElmer by email that PennySaver had decided to purchase a CTP machine from another vendor, not PerkinElmer. PennySaver acknowledged that PerkinElmer's acquisition of the business had "improved financial stability," but explained that it had chosen a competitor for several other reasons, including: (a) there would be "less risk" working with a vendor that had experience in the CTP industry, (b) the competitor's machine was less expensive, which allowed the customer to purchase two machines rather than one, and (c) the competitor's machine was "bundled" with consumable plates, which would ensure ongoing support.  PennySaver Email – SS04320-04321 (Ziegler Exh. 57); Antley Dep. 145:3-146:7.

75.     Donahue later acknowledged that PennySaver "was not an optimum target for the ProForm Metro."  Donahue Email - PE00929 (Ziegler Exh. 58).  Donahue testified that the ProForm Metro was "overkill" for PennySaver because they did not need high speeds.  Donahue Dep. 448:20-449:4.  Donahue also testified that PennySaver wanted PerkinElmer to supply a solid state laser at the same price as a gas laser.  Donahue Dep. 449:14-450:7.

76.     By the end of February 2002, PerkinElmer had discussed potential beta site interest with at least 24 newspapers, including the following:  *Wall Street Journal, USA Today, New York Times, LA Times, Washington Post, Houston Chronicle, Dallas Morning News,*

Philadelphia Newspapers, *Rocky Mountain News, Cleveland Plain Dealer, Atlanta Journal Constitution, Miami Herald, Baltimore Sun, Seattle Times, St. Louis Post Dispatch, San Diego Union Tribune, News-Press, Post and Courier, New Orleans Times-Picayune, Orange County Register,* Knight Ridder, *Quebecor*, Tucson Newspapers, and *San Jose Mercury News*.  Antley Decl. ¶ 12; Antley Email – SS04329-4330 (Ziegler Exh. 82).

77.     In March 2002, a representative of the New York Times Company informed PerkinElmer by email that "nearly all [of his print sites] agreed that the size of the CTP equipment and the need for separate processing equipment was going to be a problem at most of their sites."  New York Times Company Email – PE001504 (Ziegler Exh. 68).  The New York Times Company representative also reported to PerkinElmer that "pairing up with an established front-end software vendor will probably be a necessary hurdle for you to cross before there will be a lot of interest with [his] group."  New York Times Company Email – PE001504 (Ziegler Exh. 68).

78.     In April 2002, during the weeks of April 1 and April 8, PerkinElmer met with representatives of at least seven potential customers or strategic partners, including *Post & Courier*, *The Record*, Citiplate, *Virginia Pilot*, Gannett Newspapers, *Chicago Sun Times*, Wholesale Printing Products, Inc.  Antley Decl. ¶ 13; Antley Trip Report – PE001275-1279 (Ziegler Exh. 3).

79.     In June 2002, during the week of June 17, PerkinElmer met with at least five potential customers, including Newspaper Agency Corporation, *Forth Worth Star-Telegram*, *Dallas Morning News*, Trader Publications, and Citiplate.   Antley Decl. ¶ 14; Antley Trip Report – SS04538-4540 (Ziegler Exh.3).

80.     PerkinElmer also attended the NEXPO show in June 2002 in Orlando.  Antley

Decl. ¶ 15; Antley Trip Report – SS04541-4542 (Ziegler Exh. 3).  At least five PerkinElmer

employees participated, including Antley, Kristen Schnittger, Irene Kartikasari (a sales and

marketing employee), Shaver, Stapleton, and Daniel Obregon.  Antley Decl. ¶ 15; Antley Trip

Report – SS04541-4542 (Ziegler Exh. 3).  Before the show, PerkinElmer sent out approximately

200 invitations to potential customer contacts and made approximately 100 calls to confirm

attendance.  Antley Decl. ¶ 15; Antley Trip Report – SS04541-4542 (Ziegler Exh. 3).

