UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| SONORAN SCANNERS, INC. and JOSEPH P. DONAHUE, *Plaintiffs* v. PERKINELMER, INC., *Defendant.* | ) ) ) ) ) ) ) ) ) ) | Civil Action No. 06-12090-WGY |

## DEFENDANT PERKINELMER, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Jonathan I. Handler
Jillian B. Hirsch
DAY PITNEY LLP
One International Place
Boston, MA 02110
(617) 345-4600

T. Christopher Donnelly
Adam B. Ziegler
DONNELLY, CONROY & GELHAAR, LLP
One Beacon Street, 33rd Floor
Boston, Massachusetts 02108
(617) 720-2880

*Counsel for Defendant PerkinElmer, Inc.*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

SUMMARY OF MATERIAL UNDISPUTED FACTS ...................................................... 2

    A.    Background of Sonoran Scanners and Sale to PerkinElmer ...................... 2

    B.    PerkinElmer's Undisputed Efforts to Conduct the CTP Business .............. 4

    C.    Market Response to PerkinElmer's Efforts ................................................ 5

PROCEDURAL BACKGROUND ....................................................................................... 6

    This Court's Previous Decision Granting Summary Judgment to PerkinElmer ................ 6

    The First Circuit's Decision and Remand ........................................................................ 6

ARGUMENT ....................................................................................................................... 7

    I.    Sonoran Cannot Prove Any Breach By PerkinElmer ............................................ 7

        A.    The APA, as Construed by the First Circuit, Required PerkinElmer to Make No More Than Active, Good Faith Efforts to Conduct its Business 8

        B.    PerkinElmer Made Reasonable Efforts to Conduct its Business ............. 13

        C.    Sonoran's Hindsight Criticism of Isolated Business Decisions Does Not Create a Material Factual Dispute on the Issue of Breach ........................ 14

    II.    Sonoran Cannot Prove Causation ....................................................................... 17

    III.    Sonoran Cannot Prove the Amount of Any Damages With Reasonable Certainty and Without Resort to Speculation ..................................................................... 19

CONCLUSION ................................................................................................................... 20

## INTRODUCTION

All that remains of this case is a single breach of contract claim asserted by plaintiff Sonoran Scanners, Inc. ("Sonoran") against defendant PerkinElmer, Inc. ("PerkinElmer") under an Asset Purchase Agreement (the "APA") that transferred to PerkinElmer sole ownership and control of Sonoran's insolvent start-up business in return for $3.5 million and the possibility of additional payments if PerkinElmer were able to rescue the business and bring it to a significant level of commercial success. Notwithstanding PerkinElmer's compelling economic interest in successfully transforming the CTP business into a revenue-generating operation, its substantial up-front investment, its expenditure of millions more dollars over the next three years, its numerous interactions with potential customers and strategic partners, and its steady application of engineering resources, PerkinElmer's CTP business did not succeed. In late 2004, PerkinElmer closed the CTP business and lost virtually its entire investment.

Two years later, Sonoran and its founder, Joseph P. Donahue ("Donahue"), brought this suit contending that PerkinElmer breached the terms of the APA because it did not make a success of the CTP business. This Court dismissed their claims on summary judgment, and the First Circuit affirmed, with one exception. It concluded the APA imposed on PerkinElmer an implied obligation to use "reasonable efforts" to conduct the CTP business and, because the record had not sufficiently addressed that claim, remanded for this Court to decide whether or not a factual dispute existed sufficient to force the case to trial.

The undisputed facts are dispositive. As a matter of law, there are no triable issues on three essential elements – breach, causation and damages – of Sonoran's last remaining claim.

First, Sonoran cannot dispute that PerkinElmer undertook active, substantial and sustained efforts to conduct the CTP business. Neither the law nor the governing contract requires anything more. Indeed, PerkinElmer's undisputed efforts here far exceeded even those

1

that would be required if the parties had agreed upon an express "best efforts" obligation, which they did not. Nor do Sonoran's differences in business judgment on a few discrete decisions bear on whether there was a lack of reasonable efforts. Sonoran therefore cannot prove breach.

Second, even if the burden of proving breach were so light that Sonoran could carry it merely by complaining about PerkinElmer's good faith business decisions, Sonoran cannot prove causation. Sonoran has no admissible evidence that the business judgments it now questions caused the loss of any contingent payments. This absence of evidence is itself fatal. Equally dispositive is Sonoran's inability to produce any evidence to counter the many undisputed, objective and documented reasons why the CTP business did not succeed, including vigorous competition from other established companies, a substantial economic downturn and prospective customer concerns about the attributes and unproven nature of the product itself.

Third, in no event can Sonoran establish with reasonable certainty, and without resort to speculation, the amount of contingent payments that might have been payable to Sonoran if PerkinElmer had made different personnel, pricing and budgetary decisions.

Because no triable issues exist on any of these essential elements, much less all three of them, this Court should award summary judgment to PerkinElmer on the sole remaining claim.

## SUMMARY OF MATERIAL UNDISPUTED FACTS

A.    Background of Sonoran Scanners and Sale to PerkinElmer

Donahue founded Sonoran in 1997 to develop and market computer-to-plate ("CTP") technology to large newspapers and other graphic arts publishers. DSOF ¶ 1.[1] By June 2000, Sonoran was in a serious financial crisis. DSOF ¶¶ 5-9. After three years of work, Sonoran had only a partially completed prototype and no purchase orders, sales or customers. DSOF ¶¶ 4, 14-

---

[1] "DSOF" refers to Defendant's Statement of Undisputed Facts, which contains a more detailed recitation of all the undisputed facts pertinent to Sonoran's remaining claim, with citations to materials in the record.

