UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| SONORAN SCANNERS, INC. and JOSEPH P. DONAHUE, *Plaintiffs* | ) ) ) ) | |
| v. | ) ) | Civil Action No. 06-12090-WGY |
| PERKINELMER, INC., *Defendant.* | ) ) ) ) ) | |

## PLAINTIFFS' RESPONSE TO DEFENDANT PERKINELMER, INC.'S STATEMENT OF "UNDISPUTED" FACTS

### CAVEATS

1. The plaintiffs have followed the usual, local practice in responding to Defendant's claims that the below stated "facts" are "undisputed". That is, they have not refused to respond even where the allegation does not state a fact. For instance, where the Defendant has referred to a statement within a document or deposition testimony and stated that the document states x or the deponent testified y, plaintiffs have responded based on whether the document or testimony contains the reference and whether it is taken out of context or not, and have, at times, provided the true fact to aid in the process of deciding summary judgment. The Defendant's Statement is replete with these allegations, and plaintiffs object for the record, because such an allegation, except in so far as it represents a party's admission, is not a statement of fact.

2. The Plaintiffs object that the defendant claims to have made an undisputed statement of fact without agreeing to those undisputed facts which support the Plaintiffs' side of the case (and not the Defendant's). In this instance, oral argument is scheduled to

1

occur soon after the parties' filings, and Defendant has informed the plaintiffs it will not respond to a counter-statement.  As such, the goal being to determine whether there are material facts in dispute, plaintiffs have done their best to include additional relevant facts with record citation in context to their responses to Defendant's statements and have provided a separate Statement of Material Facts limited to the reasonable inferences that can be drawn from the evidence to support Plaintiffs' claim that the Defendant failed to use reasonable efforts to market and sell CTP products. To the extent that the Court declines to recognize the Plaintiffs' statements of fact contained in the plaintiffs' responses below, plaintiffs object.

3.   The Defendant has occasionally included argument in footnotes. The plaintiffs object, and it should be understood that, to the extent that a proposition is stated in a footnote, the plaintiffs deny it.

With these caveats and objections, the plaintiffs respond to Defendant's "statements of undisputed facts", as follows:

1..Sonoran was founded in 1997 by Joseph Donahue ("Donahue") to develop and market high speed computer-to-plate ("CTP") technology to large metropolitan newspapers and other graphic arts publishers.  Donahue Decl. ¶ 2 (Docket No. 34). **Response: Admitted, but "graphic arts" should be understood to include all commercial printing industries. See, Ziegler Exhibit (hereinafter "Z") 13, SS 03286 and 03288 (financial overview section).**

2.  Donahue funded Sonoran initially through an investment of $1 million of his personal funds. Donahue Dep. 33:23-34:9. Donahue later invested an additional $2.5 million of his personal funds, bringing his total investment to $3.5 million.  Donahue Dep. 34:10-13.  Donahue also persuaded associates and some employees to loan money to Sonoran.  Donahue Dep. 65:9-

66:2. He granted equity interests to many employees. Donahue Dep. 24:15-25:4. **Response.**
**Admitted.**

3.   By late 1998, its first year of operation, Sonoran knew it could not be successful on
its own. Donahue Dep. 55:24-56:6. Sonoran knew that potential customers, such as newspapers,
would not be comfortable buying a machine from a small company with few employees.
Donahue Dep. 56:7-16.   Sonoran started looking for an "industrial partner" in late 1998.
Donahue Dep. 55:19-56:6. **Response: Admitted, except that in 1998 an "industrial partner"**
**meant a venture capital investor, joint venture, or purchaser to help market the**
**CactusSetter. Z 13 SS03288. As Sonoran stated, it needed significant funding to ramp up to**
**achieve sales. *Id.* at 03286.**

4. By June 2000, Sonoran had developed the first prototype of a machine called the
CactusSetter.  Donahue Dep. 55:10-18.   According to Donahue, the prototype was not complete
and not yet ready for sale.  Donahue Email – SS00404 (Ziegler Exh. 46); Donahue Email -
SS04722 (Ziegler Exh. 76).[1] **Response: Admitted as to the first sentence. Denied as to the**
**second. The CactusSetter was ready for sale and installation at least as a Beta product by**
**June, 2000. It was successfully operated at the NEXPO show at that time. Z 13 SS 03315.**
**The product which was not complete was the Pro Form Metro. See Response to ¶14 below.**

5. By June 2000, Sonoran had "r[u]n very low on cash" and "needed operating capital."
Donahue Dep. 57:4-9; 64:16-21.  Donahue personally had reached the "threshold of the amount
of money that [he] wanted to put in the company."  Donahue Dep. 57:13-17.  He was unwilling

---

[1]   The prefixes "SS____" and "PE____" refer to Bates numbers used, respectively, by Sonoran Scanners and
PerkinElmer to mark their document productions.

to invest any more of his own funds in Sonoran. Donahue Dep. 57:18-20. He decided to "cap [his] investment in Sonoran and sell the company." Donahue Email – SS0 4722 (Ziegler Exh. 76). Because Sonoran was "running low on funds," Donahue and all of the other executives ceased trying to sell machines and focused instead on trying to sell Sonoran. Donahue Dep. 50:3-7, 51:5-7, 52:12-14. **Response: Admitted, except that the plaintiffs admit that selling Sonoran was one of the options Donahue considered as of June, 2000. See Z 13 SS 03288.**

6. As of June 30, 2000, Sonoran reported liabilities exceeding assets by approximately $5.1 million, and net losses of $1.7 million. Sonoran Business Plan (July 2000) – SS03328 (Ziegler Exh. 13). **Response: Admitted, but, as the document shows, many of the outstanding liabilities on the balance sheet were owed to Donahue and other investors who were executive employees and who agreed to defer part of their salaries, as is common in early stage companies. Donahue Aff. ¶ 3.**

7. By the winter of 2000, many of Sonoran's employees were "working for free" or for "deferred wages" due to Sonoran's financial problems. Donahue Dep. 60:16-61:3. Sonoran had allowed its workers' compensation and medical coverage plans to lapse for non-payment. APA, Disclosure Schedule § 2.28; Bogen Dep. 48:5-14.[2] Sonoran's inability to pay its employees continued from winter of 2000 to May 2001, when the sale to PerkinElmer closed. Donahue Dep. 60:22-61:3. Sonoran lost some employees during this time because it could not afford to pay them. Donahue Dep. 61:4-7. One former employee had a pending suit against Sonoran for back wages and undistributed equity, and Sonoran feared that others would follow the same course. Sonoran Pre-Acquisition Disclosures - SS01545-1546 (Ziegler Exh. 14). **Response: Admitted, except that no employees were literally working for free, some salary had been**

---

[2] "Bogen Dep." refers to the transcript of Norm Bogen's deposition, and the cited pages are at Ziegler Exh. 6.

deferred by Sonoran executives who were stockholders in the company, including Mr.

Bogen and Mr. Donahue. Z 7, pp. 24-25 and Paragraph 6 above.

