# DANGEL EXHIBIT 6



C. Baxter
EXHIBIT: 27
DATE: 022908
CHRISTINA S. MORTON CSR 12465

## Joe Donahue

| | |
|---|---|
| From: | JHall@macdermid.com |
| Sent: | Wednesday, January 23, 2002 1:09 PM |
| To: | Donahue, Joe |
| Cc: | Baxter, Greg; GMueller@macdermid.com; DRoberts@macdermid.com |
| Subject: | Follow up to your e-mails and our discussion |

Joe, this is to follow up on our discussion of last week.  We first talked
about the action items due you from our December 17th meeting.  That is,
you asked we provide a reasonably well considered estimate of the market
opportunity and speak to your question on the cost of ownership models.  In
addition to this, you asked for plates for your engineering work and how we
might work together to address this opportunity going forward.  A summary
of my responses follows.
We believe the market potential for a NAPPflex plate version of your
ProForm Metro CTP to be around 150 units.  Our projections of the sales
ramp-up would be two machines in 2002, five to ten machines in 2003, then
ten to twenty machines per year for a number of years going forward.  These
projections assume the machine's productivity to be greater than 120 pph
for a standard size newspaper plate and we are able to sell the customer on
the value of the approach to their operation.  We believe your projection
of 100 units to be very doable.  As mentioned during my visit, we do have
one account with the potential to purchase 23 units, probably over a five
to seven year period.

Regarding the Cost of Ownership models, we feel the situation in flexo is
different than the situation you see in offset.  In newspapers using offset
technology, customers can choose between your technology and others.  For
this reason the comparisons you have developed are necessary.  In flexo,
there is no other choice if the customer is to use their existing flexo
technology.  If a flexo newspaper wants to go CTP, and our view is that
they all do, they need a system like this.  Up to now, we have not had a
way to provide the 120+ pph they seek.  But with your machine, the 8w
Coherent laser and the new plate we've recently developed, we have all the
elements to address their needs.

We have been concerned that the cost of your machine could be a stumbling
block, but I left our December 17th meeting believing you have a story to
tell regarding the functionality provided that will blunt some, if not all,
of these issues.  Working together, I believe we can address that issue and
that we have an excellent opportunity before us.

Regarding NAPPflex plates, my understanding is that we already have a
shipment of plates on its way to you.   If (or when) you need more,

1

SS 04286

contact
Greg. We'll supply what you need.

Regarding next steps, we have several accounts who are anxious for a CTP
system. Logically, we'll present the concept to one or more of these, with
the goal of selling them a system to prove the concept, with additional
units to follow. I'm currently gathering input from Sales regarding
customer options and will be in touch to discuss how we might work together
to do this, probably early next week. As for the timing of customer
visits, we're thinking of meetings in late February, early March. This
gives us some time to speak more to the subject of how we best work
together to address this opportunity.

Joe, if there's anything I missed, please let me know. Otherwise, I'll
call you next week.

Jerry

2

SS 04287

# DANGEL EXHIBIT 7

10-K 1 d10k.htm FORM 10-K

Table of Contents

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## Washington, DC 20549

# Form 10-K

### for Annual and Transition Reports Pursuant to
### Sections 13 or 15(d) of the Securities Exchange Act of 1934

(Mark One)

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended January 2, 2005**

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from            to·**

### Commission file number 001-5075

# PerkinElmer, Inc.
*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| **Massachusetts** | **04-2052042** |
| *(State or other jurisdiction of* | *(I.R.S. Employer* |
| *incorporation or organization)* | *Identification No.)* |
| **45 William Street, Wellesley, Massachusetts** | **02481** |
| *(Address of Principal Executive Offices)* | *(Zip Code)* |

### Registrant's telephone number, including area code:
### (781) 237-5100
### Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Common Stock, $1 Par Value | New York Stock Exchange |

### Securities registered pursuant to Section 12(g) of the Act:
### None

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☑    No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.    ☑

Indicate by check mark whether the registrant is an accelerated filer (as defined in Exchange Act Rule 12b-2).    Yes ☑    No ☐

The aggregate market value of the common stock, $1 par value per share, held by nonaffiliates of the registrant on June 25, 2004, was $2,442,803,134 based upon the last reported sale of the common stock on that date.

Table of Contents

## PART I

### Item 1.  *Business*

### Overview

We are a leading provider of scientific instruments, consumables and services to the pharmaceutical, biomedical, environmental testing and general industrial markets, commonly referred to as the health sciences and industrial sciences markets. We design, manufacture, market and service products and systems within three businesses, each constituting one reporting segment:

- *Life and Analytical Sciences*. We are a leading provider of drug discovery, genetic screening and environmental and chemical analysis tools, including instruments, reagents, consumables and services.

- *Optoelectronics*. We provide a broad range of digital imaging, sensor and specialty lighting components used in biomedical, consumer products and other specialty end markets.

- *Fluid Sciences*. We provide a variety of precision valves, seals, bellows and pneumatic joints for critical fluid control and containment systems for highly demanding environments such as turbine engines and semiconductor fabrication equipment.

The health sciences markets include all of the businesses in our Life and Analytical Sciences reporting segment and the medical imaging, elements of the medical sensors and lighting businesses in our Optoelectronics reporting segment. The industrial sciences markets include the remaining businesses in our Optoelectronics reporting segment and all of the businesses in our Fluid Sciences reporting segment.

In fiscal 2004, we had $1,687.2 million in sales from continuing operations.

We are a Massachusetts corporation, founded in 1947. Our headquarters are in Wellesley, Massachusetts, and we market our products and systems in more than 125 countries. As of January 2, 2005, we had approximately 10,000 employees. Our common stock is listed on the New York Stock Exchange, and we are a component of the S&P 500 Index.

We maintain a website with the address http://www.perkinelmer.com/. We are not including the information contained in our website as part of, or incorporating it by reference into, this annual report on Form 10-K. We make available free of charge through our website our annual reports on Form 10-K, quarterly reports on Form 10-Q and current reports on Form 8-K, and amendments to these reports, as soon as reasonably practicable after we electronically file these materials with, or otherwise furnish them to, the Securities and Exchange Commission.

### Significant Developments

As part of our efforts to focus and grow our core businesses, we have taken the following significant measures in recent years.

*Acquisition of Elcos AG*. In February 2005, we acquired Elcos AG, a leading European designer and manufacturer of custom light emitting diode, or LED, solutions for biomedical and industrial applications. The transaction combines Elcos' visible LED technology platform and strong customer and application base with our global sales, application and support organization, therefore expanding the sales growth opportunities for the Elcos technology.

*American Job Creation Act*. The homeland investment provisions of the American Jobs Creation Act enacted October 22, 2004, provides us with the opportunity to repatriate earnings from our foreign subsidiaries in a more tax and cash flow efficient manner.

*Computer-To-Plate Business*. In September 2004, our Board of Directors approved a plan to shut down our Computer-To-Plate business as part of our continued efforts to focus on higher growth opportunities. We reflected this business as a discontinued operation for all periods presented in this annual report on Form 10-K. The abandonment of this business resulted in a $1.0 million pre-tax loss related to a write-down of fixed assets and inventory. We recognized this loss during fiscal 2004 as a loss on the disposition of discontinued operations.

1

Table of Contents

*Electroformed Products and Ultraviolet Lighting Businesses.* In June 2004, our Board of Directors approved, and we executed, separate plans to shut down our Electroformed Products business and sell our Ultraviolet Lighting business as part of our continued efforts to focus on higher growth opportunities. We reflect these businesses as discontinued operations for all periods presented in this annual report on Form 10-K. The net assets of the Electroformed Products business were written off, resulting in a $1.6 million pre-tax loss in fiscal 2004. We sold the fixed assets and inventory of the Ultraviolet Lighting business in July 2004 for their approximate book value.

*Other Operations Classified as Discontinued.* Included in this Form 10-K are the financial results of other operations that were discontinued or sold prior to fiscal 2004. These include our Telecommunications Component and Entertainment Lighting businesses which were approved for shut down by our Board of Directors in June 2002, our Security and Detection Systems business which was sold in June 2002, and our Technical Services Business which was sold in August 1999. We reflected these businesses as discontinued operations for all periods presented in this annual report on Form 10-K.

## Life and Analytical Sciences

Our Life and Analytical Sciences business unit is a leading provider of drug discovery, genetic screening and environmental and chemical analysis tools, including instruments, reagents, consumables, and services. Our instruments are used in daily applications for scientific research and clinical applications. Our research products provide the fundamental tools necessary for a variety of testing applications that are critical to the development of many of our customers' new products.

Our Life and Analytical Sciences business helps our customers solve complex analytical problems encountered in drug discovery, genetic screening and environmental and chemical analysis laboratories. In fiscal 2004, our Life and Analytical Sciences business generated sales of $1,062.8 million.

For drug discovery, we offer a wide range of systems comprised of instrumentation, software and consumables, including reagents, based on our core expertise in fluorescence, chemiluminescence, radioactive labeling and the detection of nucleic acids and proteins.

For genetic screening and clinical laboratories, we provide instrumentation, software, reagents and analysis tools to test for various inherited disorders in newborns and to monitor risk factors during pregnancy. These clinical screening programs help by identifying women at risk during pregnancy and newborn babies at risk from inherited metabolic or endocrinological disorders. We sell our genetic screening solutions to public health authorities and private health care organizations around the world.

For chemical analysis, we offer analytical tools employing technologies such as molecular and atomic spectroscopy, high performance liquid chromatography, gas chromatography and thermal analysis. Our instruments and related application solutions measure a range of substances from bio-molecular matter to organic and inorganic chemicals. We sell these products to pharmaceutical manufacturers and customers in the environmental, food and beverage and chemical markets. These customers use our instruments in various applications to verify the identity, quality or composition of the materials they examine.

For service and support, we offer customers a range of products including service plans, first-year warranties, training, and preventive maintenance. OneSource®, our managed maintenance service plan, helps customers consolidate the essential maintenance and equipment management needs of their laboratory(s).

*Principal Products.* The principal products of our Life and Analytical Sciences business include:

* Chemical and biological reagents, such as LANCE™ and AlphaScreen™ assay technologies, fluorescent labeled probes and cloned receptors, are used in and support a broad and flexible range of assays used in high throughput screening for drug discovery, functional genomics, proteomics, and genotyping.

2

## Table of Contents

- DELFIA® Xpress. Our random access platform for maternal health clinics and laboratories has been expanded for use in 2nd trimester risk assessment. The introduction of two new analytes in 2004 enables the more efficient triple test screening of human alphafetoprotein, or AFP, Free hCGbeta and Estriol.

- prOTOF™ 2000 MALDI O-TOF mass spectrometer. This instrument features MALDI-TOF technology for the identification and characterization of proteins.

- LABWORKS™ ES Laboratory Information Management System (LIMS). This robust information management system enables scientists to store, share and create reports on laboratory data in both small and large laboratory environments.

- EnVision™. This high throughput screening plate reader combines luminescence homogeneous assay technology with a high capacity high throughput screening plate reader to provide excellent results, versatility and ease-of-use with high sensitivity and wide dynamic range.

- UltraVIEW™. This fully automated, high-resolution, live cell imaging system allows for the observation and measurement of cellular and molecular processes in proteomics applications.

- Spectrum™ Spotlight™ 300 FT-IR Imaging System. This system enables rapid extraction and analysis of data on molecular composition from a wide range of materials. The 300's speed and ability to complement other imaging techniques improves problem solving time and extends infrared, or IR, analysis to many applications.

- ViewLux™. This ultra high throughput microplate imager offers high sensitivity and fast measurement of light from fluorescence polarization, fluorescence intensity, time-resolved fluorescence, luminescence and absorbance assays.

- The PerkinElmer® family of inorganic analysis instrumentation, including the AAnalyst™ series of atomic absorption spectrometers, the Optima™ family of inductively coupled plasma, or ICP, spectrometers and the ELAN® family of ICP mass spectrometers. These instruments are used in the environmental and chemical industries, among others, to determine the elemental content of a sample.

- The Clarus® 500 gas chromatograph, mass spectrometer and TurboMatrix™ family of sample-handling equipment. These instruments are used for compound identification and quantitation in industries such as environmental, petrochemical, forensics, food, pharmaceutical and semiconductor.

*New Products.* New product releases by our Life and Analytical Sciences business include:

- CellLux™. This is a flexible system for cellular assay development and screening, offering high performance in intracellular calcium, membrane potential and ion channel assays. The CellLux can be either a standalone workstation or integrated into a robotic system.

- TruPoint™ Beta-Secretase assay kits. These kits enable the detection of enzymes in biological samples, as well as screening for enzyme inhibitors in high-throughput screening. They consist of four components: a betasecretase, or BACE1, substrate, BACE1 reaction buffers, BACE1 stop solutions and four 384-well OptiPlates. The reagents are enough for 1536 assays when using 384-well plates.

- FlashBlue™ GPCR. These scintillating beads are used in receptor binding for all phases of screening – assay development through high throughput screening, or HTS, through profiling studies. The beads provide platforms for all applications, including enzyme, protein and functional assays, and receptor binding assays.

- Optima™ 2100/5000 Series ICP-OES. These inductively coupled plasma systems offer updated and new features to further increase laboratory analytical capability and productivity.

- ProScanArray™ and ScanArray™ $G_x$. This series of microarray scanners for supporting both proteomic and genomic array-based applications, is designed to integrate image acquisition and analysis for proteomic and genomic applications through our exclusive ProScanArray Express software.

