UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| SONORAN SCANNERS, INC. and<br>JOSEPH P. DONAHUE,<br>   *Plaintiffs,*<br><br>v.<br><br>PERKINELMER, INC.,<br>   *Defendant.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 06-12090-WGY |

### PLAINTIFFS' MEMORANDUM IN OPPOSITION TO PERKINELMER'S MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF REASONABLE EFFORTS

   This memorandum makes two points. First, PerkinElmer did not use reasonable efforts in the three years it owned the plaintiffs' technology to achieve the earnouts provided for in the parties' contracts, and this cost the plaintiffs substantial damages. Second, the defendant has greatly inflated its claim that it did make reasonable efforts.

   **I. The "Reasonable Efforts" Standard**

     A. <u>Reasonable Efforts is an Objective Standard.</u> The question is whether PerkinElmer breached its obligation owed to plaintiffs to use reasonable efforts to market and sell CTP products, given that plaintiffs were dependent on PerkinElmer to achieve the earnouts provided for in the contracts. *Sonoran Scanners, Inc. v. PerkinElmer, Inc.,* 585 F.3d 535, 544-545. This is an objective standard[1], and it is a higher standard than good faith. E. Farnsworth,

---

[1] During the oral argument, Justice Boudin asked in substance, "Aren't you saying as to Count I, that defendant was bound to make reasonable efforts, and this is an objective standard?" Plaintiffs' counsel responded, based on the complaint and its arguments in the District Court and the Court of Appeals, "Yes."

Farnsworth on Contracts, 2d ed. (2001)§ 7.17(c)[2].   Although defendant seeks to revisit the case law cited by the First Circuit and blur good faith and best efforts into the concept of reasonable efforts-- apparently in hopes of resurrecting its specific intent argument as to the bad faith and unfair dealing count which is no longer part of the case--there is a bright line to follow. Diligence is the core, along with reason. As Black's Law Dictionary, 9th Edition (2009) puts it succinctly (at page 523), reasonable efforts is equivalent to the "due diligence reasonably expected from and ordinarily exercised by a person who seeks to satisfy a legal right or to discharge an obligation." Reasonable means fair, moderate and proper, not the minimum, as the defendant wants it, and denotes not only quantity but "(a)ccording to reason" including "the proper use of the reasoning power." *Id.* at 1379. It is a "word of assessment of a person having the faculty of reason" *Id.*  Juries have been deciding cases in which they determine whether that reasoning power has been properly exercised for generations. The Massachusetts cases cited by the First Circuit in *Sonoran Scanners* uniformly use the term "reasonable", not "best efforts" or "good faith" or "continuous activity".

As Defendant knows, it has a problem as soon as reasoning power is introduced into the case as a legal standard. The evidence it has relied upon--Antley's trip reports—contains no statements about what Antley ever said and did, other than that he made telephone calls and went to see roughly 35 newspapers. His reports are remarkable for the total absence of description of anything he ever said and did, other than listen. Further, the evidence shows that the defendant expended next to nothing to promote or market the CTP product in the critical first years of ownership (and thereafter). It did not follow the tried and true methods (and the common

---

[2] The section is attached hereto because it is a good general discussion of the standards the defendant has proposed, it is somewhat applicable to the reasonable efforts standard, and it is not readily available.

industry standards) for new product introduction. It employed only one, untrained part-time salesman as its sales effort in the US and refused to commit the necessary funds to promote the project. The plaintiffs and their former employees wrote scathing e-mails about PerkinElmer's lack of effort during the contract period.

Defendant mistakenly relies *Zilg v. Prentice Hall*, 717 F. 2d 671, 674 (2d Cir. 1982), a case in which a book publisher failed to spend anything to advertise or promote a book the defendant agreed to publish. Contrary to the impression the defendant gives, there are two aspects to the case: first, the Court's ruling that the defendant could be liable if it failed to make reasonable efforts to promote the product after the book's publication; second, the holding that defendant was not liable after this initial period because the contract <u>expressly provided</u> that it was not required to promote the book after its initial publication. *Zilg*'s ruling does not aid the defendant, far from it.

