UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SONORAN SCANNERS, INC. and<br>JOSEPH P. DONAHUE,<br>        *Plaintiffs,*<br><br>v.<br><br>PERKINELMER, INC.,<br>        *Defendant.* | Civil Action No. 06-12090-WGY |

## **PLAINTIFFS' STATEMENT OF MATERIAL FACTS ON REASONABLE EFFORTS**

A. <u>PerkinElmer Expended Virtually Nothing To Market CTP Products.</u>

1. During the first years of the CTP program, PerkinElmer invested virtually nothing in CTP product promotion, advertising, and public relations. Donahue Aff. ¶ 6.

2. In 2002, PerkinElmer ranked the priority of the product introduction of the CTP line as "low". D 3.

3. The universally accepted method for introduction of new, expensive machines like the CTP machine at issue is to place the new machine, including its prototype, with "first adopters" who get a terrific deal for purchasing an untested machine. The purchasers are known as BETA sites, and the price is referred to as a BETA price. Donahue Aff. ¶ 5, 12; Z3 SS04736; D 1, p 8; Baier Dep. 194. First purchasers also get extended warranties, assurance of immediate service, and replacement parts at low prices. In return, the machine gets to prove itself and it serves as a reference machine in the field for future, more conservative purchasers. Donahue Aff. ¶ 5, 12.

4. Although BETA prices and sites are mentioned by name 48 times and by concept 10 additional times in PerkinElmer's salesman's reports, although PerkinElmer had something it

called a BETA deal, and although Norm Bogen, formerly Sonoran's head of Sales & Marketing told the salesman and PerkinElmer's General Manager right after its purchase of the product line that first customers were lined up and were requiring BETA pricing and other perks, it refused to lower the price of its first machines to anything approximating a BETA deal. Donahue Aff. ¶¶ 5, 12; Bogen Aff. ; Z 84. The salesman, Guy Antley, admits that by February, 2002, he had discussed BETA placements with 24 potential customers (Antley Dec. ¶ 12); yet, although PerkinElmer knew it could sell CTP machines readily to first customers by reducing the price to $300,000—which was above cost—it refused to do so. Z 84; Iadonisi Dep. p. 69.

6. As a result, PerkinElmer lost all of its potential first adopters, all of whom were lined up to be BETA purchasers--including PennySaver, the Cleveland Plain Dealer, the Washington Post and the Los Angeles Times. Bogen Aff. ¶3; Donahue Aff. ¶ 5--and the sales effort never got off the ground. No machines were sold until almost the last days of the project, when a Flexo plate supplier, MacDermid, stepped up and paid full price, then turned around and sold the unit at a BETA price.

B.  <u>PerkinElmer Ignored The Offset Customers' Needs.</u>

7. At the time PerkinElmer purchased Sonoran Scanners' technology and assets, fewer than two hundred machines had been placed in the US, and 500 worldwide Z 13 SS 003291; Donahue Aff. ¶ 2.

8..The machine Sonoran developed, which it called the CactusSetter, had superior product attributes to its competitors: it was faster, it used the latest technology, and it used conventional ultraviolet ("UV") plates—in contrast to its competitors which required more expensive thermal and visible plates. Donahue ¶ 8.

9. At least 3800 machines were sold from 2001-2006. Donahue Aff. ¶ 2; Baier Suppl. Report and attachment, Dangel Ex. 8.

10. Sonoran priced the machine at $495,000, more than its competitors, and PerkinElmer, after extensive due diligence, did the same. Donahue Aff. ¶ 5. But, whereas, Sonoran understood and communicated to PerkinElmer that a $1.2 million promotional effort would be needed to achieve sales at that price, that the price to first adopters would have to be much lower, and that three machines would have to be built beyond the prototype, Z 18 SS00190, PerkinElmer, after buying the company, made none of these essential investments. Donahue Aff. ¶ 5 ; Z 3 SS 04736; Z 68 PE 001504.

11. Norm Bogen was the head of sales and marketing at Sonoran from 1998 until the sale to PerkinElmer in May, 2001. He was an engineer and held an MBA, and he had extensive experience in the sale of computer printing equipment. For three years, he had the good fortune to be trained in the newspaper industry by Joe Barrett, a 25 year veteran of that industry. By 2001, Bogen had made extensive contacts with newspapers and commercial printers and he had lined up deals to do BETA sales and placements with Harte-Hanks (Pennysaver), the LA Times, and the Cleveland Plain Dealer, and was close to deals with several other newspapers as of the time of the closing. Because of an unfortunate decision on PerkinElmer's part[1], it was unwilling to pay Mr. Bogen the $25,000 he was looking for, plus a commission deal and his Phoenix-Tuscon expenses, and as a result, the parties lost a key component of the initial sales and marketing effort. Bogen Aff. ¶ 1 and 2. PerkinElmer also did not retain Joe Barrett.

C. <u>PerkinElmer Ran An Incompetent Sales Operation.</u>

12. Instead of hiring Bogen, PerkinElmer placed Guy Antley, the Lithography Division's only salesman, as "Director of North American" sales. He had been selling much less complicated machines; and he had never tried to sell a CTP machine or tried to sell anything to a newspaper. Over the next few years he demonstrated consistent incompetence. Donahue Aff. ¶ 8.

13. One of the key elements of the sale process was to convince the customer that the speed and UV aspects of the machine allowed customers a better return-on-investment than the competitors. This involved understanding the individual labor costs of each customer, their plate costs, and understanding the competitors' cost models. Mr. Antley never took the time to master this. *Id.* Antley admits that he made mistakes in understanding and explaining the cost of ownership model. Antley Dep. pp 104-05. Further, Mr. Antley, a history major with no engineering or business education, never learned the "hows and whys" of the machine's innerworkings, and so, he was unable to converse easily with technical people at the potential purchaser's newspapers. Donahue Aff. ¶ 8.