PerkinElmer conducted at least 7 pre-arranged product demonstrations for potential customers,

including *San Francisco Chronicle*, *Newsday*, *New York Times*, *Quebecor*, Scripps Howard

Publishing group, the *Orlando Sentinel*, *Los Angeles Times*, *Virginian-Pilot*, *OC Register*, the

Tucson Newspaper Group, and *Charlotte Observer*.  Antley Decl. ¶ 15; Antley Trip Report –

SS04541-4542 (Ziegler Exh. 3).  PerkinElmer also met representatives from several other

potential customers, including *The Wall Street Journal*, Knight Ridder, Gannett, *Grand Rapids

Press*, and the *Boston Herald*.  Antley Decl. ¶ 15; Antley Trip Report – SS04541-4542 (Ziegler

Exh. 3).  PerkinElmer also spent time with representatives from plate manufacturers, from

Seybold Publications, an industry consultant, and *Editor & Publisher*.  Antley Decl. ¶ 15; Antley

Trip Report – SS04541-4542 (Ziegler Exh. 3).

81.     PerkinElmer marketed the ProForm Flexo in Europe and in the United States,

with Winn taking the lead in Europe while Donahue "really took the lead on" and was "heavily

involved in" ProForm Flexo sales efforts in the United States market.  Donahue Dep. 264:6-16,

257:3-11.

82.     In August 2002, PerkinElmer's ProForm Metro was featured on the cover of an

issue of *Editor & Publisher*, which contained an article that described PerkinElmer's CTP

business and product and quoted Antley discussing the PerkinElmer, its products, and the

industry.  *Editor & Publisher* Cover and Excerpt – SS04644-04651 (Ziegler Exh. 61); Antley

Decl. ¶ 16.  PerkinElmer also met with several potential customers or strategic partners during

August 2002, including New York Times Company, *New York Times*, *Virginian Pilot, Baltimore

Sun*, and Citiplate.  Antley Decl. ¶ 17; Antley Trip Report – SS04630-4634 (Ziegler Exh. 3).

Both Antley and Baxter attended the meeting with Citiplate.  Antley Decl. ¶ 17; Antley Trip

Report – SS04630-4634  (Ziegler Exh. 3).

83.     In September 2002, PerkinElmer met with at least four potential customers or

strategic partners, including Anocoil, Dow Jones Company, *Los Angeles Times*, *Miami

Herald*/Knight Ridder.  Antley Decl. ¶ 18; Antley Trip Reports – SS04684-4685, SS04735-4736

(Ziegler Exh. 3).  In September 2002, PerkinElmer performed a product demonstration for

representatives of MacDermid.  Antley Decl. ¶ 18.

84.     In September 2002, Donahue stated in an email:  "If times were better we'd have

sales now.  And if times were better and we had a better sales dept., we'd have even more sales."

Donahue Email - SS04722 (Ziegler Exh. 76).

85.     In October 2002, PerkinElmer attended two and a half days of the Graph Expo

Trade Show and met with at least six potential customers or strategic partners, including

Anocoil, American Litho, *New York Times*, Citiplate, *Chicago Sun Times*, and *Chicago Tribune*.

Antley Decl. ¶ 19; Antley Trip Report – SS04738-4741 (Ziegler Exh. 3).

86.     In October 2002, PerkinElmer performed a product demonstration for

representatives of the *Gary Post Tribune*.  Antley Decl. ¶ 20.   In December 2002, PerkinElmer

performed another product demonstration for representatives of the *Gary Post Tribune*.  Antley

Decl. ¶ 20.

87.     In February 2003, PerkinElmer met with representatives of the *Los Angeles Times*, K&F International, *Post Tribune*, and *Chicago Tribune*.  Antley Decl. ¶ 21; Antley Trip Reports – SS04904-4908, SS04927-4931 (Ziegler Exh. 3).

88.     In March 2003, PerkinElmer met with representatives of *San Francisco Chronicle*, PennySaver, *Los Angeles Times*, Wholesale Printing Products, *El Paso Times*, *Fort Worth Star Telegram*, *Virginian Pilot, New York Times, Washington Post, Baltimore Sun, Metroland*, *Toronto Star*.   Antley Decl. ¶ 21; Antley Trip Reports – SS04968-4972, SS04995-4998 (Ziegler Exh. 3).  Jerry Jurkiewicz, Optoelectronics' Vice President of Operations, joined Antley for at least four of these meetings, and Dan Iadonisi, Optoelectronics' Global Sales Director, joined Antley for at least three meetings.  Antley Decl. ¶ 21; Antley Trip Report – SS04968-4972, SS04995-4998 (Ziegler Exh. 3).  In March 2003, PerkinElmer performed a product demonstration for representatives of Wholesale Printing Products.  Antley Decl. ¶ 21; PerkinElmer Email – PE001370-1373 (Ziegler Exh. 62).  In April 2003, PerkinElmer met with representatives of *San Jose Mercury News*.  Antley Decl. ¶ 21; Antley Trip Report – SS05086-5087 (Ziegler Exh. 3).