15.  Sonoran could not pay its lenders and trade creditors, and it had allowed its workers'

compensation and medical coverage plans to lapse for non-payment.  DSOF ¶¶ 7-9.  Employees

were leaving because Sonoran could not pay them; one former employee had sued for back

wages, and Donahue feared others would follow suit.  DSOF ¶ 7.  Sonoran's key employees had

ceased trying to sell product and were focused instead on trying to sell Sonoran's business.

DSOF ¶ 5.

    In late 2000, Sonoran reached out to PerkinElmer about a potential deal.  DSOF ¶ 10.

Sonoran's proposal forecast large and lucrative sales.  DSOF ¶ 11.  But PerkinElmer expressed

reservations about the market and the difficulty of successfully launching a "product" that was an

incomplete prototype using unproven technology.  DSOF ¶¶ 13-14.  In addition, the CTP market

was new to PerkinElmer; competition within that market was active and mature; the proposed

sales targets – major newspapers – were conservative, risk averse, and budget conscious; and the

economy was entering a downturn.  DSOF ¶¶ 16, 107-08.

    On May 2, 2001, PerkinElmer purchased "all right, title and interest in and to all of the

assets, properties and rights" that constituted Sonoran's business and received "operating

control" and "actual possession" of all CTP business assets.  DSOF ¶¶ 26-30, 40 (APA §§ 1.1(a),

1.2, 5.1(d)(ii), 6.3(b); Bill of Sale).[2]  In exchange for relinquishing all assets and control of the

CTP business, Sonoran received an up-front purchase price of $3.5 million and the possibility of

other payments contingent on the achievement of specific sales and profitability goals

("earnouts").  DSOF ¶¶ 32-39.  These contingent payments were determined by a detailed

formula with two components.  First, if PerkinElmer completed at least ten sales in two years (by

---

[2]  The APA was fully integrated and governed by Massachusetts law.  DSOF ¶ 31.

May 2003), then Sonoran would receive $1.5 million.[3]  DSOF ¶ 35 (APA § 1.6).  Second, if

PerkinElmer achieved specified margins within specified periods, Sonoran would receive up to

1% of revenues.  DSOF ¶ 37 (APA § 6.2(c)).  The maximum, if all contingencies were met, was

$3.5 million.  DSOF ¶ 39.

     At the time of the sale, Donahue became a PerkinElmer employee.  He signed an

employment agreement in which he promised to devote his "best efforts" to perform his assigned

duties and "to promote the interests and business of [PerkinElmer]," and he acknowledged that

he, like other PerkinElmer employees, could be re-assigned or transferred by PerkinElmer and

terminated at any time, with or without cause.  DSOF ¶ 41.

B.     PerkinElmer's Undisputed Efforts to Conduct the CTP Business

     PerkinElmer established a new Tucson-based CTP design center in May 2001, made it

part of the Lithography Systems sub-division of the Optoelectronics Division, and operated the

CTP business until October 2004.  DSOF ¶¶ 43-45.  During this period, PerkinElmer spent over

$6.9 million on the business, virtually all of which constituted operating losses:  (1) losses of

$891,000 in 2001; (2) losses of $1.2 million in 2002; (3) losses of $2.557 million in 2003; and

(4) losses of $2.248 million in 2004.  DSOF ¶ 46.  Including the up-front price, PerkinElmer's

total investment in the business was well over $10 million.  DSOF ¶ 46.

     PerkinElmer's operational, development, production and sales efforts were substantial.

At the outset, PerkinElmer hired engineering personnel, invested in the lease and build-out of

new facilities, purchased valuable inventory, and put its marketing and communications

---

[3]  Sonoran could receive half of this $1.5 million payment if PerkinElmer completed at least three sales in the first year (by May 2002).  DSOF ¶ 35 (APA § 1.6(a)).  The Court should not accept Sonoran's inaccurate assertion that this component of the earnout formula provided for incremental payments of $150,000 for each of the first ten units sold.  In fact, Sonoran was entitled to *none* of the $1.5 million in year one unless PerkinElmer sold *at least* three units; Sonoran was entitled to *none* of the $1.5 million in year two unless PerkinElmer sold *at least* ten units.  DSOF ¶ 36.  An accurate understanding of the earnout formula is essential, because it increases the burden on Sonoran with respect to causation and damages.

resources to work for the new CTP business. DSOF ¶¶ 47, 54-55. PerkinElmer assigned Guy

Antley, Lithography's Director of North American Sales, to lead the U.S. sales effort, and his

efforts were actively assisted by many other executives, including Greg Baxter (General

Manager, Lithography), Thomas Keddy (Director of Sales and Marketing, Lithography), Jerry

Jurkiewicz (Optoelectronics' V.P. of Operations), Dan Iadonisi (Optoelectronics' Global Sales

Director), and Caroline Winn (Optoelectronics' European Sales Manager). DSOF ¶¶ 51-52, 58,

67, 71, 80, 88, 91, 96, 102. Collectively, this team participated in hundreds of in-person

meetings, calls and written communications with potential customers and strategic partners

between 2001 and 2004. DSOF ¶¶ 52-100.[4] PerkinElmer also sent multiple employees to the

key trade show (NEXPO) each year, attended other industry events and garnered a 2002 cover

photo and profile in a leading trade publication. DSOF ¶¶ 58, 73, 80, 82, 85, 90-91, 93-94, 100.