8. Sonoran had "no receivables or work-in-process." Donahue Email – SS00238 (Ziegler

Exh. 15). It reported liabilities exceeding assets by approximately $5.9 million, and net losses of

$2.6 million. Sonoran Financials – SS00334-338 (Ziegler Exh. 66). **Response: As to the first**

**sentence, admitted, but this was because the CactusSetter was complete and was included**

**as inventory. Donahue Aff. ¶ 3. As to the second sentence, admitted, except that the**

**negative net worth was due to loans made by Mr. Donahue and other owners to fund**

**Sonoran's development. This is common in early stage technology companies and was fully**

**disclosed to PerkinElmer. See Donahue Aff. ¶ 3.**

9. Sonoran could not pay its lenders. APA, Disclosure Schedule 1.9(a). Sonoran could

not keep up with its trade payables. Donahue Dep. 106:6-13; Donahue Email - SS02815 (Ziegler

Exh. 16); APA, Disclosure Schedule 1.9(a). **Response: Denied as to most trade payables. As**

**to the "lenders" it should be noted that all of them were investors in Sonoran with the right**

**to convert into more equity and that none of them asked to do that, and, so, it is denied.**

**Donahue Aff. ¶ 3. Further responding, PerkinElmer knew Sonoran Scanners' financial**

**situation well, knew that it was an early stage company, and knew that approximately $2**

**million had to be advanced at the closing to buy Sonoran Scanners without incurring**

**possible liability for its liabilities. Z 71 SS 20172. It also knew that Donahue was owed**

**approximately $3.5 million in secured debt because of his advances to the company, but it**

**required him to defer this. Z 1, APA Disclosure Schedule 2. 9 (a)(vii).**

10. Sonoran first reached out to PerkinElmer about a possible transaction in October 2000. Donahue Dep. 66:5-11. Initial discussions involved various possible transactions, including an investment by PerkinElmer, a cooperative OEM relationship between the two companies, and a purchase of Sonoran by PerkinElmer. Donahue Dep. 67:13-68:6. **Response: Admitted.**

11. The CTP technology, according to Sonoran's proposal, complemented PerkinElmer's existing technology and would introduce PerkinElmer to a new market segment. Donahue Email – SS01359 (Ziegler Exh. 17); Sonoran Presentation to PerkinElmer (November 2000) – SS00152-202 (Ziegler Exh. 18). Sonoran's proposals forecasted large and lucrative sales and revenues, based on per-unit list price of $495,000 that had been set by Sonoran and Donahue. Sonoran Business Plan (July 2000) – SS03327 (Ziegler Exh. 13) **Response: The statements included in this paragraph are too generally stated to be admitted or denied, so plaintiffs respond as follows: As to the first sentence, PerkinElmer had a Lithography Division which was part of its Optoelectronics Division. Lithography manufactured printed circuit board technology products with (out-dated) analog technology. Optoelectronics made data-imaging equipment and other products for sale in the biotech industries, also based on outdated technology. Sonoran's CactusSetter utilized modern digital technology which could be applied to Lithography's and certain of Optoelectronic's products. Donahue Aff. ¶ 4. As PerkinElmer admitted in October, 2004, it had by then successfully completed the exploitation of Sonoran's technology for its own use in other products, while at the same time refusing to commit the resources necessary to compete in CTP, and, so, it closed down CTP and sold it. D (meaning Dangel Exhibit submitted herewith) 2 (formerly Pl. Ex. 32) PE 005869. As to the second sentence, Sonoran's business plan did provide $495,000 as a list**

price; however, it also recognized that prototypes needed to be placed initially as reference machines. Z 20 SS 03580. The nearly universal practice in the industry, indeed, in industries involving the sale of expensive capital equipment, is to sell the first few machines on a trial basis at very low prices with deferred payments and attractive warranties and parts arrangements in order to gain acceptance in the market-place. This is called a BETA placement. Donahue Aff. ¶ 5;  Bogen Aff. ¶ 3.  Antley's Trip Reports are replete with references to Beta sites, Beta machines and Beta pricing.  There are 58 such references in the reports included in Z 3, 48 explicitly referring to BETA pricing or strategy and 10 referring to such a pricing or policy without using the word BETA[3].  Further, in Antley's Declaration ¶ 12, he admits that he had discussed BETA placements with 24 potential customers by February, 2002. Discounts from list would always be a necessary tool in sales; and, as to BETA placements or sites, it makes no sense to discuss this or propose this to customers, unless the price is a BETA price.  Sonoran projected sales based on the reasonable assumption that sufficient funds, resources and other reasonable efforts would be made to market and sell the product.  In its business plan, which was provided to PerkinElmer, Sonoran stated that $1.2 million was required to market and promote the CactusSetter and that a similar sum was required to build three of the same type of machine for demonstration and sales purposes (because customers required redundancy). Z 18, SS 00190; Donahue Aff. ¶ 5.   However, after the closing, PerkinElmer committed almost nothing to market the product and would not commit the funds to build the necessary machines.  It also, completely irrationally, refused to follow the BETA approach--which included BETA pricing, support, warranty and parts replacement commitments--although, as Mr. Antley recognized, it was the "universal industry practice" (Z 3 SS 04736).

[3]

Its refusal to commit the funds and support necessary to be successful was because PerkinElmer refused to commit to the project. Donahue Aff. ¶ 5. Although it was very familiar with Beta-pricing, as demonstrated in several reports included in Z 3, starting with the August, 2001 Report, management of PerkinElmer refused to Beta price the first machines and to offer appropriate support, warranty and parts replacement deals even though it discussed "Beta placements" with some prospective customers and 24 prospective customers agreed or asked to have the machine on a trial—BETA—basis. See, for example, Z 3 SS 04736. While it was industry practice, as PerkinElmer admitted, to place a first machine for free (to be paid for at a reduced rate later), and to price the machine higher after a successful trial run, PerkinElmer was unwilling to do that. *Id.*; Z 68, PE 001504. Dan Iadonisi, a sales manager who oversaw Antley's activities in 2003, stated that it was necessary to dramatically lower the price of the first machines, then obtained permission to offer a trivial discount, but, although he knew that better discounts were needed, refused to ask PerkinElmer management for more—probably because it would have affected his commission arrangement. Z 84. Both sides agreed that $495,000 was an appropriate list price for the CTP machines, but only after they gained market acceptance for the CTP product.

12. Sonoran's lead salesperson, Norm Bogen, stated in December 2000 that: "Forecasting close percentages more than six months out is B.S." Bogen Email and Forecast – SS02204-2205 (Ziegler Exh. 19). The sales forecast attached to his email include forecasted close percentages through the fourth quarter of 2002. Bogen Email and Forecast – SS02204-2205 (Ziegler Exh. 19). Donahue used Bogen's forecast in his response to PerkinElmer's due diligence requests. Sonoran Pre-Acquisition Disclosures – SS01538 (Ziegler Exh. 14). Donahue

did not disclose that Bogen believed the forecasted close percentages for more than six months

out were baseless.  Sonoran Pre-Acquisition Disclosures – SS01538 (Ziegler Exh. 14).

**Response: This is denied. Mr. Bogen testified that his reference to "BS" was to the**

**requirement in the document that he state the specific buyers who would be buying**

**machines well into the future. He testified that listing the potential purchasers by name was**

**"BS" for a period beyond six months. Those within the six month period included**

**Pennysaver (Harte-Hanks), the Cleveland Plain Dealer, the Los Angeles Times and the**

**Washington Post, all of whom had asked to receive the first machine as BETA purchasers.**

**Antley agreed that those potential customers on Bogen's list were likely purchasers. Z 19.**

**Bogen testified that his opinion and judgment as to the number of machines that would in**

**all probability be sold over the next three years was carefully considered and accurate, in**

**his judgment, and that, while the exact purchasers could not be predicted precisely, the**

**number of units likely to be sold was not BS. See, Bogen Dep. pp 146:3-147:12; Bogen Aff.**

**¶ 4.  Further, it is noteworthy that almost all of the potential purchasers on the list, inside**

**of the six months period and beyond, are among the 24 potential purchasers willing to**

**serve as Beta buyers on the Defendant's 2003 list of customers referenced in ¶75 below.**

13. PerkinElmer expressed reservations about the product market and about

PerkinElmer's ability to successfully bring the product to that market.  Donahue Email –

SS03580 (Ziegler Exh. 20); Donahue Email – SS01359 (Ziegler Exh. 17); PerkinElmer Email –

SS02164 (Ziegler Exh. 21); PerkinElmer Email – SS00240 (Ziegler Exh. 22); PerkinElmer Email

– SS02161 (Ziegler Exh. 23); Sonoran Pre-Acquisition Disclosures – SS01539 (Ziegler Exh. 14).