3

Table of Contents

### Financial Information About Reporting Segments

The table below sets forth sales and operating profit (loss) by reporting segment for the 2004, 2003 and 2002 fiscal years:

|  | 2004 | 2003 | 2002 |
|---|---|---|---|
|  |  | (In thousands) |  |
| **Life and Analytical Sciences** |  |  |  |
| Sales | $1,062,767 | $1,003,711 | $ 991,712 |
| Operating profit | 103,609 | 94,745 | 27,431 |
| **Optoelectronics** |  |  |  |
| Sales | 380,637 | 348,669 | 319,797 |
| Operating profit (loss) | 57,403 | 46,778 | (459) |
| **Fluid Sciences** |  |  |  |
| Sales | 243,827 | 179,670 | 189,485 |
| Operating profit | 38,221 | 17,922 | 17,476 |
| **Other** |  |  |  |
| Operating loss | (22,163) | (17,604) | (16,591) |
| **Continuing operations** |  |  |  |
| Sales | 1,687,231 | 1,532,050 | 1,500,994 |
| Operating profit | $ 177,070 | $ 141,841 | $ 27,857 |

Our Security and Detection Systems, formerly included in the Life and Analytical Sciences reporting segment, Telecommunications Components, Entertainment Lighting, Electroformed Products, Ultraviolet Lighting and Computer-To-Plate businesses, all formerly included in the Optoelectronics reporting segment, are discontinued operations and therefore have not been included in the preceding table.

Additional information relating to our reporting segments for the 2004, 2003, and 2002 fiscal years is as follows:

|  | Depreciation and Amortization Expense | | | Capital Expenditures | | |
|---|---|---|---|---|---|---|
|  | 2004 | 2003 | 2002 | 2004 | 2003 | 2002 |
|  |  |  | (In thousands) |  |  |  |
| Life and Analytical Sciences | $ 47,645 | $ 47,938 | $ 44,723 | $ 6,747 | $ 9,841 | $ 25,014 |
| Optoelectronics | 19,633 | 21,818 | 19,813 | 7,677 | 5,398 | 38,271 |
| Fluid Sciences | 7,726 | 8,403 | 9,632 | 3,022 | 919 | 3,754 |
| Other | 1,237 | 1,335 | 1,665 | 1,515 | 430 | 780 |
| Continuing operations | $ 76,241 | $ 79,494 | $ 75,833 | $ 18,961 | $ 16,588 | $ 67,819 |
| Discontinued operations | $ 864 | $ 656 | $ 2,262 | $ — | $ 384 | $ 3,053 |

|  | Total Assets | | |
|---|---|---|---|
|  | January 2, 2005 | December 28, 2003 | December 29, 2002 |
|  |  | (In thousands) |  |
| Life and Analytical Sciences | $2,112,322 | $2,080,916 | $2,076,213 |
| Optoelectronics | 292,500 | 291,746 | 283,228 |
| Fluid Sciences | 126,603 | 119,966 | 128,193 |
| Other | 43,786 | 110,211 | 320,475 |
| Net current and long-term assets of discontinued operations | 296 | 4,888 | 17,373 |
|  | $2,575,507 | $2,607,727 | $2,825,482 |

Table of Contents

## EXECUTIVE OFFICERS OF THE REGISTRANT

Listed below are our executive officers as of March 11, 2005. No family relationship exists between any one of these officers and any of the other executive officers or directors.

| Name | Position | Age |
| --- | --- | --- |
| Gregory L. Summe | Chairman of the Board, Chief Executive Officer and President | 48 |
| Robert F. Friel | Executive Vice President and Chief Financial Officer | 49 |
| John P. Murphy | Executive Vice President and Chief Operating Officer | 38 |
| Robert A. Barrett | Senior Vice President, President — Fluid Sciences | 61 |
| Peter B. Coggins | Senior Vice President, President — Life and Analytical Sciences | 56 |
| Richard F. Walsh | Senior Vice President, Human Resources | 52 |
| Jeffrey D. Capello | Vice President — Finance, Treasurer and Chief Accounting Officer | 40 |
| John A. Roush | Vice President, President — Optoelectronics | 39 |

*Gregory L. Summe, 48.* Mr. Summe was named Chief Executive Officer of PerkinElmer effective January 1, 1999 and Chairman effective April 27, 1999. He was appointed President and Chief Operating Officer and elected to our Board of Directors in February 1998. From 1993 to 1998, Mr. Summe held several management positions with AlliedSignal, Inc., now Honeywell International: President of the Automotive Products Group, President of Aerospace Engines and President of General Aviation Avionics. Prior to joining AlliedSignal, he worked at General Electric, and was a partner at McKinsey & Company where he worked from 1983 to 1992. Mr. Summe is a director of State Street Corporation.

*Robert F. Friel, 49.* Mr. Friel joined us in February 1999 as our Senior Vice President and Chief Financial Officer. Since November 2004, he has served as our Executive Vice President and Chief Financial Officer, with responsibility for business development and information technology in addition to his oversight of the finance functions. From 1980 to 1999, he held several positions at AlliedSignal, Inc., now Honeywell International, including Corporate Vice President and Treasurer from 1997 to 1999 and Vice President, Finance and Administration of Aerospace Engines from 1992 to 1996. Mr. Friel is a director of Fairchild Semiconductor Corp.

*John P. Murphy, 38.* Mr. Murphy joined us in August 2001 as our Senior Vice President and President of our Optoelectronics business. Since November 2004, he has served as Executive Vice President and Chief Operating Officer of PerkinElmer, Inc. From July 2000 to August 2001, Mr. Murphy served as Vice President and General Manager of the Business Regional and General Aviation Unit of Honeywell International. From July 1993 to June 2000, Mr. Murphy served at AlliedSignal, Inc., now Honeywell International, a diversified technology and manufacturing company, in various capacities, most recently as Vice President and General Manager of Business and General Aviation.

*Robert A. Barrett, 61.* Mr. Barrett has served as President of our Fluid Sciences business since May 1998 and was appointed Senior Vice President in October 2002. From 1990 to 1998, he served as President and General Manager of our Pressure Science division.

*Peter B. Coggins, 56.* Dr. Coggins joined us in July 2002 as our Senior Vice President and President of our Life Sciences business. He currently serves as President of our Life and Analytical Sciences business. From 1994 to June 2002, Dr. Coggins served in various capacities at Amersham BioSciences, a developer of systems for medical research, drug discovery and manufacture, most recently as Executive Vice President, Global Sales and Marketing, Chairman of the Board of Amersham Japan KK and a member of the Amersham BioScience Executive Committee.

14

Table of Contents

*Richard F. Walsh, 52.*    Mr. Walsh joined us in July 1998 as our Senior Vice President of Human Resources. From 1995 to 1998, he served as Senior Vice President of Human Resources of ABB Americas, Inc., the United States subsidiary of an international engineering company. Prior to that, Mr. Walsh held a number of managerial positions in human resources with ABB starting in 1989. His prior employment was with Unilever where he spent nine years in human resource management.

*Jeffrey D. Capello, 40.*    Mr. Capello joined us in June 2001 as our Vice President of Finance and was named Chief Accounting Officer in April 2002. From 1997 to June 2001, he served as a partner at PricewaterhouseCoopers LLP, a public accounting firm, initially in the United States and later in the Netherlands.

*John A. Roush, 39.*    Mr. Roush was named Vice President of PerkinElmer and President of the Optoelectronics business in November 2004. Mr. Roush joined us in 1999 as the General Manager of a specialty lighting division within our Optoelectronics business and subsequently held several additional roles with Optoelectronics. From 2001 to 2002, he served as Vice President & General Manager of our Sensors business, and from 2002 to 2004, he held the role of Vice President of Sales & Product Management. Before joining the Company, Mr. Roush held leadership positions with General Electric, Allied Signal, Inc., now Honeywell International, and McKinsey & Company.

15

Table of Contents

$1,062.8 in 2004, and reflects approximately $39.2 million in sales attributable to favorable changes in foreign exchange rates, as compared to 2003. Our Optoelectronics segment sales grew $31.9 million, or 9%, from $348.7 million in 2003 to $380.6 million in 2004, including approximately $6.5 million in sales attributable to favorable changes in foreign exchange rates, as compared to 2003. The Fluid Sciences segment grew sales by $64.1 million, or 36%, from $179.7 million in 2003 to $243.8 million in 2004, including approximately $1.4 attributable to favorable changes in foreign exchange rates, as compared to 2003.

*2003 Compared to 2002.*     Sales for 2003 were $1,532.1 million, versus $1,501.0 million during 2002, an increase of $31.1 million, or 2%. Changes in foreign exchange rates, primarily the Euro, increased sales by approximately $73.0 million in 2003, as compared to 2002. The overall increase in sales reflects a $12.0 million, or 1%, increase in our Life and Analytical Sciences *segment sales,* which grew from $991.7 million in 2002 to $1,003.7 in 2003, and includes approximately $61.0 million in sales attributable to favorable changes in foreign exchange rates, as compared to 2002. Our Optoelectronics segment sales grew $28.9 million, or 9%, from $319.8 million in 2002 to $348.7 million in 2003, including approximately $10.0 million in sales attributable to favorable changes in foreign exchange rates, as compared to 2002. The increased sales in our Life and Analytical Sciences and Optoelectronics segments were offset by a decrease in sales of $9.8 million, or 5%, in our Fluid Sciences segment, which declined from $189.5 million in 2002 to $179.7 million in 2003. Changes in foreign exchange rates increased Fluid Sciences segment sales by approximately $2.4 million in 2003, as compared to 2002.

## Cost of Sales

*2004 Compared to 2003.*     Cost of sales for 2004 was $1,006.7 million, versus $900.8 million for 2003, an increase of $105.9 million, or 11.8%. As a percentage of sales, cost of sales increased to 59.7% in 2004 from 58.8% in 2003, resulting in a decrease in gross margin of 90 basis points from 41.2% in 2003 to 40.3% in 2004. The decrease in gross margin was largely attributable to greater revenue contribution, as a percentage of overall sales, from Optoelectronics and Fluid Sciences versus Life and Analytical Sciences. Although our Optoelectronics and Fluid Sciences segments have lower gross margins than our Life and Analytical Sciences segment, they also have lower operating expenses as a percentage of sales.

*2003 Compared to 2002.*     Cost of sales for 2003 was $900.8 million, versus $898.5 million for 2002, an increase of $2.3 million, or 0.2%. As a percentage of sales, cost of sales decreased to 58.8% in 2003 from 59.9% in 2002, resulting in an increase in gross margin of 110 basis points from 40.1% in 2002 to 41.2% in 2003. The 110 basis point increase in gross margin was primarily attributable to a 2002 $17.2 million inventory adjustment charge recorded within our Optoelectronics segment. We did not record a similar charge in 2003.

### Research and Development Expenses

*2004 Compared to 2003.*     Research and development expenses for 2004 were $87.1 million versus $81.4 million in 2003, an increase of $5.7 million, or 7%. As a percentage of sales, research and development expenses decreased to 5.2% in 2004 from 5.3% in 2003, due to the increase in sales. We directed research and development efforts during 2004 and 2003 primarily toward genetic screening and biopharmaceutical end markets within our Life and Analytical Sciences *reporting* segment and medical digital imaging and Cermax lighting within our Optoelectronics *reporting* segment. We expect our research and development spending to increase in 2005 and to continue to emphasize the health sciences end markets.

*2003 Compared to 2002.*     Research and development expenses for 2003 were $81.4 million versus $85.0 million in 2002, a decrease of $3.6 million, or 4%. As a percentage of sales, research and development expenses decreased to 5.3% in 2003 from 5.7% in 2002, primarily due to our consolidation of research and development activities to take advantage of increased synergies and corresponding cost savings as a result of fewer sites. We directed research and development efforts during 2003 and 2002 primarily toward genetic screening and biopharmaceutical end markets within our Life and Analytical Sciences reporting segment, and medical digital imaging and industrial sensors within our Optoelectronics reporting segment.

19

Table of Contents

**Discontinued Operations**

We recorded the following gains and losses, which we report as the loss on dispositions of discontinued operations, during the years ended January 2, 2005 and December 28, 2003:

|  | 2004 | 2003 |
|---|---|---|
|  | (in thousands) | |
| Loss on Electroformed Products business | $(1,606) | $  — |
| Loss on Computer-To-Plate business | (951) | — |
| Gain on the resolution of contingencies associated with the Technical Services business | 1,487 | 6,535 |
| Loss on the sale of the Security and Detection Systems business | — | (2,414) |
| Loss on Entertainment Lighting business | 255 | (1,957) |
| Loss on Telecommunications Component business | (1) | (2,383) |
| Net loss on disposition of discontinued operations before income taxes | (816) | (219) |
| Benefit (provision) for income taxes | 321 | (229) |
| Loss on disposition of discontinued operations, net of income taxes | $  (495) | $  (448) |

As part of our continued efforts to focus on higher growth opportunities, in June 2004, we approved a plan to shut down our Electroformed Products business and sell our Ultraviolet Lighting business. In September 2004, we approved a plan to shut down our Computer-To-Plate business. We previously had reported the results of all three of these businesses as part of the Optoelectronics reporting segment. We have accounted for these businesses as discontinued operations in accordance with SFAS No. 144 and, accordingly, have presented the results of operations and related cash flows as part of discontinued operations for all periods presented. The assets and liabilities of these businesses have been presented separately and are reflected within the assets and liabilities from discontinued operations in the accompanying balance sheets as of January 2, 2005 and December 28, 2003. The net assets of the Electroformed Products business were written off resulting in a $1.6 million pre-tax loss for the year ended January 2, 2005. We sold the fixed assets and inventory of the Ultraviolet Lighting business in July 2004 for their approximate book value. The abandonment of the Computer-To-Plate business resulted in a $1.0 million write-down of fixed assets and inventory which we recognized in our loss on dispositions for the year ended January 2, 2005.