It is true that reasonable efforts and best efforts are sometimes confused—because there is an element of reasonable efforts even where the defendant is under a duty to do its best. But, there is a difference: the best efforts standard takes into account the individual capabilities of the actor, and, therefore, there is an element of subjectivity; whereas, reasonable efforts denotes ordinary prudence and is judged by circumstances and reasonable expectations. A recent Maryland federal decision, *Baron Financial Corp. v. Natanzon*, 509 F. Supp. 2d 501, 514 (D. Md. 2007), analyzed most of the best efforts decisions the defendant relies upon in this case, and decided, under the facts of that case, that the case must go to the jury. In the process, the Court set forth a four prong reasonable efforts test:

- What promises were made during negotiation
- What was the industry practice
- What were the practices with respect to the contract

- How would the promisor have acted if the parties had been a single entity.

As the fourth prong suggests, good faith is a consideration, but it is not the test. Farnsworth, *supra*, pages 404-05.

### B.  The Parties' Interests Were Significantly Unaligned.

Defendant argues that it was in good faith because it exercised faulty business judgment, perhaps, but it had contract incentives to sell as many CTP as it could during the contract period. It is arguing, to put it in the language of *Baron Financial Corp.,* that the contracts gave it incentive to act as if the parties were a single entity. However, whatever the parties' positions as this argument was presented previously under the good faith and fair dealing count, it is simply untrue, as the record shows.  In Paragraphs 35-37 of its Statement of Undisputed Material Facts, Defendant has set forth the payment terms under the APA—a virtual recognition that the parties interests were not aligned in the first two years of the contract and probably beyond. It has also attached the Plaintiffs' Reply Brief which lays out clearly why it was that the parties were not aligned. See, also, Z 74[3], pages 1-4.  Briefly, the plaintiffs were to receive a royalty, a payment from *revenues* from the sale of the first ten machines sold over the first two years regardless of Perkin's profit or lack thereof. In addition, they were to receive a portion of the revenue for each machine sold according to the formula for gross margins defined in great detail in the earnout provisions, and the payments were to be made off the top over a five year period. PerkinElmer's interests were concerned with corporate net profits--the company's bottom line--and its incentives were, as Justice Boudin put it (in substance), "to go slow, isn't that it?" That was about it, and it would be fair to say, the defendant was given little credence when it tried to argue

---

[3] "Z" represents "Ziegler Exhibit", submitted by the Defendant. "D" represents "Dangel Exhibit" submitted by the Plaintiffs. "Dep." means Deposition; "Aff." means Affidavit; "Donahue Aff." means the affidavit submitted by Mr. Donahue herewith.

4

otherwise. Simply put, the defendant's incentives in the first few years of the contract were to manufacture as few machines as it could while selling at the maximum price, and to spend as little as it could on promotion, in order to maximize net profits from the machines it sold.

As plaintiffs' expert testified, and, as Perkin knew, the first few years of a new product's introduction were key to long-term success. D 1. This would also assure the plaintiffs' first payouts. But, as shown below, Perkin did not make the investment nor make a reasonable effort to launch the product. The plaintiffs wanted as many machines sold as quickly as could be accomplished, and PerkinElmer had the resources readily available to make the necessary investment—which, defendant admitted in an internal document, it was unwilling to do. D 2. As the Court's previous rulings indicate, however, although there were discussions about how the CTP division was going to be managed during the contract period, there was nothing explicit in the contracts that prevented defendant from taking over complete control, and this is what defendant did. What the First Circuit ruled was that, in doing so, the defendant placed the plaintiffs at its mercy, and, going forward the defendant had the duty to make reasonable efforts to promote and sell the product. The argument now is not about alignment—it is about reasonable efforts, and PerkinElmer's argument that it decided not to expend the resources necessary to compete in the CTP marketplace is not a point in its favor. It is a virtual admission that it did not make a reasonable effort in the absence of definitive proof—and there is certainly nothing in the defendant's presentation to suggest that the marketplace was so locked up or the machine was so poor that the CTP machine at issue could not have been marketed[4].

---

[4] Plaintiffs have strong proof of the machine's capabilities, including expert reports, and of the market's openness, which they will seek to add to the record if the defendant tries to open these issues in its reply brief.