14. After the closing, Norm Bogen was hired for two months as a consultant. His primary task was to prepare for and attend the 2001 NEXPO show, but he met on two occasions with Guy Antley, and told him that sales of CTP machines, typical of other large capital equipment sales, was based on the cost of ownership model and the belief that the seller was in the business for the long haul. He told Antley that the first placements had to be BETAs, and that he had Pennysaver, the Los Angeles Times, the Miami Herald, and the Cleveland Plain Dealer ready to go. Mr. Bogen also discussed other, longer-out prospects, but Antley did not seem interested. Bogen Aff ¶ 3.

---

[1] There has already been extensive briefing relating to PerkinElmer's failure to hire

15. On the second occasion, Bogen met with Antley and Lithography's general manager, Greg Baxter, after the three of them had visited with Pennysaver—during which meeting Mr. Baxter extolled the resources that PerkinElmer brought to the table. When the three met after the Pennysaver meeting, Mr. Bogen reiterated the need for a BETA approach with Pennysaver and other first adopters, Mr. Baxter asked why Sonoran had not done this. Bogen explained that it couldn't afford to do it because it did not have the funds to build multiple machines and, therefore, could not afford to place its only machine with a customer on a trial and reduced price basis, and then other machines to fill Pennysaver's and other customers' following orders. Mr. Baxter replied that that PerkinElmer could afford to wait until Pennysaver or another customer bought machines at full price, and he said this was how PerkinElmer wanted to do business with this machine. *Id.*

16. As the first year of PerkinElmer's ownership came to a close, there were several complaints about Mr. Antley's performance. See, e.g., D 4. In October, 2002, John Watkins sent a scathing e-mail to Mr. Baxter and PerkinElmer's top management about the company's unreasonable sales effort, singling out Mr. Antley. D 5.

17. However, no such change was forthcoming. Dan Iadonisi, a sales manager who became Antley's overseer, certainly understood the BETA approach, but never asked corporate finance for permission to lower the price below $450,000.

D. <u>PerkinElmer Treated Potential Sales of $35,000,000 in Flexo Machines As Trivial</u>

18. MacDermid represented a huge opportunity for PerkinElmer's CTP business.. Before PerkinElmer bought Sonoran, MacDermid, the dominant manufacturer of flexographic plates for the newspaper industry, had tried to build a Flexographic CTP machine for customers

---

Bogen, which need not be re-stated, and is incorporated by reference.

who were anxious for such a product, and it had failed. *Id.* It approached Sonoran and asked whether the Cactussetter could be configured to run flexographic plates. In early 2002, Jerry Hall of MacDermid approached Joe Donahue to see in earnest whether a machine could be constructed which could meet MacDermid's customers' needs, and he indicated that the immediate need for the next two years was 7-10 machines and thereafter ten to twenty machines a year to reach a total need of 150 units. D 6. Thus, over the life of Sonoran's contract, as the deal was first presented, this represented roughly a 70 machine opportunity. Later in 2002, Mr. Hall indicated that MacDermid needed 24 machines in 2002-2003 to meet its immediate needs.

19. MacDermid tried to obtain a market development agreement to market the machines together with MacDermid's plates to MacDermid's existing customers. PerkinElmer refused to move on it.

20. MacDermid placed an order for a first machine as a sign of good faith in mid-2002. PerkinElmer refused to advance the funds to design and build the machine until mid-2003, at which time Jerry Jurkiewicz indicated that PerkinElmer would build the machine only if MacDermid paid half of the R&D cost. MacDermid agreed to do so and wrote the check, and thereafter, Tucson was given the go-ahead. At least 16 months had passed from the time Mr. Hall had approached the company until PerkinElmer proceeded. Donahue Aff. ¶ 10.

21. MacDermid purchased the machine for full price, $535,000 and resold it for $385,000 as a BETA to the Manchester Union Leader. It was installed and successfully operated in April, 2004. At the time, Mr. Hall asked Mr. Donahue whether PerkinElmer was committed long term to the project. Mr. Donahue consulted Mr. Jurkiewicz on this and was told not to commit.

22. 50 machines have been sold to Flexo customers of MacDermid's since it took over the business in 2004. All of the customers were ready to purchase CTP from PerkinElmer if it (PerkinElmer) had been willing to build the machines. Shaver Aff. ¶ 7.

23. At least one PerkinElmer executive began to consider closing the CTP operation by late 2003 or early 2004. Z 8, 117-18. Mr. Donahue was informed of the decision to close the business in mid-2004, and, by the Fall of 2004, the business had been sold (or licensed) to MacDermid, Defendant's Statement of Facts ¶ 124, thus eliminating the last two years of earnouts in the parties' contracts.

24. PerkinElmer's efforts to market and sell CTP products was grossly inadequate. Dangel Ex. 1, p. 10.

       /s/ Edward T. Dangel, III
Edward T. Dangel, III, BBO # 113580
Dangel & Mattchen LLP
Ten Derne Street
Boston, MA 02114
(617) 557-4800

**CERTIFICATE OF SERVICE**

I, Edward T. Dangel III, hereby certify that on this 22nd day of January, 2010, I electronically filed the foregoing *Plaintiffs' Statement of Material Facts* with the Clerk of Court using the CM/ECF system, which will send notification of such filing(s) to all counsel of record.

       /s/ Edward T. Dangel III
Edward T. Dangel, III