89.     In March 2003, PerkinElmer learned that Wholesale Printing Products ("Wholesale") was "not willing to bet [its] plate production and site success on 'untested' technology" offered by PerkinElmer.  PerkinElmer Email – PE001370-1373 (Ziegler Exh. 62).  Donahue testified that Wholesale had cancelled its purchase order due to "internal Wholesale issues," including the firing of the general manager of the facility and the decision not to do "massive capital expenditures at the time."  Donahue Dep. 455:22-456:11.

90.     In May 2003, PerkinElmer participated in the Computer to Plate Technology Symposium and met with representatives of Knight Ridder, *San Jose Mercury News*, *Plain*

*Dealer, Chicago Tribune,* and *St. Louis Post-Dispatch.*  Antley Decl. ¶ 22; Antley Trip Report –
PE001301-1305 (Ziegler Exh. 3).

91.     In June 2003, PerkinElmer met with representatives of *Miami Herald* and
attended the NEXPO show in Las Vegas.  Antley Decl. ¶ 23; Antley Trip Reports – PE001299-
1300, PE001297-1298 (Ziegler Exh. 3).  During the NEXPO show, PerkinElmer met with
representatives from *New York Times, Los Angeles Times, St. Petersburg Times*, Knight Ridder,
*San Jose Mercury News, Forth Worth Star Telegram*, Denver Newspaper Agency, *Standard
Examiner, Metroland, Plain Dealer, Toronto Star*, and *Orlando Sentinel.*  Antley Decl. ¶ 23;
Antley Trip Report – PE001297-1298 (Ziegler Exh. 3).  PerkinElmer also met with
representatives of several plate manufacturers, including American Litho, Citiplate, Kodak
Polychrome Graphics, AGFA, Anocoil, and IBF.  Both Jurkiewicz and Iadonisi attended the
show in addition to Antley.  Antley Decl. ¶ 23; Antley Trip Report - PE001297-1298 (Ziegler
Exh. 3).

92.     In July 2003, PerkinElmer met with representatives of several potential customers
or strategic partners, including *Newsday*, *Manchester Union Leader*, *Boston Herald*, *Brockton
Enterprise*, *Miami Herald, St. Louis Post-Dispatch*, and Median Supply, which handled
purchasing for at least four newspapers, including the *Plain Dealer*, *Star Ledger*, *Times-
Picayune*, and the *Oregonian.*  Antley Decl. ¶ 24; Antley Trip Report – SS05285-5287 (Ziegler
Exh. 3).  In July 2003, PerkinElmer performed a product demonstration for representatives of the
*Miami Herald.*  Antley Decl. ¶ 24.

93.     In September 2003, during the week of September 28, PerkinElmer met with
representatives of *St. Petersburg Times* and *Kansas City Star* and attended the Graph Expo in
Chicago.  Antley Decl. ¶ 25; Antley Trip Report – PE001289-1290 (Ziegler Exh. 3).

94.     In October 2003, during the week of October 13, PerkinElmer met with representatives from Knight Ridder.  Antley Decl. ¶ 25; Antley Trip Report – SS05380-5381 (Ziegler Exh. 3).  PerkinElmer also attended the IFRA, the leading international trade show, during October 2003.  PerkinElmer Email - PE00726-728 (Ziegler Exh. 53).  PerkinElmer met with MacDermid's European sales team at the IFRA.  PerkinElmer Email - PE00726-728 (Ziegler Exh. 53).

95.     In January 2004, PerkinElmer met with representatives of the *Miami Herald*. Antley Decl. ¶ 26; Antley Trip Report – SS05490-5493 (Ziegler Exh.3).