In addition to its three-year sales effort, PerkinElmer also ramped up product

development. It hired Sonoran's engineering staff as well as new engineering personnel and

assigned Azusa-based engineers to supplement the Tucson team. DSOF ¶¶ 47, 60. This team

worked continuously over more than three years on development of the original prototype (the

ProForm Metro) designed for customers using offset plates and on development of a second

product (the ProForm Flexo) for users of flexographic plates. DSOF ¶¶ 60-61, 66, 72, 105.

C.    Market Response to PerkinElmer's Efforts

Throughout the May 2001 to mid-2004 period, prospective customers declined to

purchase from PerkinElmer because of diminishing revenues and difficult business conditions,

PerkinElmer's unproven technology, PerkinElmer's inability to offer an "end-to-end" solution,

the high cost of replacement parts, especially lasers, and the high-end price of PerkinElmer's

---

[4] Many of these meetings and calls are detailed in the DSOF, the Antley Declaration, and the trip reports prepared by Antley as a record of his sales efforts. All of this material is in the summary judgment record.

machine, which made it difficult to afford critical redundancy.  DSOF ¶¶ 68, 74, 77, 113-117.

Despite its extensive efforts, PerkinElmer was unable to sell any ProForm Metro units; in 2004,

it sold one ProForm Flexo unit to MacDermid, a flexo plate supplier that was able to place the

machine temporarily with an existing customer.  DSOF ¶ 120.  On October 15, 2004, after

evaluating its options, PerkinElmer shut down the Tucson site, DSOF ¶ 123, and PerkinElmer

eventually licensed its CTP technology to MacDermid.[5]  DSOF ¶ 125.

## PROCEDURAL BACKGROUND

### This Court's Previous Decision Granting Summary Judgment to PerkinElmer

Sonoran and Donahue filed this action in November 2006 to recover earnout and bonus

payments they contend would have been due if the business had prospered.  In a detailed

published decision, this Court granted summary judgment for PerkinElmer on all claims.

*Sonoran Scanners, Inc. v. PerkinElmer, Inc.*, 590 F. Supp. 2d 196 (D. Mass. 2008).  This Court

observed that the plaintiffs and PerkinElmer were motivated by "identical" economic interests:

"The Plaintiffs stood to benefit from the earnout or bonus provisions only if the CTP Business

succeeded, and if the CTP Business succeeded, PerkinElmer would have realized a substantial

profit." *Id*. at 210.  This Court concluded that PerkinElmer's actions in conducting the business

after the sale were "all undertaken in good faith and motivated solely by legitimate financial

considerations." *Id*. at 209.  These conclusions were supported by "[s]trong undisputed

evidence" and "no evidence" to the contrary. *Id*.

### The First Circuit's Decision and Remand

The First Circuit affirmed summary judgment dismissal, with the exception of the claim

that PerkinElmer had an implied obligation to use "reasonable efforts" to operate the CTP

---

[5]   As of April 2008, MacDermid had no more than 15 worldwide installations of equipment that incorporated some of PerkinElmer's former technology; these installations resulted from sales made to MacDermid's existing customers on a bundled basis in conjunction with sales of MacDermid's flexo plates.  DSOF ¶ 126.

business.  *Sonoran Scanners, Inc. v. PerkinElmer, Inc.*, – F.3d –, Case No. 09-1089 (1st Cir.

2009) (cited hereafter as "Slip Op.").  The Court based its decision on *Eno Sys. v. Eno*, 41

N.E.2d 17 (Mass. 1942), a case that turned on a licensee's "inexcusable inactivity" and total

"abandon[ment]" of the licensed technology.

 The First Circuit recognized that summary judgment might be appropriate on the issue of

whether PerkinElmer had breached this implied obligation, but it deferred to this Court to

determine whether Sonoran could overcome the fact that PerkinElmer invested substantial

resources in the business and had a significant incentive to succeed:

> We recognize, as did the district judge, that <u>PerkinElmer made a
> substantial investment in Sonoran and therefore had a substantial
> interest in making the CTP Business succeed, and so it may not be
> easy for Sonoran to show a lack of reasonable efforts</u>.  Whether on
> remand a trial is required to determine whether PerkinElmer
> utilized reasonable efforts is a matter for the district court to
> consider.

*Id*. at 20 (emphasis added).  The Court of Appeals also recognized that the essential issues of

causation and damages might be susceptible to summary judgment.  *Id.* at 21.  In the absence of

a complete record, the First Circuit deferred to this Court to determine "whether on remand a

trial is required" with respect to all three elements of Sonoran's remaining claim:  (1) lack of

reasonable efforts, (2) causation and (3) damages.  *Id*. at 21.

## ARGUMENT

### I.   Sonoran Cannot Prove Any Breach By PerkinElmer

 The First Circuit recognized, on a limited record, that PerkinElmer's "substantial

investment" in purchasing the CTP business and "substantial interest" in its success would make

it difficult for Sonoran "to show a lack of reasonable efforts" by PerkinElmer.  Slip Op. 20.  The

more complete record now before the Court shows that Sonoran has no possibility of proving "a

lack of reasonable efforts."[6]

The undisputed facts establish that PerkinElmer made active and substantial efforts to conduct its CTP business in good faith and to promote sales for over three years.  Between May 2001 and October 2004, PerkinElmer spent at least $6.9 million on the business; it paid for a new facility, an inventory of expensive parts, and at least 10 full-time engineers; it put its corporate infrastructure (communications, IT, finance, human resources, and legal, among others) to work for the benefit of the business; its sales team made hundreds of contacts and follow-on visits with potential customers and strategic partners; and it advanced the original prototype designed by Sonoran and developed a second CTP product.  These undisputed efforts by PerkinElmer make it impossible for Sonoran to carry its burden of showing that PerkinElmer acted contrary to its own interests by failing to "make reasonable efforts" to conduct the business.