**Response: Denied. The e-mails referred to in this paragraph do not indicate "reservations".**

**They indicate that Sonoran provided a full, candid and deep explanation of its business and**

9

that PerkinElmer did extensive due diligence. Donahue Affidavit ¶ 5. While one PerkinElmer executive expressed concerns about the purchase of early stage companies generally (Z 20), Mr. Baxter reported that PerkinElmer remained "excited about the opportunity". Z 21. What is remarkable about this purported "fact" is that Defendant has argued that the integration clause in the APA bars this type of evidence.

14. The prototype was not complete, as Donahue acknowledged. Donahue Email – SS00404 (Ziegler Exh. 46); PerkinElmer Email – SS00240 (Ziegler Exh. 22). Just to complete the prototype, technical issues needed to be addressed and resolved in many areas, including electronics, software, platen, the front-end opto/mechanical system, the material handling system, the optic box, UL and laser certification, manuals and packaging. Sonoran Pre-Acquisition Disclosures - SS01539 (Ziegler Exh. 14); Sonoran Business Plan – SS03321 (Ziegler Exh. 13). **Response: Objection—this statement of "fact" does not include a date. Of course, it is true that as of the date of the Business Plan, 1998, three years before PerkinElmer bought the company, the prototype was not complete. This is denied in so far as this statement is claimed as of the closing in May, 2001. The CactusSetter was ready for sale by October, 2000, ten months before the closing. Z 17, SS 01360, ¶ 5. What happened was that Greg Baxter of PerkinElmer mandated a cosmetic re-design of the CactusSetter after the closing in May, 2001, to make it look more like the circuit board printing products Lithography sold. This did not change the machine's functionality—it was unnecessary, and it made the product more expensive, heavier, and bulkier. The new product, called the Pro Form Metro CTP to unite it with Lithography's Metro line, took eight months or so to complete. It is this product, not Sonoran's CactusSetter, which was referred to in the E-mails the defendant has cited. Z 46.**

15. Sonoran had made no product offers, received no purchase orders, achieved no sales and acquired no customers. Donahue Dep. 52:15-16; APA, Disclosure Schedule §§ 2.13(f), 2.17.[4] Sonoran had no patents. APA, Disclosure Schedule §§ 2.13(c)-(d). **Response: Denied. Sonoran had, before the closing, made offers of the CactusSetter to Pennysaver (Hart-Hanke), the Cleveland Plain Dealer, the Los Angeles Times, and the Washington Post, each of whom had asked to be a BETA site and were willing to purchase several machines if the system worked and to allow the machine to be used as references, (Z3, May 24, 2001, PE 001239-46), Bogen Affidavit ¶ 3, but Sonoran, unable to provide the machine to a customer on a BETA basis and then finance the building of a second machine, had received no purchase orders or sales and had acquired no customers. Bogen Aff. ¶ 3. As to patents, Sonoran was in the process of applying for patents which PerkinElmer processed and received. Donahue Aff. ¶ 7.**

16. The target market for the CTP product – major newspapers – was new to PerkinElmer and competition within that market was active and mature. Sonoran Business Plan (July 2000) – SS03308-3310 (Ziegler Exh. 13); Sonoran Pre-Acquisition Disclosures – SS01544 (Ziegler Exh. 14). By nature, major newspapers are conservative, risk averse and budget conscious enterprises. Antley Decl. ¶ 28; Antley Dep. 86:4-13;[5] Iadonisi Dep. 119:2-18.[6] In addition, the economy was entering a downturn. Donahue Emails – SS0424 (Ziegler Exh. 77), SS04035 (Ziegler Exh. 24). **Response: It is admitted that CTP was new to PerkinElmer as of the date of Sonoran's business plan, but it did extensive due diligence before the closing. See, for**

---

[4]  A copy of the APA is in the record as Ziegler Exh. 1, and the Bill of Sale is included as part of the APA.

[5]  "Antley Dep." refers to the transcript of Guy Antley's deposition, and cited pages are at Ziegler Exh. 4.

[6]  "Iadonisi Dep." refers to the transcript of Daniel Iadonisi's deposition, and cited pages are at Ziegler Exh. 12.

example, Z 20-23, Z 14, and Z 71. **The market for CTP was not mature; only 100 units had been sold in the US and 500 worldwide as of October, 2000. Z 13, SS 003291. From 2001-2006 at least 3800 CTP machines were sold in America and abroad.  The market was ready in 2001 and becoming active.  Donahue Aff ¶ 2. The rest of this paragraph is denied, other than it is admitted that Donahue and Baxter wrote each other in late 2001; however, Antley wrote that, although ad revenues were down at newspapers, most newspapers had already budgeted to purchase CTP and that this funding remained in place. Z3 SS 02578-02579.**

17. All of the potential deal structures proposed by Donahue included contingent payments based on the achievement of specified timing, margin and sales milestones.  Donahue Email – SS03589-3591 (Ziegler Exh. 25). **Response: Denied.   PerkinElmer insisted on contingent payments based on CTP sales from the beginning and Donahue acceded to PerkinElmer's terms. Z 71 SS 02172.**

18. In November 2000, the dialogue between Sonoran and PerkinElmer began to focus on a potential purchase of Sonoran by PerkinElmer.  Donahue Dep. 68:7-15. **Response: Admitted.**

19. Sonoran's financial situation became increasingly dire in late 2000 and into early 2001.  Donahue Email – SS03580 (Ziegler Exh. 20); Donahue Email – SS01359 (Ziegler Exh. 17); PerkinElmer Email – SS02164 (Ziegler Exh. 21).  Its lease was set to expire, remaining employees were actively seeking other employment, and suppliers were refusing to make shipments.  Donahue Email – SS03580 (Ziegler Exh. 20); Donahue Email – SS00402 (Ziegler Exh. 26). **Response: "Dire" is too strong a word, because Sonoran had other options (Z 7, p. 62 and 67), so it is denied. It is admitted that by the end of 2000, Sonoran needed to get a**

**deal done with a buyer or other financial partner in order to stay in business through 2001. As Bogen explained to PerkinElmer, Sonoran's financial situation did not allow it to do a Beta placement, as it could not afford to place a machine for little up-front and then have to build more machines to meet an order and so was stalled until additional funding could be found. Bogen Aff. ¶ 3. The lease was expiring, but this was because the building was being sold and the new owner wanted to occupy it. Z 26. A few employees sought other employment, but suppliers were providing products—none had shut off Sonoran's credit or refused to ship. Donahue Aff. ¶ 3.**