During 2004 and 2003, we settled various claims under certain long-term contracts and transition services with our Technical Services business, which we sold in August 1999. The net settlement and the reversal of certain previously established contingencies resulted in pre-tax gains of $1.5 million in 2004 and $6.5 million in 2003 that are included in gain (loss) on dispositions of discontinued operations. We reversed contingencies in the period in which the related issues were resolved. We may increase or reverse remaining contingencies in the future, pending resolution of the underlying matters.

In June 2002, we completed the sale of our Security and Detection Systems business for cash consideration of approximately $100.0 million and a net working capital adjustment. We recorded a net pre-tax gain of approximately $15.0 million pursuant to this transaction in 2002 as a gain on the disposition of discontinued operations. We accounted for our Security and Detection Systems business as a discontinued operation in accordance with APB No. 30, and accordingly, the results of operations and related cash flows of this business through the disposal date were segregated from continuing operations and reported as a separate line on our consolidated income statements. We have presented the resulting gain from the sale as a component of net income within dispositions of discontinued operations, net of income tax on our 2002 consolidated income statement. Adjustments relating to this sale resulted in a pre-tax loss from discontinued operations of $2.4 million in 2003, primarily due to revised estimates of the working capital adjustment.

In June 2002, our Board of Directors approved a plan to shut down our Telecommunications Components business as of June 30, 2002 and a plan to sell our Entertainment Lighting business as part of our continued efforts to focus on higher growth opportunities. We have reflected both businesses as discontinued operations in

24

Table of Contents

jurisdiction; for example, the IRS is currently examining 1999 through 2002. Assuming current progress, we expect the IRS examination to be completed in fiscal 2005. We regularly assess the likelihood of additional assessments in each of the taxing jurisdictions resulting from these and subsequent years' examinations. Tax reserves have been established, which we believe to be adequate in relation to the potential for additional assessments. Once established, reserves are adjusted as information becomes available and when an event occurs requiring a change to the reserves. The resolution of tax matters will not have a material effect on our consolidated financial condition, although such settlement could have a material impact on our effective tax rate and consolidated statement of income for a particular future period.

## Reporting Segment Results of Continuing Operations

### *Life and Analytical Sciences*

*2004 Compared to 2003.*    Sales for 2004 were $1,062.8 million, versus $1,003.7 million in 2003, an increase of $59.1 million, or 6%. Changes in foreign exchange rates, primarily the Euro, increased sales by approximately $39.2 million in 2004, as compared to 2003. The following analysis compares significant sales by market and product type for 2004, as compared to 2003, and includes the effect of foreign exchange rate fluctuations. Sales to environmental and chemical analysis customers increased $24.8 million, OneSource™ service sales increased by $20.4 million, sales to genetic screening customers increased $11.4 million, and sales to biopharmaceutical customers increased $2.5 million. Service revenue included approximately $2.9 million for the additional week in the 2004 fiscal year. Sales by type of product included increases in sales of instruments of $33.5 million, service of $20.4 million, and consumables of $5.2 million.

Operating profit for 2004 was $103.6 million, versus $94.7 million in 2003, an increase of $8.9 million. Research and development increased $3.5 million in 2004, as compared to 2003. Contributing to the increase were net cost savings associated with various productivity initiatives, including our restructuring and integration activities which resulted in a reduction of employees and the elimination of excess facilities. Offsetting these net cost savings were a $1.9 million restructuring reversal in 2003 for which there was no similar reversal in 2004, and dispositions which created a $0.8 million loss in 2004 versus dispositions which created a $1.6 million gain in 2003. Amortization of intangibles was $26.4 million for the year ended January 2, 2005, versus $26.0 million for the year ended December 28, 2003.

*2003 Compared to 2002.*    Sales for 2003 were $1,003.7 million, versus $991.7 million in 2002, an increase of $12.0 million, or 1%. Changes in foreign exchange rates, primarily the Euro, increased sales by approximately $61.0 million in 2003, as compared to 2002. The favorable effect of foreign exchange rate fluctuations was offset in part by reduced unit sales volume. The following analysis compares significant sales by market and product type for 2003, as compared to 2002, and includes the effect of foreign exchange rate fluctuations. Sales to environmental and chemical analysis customers increased $22.7 million, sales to genetic screening customers increased $6.3 million and our OneSource™ laboratory service sales increased by $14.8 million. These increases were offset by a $31.8 million decrease in sales to biopharmaceutical customers, primarily in sales of liquid handling instruments and radiochemical reagents, as general biopharmaceutical market demand remained weak throughout 2003. Sales by type of product included increases in sales of consumables of $23.5 million, and service of $14.8 million, partially offset by decreases in sales of instruments of $26.3 million.

Operating profit for 2003 was $94.7 million, versus $27.4 million in 2002, an increase of $67.3 million. The increase in 2003 as compared to 2002, was primarily the result of approximately $43.0 million of overall cost savings in 2003 associated with restructuring and integration activities, mainly due to a reduction of employees and the elimination of excess facilities. The increase in operating profit in 2003, as compared to 2002, was also due to approximately $31.5 million of net restructuring charges included in our results for 2002, compared to a net restructuring credit of $1.9 million in 2003. Amortization of intangibles was $26.0 million for the year ended December 28, 2003, versus $25.5 million for the year ended December 29, 2002.

27

Table of Contents

### Optoelectronics

*2004 Compared to 2003.*    Sales for 2004 were $380.6 million, versus $348.7 million for 2003, an increase of $31.9 million, or 9%. Changes in foreign exchange rates increased sales by approximately $6.5 million. The following analysis of significant sales by product line for 2004, as compared to 2003, includes the effects of changes in foreign exchange rates. Sales of digital imaging products increased by $21.4 million due to increased sales of diagnostic and radiotherapy digital x-ray products. Sales of sensors, lithography, and fiber optic test product lines increased $15.0 million. Sales of specialty lighting products decreased by $4.5 million due to lower photoflash sales into single-use cameras.

Operating profit for 2004 was $57.4 million, versus $46.8 million for 2003, an increase of $10.6 million. The increase in operating profit was primarily the result of increased sales volume, which increased operating profit by approximately $11.5 million, and net productivity improvements and cost reduction actions of $14.0 million, both offset in part by pricing reductions of approximately $14.9 million. Amortization of intangible assets was $1.2 million for 2004 and 2003.

*2003 Compared to 2002.*    Sales for 2003 were $348.7 million, versus $319.8 million for 2002, an increase of $28.9 million, or 9%. Changes in foreign exchange rates increased sales by approximately $10.0 million. The following analysis of significant sales by product line for 2003, as compared to 2002, includes the effects of changes in foreign exchange rates. Sales of specialty lighting products increased by $18.5 million due to growth in sales of flash products, and sales of digital imaging products increased by $18.9 million due to increased sales of diagnostic and radiotherapy digital x-ray products. These increases were offset in part by sales decreases totaling $8.5 million in our sensors, lithography, and fiber optic test product lines due to limited demand in these end markets.

Operating profit for 2003 was $46.8 million, versus an operating loss of $0.5 million for 2002, an increase of $47.3 million. The operating loss for 2002 includes a charge of $17.2 million for an inventory write down which was not repeated in 2003. Fiscal 2003 included a net restructuring reversal of $1.8 million compared to a net restructuring charge of $3.7 million in 2002. Increased sales and productivity improvements, including improved manufacturing performance and reduced operating expenses, and a headcount reduction of more than 200, reduced expenses by a total of approximately $20.0 million in 2003 compared to 2002. Amortization of intangible assets was $1.2 million for 2003 and $1.3 million for 2002.

### Fluid Sciences

*2004 Compared to 2003.*    Sales for 2004 were $243.8 million, versus $179.7 million for 2003, an increase of $64.1 million, or 36%. Changes in foreign exchange rates increased sales by approximately $1.4 million. The following analysis of significant sales by product line for 2004, as compared to 2003, includes the effects of changes in foreign exchange rates. Sales increased $30.5 million in our semiconductor products due to increased demand, $28.9 million in aerospace products, and $4.7 million in fluid testing and energy technology products.

Operating profit for 2004 was $38.2 million, versus $17.9 million for 2003, an increase of $20.3 million, or 113%. The increase in operating profit resulted primarily from increased sales, shifting production to lower cost locations in Asia, other productivity improvements resulting from Six Sigma and lean manufacturing initiatives. Amortization of intangible assets was $.9 million for 2004 and $1.1 million for 2003.

*2003 Compared to 2002.*    Sales for 2003 were $179.7 million, versus $189.5 million for 2002, a decrease of $9.8 million, or 5%. Changes in foreign exchange rates increased sales by approximately $2.4 million. The following analysis of significant sales by product line for 2003, as compared to 2002, includes the effects of changes in foreign exchange rates. Sales decreased $4.4 million in our semiconductor products due to declining demand, and $2.7 million in our energy technology products. In addition, sales to our aerospace and fluid testing customers declined modestly by $1.7 million and $1.0 million, respectively, in two difficult markets.

28

# DANGEL EXHIBIT 8

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SONORAN SCANNERS, INC.,<br>And<br>JOSEPH P. DONAHUE<br><br>    Plaintiffs<br><br>    v.<br><br>PERKINELMER, INC.<br><br>    Defendant | CIVIL ACTION<br>NO. 06-12090-RCL |

## SUPPLEMENTED OPINION REPORT OF PAUL A. BAIER

## INTRODUCTION

I have been asked to supplement my previous opinion report because of the passage of time of the original report, because I have received new, additional very reliable information relating to my original opinion, and because I have been asked to calculated the number of CTP machines that would in all likelihood have been sold by PerkinElmer (PKI) had PKI made a reasonable and diligent effort to market the Computer-to-Plate ("CTP") machines from May 2, 2001 to May 1, 2006.   This time frame, May 2, 2001 to May 1, 2006, is referred to as the

1

"Period" hereafter. All of my opinions stated hereunder, as in my previous report, have been arrived at and are stated to a reasonable degree of certainty. I have reviewed the new information I received objectively and without any pre-held opinion or view as to how the information would affect any opinion I have previously given.

## I.  IMPORTANT NEW AND ADDITIONAL INFORMATION  ABOUT NUMBER OF CTP MACHINES SOLD OBTAINED

### A. New, Highly Relevant Information Obtained

I have obtained additional information since submitting my earlier opinion report which has confirmed and strengthened my initial conclusions.  The credibility of this information is significant enough to warrant this supplemental.

The information obtained includes market data for the yearly unit sales of CTP machines received from State Street Consultants, Inc. ("SSC") and a lengthy conversion David Costa, a CTP industry veteran who worked at Agfa, a leading CTP vendor which sold CTP machines in the same market that PKI targeted and which would have competed directly with PKI.   The SSC data includes sales by each major CTP vendor during the Period and thus is highly relevant to this analysis.

From 1989-2004, Mr. Costa held a number of executive positions at Agfa, including VP of Corporate Product Planning and VP of Newspaper Systems.  These positions gave him direct experience with the buying patterns and needs of large printers (especially large newspapers and commercial printers), with industry standard practices for sales, marketing, and beta programs, and to other CTP competitors.   Since 2004, Mr. Costa has worked for SSC, which analyzes and

2

sells detailed market research data for the CTP market.   In short, Mr. Costa's has extremely

unique and relevant professional experience that is highly pertinent to this report.

My interview with Mr. Costa and the data provided by SSC further confirms a number of

important aspects of my previous opinion report.  (The SSC data and my interview notes with

Mr. Costs are included below in the Appendix.)     He confirmed the mission critical nature

newspaper applications and that high-end CTP machines were also needed at high volume

commercial printers (paragraph 3 in my earlier opinion report).  Data SSC provided and his

experience selling CTP machines clearly demonstrate that a very viable market for CTP

machines existed (paragraph 4 in earlier opinion report).  He confirmed the importance of a

technical pre-sales team working with experienced sales reps and the involvement of senior

management to successfully sell CTP machines to large newspapers (paragraph 8 in earlier

opinion).   To secure initial customers, he confirmed the essential need to make price

concessions and to offer additional benefits such as extended warranties (paragraph 9 in earlier

opinion).   He confirmed the need to spend money on sales and marketing, several million per

year, to be successful (paragraph 12 in earlier opinion). He told me that Agfa spent upwards of

$5 million a year on marketing, investing substantial money to exhibit at industry trade shows,

and employed technical sales assistants to help direct sales reps with sales demonstrations and

market tests.

## B. The CTP market is divided into a number of sub-segments and this report focuses on the two sub-segments most relevant to PKI CTP machine capabilities: newspapers and larger commercial printers

During the Period, the CTP market was an evolving worldwide market with different applications. CTP machines were a new type of technology used for printing newspapers, catalogs, weekly circulars, magazines and other items. During the Period, the technology was evolving rapidly with over 20 manufacturers selling CTP machines with various capabilities for different applications in different geographies. Two types of CTP machines were sold in this market, offset and flexo, and PKI sold both. The larger market for PKI was in offset.