## II. Statement of Material Facts

A. <u>PerkinElmer Expended Virtually Nothing To Market CTP Products.</u>

During the first years of the CTP program, which were to include May, 2001-May, 2006, PerkinElmer invested virtually nothing in CTP product promotion, advertising, and public relations. Donahue Aff. ¶ 6. It ranked the product introduction of the CTP line as "low". D 3. The universally accepted method for introduction of new, expensive machines like the CTP machine at issue is to place the new machine, including its prototype, with "first adopters" who get a terrific deal for purchasing an untested machine. The purchasers are known as BETA sites, and the price is referred to as a BETA price. Donahue Aff. ¶ 5, 12; Z3 SS04736; D 1, p 8; Baier Dep. 194. First purchasers also get extended warranties, assurance of immediate service and replacement parts at low prices. In return, the machine gets to prove itself and it serves as a reference machine in the field for future, more conservative purchasers. Donahue Aff. ¶ 5, 12. Although BETA prices and sites are mentioned by name 48 times and by concept 10 additional times in PerkinElmer's salesman's reports, although PerkinElmer had something it called a BETA deal, and although Norm Bogen, formerly Sonoran's head of Sales & Marketing told the salesman and PerkinElmer's General Manager right after its purchase of the product line that first customers were lined up and were requiring BETA pricing and other perks, it refused to lower the price of its first machines to anything approximating a BETA deal. Donahue Aff. ¶¶ 5, 12; Bogen Aff. ¶ 3 ; Z 84. The salesman, Guy Antley, admits that by February, 2002, he had discussed BETA placements with 24 potential customers by February, 2002 (Antley Dec. ¶ 12); yet, although PerkinElmer knew it could sell CTP machines readily to first customers by reducing the price to $300,000—which was above cost—it refused to do so. Z 84; Iodinisi Dep. p. 69. As a result, PerkinElmer lost all of its potential first adopters, all of whom were lined up to be BETA purchasers--including PennySaver, the Cleveland Plain Dealer, the Washington Post

and the Los Angeles Times. Bogen Aff. ¶..; Donahue Aff. ¶ 5. The sales effort never got off the ground. No machines were sold until almost the last days of the project, when a Flexo plate supplier, MacDermid, stepped up and paid full price, then turned around and sold the unit at a BETA price

  B. <u>PerkinElmer Ignored The Offset Customers' Needs.</u>

At the time PerkinElmer purchased Sonoran Scanners' technology and assets, fewer than two hundred machines had been placed in the US, and 500 worldwide. Z 13 SS 003291; Donahue Aff. ¶ 2. The machine Sonoran developed, which it called the CactusSetter, had product attributes superior to its competitors: it was faster, it used the latest technology, and it used conventional ultraviolet ("UV") plates—in contrast to its competitors which required more expensive thermal and visible plates. Donahue ¶ 8. The market was in the process of taking off—more than 3800 machines were sold from 2001-2006. Donahue Aff. ¶ 2; Baier Suppl. Report and attachment.

Sonoran priced the machine at $495,000, more than its competitors, and PerkinElmer, after extensive due diligence, did the same. Donahue Aff. ¶ 5.  But, whereas, Sonoran understood and communicated to PerkinElmer that a $1.2 million promotional effort would be needed to achieve sales at that price, that the price to first adopters would have to be much lower, and three machines would have to be built beyond the prototype, Z 18 SS00190. PerkinElmer, after buying the company, made none of these essential investments. Donahue Aff. ¶ 5 ; Z 3 SS 04736; Z 68 PE 001504.

Norm Bogen was the head of sales and marketing at Sonoran from 1998 until the sale to PerkinElmer in May, 2001. He was an engineer and held an MBA, and he had extensive experience in the sale of computer printing equipment. For three years, he had the good fortune to be trained in the newspaper industry by Joe Barrett, a 25 year veteran of that industry. By

2001, Bogen had made extensive contacts with newspapers and commercial printers. He had lined up deals to do BETA sales and placements with Harte-Hanks (Pennysaver), the LA Times, and the Cleveland Plain Dealer, and was close to deals with several other newspapers as of the time of the closing. Because of an unfortunate decision on PerkinElmer's part[5], it was unwilling to pay Mr. Bogen the $25,000 he was looking for, plus a commission deal and his Phoenix-Tuscon expenses, and as a result, the parties lost a key component of the initial sales and marketing effort. Bogen Aff. ¶ 1 and 2. PerkinElmer also did not retain Joe Barrett.