96.     In February 2004, PerkinElmer met with representatives of MacDermid and MacDermid's customer, the *Manchester Union Leader*, about possible installation of the first ProForm Flexo unit at the *Manchester Union Leader*.  Antley Decl. ¶ 26; Antley Trip Report – SS05664-5665 (Ziegler Exh. 3).  PerkinElmer also met with representatives of the *Miami Herald*, and both Jurkiewicz and Antley attended the meeting.  Antley Decl. ¶ 26; Antley Trip Report – SS05543-5545 (Ziegler Exh. 3); Jurkiewicz Trip Report – SS05547-5548.  PerkinElmer also met with plate manufacturer Anocoil.  Antley Decl. ¶ 26; Antley Trip Report – SS05543-5545 (Ziegler Exh. 3).  PerkinElmer also hosted representatives of *La Republica* and MacDermid for a presentation and demonstration of the ProForm Flexo product.  PerkinElmer Email and Meeting Report – SS05685-5688 (Ziegler Exh. 63)  At least four PerkinElmer employees participated, including Joe Donahue, Norm Shaver, and Caroline Winn.  PerkinElmer Email and Meeting Report – SS05685-5688 (Ziegler Exh. 63)

97.     As of March 2004, PerkinElmer's Tucson staff was busy preparing the prototype ProForm Flexo unit for shipment to and installation at the *Manchester Union Leader*.  Donahue Email - SS05725-5733 (Ziegler Exh. 72).

98.     In April 2004, PerkinElmer met with representatives of several potential customers or strategic partners, including the *Baltimore Sun*, the *Los Angeles Times*, Quebecor World, Citiplate, and R.R. Donnelly.  Antley Decl. ¶ 27; Antley Trip Reports – SS05819-5824, SS05839-5840 (Ziegler Exh. 3).  Also, in April 2004, PerkinElmer met with representatives of the *Manchester Union Leader* to discuss the status of installation and testing of the first ProForm Flexo unit.  Antley Decl. ¶ 27.

99.     In May 2004, PerkinElmer met with representatives of the *Los Angeles Times* and *San Jose Mercury News*.  Antley Decl. ¶ 27; Antley Trip Report – SS05865 (Ziegler Exh.3).

100.    In June 2004, PerkinElmer met with representatives of the Los Angeles Times and attended the 2004 NEXPO trade show in Washington, D.C.  Antley Trip Report – SS05900-5904 (Ziegler Exh. 3).  During the show, PerkinElmer met with representatives of several potential customers or strategic partners, including the *New York Times, Baltimore Sun*, and Citiplate.  Antley Trip Report – SS05900-5904 (Ziegler Exh. 3).  PerkinElmer also met with representatives of the Manchester Union Leader during June 2004 to discuss the performance of the ProForm Flexo unit in place there.  Antley Trip Report – SS05900-5904 (Ziegler Exh. 3)

101.    Donahue testified: "[m]y opinion of [Antley's] effort varied over time;" "[a]t times [Antley] appeared to be diligent and interested;" "[a]t times I was very pleased with the effort [Antley] put forward;" "[a]t that time I was very pleased with how [Antley] worked on that particular presentation, and how willingly he accepted my input."  Donahue Dep. 422:20-24, 423:19-20, 424:22-24.  In March 2003, Shaver told Antley by email that he had done "[a] very nice job yesterday" with a quote to a potential customer.  Shaver Email - PE000953 (Ziegler Exh. 73).

102.    Donahue testified that Antley had made contact with "many, many newspapers" that were potential customers.  Donahue Dep. 427:5-11.  Donahue testified that PerkinElmer executives, including Jerry Jurkiewicz and Dan Iadonisi, sometimes accompanied Antley on visits to potential customers.  Donahue Dep. 389:22-390:2, 443:13-444:5.

103.    Donahue acknowledged, before the May 2, 2001 sale of Sonoran's assets to PerkinElmer, that PerkinElmer had a desire to keep expenses under control.  Donahue Email - SS03580 (Ziegler Exh. 20).  In addition, before the May 2, 2001 sale, Donahue and Baxter discussed the difficult financial conditions facing PerkinElmer.  Donahue Email – SS03887 (Ziegler Exh. 79).