A.      The APA, as Construed by the First Circuit, Required PerkinElmer to Make No More Than Active, Good Faith Efforts to Conduct its Business

The APA, the cases relied on by the First Circuit, and analogous caselaw offer clear guidance that the implied "reasonable efforts" obligation at most required an active effort by PerkinElmer to conduct its CTP business pursuant to its good faith business judgment.  Sonoran concedes that PerkinElmer merely had an "obligation to make a reasonable go of the business," and Donahue admits that PerkinElmer enjoyed "wide latitude to run its business."  (DSOF ¶ 128).  No other standard conforms to the parties' stated intent or the law of implied contractual duties.

By its express terms, the APA transferred to PerkinElmer "all of the assets, properties and rights" that comprised Sonoran's business," DSOF ¶ 26 (APA § 1.1(a)), and put PerkinElmer in "operating control" and "actual possession" of all CTP business assets, DSOF ¶¶ 27-30, 40

---

[6]  The summary judgment standard is well-defined, as expressed previously by this Court.  *See Sonoran Scanners*, 590 F. Supp. 2d at 203-04.

(APA §§ 1.2, 5.1(d)(ii), 6.3(b); Bill of Sale).  There is no dispute that at the time the APA closed,

the CTP business was near collapse due to Sonoran's financial crisis and Donahue's

unwillingness to risk more of his own funds.  DSOF ¶¶ 5-9.  The most the APA could demand

from PerkinElmer – the new and sole owner of the business – was an active, good faith effort to

rescue, develop and promote the CTP business based on its business judgment and discretion.

Although the APA is silent about how PerkinElmer should conduct the CTP business, it

expresses clearly the essence of the transaction:  Sonoran received at closing $3.5 million which

allowed it to free itself from liabilities owed to employees (including over $700,000 owed to

Donahue), lenders and vendors; in turn, PerkinElmer assumed sole ownership and control of the

business, along with the substantial risk that it would be unable to make the business successful.

PerkinElmer clearly had a powerful incentive to succeed, and Sonoran had a modest contingent

interest in that success:  specifically, if PerkinElmer were able to grow the CTP business from no

sales and no revenues to 400 sales and $200 million within five years, a turnaround that would

mean a considerable new source of revenue for PerkinElmer, then Sonoran would receive up to

$3.5 million (1-2% of revenues).  DSOF ¶ 38.  Certainly both parties hoped that the business

would prosper, but each party knew that future success was not guaranteed.

The First Circuit has construed the APA to implicitly require PerkinElmer to make

"reasonable efforts" to conduct the CTP business.[7]  While not expressly defining "reasonable

efforts," the First Circuit made clear that the implied obligation was limited.  It acknowledged

PerkinElmer's right to exercise its business judgment and recognized that "it may not be easy for

Sonoran to show a lack of reasonable efforts" due to PerkinElmer's substantial investment and

---

[7]  PerkinElmer acknowledges that this Court presently is bound by the First Circuit's decision, but it respectfully
maintains that the First Circuit's decision does not accurately reflect or predict Massachusetts law.  PerkinElmer
does not, by any argument in this brief, intend to waive any arguments or rights it may have with respect to the First
Circuit's decision regarding an implied contractual obligation.

interest in making its CTP business succeed.  Slip Op at 20.

The First Circuit based its decision mainly on *Eno*, in which the SJC considered whether a licensor's termination of an exclusive license was warranted given that the licensee, without reason, had stopped exploiting the licensed patent.  41 N.E.2d at 19.  The SJC held that the licensor was right to complain about the licensee's "inexcusable inactivity" because neither the license nor the licensee had any purpose but exploitation of the patent.  *Id.* at 20.  The fact that the licensee had "ceased to manufacture, use and sell the patented process and had abandoned any attempt to put it on the market," led the SJC to conclude that the exclusive license had failed of its purpose and the licensor's termination of the contract was justified.  *Id.*  While the SJC used the phrase "reasonable efforts," the decision makes clear that the licensee's failure to perform its implied obligation was due to its "inexcusable inactivity," not active, good faith efforts criticized in hindsight by the licensor.  *Id.*

Nothing in the cases underlying *Eno* or cited by the First Circuit suggests that the obligation implied into the APA by the First Circuit demands more than PerkinElmer's active, good faith efforts to conduct the business it indisputably owned and controlled.  *See Russo v. Enterprise Realty Co.*, 199 N.E.2d 689 (Mass. 1964) (holding that a seller had breached its implied obligation to construct an access road because it had done nothing to construct the road); *Graustein v. H.P. Hood & Sons, Inc.*, 200 N.E. 14 (Mass. 1936) (finding that promisor breached an obligation to collect accounts receivable by being unwilling and unable to collect outstanding accounts and by having "mislaid, lost or destroyed substantially all" of the essential books and records); *Eastern Mass. St. Ry. Co. v. Union St. Ry. Co.*, 168 N.E. 781 (Mass. 1929) (defendant ceased operating its freight business in breach of an agreement for joint use of a railway and freight terminals); *Proctor v. Union Coal Co.*, 137 N.E. 659 (Mass. 1923) (involving landlord's

complete failure and inability to perform an obligation to give the tenant access to ice for life);

*cf. Wood v. Lucy, Lady-Duff Gordon*, 118 N.E. 214 (N.Y. 1917) (rejecting claim that promisor

was under no duty to make any efforts).  To the extent Sonoran's contract claim has a legal basis,

it rests on *Eno* and these other cases, which involved the inexcusable failure to exert efforts

toward fulfillment of a contract's purpose.