20. In January 2001, Sonoran asked PerkinElmer for a loan so that Sonoran could pay some of its expenses. Donahue Email - SS03580 (Ziegler Exh. 20). Donahue referred to this loan as "keep alive" money in an email he sent to PerkinElmer, which stressed the urgency of Sonoran's situation: "I also mentioned the need to get 'keep alive' money to us very fast – 'yesterday is not soon enough'." Donahue Email - SS03580 (Ziegler Exh. 20). **Response: Admitted.**

21. In February 2001, PerkinElmer loaned Sonoran $100,000 so that Sonoran could continue to operate and make limited payments of employee salaries. Donahue Dep. 70:8-19; Donahue Email – SS03602 (Ziegler Exh. 27); Security Agreements and Promissory Note – PE005842-5854 (Ziegler Exh. 28). **Response: Admitted.**

22. In March 2001, Donahue asked PerkinElmer to contact a Sonoran vendor that was owed $138,000 to inform the vendor that payment would be forthcoming once the acquisition closed. Donahue Email – SS02815 (Ziegler Exh. 16). PerkinElmer contacted the vendor, as requested. Donahue Email – SS02815 (Ziegler Exh. 16). **Response: Admitted.**

23. Sonoran, Donahue and PerkinElmer all were represented by experienced counsel throughout the negotiation of the potential purchase of Sonoran's assets by PerkinElmer. Donahue Email – SS03592 (Ziegler Exh. 78). During negotiations, Sonoran made no effort to include in the APA any specific provision obligating PerkinElmer to market or sell CTP products. Donahue Dep. 128:11-129:6. Sonoran believed that because PerkinElmer was buying the company, it would want to sell the product. Donahue Dep. 129:4-6. **Response: Admitted as to the first sentence. As to the second and third sentences, the plaintiffs believed then, as now, that the requirement that PerkinElmer use reasonable efforts to market and sell CTP products was a contract term. 585 F.3d 535, 544-45 (1st Cir. 2009).**

24. Sonoran accepted the proposed purchase by PerkinElmer because that was the most "timely" transaction in light of Sonoran's "difficult financial situation." Donahue Dep. 60:10-15. Because Sonoran had such limited financial resources, Sonoran gave no consideration to not going through with the sale, even after learning that not all of its desired former employees had accepted the employment offers made to them by PerkinElmer. Donahue Dep. 125:5-17. **Response: The first sentence is admitted; the second is denied. As Mr. Donahue testified, he went forward with the closing based on Mr. Baxter's assurance that Mr. Bogen would receive a better offer after the closing. Donahue Dep. pp 115:12-116:23.**

25. On May 2, 2001, PerkinElmer purchased sole control and ownership of the assets and business of Sonoran through the APA, a Bill of Sale and other legal documents. APA.[7] At the same time, Donahue signed an Employment Agreement (the "EA).[8] **Response: admitted.**

---

[7] A copy of the APA is in the record as Ziegler Exh. 1, and the Bill of Sale is part of the APA.

[8] A copy of the EA is in the record as Ziegler Exh. 2.

26. The APA stated that PerkinElmer would acquire "substantially all of the assets and business associated with the operations of [Sonoran]." APA, Preliminary Statement. The APA provided that Sonoran sold, and Perkin Elmer bought, "all right, title and interest in and to all of the assets, properties and rights, whether real, personal, tangible or intangible, of every kind, nature and description" that constituted Sonoran's business. APA § 1.1(a). The APA stated that Sonoran relinquished and PerkinElmer acquired, among many other things: all "right, title and interest in and to all intangible property rights used or useful in conducting the Business," APA § 1.1(a)(iii); all books and records "relating to the Acquired Assets or to the operation of the Business," APA § 1.1(a)(iv); all rights to products and products under development, APA § 1.1(a)(v); and all equipment "used or useful in conducting the Business, APA § 1.1(a)(vi). **Response: Admitted.**

27. The APA required Sonoran to do everything PerkinElmer reasonably requested in order "to more effectively transfer, convey and assign to [PerkinElmer], and to confirm [PerkinElmer's] rights to, title in and ownership of, the Business and all of the Acquired Assets, to put [PerkinElmer] (through its ownership of the Acquired Assets) in actual possession and operating control therefore, to assist [PerkinElmer] in exercising all rights with respect thereto and to carry out the purpose and intent of this Agreement." APA § 1.2. **Response: Admitted.**

28. Sonoran represented by executing the APA that from December 31, 2000 to the May 2001 closing date there were no material adverse changes in the business, it had continued to operate the business as it had in the past, and it had not taken any material actions, such as make any loans, incur any debt, enter into any written agreements involving more than $5,000, or make capital expenditures in excess of $10,000 total. APA § 2.6. Sonoran also represented that none of the following types of arrangements had been made: arrangements for the receipt of

15

services or products; arrangements for the performance of any services or delivery of any products; partnership or joint venture arrangements; and arrangements requiring the business to perform services at a loss. APA § 2.9. Sonoran represented that the assets being sold "are, when utilized by a labor force substantially similar to that employed by [Sonoran] on the date hereof, adequate to conduct the Business as currently conducted by [Sonoran]." APA § 2.19. **Response: Admitted, but it should be noted that Donahue was required to assure some of the matters referred to above personally as well and was required to complete his employment contract as an express requirement of the APA. Ziegler 1, the APA Article 2, ¶¶ 5.2 (d), 8.2, 8.3.**

29. PerkinElmer's purchase obligations were made subject to several conditions, including the condition that there be no pending or threatened government enforcement action that would "affect adversely the right of [PerkinElmer] to own, operate or control the Acquired Assets or the Business." APA § 5.1(d)(iii). PerkinElmer's purchase obligations also were contingent upon Donahue's execution of a mutually agreed employment agreement and the execution of employment letters by at least seven (or 85%) of the eight identified Sonoran employees. APA § 5.1(i)-(iii). **Response: Admitted.**

30. The parties' post-closing covenants included a covenant giving Sonoran reasonable access to various business records so that Sonoran could verify PerkinElmer's calculation of any earnout payments, and so that Sonoran could "conclude[] its involvement in the Business prior to the Closing Date." APA § 6.3(a)(ii). The parties also agreed to "cooperate fully with each other to facilitate the transfer of the Acquired Assets from [Sonoran] to [PerkinElmer] and the operation thereof by [PerkinElmer]." APA § 6.3(b). **Response: Admitted.**

31. The APA stated that it "constitutes the entire agreement between the Parties and supersedes any prior understandings, agreements, or representations." APA § 8.4. The APA prohibited amendments, except in writing and signed by both parties, and stated: "The language used in this Agreement shall be deemed to be the language chosen by the Parties hereto to express their mutual intent, and no rule of strict construction shall be applied against any Party." APA §§ 8.13. The APA specified that it would be governed and construed according to Massachusetts law. APA § 8.9. **Response: Admitted.**

32. In exchange for relinquishing all of its assets and its entire CTP business, Sonoran received an up-front purchase price of $3.5 million and contingent payment rights ("earnouts") which, if triggered at all, could yield no more than $3.5 million. APA §§ 1.4, 6.2. **Response: It is denied that Sonoran received $3.5 million dollars up-front. Donahue Affidavit ¶3.**

33. The $3.5 million purchase price consisted of three components: (1) a cash payment directly to Sonoran of $2,788,562.56; (2) debt cancellation of $101,600; and (3) payments to certain Sonoran creditors totaling $609,837.44. APA § 1.4. Sonoran used its cash payment to pay other creditors and lenders, as well as employees to whom Sonoran owed back wages. APA § 1.9, Disclosure Schedule 1.9(a). Donahue himself received approximately $700,000 in unpaid compensation and interest. APA § 1.9, Disclosure Schedule 1.9(a). **Response: It is denied that Sonoran received anything and that the "debt cancellation" was only $101,600. Z 7, Donahue Aff. ¶ 3.**