**This report focuses on the 2 sub-segments most relevant for PKI products: newspapers and larger commercial printers, located worldwide.** The applications for CTP machines divide into a number of sub-segments, and larger newspapers were a critical target segment for PKI. Newspapers were large, demanding, very time sensitive, and risk adverse prospects. Newspapers in North America mainly used offset CTP machines and the newspapers in Europe used both offset and flexo. The commercial printers segment was varied and can be further divided into larger commercial printers who had high volume print runs using web printer which relied on rolls of paper and smaller commercial printers which used lower volume, sheet feed paper technology. The larger commercial printers which used rolls of paper were an important sales target for PKI. Other sub-segments for CTP machines were packaging, government, and ad/design. While the smaller commercial printers and these later three sub-segments could have been sales targets for the PKI CTP machines, this analysis assumes PKI did not try sell to these sub-segments.

4

Customer needs, market maturity and competitive dynamics differed geographically.  The primary geographic segments are North America (US and Canada), Europe, Africa, South America and Asia.

Newspapers and commercial printers were risk adverse companies and typically required at least 2 machines, one for production and one for backup.  Some newspapers purchased quite a few CTP machines.  USA Today had 100 CTP machines (Newspaper & Technology July 2003); Associated Newspapers (UK) bought 32 Polaris CTP machines (Newspaper & Technology July 2003), and the Globe and Mail (Canada) acquired 13 Autologic CTP machines ((Newspaper & Technology July 2003).

CTP machines required plates to operate.   PKI did not sell plates but partnered with plate manufacturers.  Some PKI competitors like Agfa sold both CTP machines and plates.  Competitive pricing at times involved a classic "razor and razor blade" pricing strategy, where CTP machines were priced lower and margins were recouped with volumes of plates (or perhaps a referral fee from plate manufacturer).   The 3 largest plate manufacturers were Afga, Kodak and Fuji.

During the Period a number of vendors acquired other vendors, which demonstrates the dynamic nature of this market.  Agfa purchased Autologic (AII) in 2001; Esko Graphics in 2003, and Laustra in 2004.   Kodak purchased Creo in January 2005.

5

**C.  At least, 3,845 CTP machines were sold in the relevant sub-segments of newspapers and larger commercial printers during the Period**

My initial analysis of the CTP market was based in market data from IFRA, a reputable

and widely used source of market data.  PKI used IFRA data in their business plan.  IFRA

estimated that 1886 CTP units would be sold between 2001 and 2004 worldwide, with 578 in the

United States (Seybold 12.27.01).  (Note that 1,886 units are for the first part of the Period and

the industry had significant growth during 2005 and 2006.  The market growth in 2005-6 would

make this IFRA data similar to the SSC data for the entire Period.)   IFRA identified the

dominate market share leaders were Agfa and Creo (with both comprising two thirds of the

market), while numerous other vendors split the final third (Seybold 12.27.01).

I have concluded that the market data from SSC is even more relevant than IFRA data.

While the IFRA and other industry data are generally consistent with the SSC data, the SSC data

are a more thorough and more relevant data source of CTP unit sales.  Unlike other sources of

market share data which rely on vendor provided numbers or estimates from computer models,

the SSC data were compiled through phone calls to actual newspapers and commercial printers

asking them how many and which brand of CTP machines were installed.   Requiring thousands

of phone calls each year, this approach provides SSC with a deeply empirical and highly reliable

summary of actual CTP machine sales.  Moreover, SSC has a particular research emphasis on the

North America newspaper and commercial printer market, key sub-segments for this analysis.

Note the SSC data provide for this report is for North America only (defined as the

United States and Canada), and, according to SSC and Mr. Costs, this data underestimates the

market size, as measured by units, by 10-15%, because an estimated 5-7% of printers refused to

share CTP machine information with SSC (recall that SSC reported CTP unit sales and that

6

printer typically had 2 CTP machines).  Since SSC only reports data directly reported SSC, the

SSC data under reports the actual number of CTP machines actually purchased.   This report

only uses the reported SSC data to be conservative.

I calculate that the worldwide market for CTP machines is 2.5 times larger than the North

America market.  Mr. Costa at SSC confirmed this as a reasonable and indicated that the

worldwide market may actually be 3 to 3.5 larger than the North America market.

**At least, 3,845 CTP units were sold worldwide to newspapers and larger commercial**

**printers, sub-segments relevant to this analysis.**   The CTP market grew rapidly in all

segments with over 6000 CTP machines being sold worldwide during the Period in sub-

segments.  The sub-segments relevant for this analysis are newspapers and larger commercial

printers and total unit sales for the Period are below.

**CTP Sales for Newspapers and Larger Commercial Printers during the Period**

| | North America (Provided by SSC) | | Worldwide (Estimated) |
|---|---|---|---|
| **Newspapers** | **Units** | **Share %** | Units |
| Agfa | 200 | 28% | |
| Creo-Kodak | 357 | 50% | |
| Basys | 50 | 7% | |
| ECRM | 43 | 6% | |
| Other | 64 | 9% | |
| | 713 | 100% | 1783 |

| | North America (Provided by SSC) | | Worldwide (Estimated) |
|---|---|---|---|
| **Larger Commercial Printers** | Units | Share % | Units |
| Agfa | 143 | 17% | |
| Creo-Kodak | 300 | 36% | |
| Fuji | 204 | 25% | |
| Screen | 154 | 19% | |
| Other | 24 | 3% | |
| | 825 | | 2063 |

| | |
|---|---|
| **Newspapers and Large Commercial Printers** | 3845 |

7

Source: SSC data for North America and estimates for worldwide units.

This data for CTP machine unit sales clearly shows that a large market existed for CTP machines during the Period.

**D. While actual pricing is difficult to obtain, list prices for high end CTP machines ranged from $300K to $500K. PKI's list price of $495K was highly competitive because of the cheaper plate cost and labor savings.**

PKI CTP machines had list prices of $495K. While this list price was higher than many competing CTP products, it was justified by a lower total cost of ownership for the printer because of the use of significantly cheaper plates and labor savings (this savings are discussed more in section F. below). Prospects did not make purchasing decisions solely on the price of the CTP machine, but evaluated the total cost of the operations, including the CTP machines, plate prices, labor and other factors over the many years that the CTP machines were used.

While pricing is difficult to find, the prices that were advertised suggested that many CTP machines had list prices over $300K. Examples of CTP machine list pricing in 2000 were: Basys Print UV Setter 57-Z at $350K; ECRM XL 240 at $330K; ECRM XL 180 $255K; and Purup-Eskof DMX 2727 HS at $225K (Seybold 11.20.00). Agfa priced a high end CTP machine, C160 model, at $413K in 2003 (list price quoted at 310K euros and converted to dollars with 1.25 conversion rate for 2003) (Seybold 11.24.03). Creo had similar list pricing. Mr. Costa confirmed that actual pricing is extremely to obtain and that $300K-$500K is a reasonable range for high volume CTP machines.

The PKI business plan document (PE 002275) forecast average industry selling prices for CTP machines of $231K in 2001; $235K in 2002, $250K in 2003 and $255K in 2004.

Because printers needed CTP machines, labor and plates, CTP machine purchase decisions were not made solely based on the price of the CTP machine. Total cost of ownership is very important. While PKI had a higher CTP machine price than some CTP vendors, the lower total cost of ownership PKI provided would make the PKI CTP machines attractive to many customers, particularly printers which used many plates. Moreover, some sub-segments of the market, such as the flexo segment, were less price sensitive. In short, prospects for the PKI CTP machines would have focused on total cost of ownership, which PKI had an advantage, and not solely list price of the CTP machine.

**E. This analysis assumes that PKI would have used industry standard efforts and efforts similar to competitors during the Period to take advantage of this rapidly expanding market**

My assertions of the required marketing and sales efforts to be successful in this market, detailed in my initial opinion report, were confirmed by my interview with Mr. Costa. To calculate PKI unit sales to a reasonable degree during the period, PKI would have conducted sales and marketing consistent with industry standards. These activities would include hiring experienced sales reps, supporting these reps with pre-sales technical engineers, often called application specialists or sales engineers. Marketing activities would have included exhibiting at key trade shows such as Graph Expo, PRINT, Nexpo and others. These shows were critical to educate prospects about the PKI CTP machines (PKI only attended one show during the Period).

9

Other marketing efforts would have included educating key press and industry analysts, generating press articles, and publicizing case studies.

PKI would have implemented industry-standard and successful beta program. This is mentioned by PKI as an important success factor and is absolutely essential in establishing a foothold with a new product in a growing market. The challenges with the actual PKI beta effort were discussed in my earlier report.

My calculation of the number of CTP units sold by PKI during the period, to a reasonable degree of certainty, assumes that PKI would have used these industry standard practices.

**F. Industry standard sales and marketing efforts, technology-advanced CTP machines, and the financial strength of PKI would have enabled PKI to sell hundreds of CTP machines during the Period**

PKI CTP machines allowed printers to save money in labor and plates and newspapers to gain competitive advantage by moving their print deadline later because less time was needed to print.  One of the most attractive aspects of the PKI CTP machines was the lower total cost of ownership.   PKI CTP machines saved customers money through labor savings and reduced plate costs.  PKI CTP machines were unique in the market place because they were 1) faster than competing CTP machines and 2) because they used cheaper plates than competitive models. The high processing speed of the CTP machines enabled a quicker print run thus saving money on labor.   Unlike competing CTP machines, the PKI CTP machine used cheaper plates (ultraviolet plates). The use of cheaper plates generated a significant ongoing cost savings for

customers, often as high as 40-70% savings as compared to more expensive plates used by competing CTP products.

This competitive advantage was noted in a industry magazine which wrote in 1999 that "the most significant new CTP product …comes from Sonoran Scanner…The most notable aspect of the product is that, unlike all other high speed CTP systems, it images ultraviolet sensitive plates, rather than higher priced special CTP plates…Newspapers typically pay in the vicinity of $.50 per square foot for conventional UV plants and around $1.20 per square foot for CTP plates. Plate prices are believed to be one of the major inhibitors to sales of CTP devices to newspapers, since newspapers use so many plates." (Seybold report on Publishing Systems 5.31.99).

For newspapers, the faster printing capability of the PKI CTP machine offered a competitive advantage of being able to start the daily newspaper print later in the day. This allowed a newspaper more time for late breaking stories.

The financial strength of PKI would be an advantage in competitive sales deals involving smaller venders like Creo, Basys and Esko-Graphics. For risk adverse newspapers, the financial size and global breadth of PKI would be attractive, particularly during the 2001-2 recession and for risk adverse newspapers. When considering an investment in a CTP machines which would be a commitment to use a certain technology for 7-15 years, large news newspapers simply must have confidence the CTP vendor will be around and a large corporate parent provides this confidence. PKI has overall revenue of $1.5 billion. Agfa had corporate sales of $5B, but PKI overall corporate revenue was larger than Basys ($13m), Esko-Graphics ($227m) and Creo ($450m).

PKI presence in the US would offer additional competitive advantages. The executives, headquarters, design, manufacturing and customer service were all located in the United States and this would have been valued by some US prospects.

The customer benefits from the superior technology and the financial strength of PKI, coupled with a robust CTP market during the Period would allowed PKI to sell many CTP units had industry standard practices and investments been used in sales, marketing and other areas. These company and product advantages of PKI would have enabled, in all likelihood, to win sales when directly competing with the leading CTP vendors such as Agfa, Creo, Baysis, ECRM, and others. The next section calculates the number of units that would have been sold to a reasonable degree of certainty.

## II. CALCULATION OF THE NUMBER OF CTP MACHINES THAT WOULD HAVE, IN ALL LIKELIHOOD, BEEN SOLD BY PKI HAD IT MADE REASONABLE AND DILIGENT EFFORTS

In this section, I calculate the number of CTP machines would have been in all likelihood have been sold by PKI had it made reasonable and diligent efforts. All assumptions I have made have come from my prior opinion report and section I above, unless noted.

I analyzed the industry, strengths of the CTP machines relative to competitors, assumed that PKI used industry-standard efforts for sales, marketing, manufacturing, beta programs and customer support. This calculation of the number of units is based on a reasonable degree of certainty.

12

**I calculate to a reasonable degree of certainty PKI would have sold 473 units during the Period.** PKI would have secured 15% of the worldwide market CTP machines sold to newspapers and 5% of CTP machines sold to large commercial printers, based on my professional experience, understanding of the CTP technology and market, and information I have received from to date.

Estimated CTP Machines (unit sales) for PKI
in Units

| | 2001* | 2002 | 2003 | 2004 | 2005 | 2006* | Total | NA Share | WW Share | Notes and Assumptions |
|---|---|---|---|---|---|---|---|---|---|---|
| * partial years only. May-Dec for 2001; Jan-May 2006 | | | | | | | | | | |
| A. Offset | | | | | | | | | | |
| US Newspapers | 2 | 10 | 25 | 30 | 50 | 60 | 177 | 25% | | |
| EU Newspapers | 0 | 2 | 4 | 6 | 10 | 15 | 37 | | | |
| Asia Newspapers | 0 | 0 | 0 | 10 | 20 | 25 | 55 | | | |
| Total newspapers (worldwide) | 2 | 12 | 29 | 46 | 80 | 100 | 269 | | 15% | |
| Commercial Printers (ww) | 0 | 4 | 10 | 20 | 30 | 40 | 104 | | 5% | assume 65% of units sold in US |
| B. Flexo | | | | | | | | | | |
| Flexo Units (worldwide) | 0 | 5 | 10 | 20 | 30 | 35 | 100 | | | through MacDermid; assume all units outside North America unit growth based on forecasts by MacDermid, PKI, and Norm Shaver |
| Total | 2 | 21 | 49 | 86 | 140 | 175 | 473 | | | |
| year/year growth - units | | | 28 | 37 | 54 | 35 | | | | |
| year/year growth - % | | | 133% | 76% | 63% | 25% | | | | |
| North America - units | 2 | 13 | 32 | 43 | 70 | 86 | 245 | | | assumes 65% of commercial printer units are North America |

This analysis is realistic for multiple reasons, one of which is that newspapers contacted during the Period by PKI make purchases during the Period or soon after from other CTP vendors. LA Times bought 22 Afga machines by 2006-7. Dallas Morning News invested in CTP machines from Western Litho in 2003 (Newspaper and Technology July 2003). Denver Post purchased 5 Kodak CTP machines in 2006 (Printing News 1.23.07). Arizona Republic,

13

mentioned by Mr. Iadonsi, purchased 5 Kodak CTP machines in 2006 (Newspaper &Technology January 2007).