    C. <u>PerkinElmer Ran An Incompetent Sales Operation.</u>

Instead, it placed Guy Antley, the Lithography Division's only salesman, as "Director of North American" sales. He had been selling much less complicated machines; and he had never tried to sell a CTP machine or tried to sell anything to a newspaper. Over the next few years he demonstrated consistent incompetence. Donahue Aff. ¶ 8. One of the key elements of the sale process was to convince the customer that the speed and UV aspects of the machine allowed customers a better return-on-investment than the competitors. This involved understanding the individual labor costs of each customer, their plate costs, and understanding the competitors' cost models. Mr. Antley never took the time to master this. *Id.* Antley admits that he made mistakes in understanding and explaining the cost of ownership model. Antley Dep. pp 104-05. Further, Mr. Antley, a history major with no engineering or business education, never learned the "hows and whys" of the machine's inner-workings, and so, he was unable to converse easily with technical people at the potential purchaser's newspapers. Donahue Aff. ¶ 8.

After the closing, Norm Bogen was hired for two months as a consultant. His primary task was to prepare for and attend the 2001 NEXPO show, but he met on two occasions with

---

    [5] There has already been extensive briefing relating to PerkinElmer's failure to hire Bogen, which need not be re-stated, and is incorporated by reference.

Guy Antley and told him that sales of CTP machines, typical of other large capital equipment sales, was based on the cost of ownership model and the belief that the seller was in the business for the long haul. He told Antley that the first placements had to be BETAs, and that he had Pennysaver, the Los Angeles Times, the Miami Herald, and the Cleveland Plain Dealer ready to go. Mr. Bogen also discussed other, longer-out prospects, but Antley did not seem interested. Bogen Aff ¶ 3. On the second occasion, Bogen met with Antley and Lithography's general manager, Greg Baxter, after the three of them had visited with Pennysaver—during which meeting Mr. Baxter extolled the resources that PerkinElmer brought to the table. When the three met after the Pennysaver meeting, Mr. Bogen reiterated the need for a BETA approach with Pennysaver and other first adopters, Mr. Baxter asked why Sonoran had not done this. Bogen explained that it couldn't afford to do it because it did not have the funds to build multiple machines and, therefore, could not afford to place its only machine with a customer on a trial and reduced price basis, and then build additional machines to fill Pennysaver's and other customers' full orders. Mr. Baxter replied that that PerkinElmer could afford to wait until Pennysaver or another customer bought machines at full price, and he said this was how PerkinElmer wanted to do business with this machine. *Id.*

As the first year came to a close, there were several complaints about Mr. Antley's performance. See, e.g., D 4. In October, 2002, John Watkins sent a scathing e-mail to Mr. Baxter and PerkinElmer's top management about the company's unreasonable sales effort, singling out Mr. Antley. D 5. The net result was that Mr. Baxter was removed, and Mr. Antley was not.

Dan Iodinisi, a sales manager who became Antley's overseer, certainly understood the BETA approach, but never asked corporate finance for permission to lower the price below $425,000. Iodinisis Dep. pp168-170. Mr. Jurkiewicz agreed to lower the price to the Miami Herald to $400-425,000 in 2003, and the Miami Herald indicated that it would pay $350,000-

375,000. Mr Jurkiewicz, apparently, never made the deal. One would think that by this time any squirrel would have figured out what was needed to get the nut. Mr. Iodinisi's explanation was simple: if PerkinElmer had been willing to lower the price of the first machines to $300,000 there would have been many takers. Iodinisi Dep. p. 69.

  D. <u>PerkinElmer Treated Potential Sales of $35,000,000 in Flexo Machines As Trivial</u>

 By 2003, MacDermid had complained about Mr. Antley to Joe Donahue and Norm Shaver, and he (Antley) had next to nothing to do with the account. Shaver Aff. ¶ 6.  MacDermid also was actively questioning PerkinElmer's commitment to CTP. Shaver

 MacDermid represented a huge opportunity for PerkinElmer. Before PerkinElmer bought Sonoran, MacDermid, the dominant manufacturer of flexographic plates for the newspaper industry, had tried to build a Flexographic CTP machine for customers who were anxious for such a product, and it had failed. *Id.*  It approached Sonoran and asked whether the CactusSetter could be configured to run flexographic plates. In early 2002, Jerry Hall of MacDermid approached Joe Donahue to see in earnest whether a machine could be constructed which could meet MacDermid's customers' needs, and he indicated that the immediate need within the next two years was 7-10 machines and thereafter ten to twenty machines a year to reach a total need of 150 units. D 6. Thus, over the life of Sonoran's contract, as the deal was first presented, this represented roughly a 70 machine opportunity. Later in 2002, Mr. Hall indicated that MacDermid needed 24 machines in 2002-2003 to meet its immediate needs. It tried to obtain a market development agreement to market the machines together with MacDermid's plates to MacDermid's existing customers, and, inexplicably, PerkinElmer refused to move on it. MacDermid placed an order for a first machine as a sign of good faith in mid-2002. PerkinElmer refused to advance the funds to design and build the machine until mid-2003, at which time Jerry Jurkiewicz indicated that PerkinElmer would build the machine only if

MacDermid paid half of the R&D cost. MacDermid agreed to do so and wrote the check, and thereafter, Tucson was given the go-ahead. At least 16 months had passed from Mr. Hall approaching the company until PerkinElmer proceeded. Donahue Aff. ¶ 10.