104.    PerkinElmer did not bring a machine to either the 2003 or 2004 NEXPO trade shows.  Donahue testified that this decision was due to the fact that:  "They were under severe budget constraints because of the tanking of the Lithography business, and they didn't – did not want to spend the money."  Donahue Dep. 504:15-21.  Donahue understood at least by 2001 that "uniformly [] business was off in the entire electronic substrate business."  Donahue Dep. 509:12-21.  Donahue testified that this industry-wide financial downturn continued through 2004.  Donahue Dep. 509:22-24.  Donahue testified that the fact that the Lithography division was doing poorly led directly to a reduction of resources available for the CTP business.  Donahue Dep. 499:10-14.

105.    Donahue testified that PerkinElmer laid off "more than a few people" from its Lithography division over a several year period.  Donahue Dep. 407:24-408:7.  During this same time, no one was laid off from the CTP business in Tucson.  Donahue Dep. 408:8-13.  As late as March 2004, PerkinElmer's Tucson staff included at least 10 full-time engineering employees.  Donahue Email - SS05725 (Ziegler Exh. 72).

106.    Donahue testified that he has "no firsthand information from anyone at a major

Metropolitan newspaper in the United States that they did not purchase a machine from

PerkinElmer because of the abilities of PerkinElmer's sales personnel."  Donahue Dep. 527:17-

528:3.

## MARKET REACTION TO PERKINELMER'S EFFORTS

107.    The CTP market was occupied by many competitors, including:  Agfa, Anitec,

Autologic Information International ("Autologic"), Barco Graphics ("Barco"), CreoScitex

("Creo"), Cymbolic Sciences, ECRM, K&F Printing Systems ("K&F"), Krause, Monotype

Systems, Purup-Eskofot, and Western Litho.  Sonoran Business Plan (July 2000) – SS03308-

3310 (Ziegler Exh. 13).

108.    Many of PerkinElmer's potential customers had vendor-vendee relationships with

PerkinElmer's competitors, pursuant to which they purchased plates, machines and processing

equipment.  Antley Decl. ¶ 29.  These potential customers including the following:  New York

Times Co. (Western Litho, Agfa); *Washington Post* (K&F); *Miami Herald* (Purup-Eskofot,

Autologic, Western Litho); *LA Times* (Western Litho); *Virginian Pilot* (Autologic, Agfa, K&F);

*Baltimore Sun* (Western Litho); Metroland (Anitec); *News-Press* (Barco, Agfa, Western Litho,

Autologic); *Arkansas Democrat Gazette* (Agfa); *Dallas Morning News* (Western Litho, Agfa);

American Color Graphics (Creo); *The Record* (Agfa, Purup-Eskofot); Newspaper Agency

Corporation (Barco, Agfa); *Fort Worth Star-Telegram* (Creo, Western Litho, Purup Eskofot);

Trader Publications (Agfa); Dow Jones Company (Western Litho); *Chicago Tribune* (Autologic,

Western Litho); Median Supply Co. (Western Litho, Agfa).  Antley Decl. ¶ 29; Antley Trip

Reports (various) (Ziegler Exh. 3).

109.    The $495,000 list price used by PerkinElmer was set by Sonoran and Donahue

prior to closing.  Donahue Dep. 222:9-223:20.  Donahue did not ever tell anyone at PerkinElmer

that a particular potential customer needed a particular discount to purchase a machine.  Donahue
Dep. 224:8-225:5.  Donahue does not know what price PerkinElmer should have used or what
level of discount would have been appropriate for particular customers.  Donahue Dep. 225:18-
227:9.

110.    As of July 2000, established competitors' reported prices for CactusSetter Class
and CactusSetter Lite Class units ranged from $140,000 to $500,000.  Sonoran Business Plan
(July 2000) – SS03308-3310 (Ziegler Exh. 13).  Donahue testified that most of the Metro class
competitors had machines in the $300,000 to $450,000 range.  Donahue Dep. 222:21-223:2.