The implied obligation read into the APA by the First Circuit therefore is limited, and

Sonoran bears a heavy burden in trying to show breach.  The obligation requires far less than the

duty that arises when parties agree upon an express "best efforts" provision.[8]  *See Zilg v.*

*Prentice-Hall, Inc.*, 717 F.2d 671, 679-82 (2d Cir. 1983) (reversing district court's judgment that

a publishing contract imposed an implied "best efforts" obligation, and holding that the publisher

had an obligation only to promote the property pursuant to its good faith business judgment).[9]

Moreover, by recognizing PerkinElmer's financial investment and interests, the First Circuit

made clear its presumption that Sonoran would have difficulty proving a "lack of reasonable

---

[8]  Here, the parties chose to impose an express "best efforts" duty on Donahue in his employment agreement but chose not to impose any "best efforts" duty on PerkinElmer in the APA.  DSOF ¶ 41.  This stark difference in language is especially powerful evidence that there was no intention to subject PerkinElmer to anything like a "best efforts" obligation.  *See Allied Comm's Corp. v. Cont. Cellular Corp.*, 821 F.2d 69, 71 (1st Cir. 1987).

[9]  "It is well-settled that, in construing discretionary promotional contracts, courts will not read into them a 'best efforts' or a 'promote fully' clause unless the parties have explicitly bargained for such an obligation."  *Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1575 (2d Cir. 1994).  "In the absence of an explicit 'best efforts' clause or specific promotional obligation, courts are properly reluctant to award lost profits damages for a failure to adequately promote a product where a party's discretionary decisions are exercised pursuant to good faith business judgment."  *Id.* at 1576.  For that matter, even when negotiations *do* produce an *express* "best efforts" clause, courts often define that explicit obligation as demanding no more than "active exploitation in good faith."  *Triple-A Baseball Club Associates v. Northeastern Baseball, Inc.*, 832 F.2d 214, 225 (1st Cir. 1987) ("We have been unable to find any case in which a court found…that a party acted in good faith but did not use its best efforts."); *see also Western Geophysical Co. of Am., Inc. v. Bolt Assocs., Inc.*, 584 F.2d 1164, 1171 (2d Cir. 1978) (affirming construction of "best efforts" clause in exclusive licensing agreement to "indicate[] a degree of discretion" and to require only "active exploitation in good faith")  In short, all that an *express* "best efforts" provision requires is "that the party put its muscles to work to perform with full energy and fairness the relevant express promises and reasonable implications therefrom." *Macksey v. Egan*, 633 N.E.2d 408, 414 (Mass. App. 1994) (citing *Triple-A Baseball*, 832 F.2d at 225-26).  Moreover, even an express "best efforts" provision must take its meaning from the contract in which it appears and cannot be "read in a way that would import a material new promise into an express contract and then go on to find that promise violated."  *Macksey*, 633 N.E.2d at 414.  Thus, summary judgment would be necessary in this case even under an express "best efforts" provision.

efforts." Slip Op. at 20.  In sum, to defeat summary judgment, Sonoran must have evidence of

"inexcusable inactivity" or an unjustified abandonment of efforts, as in *Eno*, 41 N.E.2d at 20.

In briefing filed *after* the First Circuit's decision, Donahue admitted that PerkinElmer

enjoyed "wide latitude to run its business."  DSOF ¶ 128.  And in seeking reversal of this Court's

judgment, Sonoran told the First Circuit that PerkinElmer merely had an "obligation to make a

reasonable go of the business."  DSOF ¶ 128.  Despite these concessions before the First Circuit,

on remand Sonoran may revert to its contention that the APA deprived PerkinElmer – the sole

owner of the business – of discretion to make business decisions about personnel, pricing and

resource allocation.  Sonoran may insist that PerkinElmer had a contractual duty to exert every

conceivable effort, without regard to PerkinElmer's own legitimate interests and good faith

business judgment – a standard of performance that even an express "best efforts" provision

would not demand.[10]

Nothing in the APA, the First Circuit's opinion, or the law of implied obligations

supports Sonoran's view.  While the First Circuit deems it appropriate to imply into the APA a

"reasonable efforts" obligation, this Court must define that implied duty in a manner that

conforms to the "conviction" produced by the APA concerning the parties' mutual intent.

*Spaulding v. Morse*, 76 N.E.2d 137, 139 (Mass. 1947) (permitting implication of a contract term

only if the written "instrument as a whole produces a conviction that a particular result was

fixedly desired although not expressed by formal words").[11]  By no means can the APA be read

---

[10]  *See Triple-A Baseball*, 832 F.2d at 226-28 (holding that an express "best efforts" clause does not require "every conceivable effort;" can be satisfied by "little effort;" does not permit speculation as to what "other steps" could be taken; and does not "strip the [promisor] of its right to give reasonable consideration to its own interests").  Moreover, even extraordinary efforts would not guarantee that Sonoran would realize any contingent payments.

[11]  *See also Town of Allenstown v. Nat'l Cas. Co.*, 36 F.3d 229, 234 (1st Cir. 1994) ("Contracts are, after all, specific agreements to take specific steps to accomplish particular results, and those commitments are the central measure of each party's responsibility. With diffidence, the courts have implied or imposed ancillary obligations (such as good faith requirements or implied warranties) in discrete situations.  But the unlimited implication of new, free-floating duties is a matter in which courts have to be very careful, lest they undo the bargain struck by the parties."); *Allied*

to produce a "clear and undoubted" implication that the parties intended to impose such extraordinary constraints on PerkinElmer's ability to conduct its business consistent with its business judgment. *Stop & Shop, Inc. v. Ganem*, 200 N.E.2d 248, 251 (Mass. 1964) ("Covenants will not be extended by implication unless the implication is clear and undoubted.")