34. The contingent earnouts were to be determined according to a specific formula in the APA, with defined triggers. APA §§ 1.6, 6.2. That formula had two components. APA §§ 1.6, 6.2. **Response: Admitted.**

35. Under the first component of the formula, if PerkinElmer completed at least ten sales by May 12, 2003, then Sonoron would receive $1.5 million. APA § 1.6(a)(ii). Sonoran could receive half of this amount – $750,000 – if PerkinElmer completed at least three of the ten sales by May 12, 2002. APA § 1.6(a)(i). Only "Qualifying Product Sales" counted toward these thresholds, and the APA defined that term as a product sale by PerkinElmer "all of the revenues for which have been recognized by [PerkinElmer] in accordance with GAAP applied consistently with the past practice of PerkinElmer." APA § 1.6. **Response: Admitted.**

36. If PerkinElmer made less than three sales by May 12, 2002 and less than ten sales by May 12, 2003, then Sonoran was entitled to none of the $1.5 million provided for in APA § 1.6. APA § 1.6. **Response: Admitted.**

37. Under the second component of the formula, if PerkinElmer achieved specified gross margins during specified periods, Sonoran would receive a specified percentage of product revenues, as follows:  Fiscal 2001 – 0.2% to 1.0% of product revenues if PerkinElmer achieved gross margins of at least 26%;

Fiscal 2002 – 0.2% to 1.0% of product revenues if PerkinElmer achieved gross margins of at least 36%;

Fiscal 2003 – 0.2% to 1.0% of product revenues if PerkinElmer achieved gross margins of at least 42%;

Fiscal 2004 through Q1 2005 – 0.2% to 1.0% of product revenues if PerkinElmer achieved gross margins of at least 44%;

Q2 2005 through Q1 2006 – 0.2% to 0.6% of product revenues if PerkinElmer achieved gross margins of at least 48%.

APA § 6.2(c). The APA defined "Product Revenues" as "revenues which are recognized by [PerkinElmer] in accordance with GAAP…." APA § 6.2(c)(iv). Under this component of the earnout formula, Sonoran was entitled to no payments unless PerkinElmer achieved the minimum gross margin levels specified for each year. APA § 6.2(c). **Response: Admitted, and it is because of these provisions and those stated in Paragraph 36 above that it can not be argued that the parties were in alignment, let alone "perfect alignment" during the plaintiffs' earnout years. The plaintiffs' payments were due from the gross while PerkinElmer's payments were from net profits. As demonstrated in Z 73 pp. 1-5, PerkinElmer's incentives were to go slow (as Justice Boudin put it in the oral argument) while plaintiffs wanted as many sales as could be generated over the five year period.**

38. The maximum Sonoran could receive under the second component of the formula, if all timing and margin triggers were met, was $2 million. APA § 6.2(d). Donahue estimated that reaching the maximum earnout level under this component of the formula would require 400 unit sales and $200 million in revenues within five years. Donahue Dep. 97:18-98:17. **Response: Admitted as to the number of machines. Otherwise, denied that Donahue so testified.**

39. The maximum Sonoran could receive under both earnout components, if all contingencies were met, was $3.5 million. APA §§ 1.6(a)(ii), 6.2(d). **Response: Admitted.**

40. The Bill of Sale effected Sonoran's transfer of all of its assets and business to PerkinElmer and reaffirmed Sonoran's covenant and agreement to "take such other action, as may reasonably be necessary to effectively sell, transfer, convey, assign and deliver to, and vest

in [PerkinElmer], good, clear and marketable title to the Acquired Assets, and to put
[PerkinElmer] in actual possession and operating control thereof, to assist [PerkinElmer] in
exercising all rights with respect thereto and to carry out the purpose and intent of the [APA]."
Bill of Sale ¶ 2 (APA Exhibit). **Response: Admitted.**

41. As condition to PerkinElmer's purchase of the business, Donahue executed the EA.
APA § 5.1(i)(ii). The EA specified, among other things, that PerkinElmer could terminate
Donahue's employment with or without cause at any time. EA§ 5(a). It required Donahue to
acknowledge that he "understood that all employees may be subject to transfer or reassignment
from time to time, as [PerkinElmer] determines appropriate," although it gave Donahue certain
rights if PerkinElmer forced him to relocate away from Tucson. EA § 2. It required Donahue to
"devote [his] full business time and [his] best professional efforts to the performance of [his]
duties and responsibilities…." EA § 2. It stated that it was "currently [PerkinElmer's] intention
to establish a Tuscon, AZ based direct laser imaging design center with certain Sonoran Scanner,
Inc. personnel." EA § 2. It stated that Donahue's duties would "include those inherent to [his]
position and such other duties as may be assigned to [him] from time to time." EA § 2. The EA
required Donahue to "devote [his] best efforts to promote the interests and business of
PerkinElmer." EA, Exh. 2 ("Employee Patent and Proprietary Information Utilization
Agreement"). **Response: Admitted.**

42. The EA did not commit PerkinElmer to establish any design center in Tucson,
Arizona, or to run any such design center in any particular way, with any specific employees or
for any particular period. EA. **Response: Denied. The EA required PerkinElmer to consult
with Donahue over pricing of CTP units and for Donahue, as the General Manager of the
Tucson CTP unit, to have general overall control of the CTP operation subject to his**

reporting to Greg Baxter.  **Further, as expressed in the EA, it was the parties' intention that the Tucson center be established, and the APA required that offers of employment be made to all or almost all of Sonoran's Tucson employees when PerkinElmer bought the business.**

43. After closing, PerkinElmer established a CTP design center in Tucson, Arizona and staffed it initially with former Sonoran employees.  PerkinElmer operated its CTP business from May 2001 to October 2004.  APA; Donahue Termination Letter - SS00917-925 (Ziegler Exh. 29). **Response: Admitted.**

44. After the acquisition, Sonoran had no role in the development, marketing, or selling of any of the products of PerkinElmer's CTP business.  Plaintiff's Interrogatory Response No. 9 (Ziegler Exh. 30). **Response: Admitted in the corporate sense.  However, as Bogen's affidavit states, he was hired briefly as a consultant and advised PerkinElmer to employ the usual BETA approach used by all industry companies to place the first few machines.  The details of his advice are provided in his affidavit, Bogen Affidavit¶ 3, deposition testimony Bogen Dep. 135-140, and Z3 PE 001239-46.  Mr. Bogen offered to be of service indefinitely, but Antley and Baxter did not avail themselves of his services.  Bogen Dep. 86.  The BETA approach was described by him to Antley on May 24, 2001, (Z3 PE 001240) and was subsequently mentioned 48 times in Antley's Trip Reports, Z 3, and an additional 10 times in the Reports without reference to it by name (using such terms as free machine, trial period and so forth).  Additionally, Mr. Donahue and Mr. Shaver, formerly of Sonoran, participated in efforts to sell machines to MacDermid and, when asked, provided information and assistance to the sales effort,  Donahue Affidavit ¶8; Shaver Affidavit ¶ 1, as did Mr. Bogen with Pennysaver. Bogen Affidavit¶ 3, Z 35, Z 69.**