Other newspapers made CTP purchases after the Period, but their purchases demonstrate a market need and PKI superior technology and financial strength could have caused the some of these purchases to be made during the Period. Examples include: the Miami Heard, mentioned by Mr. Iadonsi, purchased $3.5m of Kodak/Creo machines in 2007 (Newspaper and Technology Apr 2007); the Minneapolis Star Tribune purchased Afga machines in 2008 (Agfa press release 5.6.08); and the San Jose Mercury News purchased Kodak CTP machines in 2008 (Editor and Publisher 4.28.08).

This analysis is also conservative because PKI would have opportunities for additional CTP machine sales sub-segments assumed outside the scope of this analysis. These opportunities include additional sales deals with plate manufacturers (deals similar to the MacDermid deal), sales to South America, sales to packaging sub-segment, and the use or licensing of the technology in other products.

## CONCLUSION

This supplemental report introduced new and highly relevant information about the robust size of the CTP machine market during the Period and industry standard practices which confirm conclusions in my initial opinion report. My calculations are based on reliable data and demonstrate that with a reasonable investment, diligence, and efforts PKI would have sold, in all likelihood, 473 CTP machines during the Period.

DATED: 12/7/09

Paul A. Baier

14

**APPENDIX**

Raw data provided by State Street Consultants, Inc on December 1, 2009. This data was send in
Excel from David Costa of State Street Consultants to Paul Baier (note this data are for North
America (US and Canada) only)

# Market Share of Units Installed
# by Segment for 2001 to 2006
**Prepared by State Street Consultants, Inc. December 2009**

| Newspapers | Share % |
|---|---|
| Agfa | 28% |
| Creo | 50% |
| Basys | 7% |
| ECRM | 6% |
| Other | 9% |
| | 100% |
| | |
| Commercial Printer >100 employees | Share % |
| Agfa | 18% |
| Creo-Kodak | 37% |
| Fuji | 25% |
| Screen | 18% |
| Other | 2% |
| | 100% |
| | |
| Commercial Printer 50-99 employees | Share % |
| Agfa | 16% |
| Creo-Kodak | 35% |
| Fuji | 24% |
| Screen | 20% |
| Other | 5% |
| | 100% |
| | |

15

## Installations - CTP Units by Year
**Prepared by State Street Consultants, Inc. December 2009**

| | 5/1/01-12/31/01 | 2002 | 2003 | 2004 | 2005 | through 9/30/2006 | Total |
|---|---|---|---|---|---|---|---|
| Newspaper | 25 | 76 | 114 | 152 | 182 | 164 | 713 |
| Commercial Printers >100 employees with web press | 45 | 112 | 156 | 112 | 82 | 67 | 574 |
| Commercial Printers 50-99 employees with web press | 20 | 49 | 68 | 49 | 36 | 29 | 251 |
| Total | 90 | 237 | 338 | 313 | 300 | 260 | 1538 |

Paul Baier Notes from Interview with David Costa on November 24, 2009 at State Street Consultants, Inc. offices

Notes
- Over 6,000 CTP units sold worldwide in all segments form 2001-2006, nearly 3800 were sold in North America in all sub-segments and 3+ times this number worldwide
- Agfa spent $3-5m/year on marketing.  Trade shows were very important but expensive (because you had to bring out CTP machine)
- It is absolutely industry standard practice to have pre-sales technical assistants for sales reps.  Agfa called them Application Engineers
- Average sales reps at Agfa carried quote of $600K to $800K
- Mr. Costa never heard of Perkin Elmer, but suspect that this technical team may have been monitoring their software
- Beta programs were absolutely essential for success with new CTP machines and often involved a price discounts for the first units, visits by and assurances from senior executives, extended warranties, and other incentives for early customers
- Newspapers are very risk adverse and wanted to be sure a chosen CTP vendor was committed and would support the product for many years

16

# DANGEL EXHIBIT 9

**Joe Donahue**

| | |
|---|---|
| **From:** | Jurkiewicz, Jerry |
| **Sent:** | Tuesday, February 03, 2004 2:05 PM |
| **To:** | Weiler, Rick; Donahue, Joe; Ortega, Denise |
| **Subject:** | Re: Nexpo 2004 |

I say we go cheap and machineless as we did last year. The only thing
worth bringing would be the Flexo unit. We can't expect one will be
available as Joe pointed out.


Jerry Jurkiewicz
VP of Operations
Optoelectronics

PerkinElmer Optoelectronics
44370 Christy Street
Fremont, CA 94538-3180
Phone: 510-979-6803
Cell:  510-579-1659
Fax: 510-687-1344
jerry.jurkiewicz@perkinelmer.com


-----Original Message-----
From: Weiler, Rick <Rick.Weiler@perkinelmer.com>
To: Donahue, Joe <Joe.Donahue@perkinelmer.com>; Jurkiewicz, Jerry
<Jerry.Jurkiewicz@perkinelmer.com>; Ortega, Denise
<Denise.Ortega@perkinelmer.com>
Sent: Tue Feb 03 15:00:14 2004
Subject: RE: Nexpo 2004

I recall some negative publicity about "nothing new" from PKI on this
front, so if we're going to show anything, probably want smaller/newer
model

-----Original Message-----
From: Donahue, Joe
Sent: Tuesday, February 03, 2004 1:43 PM
To: Jurkiewicz, Jerry; Ortega, Denise
Cc: Weiler, Rick
Subject: RE: Nexpo 2004


Jerry:

If we have a flexo prototype still in the shop come June, then it makes
sense. But the flexo prototype will likely be shipped and installed by
then.

Our tentative plan to get to NEXPO is to build the new, smaller
cover/frame, shrink the granite, build a new out-feed, and borrow the
rest from Wholesale (part of the in-feed, stages, optics, electronics)
except for a solid-state laser (to be borrowed from inventory, we hope).
This is about all we can get done before the show. We can't shoehorn
today's large flexo in-feed into this new packaging. The smaller
in-feed (flexo or offset) won't be ready until August or September.

 The majority of the show attendees will be there to see offset. This is
the market in which we desperately need share-of-mind since
MacDermid/flexo is, by comparison, a captive market and near-term sales

1


DEPOSITION
EXHIBIT
203
5/5/08

SS 05529

are a result of pent-up demand of MacDermid's current customers.

If MacDermid is willing to share costs for a NEXPO machine, we must
build a second copy of today's large and heavy prototype in order to
meet the show deadline.


Denise:

Our new system will be 2 to 3 feet shorter but we'll still have G&J 85HD
processor coupled to it, assuming offset/metro, so we'll still take up a
lot of floorspace.  If we align the coupled systems diagonally, we can
fit it in a 20 x 20 booth (we did this at NEXPO 2000) but there will
only be room left for a 2x2 table, a small tower, and we'll spill out
into the aisles.  We will definitely save a few $$$ because of the
planned lower weight.  The older machine, shipped with packaging, setup
equipment, and G&J processor, weighs 15,000 lbs.  I expect to need to
ship 9,000 lbs. this time.

Regards...............Joe




-----Original Message-----
From: Jurkiewicz, Jerry
Sent: Tuesday, February 03, 2004 12:48 AM
To: Ortega, Denise; Donahue, Joe
Cc: Weiler, Rick
Subject: Re: Nexpo 2004


What if we asked Macdermid for some cash?  They must want us to have a
machine there.


Jerry Jurkiewicz
VP of Operations
Optoelectronics

PerkinElmer Optoelectronics
44370 Christy Street
Fremont, CA 94538-3180
Phone: 510-979-6803
Cell:  510-579-1659
Fax:  510-687-1344
jerry.jurkiewicz@perkinelmer.com

-----Original Message-----
From: Ortega, Denise <Denise.Ortega@perkinelmer.com>
To: Donahue, Joe <Joe.Donahue@perkinelmer.com>
CC: Jurkiewicz, Jerry <Jerry.Jurkiewicz@perkinelmer.com>; Weiler, Rick
<Rick.Weiler@perkinelmer.com>
Sent: Mon Feb 02 21:02:29 2004
Subject: RE: Nexpo 2004

Joe,



Considering the ProForm will be smaller and lighter, can we get a
smaller booth and do the show for $30K? What's the smallest booth we can
get this in, a 20x20?

I can help you with logistics/suppliers/budgets but I need to know if

2

SS 05530

you think it's reasonable.

Thanks,

Denise

 -----Original Message-----
From:      Donahue, Joe
Sent: Tuesday, January 27, 2004 3:34 PM
To:   Ortega, Denise
Cc:   Jurkiewicz, Jerry
Subject:    FW: Nexpo 2004
Importance: High


Hello, Denise:

Terri reminded me that NEXPO is fast filling up.  Are we budgeted to go
this year?  I'll give Jerry the details when he is back but we are
likely to have a new ProForm Metro ready for the show - it'll be a much
smaller, much lighter, and lower cost ProForm Metro with a solid-state
laser.

Regards...............Joe


 -----Original Message-----
From:      Varese, Terri
Sent: Tuesday, January 27, 2004 4:18 PM
To:   Donahue, Joe
Subject:    Nexpo 2004
Importance: High

<http://www.eshow2000.com/nexpo/floor_map.cfm>

Joe,

I looks like PerkinElmer does not have a spot selected or even on
hold.......as you can see, room is running out and it's only 1/27.  Also,
what is left is near the back.  Of course they could be called to see if
someone has cancelled or put on a list or something to get a better
location if someone does cancel in a more ideal part of the show.

Terri

3

SS 05531

# DANGEL EXHIBIT 10

G. Baxter
EXHIBIT: 23
DATE: 022908
CHRISTINA S. NORTON CSR 12465

## Joe Donahue

| | |
|---|---|
| From: | Donahue, Joe |
| Sent: | Thursday, August 23, 2001 3:59 PM |
| To: | Baxter, Greg |
| Subject: | RE: Concerns |

-----Original Message-----

| | |
|---|---|
| From: | Baxter, Greg |
| Sent: | Thursday, August 23, 2001 2:38 PM |
| To: | Donahue, Joe |
| Subject: | Concerns |

Joe:

I like Dave Hill, and so does the rest of our team in California. I hope we will have Tim and eventually others reporting to him. I'm really counting on his expertise to link our organizations together for success. Why not put him in charge? I would much rather see him manage the short term goal below than start on a paper compactor.

*[Donahue, Joe]* Dave is slated to head up the interface on this project instead of Tim.

*[Donahue, Joe]* The paper compactor is mandatory for metro newspapers. When they buy unit #1, they typically refuse to buy one with a subset of features of the follow-on units. Taking the next step, let's take a typical metro with 3 or 4 machines. If the paper chute fills up every 15 to 20 minutes, they need to station someone there every 5 minutes or so to remove the paper. They know this and from our interviews over the past couple of years, this is an issue. Therefore, the first unit needs these features. Taking your argument to an extreme, why not attempt to sell a manual machine? Go back to the 2nd sentence - they are evaluating us and don't want to extrapolate to a completed machine. Otherwise, we will lose to Agfa or Creo.

I want us to stay aligned, so I've collected some thoughts.

Obviously the business picture is rotten and hit us during the merger. Our two businesses are rolling up to a $2 million loss for 2001. That said, I am nervous about expenses and the completion of our first PKI built machine.

To recap my vision of the deal from the presentation to Greg Summe and John Engel:
### Graphic arts sales fund development for electronic substrate application.

This means that we complete your system, penetrate the Newspaper marketplace, and self fund your site with the profits. I did exactly this at my site with the G2. We made our plan for the year and launched (self funded) a new product. Remember "Sales Now"?

*[Donahue, Joe]* Agreed. However, most of the tasks we are performing have been planned since the beginning. Our original strategy was to sell to the Pennysaver a less than complete system and eventually replace it with one that was "more complete". However, the metro newspapers are going to be a lot more demanding and finding another Bill Hobbs is not 100% certain.

Perhaps I don't have all of the information, but our sales effort appears to be less intense than it was at Sonoran Scanners. Guy's feedback is that PKI has poor visibility out there. We attacked this issue by sending Joe Barrett AND Norm Shaver to visit a number of accounts and constantly follow-up. When Sonoran Scanners dropped of the map between 7/2000 and 5/2001, we lost that momentum. The sales are not going to come to us. We need to establish personal relationships with the easily identified major metros and need to push our COO benefits hard. Joe Barrett opened a lot of doors for us, a lot more than Guy or PKI have opened.

Also, I suggest caution about the electronic substrate business since my feeling is the last couple of years have been anomolous rather than normal and that sales will not reach the same levels for quite some time. That is why I feel diversification via newspapers, packaging, etc. is very good for this business.