MacDermid purchased the machine for full price, $535,000 and resold it for $385,000 as a BETA to the Manchester Union Leader. It was installed and successfully operated in April, 2004. At the time, Mr. Hall asked Mr. Donahue whether PerkinElmer was committed long term to the project. Mr. Donahue consulted Mr. Jurkiewicz on this and was told not to commit. According to Norm Shaver, the sale of 50 machines during the contract period was lost. Shaver Aff. ¶ 7.

At least one PerkinElmer executive began to consider closing the CTP operation by late 2003 or early 2004. Z 8, 117-18. Mr. Donahue was informed of the decision to close the business in mid-2004, and, by the Fall of 2004, the business had been sold (or licensed) to MacDermid, Defendant's Statement of Facts ¶ 124, thus eliminating the last two years of earnouts in the parties contracts. To a company the size of PerkinElmer, perhaps the MacDermid relationship was trivial. D 7.

### III  Brief Response to MacDermid's Facts.

A. PerkinElmer's Sales Effort

PerkinElmer equates Antley's trip reports with sales effort. However, a careful reading of the report demonstrates that many of the meetings reported on had nothing to do with customers or sales, and Antley never reported that he so much as made a sales pitch (or, if so, what was in it). He "contacted 77 newspapers"—meaning that right after the closing, he called 77 newspapers to see if they had any interest in CTP. Thus, he ignored that he was given a list of 100 newspapers and several commercial printers by Norm Bogen, and that Bogen was willing to give him a rundown on all of the newspapers which had shown interest. What Antley did, aside from

11

calling newspapers, was actually contact the twenty or so newspapers Bogen had listed as likely customers in the next few years and pursue them. Z 19. He pursued few others over the three years of the contract. Originally, Antley worked about 80% of the time on CTP. But, by 2003, this was reduced to 50% or less. Donahue Aff. ¶ 6. Mr. Antley seems to have given time to CTP in spurts, as the trip report dates indicate. This minimal effort, defendant claims, was enough. The standard, respectfully, is reasonable efforts, not minimal efforts.

 He reported that the subject of BETA placements or pricing came up 48 times, by counsel's reading of the references, and that on ten other occasions, that discussions about a BETA approach came up without the name. He mentions a BETA contract but never says what's in it. He acknowledges in a December, 2001 report that the prevailing BETA industry practice is for a huge reduction in price and other terms, Z 3, PE 1213-14[6], and that BETA placements had been discussed with 24 customers by early 2002. Antley Dec. ¶ 12. Yet, he never asked his bosses to be allowed to offer anything like a BETA price or deal. So, the evidence was that he listened to some newspapers tell him what they wanted, or giving him the perhaps unwarranted inference, he spoke with customers, the evidence is that he offered proposals to two newspapers in the three year period—the Miami Herald and the New York Times and both proposals reflected a full price or nearly full price offer, with plenty of extra billing for service and supplies. Z 83. He attended one NEXPO show annually, twice without a machine which made the appearance at the show almost worthless. Once he attended something called the Great Lakes Conference, but did not participate. Additionally, he was instrumental in getting the machine and himself mentioned once in an article. Since it can be presumed that PerkinElmer put its best

---

[6] Mr. Antley refers to the practice in terms of providing a "free" machine. That, presumably, is a pejorative way of referring to true BETA deals with a significant discount and delayed payments.

foot forward in its presentation in this motion, it can be concluded that, roughly, that's it, except to mention that Jerry Jurkiewicz went to see a few customers who had bought other machines or who had deferred on purchasing a CTP machine for the time being to find out why, and that once he visited with the Miami Herald. Dan Iodinisi, assigned in a sales capacity, attended three meetings total, and Caroline Winn, Optoelectronic's only saleswoman, seems to have gone on a few meetings at which Jerry Hall of MacDermid carried the ball.