111.    PerkinElmer did offer potential customers prices that reflected discounts off the
$495,000 list price, including the following:  $420,000 (approximately 15% discount) to
PennySaver; $425,000 (approximately 14% discount) to *Miami Herald*; $450,000
(approximately 9% discount) to Wholesale Printing Products; $895,000 for two units
(approximately 9.5% discount) to the *Post and Courier*; and $475,000 (approximately 4%
discount) to the New York Times Co.  PerkinElmer Email – SS04357-4359 (Ziegler Exh. 31);
Antley Dep. 66:16-23; PerkinElmer Proposal – PE000544 (Ziegler Exh. 83); PerkinElmer Email
– SS04367-4369 (Ziegler Exh. 85); PerkinElmer Email – PE000828-829 (Ziegler Exh. 84).  In
addition, Antley had authority on his own to offer discounts of up to 10% off list price.  Antley
Dep. 110:14-111:4.

112.    By 2003 or 2004, all of PerkinElmer's competitors had machines that offered
through-put speeds of at least 250-plates-per-hour, which was equivalent to the through-put
speed of the PerkinElmer machine.  Shaver Dep. 76:21-78:18.

113.    At least six potential customers expressed to PerkinElmer industry-related
concerns about diminishing advertising revenues or soft business conditions, including the

following:  *Washington Post*, Gannett, NAPP Systems, Inc. (MacDermid), *Dallas Morning News, Arkansas Democrat Gazette*, Dow Jones Co..  Antley Decl. ¶ 30; Antley Trip Reports – PE01225, PE001226, SS04295, SS04317, PE001218, SS04685 (Ziegler Exh. 3).

114.    At least nine potential customers expressed concern about adopting unproven technology, including the following: *Grand Rapids Press*, Tucson Newspapers, Inc., *Knoxville News Sentinel*, PennySaver, Wholesale Printing Products, Trader Publications, *San Jose Mercury News*, Metroland, and Knight Ridder.  Antley Decl. ¶ 31; Antley Trip Reports - PE001224, PE001219, PE001217, SS04969, SS04972, SS04540, SS05086, SS05381, SS04998 (Ziegler Exh. 3).

115.    At least six potential customers expressed concern that PerkinElmer did not offer an end-to-end solution, including the following:  New York Times Co., *Virginian Pilot*, Gannett, *Knoxville News Sentinel, Post Courier, Milwaukee Journal Sentinel*.  Antley Decl. ¶ 32; Antley Trip Reports – SS04633, SS04995, PE001226, PE001217, PE001275 (Ziegler Exh. 3); Antley Email – PE001540 (Ziegler Exh. 60).

116.    At least eight potential customers expressed a need for the redundancy made possible by a back-up machine, including the following:  Metroland, PennySaver, Tucson Newspapers, Inc., *Post Courier*, Trader Publications, *San Francisco Chronicle, San Jose Mercury News*, Median Supply Co.  Antley Decl. ¶ 33; Antley Trip Reports – SS04997, SS04969, PE001219, PE001275, SS04540, SS04968, SS05087, SS05285 (Ziegler Exh. 3).

117.    At least seven potential customers expressed concerns about the cost of replacement lasers, including the following:  Metroland, PennySaver, *Miami Herald*, New York Times Co., Philadelphia Newspapers, *Post Courier*, and *San Jose Mercury News*.  Antley Decl.

¶ 34; Antley Trip Reports – SS04998, SS04969, PE001300, SS04630, PE001275, PE001227, SS05087 (Ziegler Exh. 3).

118.   Donahue heard "dozens" of times that potential customers had said that the ProForm Metro, at 10,000 pounds and approximately five and a half feet by twelve feet, was "too large for them to accommodate."  Donahue Dep. 217:7-218:5.

119.   Donahue testified that the *Miami Herald* based its decision not to buy a PerkinElmer machine on a number of factors, including the size and weight of the machine and PerkinElmer's unwillingness to accede to the request for "a very extremely discounted machine." Donahue Dep. 444:6-20.  Donahue testified that PerkinElmer had "tried to accommodate [their discount demands] up to a certain point."  Donahue Dep. 444:6-20.