B.     <u>PerkinElmer Made Reasonable Efforts to Conduct its Business</u>

Sonoran cannot dispute that PerkinElmer made active, substantial and sustained efforts to conduct the business, which were more than reasonable and which reflected PerkinElmer's good faith business judgment. As summarized at pages 4-6 above and detailed at DSOF ¶¶ 43-106, from May 2001 through at least July 2004, PerkinElmer devoted substantial efforts and resources to every aspect of the CTP business's operations, including product development and sales. This record indisputably shows substantial, ongoing investment by PerkinElmer of financial ($6.9 million) and organizational resources; hundreds of interactions with potential customers and strategic partners by Antley and other employees and executives; and sustained research and development efforts. The centerpiece of any conceivable trial on this claim necessarily would be an even more comprehensive, step-by-step recreation of everything that PerkinElmer did to develop and promote the CTP business over three-plus years. No such trial is needed. Even on a limited record, the First Circuit cautioned that it "may not be easy" for Sonoran to establish breach in light of PerkinElmer's incentives and investment. Slip Op. at 20. On the more complete record now before this Court, PerkinElmer cannot be accused of "inexcusable inactivity," *Eno*, 41 N.E.2d at 20, a "lack of effort," *Sonoran Scanners* (Slip Op. at 20), or even something less than "active exploitation in good faith," *Triple-A Baseball*, 832 F.2d at 225. This issue clearly is ripe for summary judgment.

---

*Comm's*, 821 F.2d at 70 (noting that the allocation of contract interpretation to judges, rather than juries, "may reflect the fear that leaving juries totally free to imply whatever promises might in a layman's sense seem 'reasonable' would unduly undermine contracting parties' need for certainty").

C.     Sonoran's Hindsight Criticism of Isolated Business Decisions Does Not Create a
       Material Factual Dispute on the Issue of Breach

Sonoran offers only hindsight criticism of a handful of business decisions made over a

three and a half year period by PerkinElmer concerning personnel, pricing and budgeting.  The

Court need not consider whether a juror might plausibly disagree with PerkinElmer's business

judgment on these discrete points.  *See Zilg*, 717 F.2d at 680 (reversing district court's legal

conclusion and holding that "[i]f a trier of fact is free to determine whether such decisions are

sound or valid, the publisher's ability to rely upon its own experience and judgment in marketing

books will be seriously hampered."); *Trecom Bus. Sys., Inc. v. Prasad*, 980 F. Supp. 770, 776-77

(D.N.J. 1997) (granting summary judgment in defendant's favor and stating that the "business

decision to abandon the project … was a good faith decision made after devoting considerable

resources and energy to the project.")

Moreover, PerkinElmer unquestionably had the right to make decisions about personnel,

pricing and resource allocation within the business it owned.  That PerkinElmer made one set of

business decisions where a different owner might have made different decisions does not bear on

whether PerkinElmer exerted reasonable efforts.  The APA did not give Sonoran a right to sue

for breach simply because Sonoran disagreed with some of PerkinElmer's business decisions.

Nevertheless, even a brief analysis of Sonoran's criticisms reveals their lack of merit.

Sonoran's main attack concerns staffing in the sales function.  Sonoran criticizes PerkinElmer's

unwillingness to meet the salary and perk demands of Bogen, Sonoran's former salesman, as

well as PerkinElmer's choice of Antley to lead the sales efforts when Bogen rejected

PerkinElmer's offer.  Both this Court and the First Circuit have already discarded the claim that

the APA required PerkinElmer to hire Bogen.  *Sonoran Scanners*, 590 F. Supp. 2d at 205-06;

*Sonoran Scanners* (Slip Op. at 10-11).  Nor can the APA be construed to require PerkinElmer to

pay Bogen what he demanded, which was more than Sonoran itself had been willing to pay him.

Moreover, PerkinElmer's assignment of Antley was well within the range of acceptable

personnel decisions.  Antley was a seasoned sales professional with relevant experience selling

capital-intensive products.  DSOF ¶ 51.  That he lacked specific newspaper experience hardly

constitutes breach of contract; Bogen did not have specific newspaper or publishing experience

before joining Sonoran.[12]  DSOF ¶ 51.  Nor can Sonoran dispute that Antley put forward a

legitimate, good faith effort to learn the market and product and to meet potential customers.

DSOF ¶¶ 52-102.  Donahue conceded as much during testimony:  acknowledging that Antley

had made "many, many" contacts with potential customers; "[a]t times he appeared to be diligent

and interested;" "[m]y opinion of his effort varied over time;" "[a]t times I was very pleased with

the effort [Antley] put forward;" "[a]t that time I was very pleased with how he worked on that

particular presentation, and how willingly he accepted my input."  DSOF ¶¶ 101-102.  Donahue

even gave Antley an "A+" for his efforts in an email in February 2002.  DSOF ¶ 71.

　　In focusing on PerkinElmer's decision to have Antley lead the U.S. sales efforts, Sonoran

ignores the other personnel PerkinElmer used to pursue sales.  PerkinElmer established a

European effort led by Winn, whom Donahue described as giving him a "very, very positive

impression of our sales staff."  DSOF ¶ 71.  The undisputed record also shows – and Donahue

admitted – that PerkinElmer executives became actively involved in sales efforts, supported

Antley and joined in visits to prospects.  DSOF ¶¶ 51-52, 58, 67, 71, 80, 88, 91, 96, 102.  There

can be no dispute that PerkinElmer made real and substantial sales efforts.