45. PerkinElmer made the CTP business part of its Lithography Systems division ("Lithography"), which in turn was part was part of PerkinElmer's Optoelectronics Division. Plaintiff's Counter-Statement of Facts, Response to ¶¶ 20-21 (Docket No. 33). **Response: Admitted.**

46. Between May 2001 and October 2004, PerkinElmer experienced operating losses of approximately $6.9 million on the CTP business, as follows:  (1) losses from operations in 2001 of $891,000; (2) losses from operations in 2002 of $1.2 million; (3) losses from operations in 2003 of $2.557 million; and (4) losses from operations in 2004 of $2.248 million.  Beeh Decl. ¶ 4;[9] Audit Committee Presentation - PE005869 (Ziegler Exh. 32).  Including the up-front purchase price of $3.5 million, PerkinElmer's total investment in the CTP business was approximately $10.4 million. **Response: Denied.  First, Plaintiffs object to the Declaration of Adam Beeh on the grounds that he is a previously unidentified expert witness and that he has utterly failed to provide any data to support his opinion as to PerkinElmer's alleged loss. Second, the Audit Committee presentation referred to also utterly lacks any data or support.  Defendant has not made any effort to provide any back-up to support the numbers.  At any rate, the numbers defendant claims in this paragraph are pure fiction in so far as they purport to state the amount PerkinElmer invested to develop, market, and sell CTP products. As Joseph Donahue, who was the General Manager of the CTP division, testifies (Donahue Affidavit ¶6), the total expenditures included approximately $700,000 per year in salaries plus an attribution of $50,000-80,000 for Guy Antley's salary and**

---

[9]  "Beeh Decl." refers to the Declaration of Adam Beeh, filed herewith. **Plaintiffs specifically object to this Declaration. Mr. Beeh's testimony is that of an expert.  He was not disclosed as an expert.  His "evidence" as to what PerkinElmer was justified in charging or did charge as an operating expense contains no back-up or support and, as such, is merely his bald assertion.**

expenses. PerkinElmer also bought the inventory to manufacture two machines and split with MacDermid the costs of a third machine, an expenditure by PerkinElmer of around $800,000. During the time period in question, the Lithography division's Azusa facility experienced a significant slowdown. It had a very large facility, and there were many lay-offs, and PerkinElmer consistently told Donahue that it would not fund the CTP operation as previously planned (D 10) and advanced only $50,000 toward the development of the key DMD technology. How Lithography chose to shift expenses and allocate them to Tucson on paper could be understood only by careful examination of financial data which has not been provided. However, it is doubtful that any allocation with numbers like those suggested in this paragraph could be correct when it is remembered that PerkinElmer was unwilling to spend any money to advertise, market, or promote the product other than attendance at NEXPO shows, Donahue, Aff. ¶ 6, and that PerkinElmer's 10-Ks for the period demonstrate that it was unwilling to invest in R & D in Lithography (or even in Optoelectronics, with the exception of biotech products). D 7. Indeed as of 2003, PerkinElmer refused to spend the money to transport a machine for demonstration to the show. Further, PerkinElmer refused to spend money to promote the DMD technology, although this was a key part of the technology roadmap—the so-called "Holy Grail"—and although this would allow the machine to be built more cheaply, without lasers, and make the machine lighter and less expensive—as competitor BasysPrint was already doing by 2003. It refused to Beta place and price any machines, though it knew this was necessary to market the product and build sales. In 2002, for instance, the Miami Herald, part of a large purchasing group, indicated that it wanted to be a Beta site for the machine, but didn't want to pay for it until 2004. Although this would have given PerkinElmer a perfect

**reference machine in place in a major newspaper which was part of a major American newspaper purchasing group, PerkinElmer refused. Z 76, SS 04722. PerkinElmer reneged on plans to place a BETA at Pennysaver, the Los Angeles Times, the Washington Post and the Cleveland Plain Dealer. Z 3, PE 1239-46. PerkinElmer's only capital expenditure after the closing was a used plate processor. It refused to purchase lab testing equipment, computer work stations and software for the engineers, hard or soft tooling, solid state lasers for the flexo prototype—in fact it required MacDermid to split the costs of production of the machine. It is quite doubtful, given its refusal to spend as outlined above—and given that it told Donahue 3-4 months after the closing that it was unwilling to finance anything but bare-bones operations because of Lithograph's downward spiral and PerkinElmer's unwillingness to bail out divisions in trouble--that anything like the amounts it now claims were spent on Tucson CTP were actually spent. Donahue Aff.¶6.**

47. Just prior to closing, PerkinElmer offered employment to eight of Sonoran's former employees: Allen Bahr; Norm Bogen; Donahue; Timothy Ellis; William Hart; Norman Shaver; Terri Varese; and John Watkins. APA, Disclosure Schedule § 6.1. All of the offers included salaries commensurate with what Sonoran had paid them, together with benefits such as health insurance. APA, Disclosure Schedule § 2.24. All of the employees except for Bogen accepted their offers from PerkinElmer. APA, Disclosure Schedule § 6.1. **Response: It is admitted that in the month before the closing the offerings described above were made and that all of the employees except Bogen accepted the offers. The offer to Bogen was not commensurate. He was not offered his prior bonus arrangement, nor his weekly travel and other expenses paid by Sonoran. Bogen Affidavit ¶ 2.**

24

48. Bogen's salary at Sonoran had been $100,000, and he expected PerkinElmer to pay him at least $125,000 based on promises made by Donahue. Bogen Dep. 74:16-77:1. PerkinElmer did not accept Bogen's counteroffer demanding both a higher salary and certain perks, but PerkinElmer did enter into a two-month, $25,000 consulting agreement with Bogen to assist the transfer of knowledge from Bogen to PerkinElmer. Consulting Agreement – PE005823 (Ziegler Exh. 33); Bogen Dep. 74:16-77:1. **Response: Admitted, except that the consulting agreement did not provide for any "transfer of knowledge" (whatever that means) and only required Bogen's help in preparation for, and attendance at the 2001 NEXPO trade show. Z 33.**

49. Bogen testified that he was not "irreplaceable." Bogen Dep. 162:17-20. **Response: Objection. What Bogen "testified" to or did not is not subject to admission of fact as to the plaintiffs. According to Donahue and the plaintiff's expert, Bogen was irreplaceable for the first year. Bogen was key to the sales effort in the first few years, and it is well-recognized that retaining sales executives with experience and contacts is key to the success of sales efforts of capital equipment after technology company purchases. Over time, if someone could have been found with his training, experience, and contacts with potential customers, he might have been replaceable. Certainly, as described in paragraphs 51 and others below, Guy Antley was no replacement for him. Donahue Affidavit ¶8.**

50. Donahue declined to offer some of his own incentive compensation to Bogen. Donahue Dep. 159:6-16; Donahue Email - SS00423 (Ziegler Exh. 34). **Response: Denied. Mr. Bogen was offered some of Mr. Donahue's compensation. Z 77 SS 00424. As Mr. Donahue indicated, PerkinElmer was suggesting that he give up some of his "back-end"**

compensation.  What Bogen wanted was a higher "front end", i.e., salary and bonuses from sales, not earnouts. *Id.*