For the very short term this means the following:
**Redesign the frame to palletize the exposure module, finish/incorporate the Anita Automation material handling into the system and leave everything that works well alone. Fix/change only things that are**

1

SS 04172

**absolutely necessary to put in a "first PKI built system" at a customer. Don't add features (like paper compactors until later). Build/complete this unit in 2001.**

*[Donahue, Joe]* See above explanation on paper catcher. It has been well advertised that our software is not complete. We will only be able to expose double trucks outside of the laboratory after we have finished the calibration routines. Also, we have had a series of software bugs that are being squashed but if not fixed would keep this machine from being declared robust. The engineering tasks we are performing are not outside of these boundaries. Remember, our customers are nowhere as skilled as the Don Hutchins of this world and have been spolied by the well crafted machines of our competitors.

The Azusa team is on board with this. Is this priority understood by everyone at your site? I don't think so. I think you all want to Engineer this and be absolutely correct before we build something. We run our business here in Azusa with measured risk taking, **so we can have a short time to market.** The above goal is not a major risk, nor does it need a bunch of analysis. It just needs to happen soon, and without spending a lot of money.

*[Donahue, Joe]* We are willing to accept compromises in the design. And we are willing to build machines with few changes - we are doing so now. However, you need a minimum critical mass in Tucson to support and build this product - and this minimum critical mass will have extra time to design the features needed to broaden the acceptance of this product.

## It is unreasonable to arbitrarily declare certain features of the product unnecessary. I VERY STRONGLY suggest a design review with engineering and marketing personnel from both facilities to address these issues now.

We're not on the same page for expenses and purchases. I do not want to see list prices for things you want to buy, and complacently hope the cost will be less. Perhaps all the purchasing should come out of Azusa???? I am uncomfortable.

*[Donahue, Joe]* You are welcome to take this function over to Azusa in order to increase your comfort level. We've gotten the prices down by truthfully alerting the suppliers that "corporate" is having a fit, over which we have no control. It is a good story. You will have to come up with another story. Also, this tactic only works on items like the software licenses/maintenance where the pricing is somewhat arbitrary, and also volume purchase of parts. Regarding the latter, I have in the past usually negotiated volume prices and know that I have gotten better prices than Etec, Orbotech, etc. I challenge anybody in Azusa to get better prices than I have gotten for the laser, the polygon, the AOM, etc. I have been through this exercise before with "professional purchasing" dept's and have ALWAYS seen less than satisfactory results, oftentimes getting parts with materials or coating changes that have negatively affected performance.

Your attendance at the AOP review next week will be helpful (and insightful for you). I attached a Cost of Sales Analysis, plus Tucson's labor/expenses for you. Sorry there was not a great deal of time for us to spend on this, due dates are due dates.

You can see the Tucson Sales on the sheet. It shows Sales of $5.5 million (11 systems) next year, which is in between the $3 million for 2001 and the $8.8 million for 2002 that were in the acquisition plan. Note that the material costs are in at $272K per system with a labor cost of $16K. This analysis if obtained, at the average sell price of $475K, makes your site break even. **We're a long way from getting to the material cost goal** and frankly your burn rate (expenses), if left unchecked, will kill this. My original analysis showed your system at about 21%GP, but you would lose a 1/2 million dollars next year. At the 28% GP in the present file, it is nothing to get the corporation excited about.

*[Donahue, Joe]* I will address this after reviewing the attached files.

I'm really surprised that I'm receiving so much resistance to these basic premises. All your folks are incentivized around Sales and Profits, and everyone clearly knows what is going on in the industry. I think we are in a cultural headlock that we need to address.

*[Donahue, Joe]* There is no headlock here. The BOMs have required a lot of time to complete to a satisfactory level. They would have been completed earlier if we hadn't been doing some of the engineering work you seem to find unnecessary.

I also mentioned that we will begin the LOR process in Tucson very soon. You need to make sure that when everyone fills out their Continuous Improvement Summary, that each individual's development needs are clearly

2

SS 04173

noted. Let me give you two examples -- Bill Hart and Tim Ellis. Most recently, when I asked why Tim wasn't finishing the weld frame, you said I don't want to take his attention span off the vacuum chuck. Sounds like he has some development needs (You don't want to hear any more from me about Bill Hart).

Case 1:06-cv-12090-WGY    Document 32-13    Filed 08/07/2008    Page 4 of 4

*[Donahue, Joe]* Yes, we all have room for improvement. My experience has been that the best members for an advanced development team are the people the rest of the corporation are uncomfortable with. Etec tried to mold the Polyscan engineers into their image and got a bunch of conformists that were unwilling or unable to think outside of the box, hence one of the two reasons for the big disaster. Regarding Tim, although I would like to get more performance from him it is also unfair to ask him to perform the role that 3 or 4 other people played in the past. With Dave here, our productivity in the mechanical area will improve by one than 100%.

Also attached is a 1 page slide that will come up at next week's meeting. Absorb all this, Joe and then let's talk.

*[Donahue, Joe]* I will read the attachments and call you to discuss further.

<< File: LITHO BUDGET TUCSON SITE.xls >>  << File: Litho AOP 1 Pager.ppt >>

Thanks

**Greg Baxter**
General Manager
PerkinElmer Optoelectronics
Lithography Systems
greg.baxter@perkinelmer.com
Phone: 626 8153133
Fax: 626 8153131

3

SS 04174

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SONORAN SCANNERS, INC. and | ) |
| JOSEPH P. DONAHUE, | ) |
| *Plaintiffs,* | ) |
|  | ) |
| v. | ) |
|  | ) |
| PERKINELMER, INC., | ) |
| *Defendant.* | ) |

Civil Action No. 06-12090-RCL

## AFFIDAVIT OF NORMAN L. SHAVER

Norman L. Shaver, 54 years old, of Oceanside, California, being duly sworn, under oath, hereby deposes and says:

1. I attended Rochester Institute of Technology working on a B.S. in Chemistry. After which I went to work as an engineer for I.B. M. in 1982 at Endicott, New York. My job title was Staff Engineer. I worked on new photolithography techniques in Research and Development for the printed circuit industry. This brought me into contact with Joe Donahue, who, at the time was a principal at Polyscan. In 1998, Mr. Donahue, who had moved on to Sonoran Scanners, told me that he needed a first rate engineer to help develop a UV Plate Computer-To-Plate Imaging System. and asked if I would take the job, which I did. At the time, Sonoran Scanners had ten employees. From 1998, I served as the lead engineer in the development of the CactusSetter, although my formal title was Product Specialist. In May, 2001, when PerkinElmer purchased Sonoran, I became an employee of PerkinElmer. My job was in the same capacity when PerkinElmer purchased the company in May, 2001, and remained in that job until MacDermid purchased the CTP division's assets in October, 2004. For about the first year after the purchase,

my job entailed design, building, and setting up the manufacturing facility in San Marcos for

MacDermid's Flexo CTP machines. The facility was not equipped to handle the building of CTP

equipment and therefore lacked some basic requirements that were available in PerkinElmer's

Azusa/Tucson plant. Since the end of 2005, my title has been Senior Design Engineer for the

facility. In my jobs at Sonoran, PerkinElmer and MacDermid, I necessarily have had some

involvement with the companies' sales effort. Although I was not a technical support sales

engineer, I played this role at PerkinElmer at times because it refused to hire technical support

for the sales staff—a very unusual thing at a company the size of PerkinElmer. At Sonoran, I did

not need to perform this duty on a regular basis, because Norm Bogen, Sonoran's head of sales

and marketing, was a qualified engineer. But Joe Donahue made sure that all of the stockholders

understood the sales and marketing plan, which was based on the speed and precision of the

machine and its cost of ownership. The cost of ownership model was based on the fact that the

CactrusSetter used ultraviolet ("UV) plates, which were considerably less expensive and the

saving of labor cost. At MacDermid I interface with sales in order to make sure that we are

meeting the purchaser's requirements for plate size and other technical matters but have not been

involved with making presentations.

        2. In my job at PerkinElmer, I watched Guy Antley make presentations on several

occasions and worked with him on demonstrations and had one uniform reaction: I was

embarrassed by his incompetence. He did not know enough about the technical aspects of the

machine to explain the engineering basis for its operation. He also could not explain a

customer's needs cogently. In one report, for instance, he described "Color 1016". The two

concepts, color, and 1016 (screen resolution) have nothing to do with each other. At the 2002

NEXPO show, I watched as Mr. Antley tried to figure out how to turn on the machine while several potential customers were watching him, too.

3.  His lack of technical capability came into play whenever we did demonstrations. These were performed in Tucson and sent back to the potential customers. It was critical that Mr. Antley obtain the correct information about page size, dimensions, resolution, line screen and other factors, so that the image would be displayed on the plate correctly. In many instances—the Minneapolis Star, the LA Times, and the Miami Herald come to mind most prominently—the information transmitted by Mr. Antley was just plain wrong, and the test was less than satisfactory. While this had the effect of turning off some customers, particularly an early one, WPP, I got involved on a number of occasions with talking with the customer and getting the right specifications, which drew me closer to the technical people and others at the newspapers involved, and, as reported below, a number of them complained to me about Mr. Antley.

4.  As I say, I watched Mr. Antley make presentations to a number of potential customers. As the Miami Herald in June, 2003, for instance, I watched Mr. Antley try to explain our cost of ownership model. It was evident to me and everyone else in the room that he did not understand how the cost of ownership worked. When confronted on specific areas of the cost of ownership Mr. Antley could not explain the present configuration let alone determine changes requested by the customer. This meeting, along with many others, ended with a frustrated customer who concluded that if our CTP machine performance was mirrored by our sales force that the machine was a piece of crap. I reported this in e-mails and, indeed, wrote a number of e-mails to higher-ups complaining about Mr. Antley's performance.

5. I also heard complaints from the Los Angeles Times and Pennysaver. I was very familiar with both, having visited them and done demonstrations for them on a number of

-3-

occasions. One person at the PennySaver told me that they were very concerned that they weren't getting a fair shake from PerkinElmer, that they wanted a machine because they liked it, but, because none were in the field, they wanted a BETA price and a deal on parts. I told them, as I told the Miami Herald and the LA Times that, while their concerns about price were fair, I had no clout but would report their concerns "upstairs". I reported this to Joe Donahue. I also reported it to Guy Antley and Greg Baxter—both of whom told me to stay out of it.

6. As to NAPP/MacDermid ("MacDermid" hereinafter), I was aware of its needs for a Flexo CTPmachine. MacDermid, the primary manufacturer of Flexo plates in the world, had tried to build its own Flexo machine and had failed, and it had come to PerkinElmer for a solution. After I had gotten to know the people at MacDermid I was told by MacDermids head of sales that they (MacDermid) almost did not pursue the PerkinElmer CTP machine because of Guy Antley's very poor presentation. MacDermid, as other newspapers, assumed that the quality of a machine is reflected in the sales personnel/presentation. Since Mr. Antely knew less about the CTP machine and process than his customers, people assumed that the PerkinElmer machine was of poor quality. MacDermid was however different from other customers in that they needed a CTP solution and they needed one immediately or they would loose a substantial amount of business (customers switching to offset printing). MacDermid aggressively pursued a relationship with PerkinElmer, despite Mr. Antley's incompetence, but by that time, I believe, PerkinElmer executives were preparing to shutdown the Tucson facility.

7. Flexo CTP sales worldwide. Because PerkinElmer abruptly shutdown their CTP business MacDermid was forced to approach Basys to start manufacturing Flexo CTP

-4-

machines. With MacDermid's and Basys combined there are 34 machines installed or soon to be installed in Europe and six more on the way. In the US there are 8 Flexo machines installed and 2 more expected to be placed this year. All of these machines have been sold to customers who have been waiting for Flexo CTP to become a reality. As of such it is fair to say that more than 50 Flexo machines will have been sold from customers available in 2002-2003.

Signed and sworn under the pains and penalties of perjury this 22nd day of January, 2010.

NORMAN L. SHAVER

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SONORAN SCANNERS, INC. and JOSEPH P. DONAHUE, _Plaintiffs,_ v. PERKINELMER, INC., _Defendant._ | Civil Action No. 06-12090-RCL |

### AFFIDAVIT OF NORMAN BOGEN

Norman W. Bogen, 53 years old, of Scottsdale, Arizona, being duly sworn, under oath, hereby deposes and says:

1. My undergraduate degree, from the University of Arizona, is in Systems Engineering; my graduate degree which I received from UCLA in 1982, is an MBA. I have been employed by a telecommunications market research firm, Reed Business Information, as Senior Director of Research where I oversee 15 analysts and support the sales force since July, 2001. After business school, I worked for Standard Oil for two years, then I worked for Printronix, a manufacturer of impact line printers (1984-89). After Printronix, I joined Blaser Industries, a start-up company which manufactured laser printer controllers (prior to the HP Laserjet) as OEM sales manager—selling to companies which were selling our units as a component of an overall computer solution. Blaser was rolled up into a larger company and I became the product manager for the printing systems. Through a friend there I was introduced to Joe Donahue, who asked me to join Sonoran Scanners, and I did so in 1997 as Vice President of Sales & Marketing. I stayed with Sonoran through its sale to PerkinElmer in May, 2001, at which time I became a part-time

consultant for two months, after which I joined Reed. While I had some familiarity with the newspaper and publishing business through my work at Blaser and its successor, I really learned the newspaper business in 1998 and 1999 by spending time with Joe Barrett, who was Sonoran's manufacturer's rep, and who had more than 25 years experience in the newspaper business— though he was new to CTP, as was virtually everyone during that time period. CTP was new-- there were 100 or fewer units sold in the US through the middle of 2001—but I could see from the interest in our machine, the CactusSetter, in 1999 and particularly 2000, it was poised for take-off, and by the middle of 2000, when we successfully demonstrated the Cactus-setter and more than 30 major newspapers showed strong interest in getting our machine as a BETA, I knew we had a hot product.