This evidence has to be put up against the level of effort required in a new introduction of capital products described in detail in the plaintiffs' expert's report. D1. It is anticipated that very senior management will visit with prospective customers' top management, that it will be realized that the first few years of the effort are crucial and that meaningful concessions have to be made to first adopters, that well-experienced sales people will be retained for at least the first year to break in new sales people and keep contacts alive, that 30% of the expected gross (in this case that projects to $1.2 million) spent on promotion, that a technical sales rep will be involved in the selling process, and that sales people will have significant commission incentives to make sales. D 1. All of these were lacking. Plaintiffs' expert concluded that the sales and marketing effort was grossly inadequate and this was clearly a blown opportunity. D1, pp. 10-11.

PerkinElmer put it nearly as succinctly. The audit committee was informed that the division was being closed because it was decided not to invest to compete in the CTP market. D 2. It is no wonder, then, that David Costa, formerly worldwide director of product placement for the AGFA division which operated CTP sales very successfully during the time period that PerkinElmer owned a competing CTP business, has testified that he knew of PerkinElmer as a company but he had never heard that it had been in the CTP business until he was contacted about this case. Costa Aff. ¶ 3.

B. <u>PerkinElmer's Claim That It Lost $6.9 Million</u>

Using a new, undisclosed expert, an internal accountant named Adam Beeh, Perkinelmer now claims that it had operating losses of $6.7 million on the CTP business. Joe Donahue, who was CTP's general manager puts the lie to that. As he testifies, this is not possible. "During the entire period PerkinElmer owned the CTP business, it put no money into promotion, public relations, advertising and almost no money into product brochures. It issued one press release internally, took a trade show ad and reprinted our old product brochures with the PerkinElmer name on it. It refused to transport and install a machine at the 2003 and 2004 NEXPO shows and took very small booths to save cost. Our salary structure was roughly $700,000 a year and eighty percent of Guy Antley's salary and expenses—$50,000- 80,000 per year. PerkinElmer refused more than $50,000 to fund the DMD technology development, it refused to buy solid state lasers, computer work stations, hard or soft tooling, it refused to BETA price the machine—in fact, it backed out of the plan to offer BETAs to PennySaver, the LA Times and the Cleveland Plain Dealer, all of whom would have bought additional machines at higher prices. The only capital investment it made was the purchase of one used plate processor.  I was told in August, 2001, by Greg Baxter that, because Lithography was tanking, CTP was going to feel the freeze and it would have to self-fund from sales. From what I saw and experienced, PerkinElmer refused to commit funds because it refused to commit to the project." Donahue Aff. ¶ 6.

PerkinElmer's 10-K's do not support a conclusion that any money was spent on CTP R&D. During the time period at issue, almost all of the R&D money was spent on Life Sciences. D 7 and 8. As such, it can not be concluded as undisputed fact that PerkinElmer had anything like the expenditures on CTP it now claims.

### IV. The Defendant's Efforts Were Inadequate

Plaintiffs acknowledge that the question of whether defendant materially breached the APA by failing to make reasonable efforts is a question of fact for the jury. But, were it otherwise, the evidence strongly points to a lack of reasonable efforts. The plaintiffs would prevail because the defendant admits it was unwilling to spend the necessary funds to compete in the CTP market--and its failure to expend to promote, advertise, and sell the product, to utilize a BETA approach to place the first machines, to fund the development of a lighter, less expensive machine, to build a first machine for MacDermid without a check for half the R&D costs, to commit to building more Flexo machines—more than fleshes out PerkinElmer's radical unwillingness to commit to the project. Further, the unwillingness to give Bogen a reasonable offer to keep him on for at least a year, to assign more than one part-time salesman, to utilize senior PerkinElmer management, to provide an extended warranty and parts at a barebones cost, to meet the potential customers halfway, to move the MacDermid opportunity along at a reasonable pace (rather than foot dragging) virtually defines a sales effort which was, to quote the plaintiffs' expert, "grossly inadequate". D 1, p. 10. It also puts flesh on the bones of Perkinelmer's admission that it prioritized the new product introduction of CTP as "low". D 3.

Defendant defends this misconduct by claiming it's all a business judgment and that the term "reasonable efforts" does not include reason, but only good faith. Only a total abdication of responsibility constitutes an unreasonable effort, according to the defendant. This makes a hash out of the First Circuit's decision in this case. The defendant is not free to ignore or play with the law of this case. None of the cases cited by the First Circuit reduce the duty of reasonable efforts to anything approximating what they claim.