120.   PerkinElmer ultimately sold no ProForm Metro units, and it sold just one ProForm Flexo unit to MacDermid in 2004.  Complaint ¶ 30 (Docket No. 1) (filed Nov. 20, 2006).  MacDermid placed this one unit temporarily with its customer, the *Manchester Union Leader*.  Shaver Dep. 159:5-13.[13]

## PERKINELMER'S DECISION TO CLOSE DOWN ITS CTP BUSINESS

121.   In late July 2004, PerkinElmer evaluated its options for the CTP business.  CTP Stragic Review – PE000251-259 (Ziegler Exh. 64).  In approximately August 2004, PerkinElmer decided to shut down its CTP business.  Falcone Dep. 9:12-14; 117:18-118:19; Jurkiewicz Dep. 164:18-166:2.[14]

---

[13]   "Shaver Dep." refers to the transcript of the deposition of Norm Shaver, and cited pages are at Ziegler Exh. 11.

[14]   "Falcone Dep." and "Jurkiewicz Dep." refer, respectively, to the transcripts of the depositions of Joel Falcone and Jerry Jurkiewicz.  Cited pages are included in the record as Ziegler Exhs. 8 and 10.

122.    Shortly thereafter, PerkinElmer informed Donahue that the company had decided to close the CTP Business and lay off the Tucson personnel, including Donahue.  Donahue Dep. 457:5-12.

123.    On October 15, 2004, PerkinElmer shut down the Tucson site.  Termination Letter to Donahue – SS00917-925 (Ziegler Exh. 29).  On October 21, 2004, PerkinElmer's audit committee was informed of the decision to close the CTP Business.  Audit Committee Presentation – PE005864-5871 (Ziegler Exh. 32); Healy Dep. 47:7-49:22.[15]

124.    By October 2004, PerkinElmer had experienced operating losses of approximately $6.9 million on the CTP business, as follows:  (1) losses from operations in 2001 of $891,000; (2) losses from operations in 2002 of $1.2 million; (3) losses from operations in 2003 of $2.557 million; and (4) losses from operations in 2004 of $2.248 million.  Beeh Decl. ¶ 4; Audit Committee Presentation - PE005869 (Ziegler Exh. 32).

125.    On November 30, 2004, PerkinElmer and MacDermid entered into a Licensing Agreement pursuant to which MacDermid obtained the intellectual property for PerkinElmer's ProForm Flexo machinery.  License Agreement (Ziegler Exh. 65).

126.    As of April 2008, MacDermid had no more than 15 worldwide installations of machines incorporating some of the former PerkinElmer technology, and these installations resulted from sales made on a bundled basis in conjunction with sales of flexographic plates to customers in MacDermid's installed base.  Shaver Dep. 165:16-172:21.

127.    During the relevant period, PerkinElmer's fiscal year end was the Sunday closest to December 31, as follows:  Fiscal 2001 ended on December 30, 2001; Fiscal 2002 ended on December 29, 2002; Fiscal 2003 ended on December 28, 2003; Fiscal 2004 ended on January 2,

---

[15]  "Healy Dep." refers to the transcript of the deposition of John Healy.  Cited pages are included in the record as Ziegler Exh. 9.

2005.  *See* Annual Reports, SEC Forms 10-K, available at www.perkinelmer.com or

www.sec.gov.

128.    Sonoran has argued that PerkinElmer had an "obligation to make a reasonable go

of the business."  Plaintiffs-Appellants Reply Br. at 8 (Ziegler Exh. 74).  Donahue stated that

PerkinElmer enjoyed "wide latitude to run its business."  Plaintiff-Appellant Donahue's Reply in

Support of His Motion for Reconsideration, at 3 (Ziegler Exh. 75).

PERKINELMER, INC.

| | |
|---|---|
| /s/ Jillian B. Hirsch | /s/ T. Christopher Donnelly |
| Jonathan I. Handler (BBO No. 561475) | T. Christopher Donnelly (BBO No. 129930) |
| Jillian B. Hirsch (BBO No. 659531) | Adam B. Ziegler (BBO No. 654244) |
| DAY PITNEY LLP | DONNELLY, CONROY & GELHAAR, LLP |
| One International Place | One Beacon Street, 33rd Floor |
| Boston, MA 02110 | Boston, Massachusetts 02108 |
| (617) 345-4600 | (617) 720-2880 |

January 6, 2010

## CERTIFICATE OF SERVICE

I hereby certify that on January 6, 2010, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to all counsel.

/s/ T. Christopher Donnelly