　　Sonoran also levies a barrage of criticism at PerkinElmer's decision not to offer units at

major discounts from the $495,000 price established by Sonoran and Donahue prior to

---

[12]   Bogen himself agreed that he was not "irreplaceable."  DSOF ¶ 49.  The record is undisputed that, despite all of Bogen's alleged talents, skills, and pre-closing efforts, Sonoran did not secure a single purchase order.  DSOF ¶ 15.

PerkinElmer's acquisition.[13]  In fact, PerkinElmer did offer potential customers meaningful

discounts, in some cases up to 15% off the $495,000 list price.  DSOF ¶ 111.[14]  And Donahue

himself resisted at least one early suggestion that PerkinElmer should consider a discounted

price.  DSOF ¶ 64.  Moreover, Donahue squarely admits that he does not know what discount

level would have been appropriate for any customer.  DSOF ¶ 109.  Donahue's admissions aside,

Sonoran has no authority for the idea that a business owner breaches an implied "reasonable

efforts" duty by making a good faith decision about how to price its own products.

Sonoran also complains that PerkinElmer should have allocated more resources to the

CTP business during the three-plus years of its operation.  But no dispute exists that PerkinElmer

paid all of the operating expenses of the business, retained and hired employees, leased a new,

improved facility, supported development of both the ProForm Metro and the ProForm Flexo,

and invested at least $6.9 million before operations were discontinued.  DSOF ¶¶ 46-47.  Indeed,

as Donahue admits, PerkinElmer chose not to lay off employees at the CTP unit even when other

parts of the Lithography division saw major reductions.  DSOF ¶ 105.

These complaints also ignore the fact that PerkinElmer faced serious financial pressures,

which imposed legitimate economic constraints on its decision-making.  DSOF ¶¶ 62, 103-105.

Donahue admitted that the problems he perceived in the business were due to financial problems

facing the Lithography division between 2001 and 2004, as well as an industry-wide financial

downturn.  DSOF ¶ 104.  He acknowledged, even before closing, that PerkinElmer had a need to

keep expenses under control.  DSOF ¶ 103.  Budgets, cost constraints, competing demands for

scarce resources, shifting priorities, market conditions, revenue and margin accountability –

---

[13]   The $495,000 price also was the basis of the revenue projections Sonoran presented to PerkinElmer prior to the
acquisition to justify the purchase and sale of the business.  DSOF ¶ 11.

[14]   Donahue testified, for example, that the Miami Herald wanted "a very extremely discounted machine," and that
PerkinElmer had "tried to accommodate [their discount demands] up to a certain point."  DSOF ¶ 119.

these are the facts of life for all businesses.  Sonoran cannot claim, under any theory of implied

obligation, that the APA was intended to protect Sonoran from the effect of these constraints.

## II.   <u>Sonoran Cannot Prove Causation</u>

Assuming *arguendo* Sonoran could clear the "reasonable efforts" barrier, summary

judgment must still enter because Sonoran cannot prove it would have received any contingent

payments if PerkinElmer had made reasonable efforts.  To avoid summary judgment in a

contract case, a plaintiff "is required to put forth competent evidence" "that he suffered damages

*from the breach*."  *Coll v. PB Diagnostic Sys., Inc.*, 50 F.3d 1115, 1122 (1st Cir. 1995) (emphasis

added).  As this Court recognized previously, there must be a proximate causal connection

between the breach and the damages sought.  *Sonoran Scanners*, 590 F. Supp. 2d at 211.

Sonoran – a company that generated no sales when it owned the CTP business – has not

offered any competent evidence that would allow a fact-finder to conclude that reasonable efforts

by PerkinElmer would have resulted in any sales, never mind sales that would have satisfied the

fixed earnout thresholds of the APA.[15]  Sonoran's failure to offer any proof on causation should

end the inquiry, and compels entry of summary judgment.  But even if the Court were inclined to

look further, the absence of any triable issue on causation is clear.  Reviewing the record in the

light most favorable to Sonoran, this Court previously concluded that PerkinElmer failed to

garner sales for "legitimate reasons," namely "PerkinElmer's unwillingness to discount the 'beta'

versions of the CTP units and concerns by customers about the size and weight of the units."

---

[15]   Confirming its lack of competent evidence, Sonoran delivered to PerkinElmer on December 7, 2009, 19 months after Sonoran's deadline for disclosing experts, a "supplement[al] opinion report" by Paul A. Baier, Sonoran's purported expert witness on marketing, in which Baier claims to have "calculate[d] the number of CTP machines that would in all likelihood have been sold by PerkinElmer had [it] made a reasonable and diligent effort to market" CTP machines from May 2001 to May 2006.  Baier's newly disclosed opinions cannot prevent summary judgment, as they are untimely, prejudicial and fail to meet the standards required by Fed. R. Evid. 702, as construed in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999).  If Sonoran offers testimony from Baier in opposition to summary judgment, then PerkinElmer will address by motion to strike the dispositive fatal flaws in such testimony.

590 F. Supp. 2d at 211.  Other undisputed obstacles to generating sales included the following:

- The fact that the market was competitive, and potential targets were conservative, risk averse and budget conscious.  DSOF ¶¶ 16, 107-108.

- The fact that the product was unproven and, at many times from 2001 to 2004, not fully complete and customer-ready.  DSOF ¶¶ 14, 61, 66, 72, 89, 97, 114.

- The fact of serious revenue pressures in the newspaper industry.  DSOF ¶ 113.

- The fact that PerkinElmer did not offer a "bundled" or "end-to-end" solution that included all necessary equipment and software, as some of its competitors did.  DSOF ¶¶ 68, 74, 77, 115.

- The fact that PerkinElmer had less experience than competitors.  DSOF ¶ 74.