51. In May 2001, PerkinElmer assigned Guy Antley, Lithography's Director of North American Sales, to lead the CTP sales effort.  Antley Decl. ¶ 2;[10] Antley Dep. 16:1-16:5, 20:13-23.  Antley was a seasoned sales professional with relevant experience selling capital equipment. Antley Dep. 8:7-9:15, 16:22-17:18, 20:13-23; Bogen Dep. 129:16-130:10.  Neither Bogen nor Joseph Barrett (another Sonoran sales representative) had specific newspaper or publishing experience before joining Sonoran.  Bogen Dep. 163:14-16; Barrett Dep. 46:21-25.[11]  **Response: Denied.  Mr. Antley was probably assigned before the closing.  See Z 4, Antley Dep., pp. 18-19. He may have had a title as Director, but he was a salesman of relatively unsophisticated circuit board printing machines. The machines he had been selling, to give a rough example, would be the equivalent technology of a copying machine compared to a commercial printer with lasers designed to go 250 times faster and to handle printing requirements fifty times larger.  While he had a pleasant personality, Mr. Antley was completely unequipped to sell CTP equipment and never took the time to educate himself. He never understood the technology from the point of view of being able to explain how the machine worked and he never understood the Cost of Ownership model, which was key to selling the machine.  He did not know, for instance, that depreciation was included as a cost of ownership, nor did he understand how the cost savings worked as between UV plates, thermal technology, and conventional plates. Donahue Aff. ¶8.  As is shown in the affidavits provided by Mr. Shaver ( Shaver Affidavit¶ 3-6) and Mr. Donahue (Donahue**

---

[10]  "Antley Decl." refers to the Declaration of Guy Antley.

[11]  "Barrett Dep." refers to the transcript of Joseph Barrett deposition, and cited pages are at Ziegler Exh. 5.

Affidavit ¶ 8), this was the least of Mr. Antley's problems. Further, when Bogen tried to impart his past experience and knowledge about the sale of CTP products, (Antley) did not seem interested. Bogen Affidavit ¶ 3. Contrary to what PerkinElmer claims in this paragraph, Mr. Barrett had worked in newspapers and the newspaper industry for more than twenty-five years, and by 2001, Mr. Bogen, who was trained by Mr. Barrett, had been involved with CTP product development for three years and had met with more than a hundred newspapers and had established relationships at many of them. Mr. Antley was a history major in college and took no engineering or science courses. Mr. Bogen, by contrast, was a college engineering major and has an MBA. Donahue Affidavit¶ 8. Further, Mr. Bogen spent full-time on CTP, while Mr. Antley's' Activity reports—which Mr. Donahue read but have not been produced by PerkinElmer—reflect that Mr. Antley spent about 80% of his time on CTP after the closing, but by 2003 was spending half his time or less on CTP. Donahue Aff. 6. See Z 3, SS05490-92 and SS 05665 (reports improperly included in Z3 because they mostly concern visits to PCB customers, not CTP).

52. On May 15, 2001 Antley, Greg Baxter (General Manager, Lithography), Thomas Keddy (Director of Sales and Marketing, Lithography) and Bill Huseman (Quality Director, Lithography) hosted executives from a potential CTP customer (Harte-Hanks, distributor of The PennySaver) at its Azusa, California facility. Antley Decl. ¶ 3; Antley Email - SS03040 (Ziegler Exh. 35). On May 29, 2001, PerkinElmer hosted PennySaver executives a second time at PerkinElmer's Azusa facility. PennySaver Email – SS02525 (Ziegler Exh. 36). **Response: Admitted that the meetings occurred; however, PerkinElmer took itself out of the game. As Mr. Bogen's Affidavit (Bogen Affidavit ¶ 3) states, and Mr. Antley's Trip Report for May 24, 2001 states (Z3 PE001240), Pennysaver was in line to receive a prototype for a BETA**

27

placement.  The BETA offer was at $300,000-400,000 (not the $400,000 Antley reports),
with a trial period and other, usual, perks for taking an early machine.  Mr. Bogen told
Antley that Pennysaver was willing to pay $300,000 and this was an appropriate price—in
fact, a good deal—for a first machine, and that it would give PerkinElmer a reference
machine on the West Coast.  Mr. Bogen repeated this to Mr. Antley and Mr. Baxter when
they met at the end of May, 2001, in Los Angeles.  However, PerkinElmer refused to
provide the machine for less than its full price, $495,000, and so, it drove Pennysaver away.
Z 31;  Bogen Aff.¶ 3.

53. On May 22 and 23, 2001, Antley visited the Tucson site.  Antley Decl. ¶ 4; Antley
Trip Report – PE001239-1246 (Ziegler Exh. 3); Antley Email – SS03073-3074 (Exh. 69).  While
in Tuscon, Antley saw a product demonstration and met with Donahue, Bogen and others.
Antley Decl. ¶ 4; Antley Trip Report - PE001239-1246  (Ziegler Exh. 3).  Antley obtained
information about PennySaver ("PennySaver").  Antley Decl. ¶ 4; Antley Trip Report -
PE001239-1246 (Ziegler Exh. 3).  Antley obtained technical information about the prototype unit
and the modifications that would be necessary to meet PennySaver's requirements.  Antley Decl.
¶ 4; Antley Trip Report - PE001239-1246  (Ziegler Exh. 3).  Antley obtained information about
other potential customers, including *The Cleveland Plain Dealer*, *The Washington Post*, *Chicago
Tribune*, *Los Angeles Times, St. Petersburg Times, Sun Sentinel,* and a Brazilian newspaper.
Antley Decl. ¶ 4; Antley Trip Report - PE001239-1246 (Ziegler Exh. 3).  Antley also obtained
contact information for potential customers.  Antley Decl. ¶ 4; Antley Trip Report - PE001239-
1246 (Ziegler Exh. 3).  Bogen provided Antley with all of the contact information he had for
potential customers.  Bogen Dep. 85:2-19, 166:2-4.  Antley also obtained industry information,
including information about plate manufacturers, customer sales cycles, industry trade magazines

and organizations, and competition. Antley Decl. ¶ 4; Antley Trip Report - PE001239-1246

(Ziegler Exh. 3). Antley also obtained information about the "cost of ownership model" that had

been used by Sonoran with potential customers. Antley Decl. ¶ 4; Antley Trip Report -

PE001239-1246 (Ziegler Exh. 3). In addition, Antley and Bogen visited at least two potential

customers together. Bogen Dep. 83:2-85:1. **Response: It is admitted that the various**

**references in this paragraph say most of what is written in it, but, see paragraphs 51 and 52**

**above. Mr. Antley did not retain the technical information he was given nor did he**

**understand the cost of ownership model in any detail. Donahue Aff. ¶ 8. Further, in spite**

**of repeated requests by potential customers in this paragraph to receive and tryout a**

**machine first as part of a BETA process, PerkinElmer (inanely) refused to offer the**

**machine in 2001 through 2003 at anything less than full price or a trivial discount. See,**

**various reports in Z3 and Donahue Affidavit ¶ 5. PerkinElmer virtually took itself out of**

**the game, while its competitors reportedly sold multiple machines to all of the above-stated**

**potential customers—almost all of whom had asked to be BETA customers of**

**PerkinElmer. Donahue Aff.¶ 5.**

54. By the end of June 2001, PerkinElmer signed a lease on a new 8,000 square foot

facility and moved the CTP business there. Donahue Dep. 33:7-11; Donahue Email – SS01953-

1957, SS01964 (Ziegler Exhs. 37-38). The new facility was more expensive than Sonoran's

previous facility and had been Donahue's preferred choice among possible new facilities.

Donahue Email - SS03909-3910 (Ziegler Exh. 39). PerkinElmer, in addition to investing in new

facilities and the buildout of those facilities, purchased a valuable inventory of parts, including

high-priced lasers. Sonoran Pre-Acquisition Disclosures - SS00292 (Ziegler Exh. 40).