2. When it became probable in early 2001 that PerkinElmer was going to purchase Sonoran, I was interviewed as were other key employees of Sonoran, to continue on with CTP in Tucson. I grew up in the Tucson area, but I had moved to Scottsdale with my family in the early 1980's and owned a home there. My children were in school and my wife worked in Scottsdale. As a result, Sonoran had been paying my housing expenses to stay in the Tucson area, where Sonoran was located, three to four nights a week. In addition, I had a commission arrangement with Sonoran, was paid $100,000 per year, and owned 9% of the company. I was overdue for a raise, in my opinion. I told Greg Baxter and the HR person from PerkinElmer that I was looking for a raise ($25,000 a year was what I had in mind), plus to continue my commission arrangement, plus either continuing my hotel expenses or expenses to move my family to Tucson. On April 23, 2001, I received the offer from Perkin/Elmer, and it was not commensurate with what I was making. The salary was the same, but there was no commission arrangement, no travel/living expenses, and no compensation for my ownership in Sonoran. So, I

refused the offer and sought to negotiate. I called the HR person, John Letcher, but an assistant came on the phone, and I told her I was rejecting the offer as is, but wanted to negotiate. She said she'd have Mr. Letcher call me back. He did, and asked me what I was looking for. We had a long discussion about moving expenses and said he'd get back to me, which he did not do until after the closing, at which time he asked me whether I'd take a consulting job for a couple of months. The primary task they wanted from me, he said, was to attend the June, 2001, NEXPO show, but they'd pay me to prepare for the show as well as attending.

3. In preparation for the show, I met with Guy Antley twice. The first time was in Phoenix where we met and rode together to Tucson. During the meeting and ride, I discussed what I had learned about placing first CTP machines and what the market looked like from there. I told him that CTP was typical large expenditure capital product. The sale was based on Cost of Ownership and the customer's belief that the company was fully committed to seeing the product through. The first placements, as I told him, had to be BETAs, meaning the prototype and a few early machines had to be well-placed geographically as reference machines and had to be sold on either a trial basis or at a substantial discount or both. I told him there had to be high level management involved and there had to be replacement parts and long inexpensive deals in place. He said he knew all this from his past experience and it was typical with new product introductions. I told him that four potential customers had already expressed an interest in being BETA customers and they had been pre-seeded and were ready. These were Harte-Hanks (Pennysaver) which was dying to be first and get the best deal--they were willing to pay $250,000-$300,000 for the prototype I told Antley—the Cleveland Plain-Dealer, the Los Angeles Times and the Miami Herald. These were in different parts of the country, the Miami Herald was part of the Knight-Ridder Group, and I told Antley that if we could get reference machines into

some or all of these sites, PerkinElmer could dominate the major newspaper CTP market. None of these companies or others I spoke to were wedded to other manufacturers, and while Agfa and Creo were very active, their machines had problems and they were anything but dominant. When I told Mr. Antley, he didn't seem very interested and said he had a list of newspapers he was going to call to see if they had any interest in CTP. My second conversation with Mr. Antley was in Los Angeles in May 2001, and Mr. Baxter was also present. There had been a visit with Pennysaver, which I attended. What struck me was that on our side, the PerkinElmer side, all of our discussion was about what a large and important company PerkinElmer was and how much it brought to the table in terms of resources. Mr. Baxter, though, seemed reluctant to discuss how that would benefit Pennysaver and he dodged their questions about service, warranties, and long term commitment, other than saying generally positive things. It was as if our side didn't have a plan as to how it was going to keep customers satisfied. After the Pennysaver meeting, Mr. Baxter, Mr. Antley and I spoke. When I reiterated the product placement BETA strategy and the likely price, Mr. Baxter told me that he and everybody knew about BETA sites, and he asked me why we (Sonoran) hadn't followed that plan and placed a machine with Pennysaver, I told him that in 2001 Sonoran couldn't afford to do it—that we couldn't afford to sell our only machine for $250-300,000 and build other machines to fill Pennysaver's or other likely customers' orders. I told him that at least three machines needed to be in-house to meet the demand for demonstrations, first placements, and follow-up orders. Mr. Baxter told me that he wasn't going to lower the price to get Pennysaver or any other customer and he could afford to wait until somebody paid full price. When I started to explain to him that this was suicide, he cut me off and said it was the way PerkinElmer wanted to do business with this machine.

4. I am, of course, familiar with the likely sales customer list which has been produced in this case and my off-the-cuff remark about "BS". As I thought I explained in my deposition, the comment about six months was meant to convey, you could be pretty sure who your customers were going to be six months going forward. These were Harte-Hanks, the Cleveland Plain Dealer, and the Washington Post, and you could be pretty sure of follow-up orders from them because of their needs for machines and for back-ups (for redundancy purposes). After that, I could predict with a high degree of probability the minimum number of machines that would be sold, though I couldn't be sure of which of the potential customers would be the purchasers. This prediction as to the number of machines was quite accurate, because I had had extensive discussion with the decision-makers at several newspapers, knew their level of interest in our machine and their decision-making timetables, and knew we had the Cadillac of the industry. I am told by Joe Donahue that each of the newspapers I listed has become a CTP user, and this is no surprise. I watched CTP go from interesting to necessary to doing business from 1999-2001.

Signed and sworn under the pains and penalties of perjury this 22nd day of January, 2010.

NORMAN W. BOGEN

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SONORAN SCANNERS, INC. and<br>JOSEPH P. DONAHUE,<br>      *Plaintiffs,*<br><br>      v.<br><br>PERKINELMER, INC.,<br>      *Defendant.* | Civil Action No. 06-12090-WGY |

## AFFIDAVIT OF DAVID COSTA

David Costa, 64 years old, being duly sworn, under oath, hereby deposes and says:

1. I am a graduate of Boston College with a B.S. in Mathematics and I received an MBA and an M.S. in Economics from the University of Rochester. From 1975 to 2004, I was employed by Compugraphic and later by Agfa responsible for output systems products, which includes Computer-To-Plate machinery and products. As of 2004 when I left Agfa I was worldwide Vice President of Product Planning and Management for the computer-to-plate systems, including Agfa's Computer-To-Plate machines which were among the industry's leaders, and I saw the business grow in the US and worldwide very substantially from 2001-2004 (and through 2006). While I worked in product management, which included overseeing marketing and product placement in the field for CTF (computer-to-film) and CTP systems, I became aware of State Street Consultants, Inc., as a customer. It had the most accurate collection of marketing and sales data in the CTF/CTP field, and it sold this data to industry organizations Agfa was a member of as well as directly to Agfa. Its methodology was superior: it actively and regularly called the manufactures and customers and kept running tallies of installations in the

US. (I was aware that sales worldwide were 2.5-3 times US sales and could forecast product

planning and marketing quite accurately from the State Street numbers.

2. In 2004 I left Agfa and joined State Street Consultants where I am the President of the

company. I have watched our people collect data and am quite familiar with the method of

collection—telephone inquiries to graphic arts companies in the U.S. and Canada, i.e.

commercial printers, packaging converters, newspapers, publishers, inplant printers, etc.—and

with the results. The methodology and results do not reflect 100% of the sales of CTP. They

reflect the sales of about 80% of the product. I know this from knowing State Street Consultants'

estimates for Agfa figures vs. the actual numbers from my previous access to those numbers

within Agfa. The 20% difference relates primarily to the unwillingness of some customers to

their internal data to confirm purchases.

3. In November, 2009, I received a call from Edward Dangel, who told me that he

represented a former manufacturer of CTP machines, Sonoran Scanners, and that his expert

wanted to know if any of our CTP data could be accessed. I had heard of Sonoran because I had

received reports from engineers who had seen the machine in operation and told me about it

while I was at Agfa. When he told me that the opposing side was PerkinElmer and that it had

been a manufacturer I was surprised. I certainly know of Perkin Elmer but had never heard it was

an active participant in the CTP business. Because State Street Consultants had no conflict with

PerkinElmer I agreed to provide data to Mr. Dangel's expert at a fixed price, but indicated that

he needed to obtain the permission of an industry organization to receive some of the data. After

he obtained it, I met with the expert, Paul Baier, and Mr. Dangel and obtained the expert's

request for data. Thereafter, we provided it—sales data by manufacturer in the US from May,

2001-May 2006 for newspapers and large commercial printers. Because there was a lag in

reporting, I recommended that the data for the 3rd quarter of 2006 be included as reflective of 2nd quarter activity.

4. State Street Consultants, Inc. collected and provided the data attached to the expert's December report. While Seybold and IFRA collected data, too, some of it worldwide, and while their data has been shown to be reliable and I used it while I was with Agfa and since I've been at State Street Consultants, I have found State Street to be the most reliable.

Signed and sworn under the pains and penalties of perjury this 21st day of January, 2010.

DAVID COSTA

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

)
SONORAN SCANNERS, INC. and                )
JOSEPH P. DONAHUE,                        )
       *Plaintiffs,*                      )        Civil Action No. 06-12090-RCL
                                     )
v.                                        )
                                     )
PERKINELMER, INC.,                        )
       *Defendant.*                       )
                                     )
                                     )
                                     )

## SECOND AFFIDAVIT OF JOSEPH P. DONAHUE

Joseph P. Donahue, being over the age of 18, being duly sworn, hereby deposes and says:

1. My name is Joseph P. Donahue. I reside near Tucson, Arizona. I am a plaintiff in this action and the president and largest stockholder of the other plaintiff, Sonoran Scanners, Inc. ("Sonoran"). I am providing this affidavit to respond to misstatements in the Defendant's Statement of "Undisputed Facts", to provide further evidence as to Defendant's lack of reasonable efforts and to clarify and provide more information about my qualifications and the data I have available to me to testify about damages. My first affidavit and interrogatory answers are attached hereto and incorporated herein.

2. Contrary to Defendant's assertion, the CactusSetter prototype was demonstrated successfully at the 2000 NEXPO show, and it was ready for sale then as a BETA. That is, there was still tweaking I planned to do once the machine was installed, but it was ready for sale. The ProForm Metro was the successor to the CactusSetter, and it was the "brainchild" of Greg Baxter, who determined after the sale of Sonoran to PerkinElmer that he wanted to make the machine heavier and bulkier, so it looked like the ProForm Printed Circuit Board exposure

machinery ("PCBs") Lithography sold. He also wanted to install Lithography's material handling

system, which was more expensive than the system we had purchased and difficult to fit into the

CactusSetter configuration. The changes were mostly cosmetic, and it took two or three

engineers at Azusa and our staff at Tucson--which was eight engineers—about 8 months to get

the new machine, called the ProForm Metro, ready for sale. (By the way, I am aware that the

defendant claims it staffed Tucson with ten engineers. It was eight, not ten; and Azusa assigned

two or three to re-engineer the CTP machine. We did not hire new engineers—we replaced

Randy Cubberly with Dave Hill, Mark Noethen with Terry Ferguson, and Eric Hegstrom with

Daniel Obregon in 2001 and Tim Ellis with Lowell Jones in 2004). This time lapse was

important. Although PerkinElmer claimed it was going to market the product while it was being

made into the ProForm Metro, it didn't really do this. It demonstrated the machine at the 2001

NEXPO show but as was reported in The Seybold Report, told people it was not for sale. It

refused to place the CactusSetter into PennySaver on a trial basis, because it wanted to put the

ProForm Metro in there. As of 2000 less than 200 units (approximately) had been installed in the

US and 500 worldwide, but, as we predicted, the market was taking off rapidly. By the end of

2006 at least 3800 units had been sold worldwide according to published data and the data of

State Street Consultants.

     3. I am aware that the defendant claims that Sonoran was in "dire" straits as of mid-

2000. Most of Sonoran's debt was owed to stockholders who were also employees of the

company. Some had deferred salary. One trade creditor needed re-assurance by early 2001, but

suppliers were providing products and none had shut off credit or refused to ship. A few

employees did seek other employment but none were key to the business. One employee of

Sonoran left because of overdue wages. While Sonoran had no work in process or receivables to

offset balance sheet liabilities, it did have the prototype machine which was carried in inventory and it had a substantial parts inventory. The lease situation had nothing to do with rent. The lease was expiring, and the building had been sold to a company that decided to occupy the space itself. As stated above, most of the balance sheet liabilities were owed to stockholders, none of whom were clamoring for payment. We had decided previously that we should seek an investment partner, a large purchaser, or an OEM relationship because the potential customers were telling us that we needed a large presence to ensure that we could provide the back-up needed to keep the CTP machines we sold operable. We had several irons in the fire when we made the connection with PerkinElmer, which told us that it would purchase us at the end of 2000. When this didn't occur, we needed to take a loan from them to cover us through the closing—because we had tabled our other options. If we had been unable to find a purchaser, investor or OEM relationship by the end of 2001, we might have been in trouble—but our financial position was not different from most start-ups and early stage companies in their first years of existence and key management was not worried. However, PerkinElmer's claim that Sonoran received any part of the $3.5 million upfront payment is dead wrong. It wanted to purchase a going business and not be subject to claims from our suppliers and creditors. The amount paid was provided to pay off past due debt, including wages and loans made by investors other than me. The "debt cancellation" was much more than $101,600. I had advanced $3.5 million and it was subject to a security interest. This was supposed to be repaid to me through the earnouts.