Further, *Air Technology Corp. v. GE*, 347 Mass. 613, 199 N.E.2d 538, 547 (1964), while certainly not on all fours, is instructive. In that case, the plaintiff and defendant were part of a

team bidding for a defense contract. GE was to be the lead contractor; plaintiff was to have "responsibility for the sensory system area" and to participate in the overall systems engineering. There was an understanding that AT would participate and get a fair portion of the contract but, as the bidding proceeded, after a while GE did not press to get AT approved and eventually GE started down to road to seek the EM sensory work for itself.  The Court did not find that the parties were joint venturers or fidiciaries, or that there was a distinct contractual obligation to include Air Tech at all costs--if, for instance, it utterly failed to meet Air Force specifications. However,"(a)s a team member (at least by implication) GE undertook if it received the prime contract (that) AT…would receive a subcontract for the EM sensor which…would give AT a reasonable opportunity to recover its costs plus fair profit. GE, by "failing to press for AT's continued participation in the program and by competing for the sensor work", breached "its duty" to AT. The Court then permitted damages for "a reasonable approximation" of the lost profits, because "close measurement" was not possible, in part because of the defendant's conduct. *Id.* at pages 626-27.

       While defendant will no doubt take issue with plaintiffs' reliance on the case, and it will point to hints of GE's bad faith--although the Court never refers to it as such--the case's value is to demonstrate that when parties start down the road together to realize an opportunity, but the interests of one of those party's diverges and it seeks to consider only its own best business interests, Massachusetts law provides, by implication, that the party in control owes the lesser party  the reasonable opportunity to obtain the benefits of the contract. PerkinElmer's argument that it was free to pursue the CTP business as it saw fit—and to put only a minimum of effort and financing behind it—ignores its contractual obligation as the First Circuit, quite clearly and correctly, construed it. To adopt the business judgment rule in the absence of an express contract provision which negated the reasonable efforts implied term of the contract—leaving only good

16

faith and fair dealing as a default—would be to abrogate the First Circuit's decision. The business judgment rule was created to protect corporate directors in the absence of self-dealing and other breaches of fiduciary duty. Its doctrinal prerogatives do not exempt PerkinElmer from its contractual duties. *Zilg, supra,* does not suggest a different result.

### V The Plaintiffs Are Entitled To Receive the Natural Damages Which Flow From The Defendant's Failure To Expend Reasonable Efforts

Whether there has been a material breach of the contract is a question of fact for the jury. *Quinn v. Mar-Lees Seafood LLC,* 69 Mass. App. Ct. 688, 871 N.E. 2d 511 (2003). Further, "[a]lmost by definition, causation questions are fact-contingent," *State of NH v. Adams,* 159 F.3d 680, 685 (1st Cir. 1998). "Damages are, of course, peculiarly a question of fact," *Mitchell v. Evelyn C. Brown, Inc.*, 310 F.2d 420, 425 (1st Cir. 1962). PerkinElmer ignores the summary judgment standards altogether, see *Greenburg v. Puerto Rico Maritime Shipping Auth.*, 835 F.2d. 932, 936 (1st Cir. 1987) and, instead, mounts its own campaign for why it failed to sell product[7].

Plaintiffs[8] have put the following evidence into the record as to damages:

1. Data as to industry sales from the Seybold Report, IFRA (the intrernational trade organization which covered the CTP industry worldwide), and State Street Consultants, Inc., the

---

[7] Some of the reasons, while found in an occasional reference in the literature, are laughable, such as the idea that as of 2001 newspapers saw themselves as dinosaurs. The point of the CTP product is that it is more efficient, required less labor, and cut costs—reasons consistent with the industry's acceptance of CTP as the standard over this time period. The defendant's justifications are belied by the sale 3,800 machines to the newspaper industry in 2001-2006, and ignore the competitive advantages of the machine they were supposed to be selling.