Even if Sonoran could identify sales lost due to PerkinElmer's alleged failure to use reasonable efforts to conduct the business, summary judgment must still enter because Sonoran has no competent proof that any such sales would have occurred at times and at levels sufficient to have triggered the earnout provisions.  The undisputed record demonstrates that PerkinElmer had no reasonable prospect of any sales by May 2002, much less three sales, and no chance of closing ten sales by May 2003.[16]  DSOF ¶¶ 61, 68, 72, 74, 77, 89.  Nor has Sonoran made any effort to show that any lost sales would have met the gross margin triggers.

In sum, Sonoran must do more than merely theorize that sales would have been made "but for" PerkinElmer's breach; it must offer competent proof that (1) PerkinElmer would have closed sales if it had made reasonable efforts to conduct the business, and (2) those sales would have been in the timeframes and at the quantities and margin levels necessary to trigger the

---

[16]  The APA made clear that only sales for which PerkinElmer recognized revenue consistent with GAAP counted toward the earnout triggers.  DSOF ¶¶ 35, 37(APA §§ 1.6, 6.2).  Although the Court need not wade deeply into GAAP rules, revenue generally may not be recognized until:  (1) persuasive evidence of an arrangement exists; (2) delivery has occurred; (3) the price is fixed or determinable; and (4) collectability is reasonably assured.  *See* SEC SAB 101, 104.  To carry its burden, Sonoran would have to prove lost sales that meet all of these criteria.  Given the undisputed record concerning ongoing development (which was not complete even in late 2002), the lengthy sales cycle, the economic and industry conditions, and customers' budgetary limits, Sonoran has no prospect of proving any qualifying sales that were lost in the specified timeframes, much less sales in the numbers and at the margins required by the APA.

contingent payment provisions of the APA.  Sonoran cannot carry this burden.

### III.   Sonoran Cannot Prove the Amount of Any Damages With Reasonable Certainty and Without Resort to Speculation

Assuming, solely for purposes of argument, Sonoran could show triable issues on breach and causation, it has no non-speculative proof of damages.  This Court articulated the legal principle:  "While it is true that a plaintiff need not prove damages with mathematical certainty, damages cannot be recovered when they are remote, speculative, hypothetical, and not within the realm of reasonable certainty."  *Sonoran Scanners*, 590 F. Supp. 2d at 211 (citations omitted).

As this Court already recognized, "to determine damages with some degree of certainty, Sonoran would have to establish (1) the approximate number of sales lost as a result of PerkinElmer's [breach of its reasonable efforts obligation], and (2) the amount of profit generated by each sale."  *Id*.  Sonoran offers no evidence at all on the second prong of this requirement.  Its evidence on the first prong, lost sales, is "simply too speculative to form any reasonably certain conclusion about the number of CTP units the CTP business would have sold within the various earnout periods."  *Id.* at 211-12.  The only evidence Sonoran presented—"[1] Antley's deposition testimony that PennySaver probably would have purchased at least one CTP unit had the price been lower,[17] [2] a December 2000 email (prior to the sale of Sonoran) from Bogen to Donahue forecasting the sale of 24 CTP units in 2002,[18] [3] a projection by a MacDermid executive for the sale of 115 units by some undisclosed date,[19] [4] Donahue's deposition testimony that he expected to sell 400 machines within the earnout period, and [5] sales statistics for the CTP industry as a whole"—is too speculative as a matter of law.  *Id*.

---

[17]   Antley did not testify that PennySaver "probably would have purchased at least one CTP unit had the price been lower."  His actual testimony was that "redundancy" – the need for and ability to buy a back-up machine – was one of several reasons given by PennySaver for choosing a competitor's product.  DSOF ¶ 74.

[18]   In this very email, Bogen described as "B.S." his forecast of potential "close percentages" for anything more than six months into the future.  DSOF ¶ 12.

[19]   In fact, as disclosed in the testimony of a MacDermid employee, as of April 2008, MacDermid had less than 15 machines installed worldwide, and these involved bundled sales made to existing customers.  DSOF ¶ 126.

The First Circuit did not disturb this ruling by this Court.  It did observe that "[t]he district court on summary judgment only addressed causation and damages with respect to the claims related to the covenants of good faith and fair dealing and PerkinElmer's alleged bad faith."  Slip Op. at 21.  But that observation does not change the inadequacy of the five items offered by Sonoran to demonstrate a non-speculative number of units that would have been sold.  Moreover, Donahue's admission that he does not know what discounts were needed to close any sales with potential customers (DSOF ¶ 109) makes it impossible to calculate what margin might have been achieved on any hypothetical "lost" sales.

In sum, Sonoran offers no evidence "within the realm of reasonably certainty" from which a potential fact-finder could determine the number of units that would have been sold within the necessary timeframes and at the required gross margin levels if PerkinElmer had conducted the business differently.  Summary judgment therefore must enter.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment to PerkinElmer.

PERKINELMER, INC.

/s/ Jillian B. Hirsch                                       /s/ T. Christopher Donnelly
Jonathan I. Handler (BBO No. 561475)          T. Christopher Donnelly (BBO No. 129930)
Jillian B. Hirsch (BBO No. 659531)               Adam B. Ziegler (BBO No. 654244)
DAY PITNEY LLP                                           DONNELLY, CONROY & GELHAAR, LLP
One International Place                                   One Beacon Street, 33rd Floor
Boston, MA 02110                                          Boston, Massachusetts 02108
(617) 345-4600                                             (617) 720-2880

January 11, 2010

## CERTIFICATE OF SERVICE

I hereby certify that on January 11, 2010, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification to all counsel.

/s/ T. Christopher Donnelly

20