**Response: Admitted, except that the plaintiffs do not know what is meant by "valuable**

inventory of parts". A great deal of the inventory needed to build units and other
necessary materials were not purchased. See Paragraph 44 above.

55. PerkinElmer's marketing and communications groups also shifted into gear shortly
after the acquisition, issuing press releases about the acquisition, developing and printing
marketing materials, and arranging for a booth, transportation and installation of a demonstration
prototype, and attendance at the major industry exposition – the NEXPO – in June 2001.
PerkinElmer Email – SS02984 (Ziegler Exh. 41); PerkinElmer email and press release –
SS02514 (Ziegler Exh. 42). PerkinElmer also set up a website for the CTP business. Antley
Dep. 165:14-23; Antley Email – SS04341-4342 (Ziegler Exh. 70). **Response: Denied. Except
for setting up a barebones website, issuing a single press release after the closing, and re-
printing Sonoran's product brochure with the PerkinElmer label, the marketing and
communications group did nothing while PerkinElmer was involved with CTP. Donahue
Aff. ¶ 6. Furthermore, no money was spent to promote or advertise the product except for
the amount spent at NEXPO shows. Donahue Aff. ¶ 6.**

56. Donahue stated that he was impressed by the professionalism, enthusiasm and energy
of the PerkinElmer marketing and communication team. Donahue Email – SS03072, SS01929,
SS01916 (Ziegler Exhs. 43-45). **Response: Denied. The exhibits cited in this paragraph do
not say anything of the sort, except that one of them refers to one early meeting with the
salesmen in early 2002 and another refers to the single press release at the time of the
closing—and marketing and communications were never involved again. PerkinElmer did
not assign any marketing professional to CTP, nor spend any money on advertising and
promotion, except for sales people, and this was principally Guy Antley. As PerkinElmer is
well aware, Donahue was far less than impressed with him and the sales effort. D 3. D 16 is**

a scathing e-mail about that effort written in October, 2002.  Although the e-mail was generated by John Watkins' (Tucson's COO), Greg Baxter testified that he and others suspected that it had been ghost-written by Mr. Donahue.  Baxter Dep. pp 180-182.

57. According to Donahue, "[t]he contacts made at NEXPO would take at least three months to visit" and "[t]his first impression will be a much stronger statement than a salesman can make without a machine."  Donahue Email - SS00404 (Ziegler Exh. 46).  **Response:  It is admitted that Donahue predicted that the NEXPO show would have such positive results, but it must be remembered that the statement was made before PerkinElmer had actually attended the NEXPO show.**

58. In June 2001, PerkinElmer attended NEXPO in New Orleans.  Antley Decl. ¶ 5; Antley Trip Report - SS02578-02582 (Ziegler Exh. 3).  PerkinElmer sent at least six employees to the show, including Antley, Baxter, Keddy, Norm Shaver (Product Specialist), Dean Stapleton (Product Specialist), Bill Hart (Senior Electrical Engineer), as well as Bogen, who was under a consulting agreement.  Bogen Dep. 84:18-85:1; Antley Decl. ¶ 5; Antley Trip Report - SS02578-02582 (Ziegler Exh. 3).  At the show, PerkinElmer performed demonstrations of the then-current prototype, which was to be marketed under the name ProForm Metro.  Antley Trip Report - SS02578-02582 (Ziegler Exh. 3).  PerkinElmer also met with representatives from at least six publications or publishing groups, including *The Los Angeles Times, The Milwaukee Journal, The Providence Journal, The Flyer, The Journal Newspapers,* and *La Nacion,* as well as with representatives from at least three plate manufacturers, including American Lithographic, Citiplate, and NAPP (MacDermid).  Antley Decl. ¶ 5; Antley Trip Report - SS02578-02582 (Ziegler Exh. 3).  PerkinElmer also met during the NEXPO with representatives from three significant trade publications: *Editor and Publisher*, *Newspapers and Technology*, and *The*

31

*Seybold Report.* Antley Decl. ¶ 5; Antley Trip Report - SS02578-02582 (Ziegler Exh. 3).

**Response: Admitted; however, it is noteworthy that Mr. Antley does not indicate in this trip report or most of the others Defendant relies on that he said or did anything other than listen at a meeting.  It defies the "DNA" or "psyche" of a salesman not to tell those he is reporting to that he said or did something of value in a meeting—if he in fact said or did anything to move a sale forward.**

59. Donahue declined to attend the NEXPO, recognizing that there were budgetary constraints and that PerkinElmer would have sufficient personnel there to represent the product and business. Donahue Email - SS03901 (Ziegler Exh. 47).  **Response: Admitted that he did not attend the show because he thought he could be more useful if he remained in Tuscson. Z 47.**

60. PerkinElmer assigned additional engineering staff from its Azusa facility and hired additional engineering personnel to support the development effort in Tucson.  Donahue Email – SS02124, SS02135, SS02139, SS02143 (Ziegler Exh. 48).  **Response: Admitted that Dave Hill was hired to replace Randy Cubberly and that two or three engineers from Azusa provided support to Tucson for a brief time to change the machine's design and install Azusa's material handling device rather than the one which Sonoran had purchased and thought was appropriate. Otherwise, denied. Donahue Aff. ¶ 2.**

61. In June 2001, Donahue reported that the original prototype machine was operable "by Tucson engineers only" and that "mod[ifications] need to be made to make [the] machine operable by customer and to resolve outstanding issue[s]."  Donahue Email and Spreadsheet of Tasks – SS02007 (Ziegler Exh. 49).  He provided a detailed list of all of the engineering work

32

that he and his team needed to do to make the prototype customer-ready. Donahue Email and Spreadsheet of Tasks – SS02005-2019 (Ziegler Exh. 49). He targeted completion of the prototype by September 2001. Donahue Email and Spreadsheet of Tasks – SS02005-2019 (Ziegler Exh. 49). **Response: It is denied that Exhibit 49 refers to the "prototype", meaning the CactusSetter, which <u>was</u> ready for sale by this time. What Exhibit 49 refers to is the new cosmetic changes mandated by Greg Baxter to come up with the Pro Form Metro. Joe Donahue was asked to oversee the conversion of the machine's operation to the new cosmetic design, while Azusa created the external design. Exhibit 49 refers to the process begun in June, 2001, a month after the purchase, to re-design the machine for cosmetic purposes and the prototype for the new machine referred to is for the Pro Form Metro. See, Z 49, SS 02005 ¶ 1.**

62. By July 2001, PerkinElmer's Lithography division was not doing well financially. Donahue testified that he learned within three months of the May 2001 closing that the "Lithography business was in deep trouble." Donahue Dep. 485:8-11. **Response: It was in August, 2001 that Mr. Donahue learned this. Donahue Affidavit ¶ 6, D 10.**

63. In July 2001, PerkinElmer continued discussions with PennySaver. Antley Decl. ¶ 6; Antley Trip Report - SS04137-4140 (Ziegler Exh. 3). In addition, during the week of July 30, 2001, PerkinElmer met with several potential customers or strategic partners, including *St. Louis Post-Dispatch*, *Milwaukee Journal Sentinel*, American Litho, and *The Cleveland Plain Dealer*. Antley Decl. ¶ 6; Antley Trip Report – SS04137-4140 (Ziegler Exh. 3). **Response: Admitted that Mr. Antley's reports say what is written in this paragraph.**