4. PerkinElmer had an Optoelectronics Division which, in turn, operated the Lithography Division. Some of Optoelectronics' products were sold to biotech companies. Lithography's product, its PCB exposure machines, and some of Optoelectronics' products used outmoded

analog imaging technology. Sonoran used modern digital imaging technology, which I knew

PerkinElmer wanted to get its hands on. When Greg Baxter and I talked about this technology fit,

I made it clear that the future for most direct imaging technology, especially CTP, was Digital

Micromirror Technology ("DMD") because it allowed CTP machines to operate without lasers

using much less expensive ultraviolet light bulbs and simplified scanning optics, which, in turn,

removed the cost of replacement lasers and allowed machines to built which were less expensive

and weighed less. This technology excited Greg and he could see lots of uses for it in his current

and future products and products for other PerkinElmer divisions. We called this technology "the

Holy Grail." In 2002, I realized that BasysPrint's CTP machine using DMD technology was

becoming very successful and again urged PerkinElmer to fund Tucson's research and

development effort to convert to DMD technology. It refused to provide more than $50,000,

even as BasysPrint sold several hundred machines.

5.  While the Sonoran business plan provided a list price for the CactusSetter, and I

thought the machine was worth it, I knew, as did everyone else who's been in the business of

selling a new, expensive piece of capital equipment (or software) that there was a process for

gaining acceptance in the marketplace which involved BETA placements of early machines,

including the prototype. In a BETA placement, the customer is offered special terms as required

to get the product installed and in use in the field. Often customers would get extended warranty

deals, free parts and labor, a free trial period, and a reduced price to near cost (called a BETA

price). Sometimes manufacturers have to give the first machine away, but almost always a

discount to near cost with favorable terms is the industry practice. I know that PerkinElmer is

familiar with this product placement approach and has used it with other products, because Greg

Baxter told me that when we discussed it. Further, it is common practice that a substantial sum,

-4-

thirty percent of the hoped for gross is a common number, is spent in the first couple of years to promote a capital product. Sonoran was completely upfront about the need for this in the Business Plan and, in PerkinElmer's substantial due diligence effort, Sonoran provided a full, candid, and deep explanation of our business and its needs for funding. The number used was $1.2 million to ramp up the sales effort, with an additional $1.2 million to build 3 additional machines for demo and sales purposes (because customers require redundancy). I discussed BETA pricing with Greg Baxter and Guy Antley many times with reference to the first accounts and told them after the closing that PennySaver, the Plain Dealer and the LA Times wanted to be BETA purchasers. We lost all three because PerkinElmer refused to budge from the list price—which was completely irrational and not at all an industry practice. I also told them that we had to offer the New York Times, the Miami Herald, and several other newspapers a BETA price. In fact, PerkinElmer irrationally refused to BETA price or even offer significant discounts on the machine, extended warranties, parts and replacement deals and, from 2001-2003, PerkinElmer took itself out of the game.

6. I am aware that PerkinElmer now claims that it had operating losses of $6.9 million in losses from its operation of the CTP business. Unless they have thrown a lot of Azusa's losses in the Lithography business and attributed them to Tucson, this is not possible. During the entire period PerkinElmer owned the CTP business, it put almost no money into sales and promotion. No money was spent on advertising, no money was spent on BETA machine placement, no representatives were hired, and very little was spent on product brochures and promotion. It issued one press release internally, took a trade show ad and reprinted our old product brochures with the PerkinElmer name on it. It refused to transport and install a machine at the 2003 and 2004 NEXPO shows and took very small booths to save cost. Our salary structure was roughly

$700,000 a year and eighty percent of Guy Antley's salary and expenses—$50,000- 80,000 per year. In fact that was unfair to Tucson. I saw Antley's activity reports and while he spent 80% of his time on CTP for the first year, by mid-2003, his time was down to 50% or less on CTP. PerkinElmer refused to spend more than $50,000 to fund the DMD technology development, it refused to buy solid state lasers, computer work stations, hard or soft tooling, it refused to BETA price the machine—in fact, it backed out of the plan to offer BETAs to PennySaver, the LA Times and the Cleveland Plain Dealer, all of whom would have bought additional machines at higher prices. The only capital investment it made was the purchase of one used plate processor. Accountants can find ways to attribute costs when they wish to, but from a real expenditure point of view, $6.9 million is a ridiculous number, and, as the General Manager for CTP, I can't remember seeing any numbers like that.  In fact, I was told in August, 2001, by Greg Baxter that, because Lithography was tanking, CTP was going to feel the freeze and it would have to self-fund from sales. From what I saw and experienced, PerkinElmer refused to commit funds because it refused to commit to the project. As I told Greg Baxter, this put Tucson CTP virtually right back to where Sonoran was—minus the balance sheet debt—before the sale. Self-funding.

    7.   Sonoran was in the process of gathering the details and putting together patent applications. PerkinElmer received this technology and our preparations for applying for patents, and it successfully processed the technology and received the patents.

    8. I was somewhat shocked that anyone would believe that I am not qualified to testify about likely sales of the CTP machine. I have been involved in new product introduction and sales at several companies throughout my 33 year work life (including a tour of duty at the CTP pioneer EOCOM in the 1970s), including the necessary sales and promotional efforts, and was informed about PerkinElmer's sales effort. I helped to develop the sales and marketing plan at

-6-

Sonoran, as I had at several of my prior companies, and was the principal involved with the sales

effort with MacDermid. The sales approach I designed with Norm Bogen (which PerkinElmer

claimed it was following) began with an understanding of the attributes of the machine. When it

was introduced in 1999-2000, the CactusSetter was the only CTP machine capable of running at

250 plates per hour. This created the potential for substantial labor savings at a plant, the

purchase of fewer CTP machines, the ability to go to press later, and several other advantages.

Additionally, it was the only high-speed machine which could utilize ultraviolet ("UV" plates),

which cost considerably less than other thermal and visible plates needed to operate competitors'

machines. Even though a few competitors caught up in speed by 2005, they still did not use UV

plates and, therefore, they were not really competitive. To demonstrate the savings generated by

our CTP machine we utilized a common sales tool, called the Cost of Ownership model. Key to

this was that we tried to include every significant cost, including intangibles such as

depreciation, to generate a return on investment. But, we recognized that every company is

different and, therefore, the Cost of Ownership model was supposed to be customized for every

customer. I tried endlessly to teach the Cost of Ownership model to Guy Antley and to teach him

enough about the technical "hows and whys" of the machine to make him conversant to a

technical person but he was unable to explain the COO model and customize it for potential

customers, and he could not retain many of the technical details about the machine. Mr. Antley,

for instance, was apparently not aware that depreciation was included in the model, according to

one of his reports at which the manufacturer criticized us for not including depreciation and Mr.

Antley did not respond. This greatly reduced his effectiveness and made him incompetent. Norm

Bogen was completely competent. He was a first rate sales manager and engineer, he understood

the machine and the Cost of Ownership model completely—he'd helped to develop the COO

model. He knew the newspaper and commercial printing market after three years of working with Joe Barrett. While no one is irreplaceable over time, he was crucial to our sales effort and his loss in 2001 set us back substantially—especially because a sales person who was not nearly his equal was assigned. There is no doubt that the loss of Norm Bogen (and replacement by Guy Antley) cost us at least 7 sales from May, 2001-May, 2002, because of the loss of what Norm knew about PennySaver's, the LA Times's, and the Cleveland Plain Dealer's needs and wants.

9. One of the best early prospects, PennySaver, who had been ready to buy before the sale to PerkinElmer, ended up buying BasysPrint's system. According to a memo sent by Antley to me, the reasons they gave were redundancy—which means price--, the feeling it had that PerkinElmer wasn't really committed to CTP, and the fact that it could see other machines working in the field. Among other things, this confirmed to me the importance of getting machines into the field at low prices and concentrating on large daily newspapers. Further, after PennySaver, I started to watch out in those of Antley's reports I received for problems in selling the product. Size was an issue for a few purchasers—but those with smaller plants had problems with all of the CTP machines on the market. A few had prior relationships in conventional technology or early CTP machines. This was never a problem for us because of our machine's speed and use of UV plates. Most purchasers liked the flexibility of being able to negotiate with different CTP machine and plate manufacturers to get the best price from each. A few purchasers wanted to buy machines and plates from one source. We were well down the line with partnerships with plate companies which would allow us to offer a one-stop solution, but PerkinElmer never was willing to negotiate a price to allow a partnership to occur.

10. A good example of this occurred with MacDermid, the preeminent manufacturer of Flexo plates. There was no Flexo newspaper CTP machine on the market. MacDermid had tried

to build one and had failed. I was aware of NAPP/MacDermid before the closing when it approached us to see whether our machine could be configured to run with a Flexo plate. I became deeply involved in the effort to sell MacDermid in 2002. MacDermid wanted to buy 150 machines from us, 24 of them in 2002-2003. PerkinElmer at first expressed excitement about the prospect of "partnering" with MacDermid. But it cooled off quickly. Jerry Hall of MacDermid was concerned that PerkinElmer was not committed to the project. When MacDermid wanted to award to PerkinElmer the first order in mid-2002, coupled with a market development agreement to provide for a sales partnership, PerkinElmer refused to enter into the partnership and delayed full funding to build the Flexo prototype. In 2003, Jerry Jurkiewicz of PerkinElmer was unwilling to advance the funds to complete the Flexo prototype without an agreement from MacDermid to pay half of the R&D and he held up the building of the machine, which cost us about sixteen months to sell Flexo systems with MacDermid. Flexo customers--particularly HQP, La Repubblica and Il Corriere in Europe, and a number of newspapers in the US—were very anxious to get machines and Jurkiewicz's delay, caused solely by his unwillingness to commit funds to the project, cost me at least 24 machines toward my payout.

11. In my first affidavit, I provided evidence concerning costs of production. I did not testify then that the DMD technology, which PerkinElmer unreasonably refused to commit more than $50,000 in funds to, would have lowered the cost of production substantially, because the laser and scanning optics components, which cost upwards of $130,000, would be replaced by ultraviolet light bulbs and simplified imaging optics costing less than $60,000. The DMD product was sometimes called the next generation CactusSetter, and later the ProForm Metro, Lite. As I stated above, BasysPrint did fund the building of this type of machine during the time period at issue and sold several hundred of this type of machine in the $350,000 range.

-9-

12. Perhaps when I provided my testimony as to lost sales I was not precise enough in providing the basis for the calculation. As stated above, getting a sales and marketing effort off the ground in the capital machinery business is not rocket science. The tried and true method, called the BETA approach, is to seed the market with promotional material and advertising, together with the placement of reference machines in a few places in the US and Europe. To do this, it is necessary to give the first adopters a terrific deal, including a price slightly above cost, favorable payment terms (which often includes a period of free use, often 90-180 days), an extended warranty, terrific assurances as to immediate service response, and a good deal on spare parts. The manufacturer will recover the cost of this down the line with sales of additional machines at better prices to the first adopters, and the ability to show new customers that the machine works well and that the cost of ownership model is close to correct, will allow the manufacturer to sell the later, more conservative purchasers at full price, or close to it. One of Mr. Antley's trip reports references the comments of the president of Anocoil, a plate manufacturer we were hoping to strike a deal with, about the conservative business practices of newspapers. This should have been a signal to the sales staff and PerkinElmer management that a BETA approach was absolutely required—a point I made again and again. There is no doubt from my discussions with management that they knew this; the problem was that Mr. Antley, Mr. Baxter, and later Mr. Iadonisi were afraid to discuss it with upper management and with the finance department. It is not that a conscious decision was made not to pursue a BETA strategy—it was more that I couldn't get PerkinElmer to take the step because of corporate politics I never understood. The defendant claims that I wrote that I was satisfied with the sales force. That's ridiculous. I made it more than clear that I thought we needed more sales people and manufacturer's reps, and I thought that Guy Antley was simply not reasonably competent

-10-

nor fully committed—oftentimes going through the motions without really trying to make sales. I thought Caroline Winn and Erick Walker were competent when I first met them, and they may be. Mr. Walker covered Asia for all of Lithography's printed circuit board product and never had much to do with CTP. Ms. Winn covered a few meetings with Flexo users in which Jerry Hall of MacDermid made the presentations and she attended a demonstration of the machine to La Repubblica. As with Mr. Antley, her reports as to what others said were literate, but she never indicated what she said or did at the few meetings she attended to further the sales process. As part of my duties, and because I had an interest in having as many sales as possible, I kept track of our sales effort and of my competitors. As mentioned previously, The Seybold Report and IFRA reported sales of CTP machines in the US and around the world and I read those reports. I was aware of State Street Consultants, but we didn't have the money to purchase their reports. I knew that at least 3,000 CTP units had been sold. I knew the superior product attributes of our CTP unit. I knew that we had first adopters, BETA customers locked up as of the closing in May, 2001—PennySaver, as well as the Cleveland Plain Dealer and the LA Times—and that if we had followed the almost universal, time honored approach to new capital product introduction, and if the reasonable resources had been committed to the project, consistent with the usual practices in capital sales introductions like this one, we would have had at least ten percent of the market, and this is very conservative. State Street Consultants' data, which shows sales of almost 4,000 units during the contract period confirms that my calculation of 300 machines is conservative.

Signed and sworn under the pains and penalties of perjury this 21st day of January, 2010.

_Joseph P. Donahue_
Joseph P. Donahue

-11-