[8] Plaintiffs are mindful that the First Circuit ruled that the Employment Contract did not provide an independent basis for a reasonable efforts claim. However, Joseph Donahue was a signatory and third party beneficiary of the APA, and as such, he may be entitled to his own award of damages flowing from the breach of the APA. The issue is beyond the scope of the issues raised in the instant motion, but, at the appropriate time, plaintiffs will brief the issue.

consulting firm which collected industry data for American industry participants and trade organizations, to the effect that at least 3800 CTP offset machines were sold worldwide;

2. Evidence from a MacDermid executive--MacDermid being the predominant supplier of flexographic plates worldwide—that at least 50 machines from customers who wanted them as early as 2002-2003 have been purchased since MacDermid took over PerkinElmer's business;

3. Evidence that the machine at issue was superior to any other machine on the market in speed and, because it utilized conventional ultraviolet plates, in overall cost of ownership;

4. Defendant has not contested that the machine worked well, so plaintiffs have not put forth their full case as to the machine's operability, but there is some evidence from NEXPO shows and from customer reactions to the machine in this record, and more in the record from the past summary judgment, to support that the conclusion that the machine was quite useful;

5. Evidence that at the time of the sale, several customers were ready, willing and able to accept machines as first users so long as they got a market deal;

6. Evidence that MacDermid tried to order 24 machines in 2002-2003 and thought it could use up to 150 machines for the needs of its current Flexo customers;

7. The expert opinion of Paul Baier, based on the data, his understanding of the attributes of the various machines on the market, his knowledge of the tried and true methods of new product introduction of capital equipment and expensive software systems, and his understanding of the market conditions during the time period at issue, that reasonable efforts on PerkinElmer's part would have resulted in the sale of 473 CTP machines.

8. The testimony of Joseph Donahue, who founded Sonoran and ran it and was employed as General Manager of CTP by PerkinElmer, that based on the data and his observation of the lack of effort to market and sell CTP that sales of at least 300 machines were lost. Additionally,

his testimony (from his prior affidavit) about the costs of production establishes the inference that the gross margin requirements under the earnouts would have been reached.

That PerkinElmer's conduct in failing to promote and sell the product, hire a complete and competent sales and marketing staff, offer a market appropriate deal, and pursue the MacDermid opportunity caused Sonoran to lose its earnouts can hardly be doubted. Still, defendant claims, the proof requires certainty and so the record falls short. Certainty has not been the standard in Massachusetts for more than a generation. The "reasonable approximation" language in *Air Technology Corp. v. GE, supra,* has been quoted in dozens of cases. In cases like this, the Court has recognized that damages cannot be proved with precision. *Marcoux v. Shell Oil Products Co., LLC,* 524 F.3d 33, 52 (1st Cir. 2008). While it must be reasonably certain that some profits have been lost, *E. Mountain Platform Tennis v. Sherwin-Williams Co.,* 40 F.3d 492, 503 n.8 (1st Cir. 1994), "an element of uncertainty is permitted in calculating damages, and damages can stand on less than substantial evidence." *Ricky Smith Pontiac, Inc. v. Subaru of New England, Inc,*, 14 Mass.App.Ct. 396, 426, rev. denied, 387 Mass. 1103 (1982). Particularly "(w)here the defendant's wrongdoing created the risk of uncertainty, the defendant cannot complain about the imprecision." *Jay Edwards, Inc. v. New England Toyota Distributor, Inc.*, 708 F. 2d 814, 821 (1st Cir. 1983). In *Augat, Inc. v. Aegis, Inc.*, 417 Mass. 484(Augat II), 631 N.E.2d 995, 997-98 (1994), the Court ruled that plaintiff could recover "generalized" damages (*id.* at 491), where the damages related to the "negative effects on operating results that would not have occurred but for the departure of the key managerial employees'" whom defendant unlawfully solicited and took from the company. *Id.* at 485. The failure to promote and market the CTP technology developed by Sonoran was egregious and cost it to lose hundreds of sales in a burgeoning market.

## CONCLUSION

The plaintiffs have more than demonstrated that there are genuine issues of fact requiring a trial. Therefore, the defendant's motion should be denied.

                SONORAN SCANNERS, INC., and JOSEPH P. DONAHUE

                By their attorney,

                /s/ Edward T. Dangel, III
                Edward T. Dangel, III (BBO # 113580)
                Dangel & Mattchen, LLP
                10 Derne St.
                Boston, MA 02114
                (617) 557-4800

## CERTIFICATE OF SERVICE

I, Edward T. Dangel III, hereby certify that on this 22nd day of January, 2010, I electronically filed the foregoing *Plaintiffs' Opposition To Defendant's Motion for Summary Judgement on the Issue of Reasonable Efforts* with the Clerk of Court using the CM/ECF system, which will send notification of such filing(s) to all counsel of record.

                /s/ Edward T. Dangel III
                Edward T. Dangel, III