UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| SONORAN SCANNERS, INC. and<br>JOSEPH P. DONAHUE,<br>　　　　　*Plaintiffs*<br><br>　　　v.<br><br>PERKINELMER, INC.,<br>　　　　　*Defendant.* | ) ) ) ) ) ) ) ) ) ) | Civil Action No. 06-12090-WGY |

## PLAINTIFFS' RESPONSE TO DEFENDANT PERKINELMER, INC.'S STATEMENT OF "UNDISPUTED" FACTS

### CAVEATS

1. The plaintiffs have followed the usual, local practice in responding to Defendant's claims that the below stated "facts" are "undisputed". That is, they have not refused to respond even where the allegation does not state a fact.  For instance, where the Defendant has referred to a statement within a document or deposition testimony and stated that the document states x or the deponent testified y, plaintiffs have responded based on whether the document or testimony contains the reference and whether it is taken out of context or not, and have, at times, provided the true fact to aid in the process of deciding summary judgment. The Defendant's Statement is replete with these allegations, and plaintiffs object for the record, because such an allegation, except in so far as it represents a party's admission, is not a statement of fact.

2. The Plaintiffs object that the defendant claims to have made an undisputed statement of fact without agreeing to those undisputed facts which support the Plaintiffs' side of the case (and not the Defendant's).  In this instance, oral argument is scheduled to

1

occur soon after the parties' filings, and Defendant has informed the plaintiffs it will not respond to a counter-statement.  As such, the goal being to determine whether there are material facts in dispute, plaintiffs have done their best to include additional relevant facts with record citation in context to their responses to Defendant's statements and have provided a separate Statement of Material Facts limited to the reasonable inferences that can be drawn from the evidence to support Plaintiffs' claim that the Defendant failed to use reasonable efforts to market and sell CTP products. To the extent that the Court declines to recognize the Plaintiffs' statements of fact contained in the plaintiffs' responses below, plaintiffs object.

3.   The Defendant has occasionally included argument in footnotes. The plaintiffs object, and it should be understood that, to the extent that a proposition is stated in a footnote, the plaintiffs deny it.

With these caveats and objections, the plaintiffs respond to Defendant's "statements of undisputed facts", as follows:

1..Sonoran was founded in 1997 by Joseph Donahue ("Donahue") to develop and market high speed computer-to-plate ("CTP") technology to large metropolitan newspapers and other graphic arts publishers.  Donahue Decl. ¶ 2 (Docket No. 34). **Response: Admitted, but "graphic arts" should be understood to include all commercial printing industries. See, Ziegler Exhibit (hereinafter "Z") 13, SS 03286 and 03288 (financial overview section).**

2.  Donahue funded Sonoran initially through an investment of $1 million of his personal funds.  Donahue Dep. 33:23-34:9. Donahue later invested an additional $2.5 million of his personal funds, bringing his total investment to $3.5 million.  Donahue Dep. 34:10-13.  Donahue also persuaded associates and some employees to loan money to Sonoran.  Donahue Dep. 65:9-

66:2. He granted equity interests to many employees. Donahue Dep. 24:15-25:4. **Response. Admitted.**

3. By late 1998, its first year of operation, Sonoran knew it could not be successful on its own. Donahue Dep. 55:24-56:6. Sonoran knew that potential customers, such as newspapers, would not be comfortable buying a machine from a small company with few employees. Donahue Dep. 56:7-16. Sonoran started looking for an "industrial partner" in late 1998. Donahue Dep. 55:19-56:6. **Response: Admitted, except that in 1998 an "industrial partner" meant a venture capital investor, joint venture, or purchaser to help market the CactusSetter. Z 13 SS03288. As Sonoran stated, it needed significant funding to ramp up to achieve sales. *Id.* at 03286.**

4. By June 2000, Sonoran had developed the first prototype of a machine called the CactusSetter. Donahue Dep. 55:10-18. According to Donahue, the prototype was not complete and not yet ready for sale. Donahue Email – SS00404 (Ziegler Exh. 46); Donahue Email - SS04722 (Ziegler Exh. 76).[1] **Response: Admitted as to the first sentence. Denied as to the second. The CactusSetter was ready for sale and installation at least as a Beta product by June, 2000. It was successfully operated at the NEXPO show at that time. Z 13 SS 03315. The product which was not complete was the Pro Form Metro. See Response to ¶14 below.**

5. By June 2000, Sonoran had "r[u]n very low on cash" and "needed operating capital." Donahue Dep. 57:4-9; 64:16-21. Donahue personally had reached the "threshold of the amount of money that [he] wanted to put in the company." Donahue Dep. 57:13-17. He was unwilling

---

[1] The prefixes "SS____" and "PE____" refer to Bates numbers used, respectively, by Sonoran Scanners and PerkinElmer to mark their document productions.

to invest any more of his own funds in Sonoran. Donahue Dep. 57:18-20. He decided to "cap [his] investment in Sonoran and sell the company." Donahue Email – SS0 4722 (Ziegler Exh. 76). Because Sonoran was "running low on funds," Donahue and all of the other executives ceased trying to sell machines and focused instead on trying to sell Sonoran. Donahue Dep. 50:3-7, 51:5-7, 52:12-14. **Response: Admitted, except that the plaintiffs admit that selling Sonoran was one of the options Donahue considered as of June, 2000. See Z 13 SS 03288.**

6. As of June 30, 2000, Sonoran reported liabilities exceeding assets by approximately $5.1 million, and net losses of $1.7 million. Sonoran Business Plan (July 2000) – SS03328 (Ziegler Exh. 13). **Response: Admitted, but, as the document shows, many of the outstanding liabilities on the balance sheet were owed to Donahue and other investors who were executive employees and who agreed to defer part of their salaries, as is common in early stage companies. Donahue Aff. ¶ 3.**

7. By the winter of 2000, many of Sonoran's employees were "working for free" or for "deferred wages" due to Sonoran's financial problems. Donahue Dep. 60:16-61:3. Sonoran had allowed its workers' compensation and medical coverage plans to lapse for non-payment. APA, Disclosure Schedule § 2.28; Bogen Dep. 48:5-14.[2] Sonoran's inability to pay its employees continued from winter of 2000 to May 2001, when the sale to PerkinElmer closed. Donahue Dep. 60:22-61:3. Sonoran lost some employees during this time because it could not afford to pay them. Donahue Dep. 61:4-7. One former employee had a pending suit against Sonoran for back wages and undistributed equity, and Sonoran feared that others would follow the same course. Sonoran Pre-Acquisition Disclosures - SS01545-1546 (Ziegler Exh. 14). **Response: Admitted, except that no employees were literally working for free, some salary had been**

---

[2] "Bogen Dep." refers to the transcript of Norm Bogen's deposition, and the cited pages are at Ziegler Exh. 6.

deferred by Sonoran executives who were stockholders in the company, including Mr.

Bogen and Mr. Donahue. Z 7, pp. 24-25 and Paragraph 6 above.

8. Sonoran had "no receivables or work-in-process." Donahue Email – SS00238 (Ziegler

Exh. 15). It reported liabilities exceeding assets by approximately $5.9 million, and net losses of

$2.6 million. Sonoran Financials – SS00334-338 (Ziegler Exh. 66). **Response: As to the first**

**sentence, admitted, but this was because the CactusSetter was complete and was included**

**as inventory. Donahue Aff. ¶ 3. As to the second sentence, admitted, except that the**

**negative net worth was due to loans made by Mr. Donahue and other owners to fund**

**Sonoran's development. This is common in early stage technology companies and was fully**

**disclosed to PerkinElmer. See Donahue Aff. ¶ 3.**

9. Sonoran could not pay its lenders. APA, Disclosure Schedule 1.9(a). Sonoran could

not keep up with its trade payables. Donahue Dep. 106:6-13; Donahue Email - SS02815 (Ziegler

Exh. 16); APA, Disclosure Schedule 1.9(a). **Response: Denied as to most trade payables. As**

**to the "lenders" it should be noted that all of them were investors in Sonoran with the right**

**to convert into more equity and that none of them asked to do that, and, so, it is denied.**

**Donahue Aff. ¶ 3. Further responding, PerkinElmer knew Sonoran Scanners' financial**

**situation well, knew that it was an early stage company, and knew that approximately $2**

**million had to be advanced at the closing to buy Sonoran Scanners without incurring**

**possible liability for its liabilities. Z 71 SS 20172. It also knew that Donahue was owed**

**approximately $3.5 million in secured debt because of his advances to the company, but it**

**required him to defer this. Z 1, APA Disclosure Schedule 2. 9 (a)(vii).**

10. Sonoran first reached out to PerkinElmer about a possible transaction in October 2000. Donahue Dep. 66:5-11. Initial discussions involved various possible transactions, including an investment by PerkinElmer, a cooperative OEM relationship between the two companies, and a purchase of Sonoran by PerkinElmer. Donahue Dep. 67:13-68:6. **Response: Admitted.**

11. The CTP technology, according to Sonoran's proposal, complemented PerkinElmer's existing technology and would introduce PerkinElmer to a new market segment. Donahue Email – SS01359 (Ziegler Exh. 17); Sonoran Presentation to PerkinElmer (November 2000) – SS00152-202 (Ziegler Exh. 18). Sonoran's proposals forecasted large and lucrative sales and revenues, based on per-unit list price of $495,000 that had been set by Sonoran and Donahue. Sonoran Business Plan (July 2000) – SS03327 (Ziegler Exh. 13) **Response: The statements included in this paragraph are too generally stated to be admitted or denied, so plaintiffs respond as follows: As to the first sentence, PerkinElmer had a Lithography Division which was part of its Optoelectronics Division. Lithography manufactured printed circuit board technology products with (out-dated) analog technology. Optoelectronics made data-imaging equipment and other products for sale in the biotech industries, also based on outdated technology. Sonoran's CactusSetter utilized modern digital technology which could be applied to Lithography's and certain of Optoelectronic's products. Donahue Aff. ¶ 4. As PerkinElmer admitted in October, 2004, it had by then successfully completed the exploitation of Sonoran's technology for its own use in other products, while at the same time refusing to commit the resources necessary to compete in CTP, and, so, it closed down CTP and sold it. D (meaning Dangel Exhibit submitted herewith) 2 (formerly Pl. Ex. 32) PE 005869. As to the second sentence, Sonoran's business plan did provide $495,000 as a list**

price; however, it also recognized that prototypes needed to be placed initially as reference machines. Z 20 SS 03580. The nearly universal practice in the industry, indeed, in industries involving the sale of expensive capital equipment, is to sell the first few machines on a trial basis at very low prices with deferred payments and attractive warranties and parts arrangements in order to gain acceptance in the market-place. This is called a BETA placement. Donahue Aff. ¶ 5;  Bogen Aff. ¶ 3.  Antley's Trip Reports are replete with references to Beta sites, Beta machines and Beta pricing.  There are 58 such references in the reports included in Z 3, 48 explicitly referring to BETA pricing or strategy and 10 referring to such a pricing or policy without using the word BETA[3].  Further, in Antley's Declaration ¶ 12, he admits that he had discussed BETA placements with 24 potential customers by February, 2002. Discounts from list would always be a necessary tool in sales; and, as to BETA placements or sites, it makes no sense to discuss this or propose this to customers, unless the price is a BETA price.  Sonoran projected sales based on the reasonable assumption that sufficient funds, resources and other reasonable efforts would be made to market and sell the product.  In its business plan, which was provided to PerkinElmer, Sonoran stated that $1.2 million was required to market and promote the CactusSetter and that a similar sum was required to build three of the same type of machine for demonstration and sales purposes (because customers required redundancy). Z 18, SS 00190; Donahue Aff. ¶ 5.   However, after the closing, PerkinElmer committed almost nothing to market the product and would not commit the funds to build the necessary machines.  It also, completely irrationally, refused to follow the BETA approach--which included BETA pricing, support, warranty and parts replacement commitments--although, as Mr. Antley recognized, it was the "universal industry practice" (Z 3 SS 04736).

---

[3]

Its refusal to commit the funds and support necessary to be successful was because PerkinElmer refused to commit to the project. Donahue Aff. ¶ 5. Although it was very familiar with Beta-pricing, as demonstrated in several reports included in Z 3, starting with the August, 2001 Report, management of PerkinElmer refused to Beta price the first machines and to offer appropriate support, warranty and parts replacement deals even though it discussed "Beta placements" with some prospective customers and 24 prospective customers agreed or asked to have the machine on a trial—BETA—basis. See, for example, Z 3 SS 04736. While it was industry practice, as PerkinElmer admitted, to place a first machine for free (to be paid for at a reduced rate later), and to price the machine higher after a successful trial run, PerkinElmer was unwilling to do that. *Id.*; Z 68, PE 001504. Dan Iadonisi, a sales manager who oversaw Antley's activities in 2003, stated that it was necessary to dramatically lower the price of the first machines, then obtained permission to offer a trivial discount, but, although he knew that better discounts were needed, refused to ask PerkinElmer management for more—probably because it would have affected his commission arrangement. Z 84. Both sides agreed that $495,000 was an appropriate list price for the CTP machines, but only after they gained market acceptance for the CTP product.

12. Sonoran's lead salesperson, Norm Bogen, stated in December 2000 that: "Forecasting close percentages more than six months out is B.S." Bogen Email and Forecast – SS02204-2205 (Ziegler Exh. 19). The sales forecast attached to his email include forecasted close percentages through the fourth quarter of 2002. Bogen Email and Forecast – SS02204-2205 (Ziegler Exh. 19). Donahue used Bogen's forecast in his response to PerkinElmer's due diligence requests. Sonoran Pre-Acquisition Disclosures – SS01538 (Ziegler Exh. 14). Donahue

did not disclose that Bogen believed the forecasted close percentages for more than six months

out were baseless.  Sonoran Pre-Acquisition Disclosures – SS01538 (Ziegler Exh. 14).

**Response: This is denied. Mr. Bogen testified that his reference to "BS" was to the**

**requirement in the document that he state the specific buyers who would be buying**

**machines well into the future. He testified that listing the potential purchasers by name was**

**"BS" for a period beyond six months. Those within the six month period included**

**Pennysaver (Harte-Hanks), the Cleveland Plain Dealer, the Los Angeles Times and the**

**Washington Post, all of whom had asked to receive the first machine as BETA purchasers.**

**Antley agreed that those potential customers on Bogen's list were likely purchasers. Z 19.**

**Bogen testified that his opinion and judgment as to the number of machines that would in**

**all probability be sold over the next three years was carefully considered and accurate, in**

**his judgment, and that, while the exact purchasers could not be predicted precisely, the**

**number of units likely to be sold was not BS. See, Bogen Dep. pp 146:3-147:12; Bogen Aff.**

**¶ 4.  Further, it is noteworthy that almost all of the potential purchasers on the list, inside**

**of the six months period and beyond, are among the 24 potential purchasers willing to**

**serve as Beta buyers on the Defendant's 2003 list of customers referenced in ¶75 below.**

13. PerkinElmer expressed reservations about the product market and about

PerkinElmer's ability to successfully bring the product to that market.  Donahue Email –

SS03580 (Ziegler Exh. 20); Donahue Email – SS01359 (Ziegler Exh. 17); PerkinElmer Email –

SS02164 (Ziegler Exh. 21); PerkinElmer Email – SS00240 (Ziegler Exh. 22); PerkinElmer Email

– SS02161 (Ziegler Exh. 23); Sonoran Pre-Acquisition Disclosures – SS01539 (Ziegler Exh. 14).

**Response: Denied. The e-mails referred to in this paragraph do not indicate "reservations".**

**They indicate that Sonoran provided a full, candid and deep explanation of its business and**

that PerkinElmer did extensive due diligence. **Donahue Affidavit ¶ 5.** While one PerkinElmer executive expressed concerns about the purchase of early stage companies generally **(Z 20),** Mr. Baxter reported that PerkinElmer remained "excited about the opportunity". **Z 21.** What is remarkable about this purported "fact" is that Defendant has argued that the integration clause in the APA bars this type of evidence.

14. The prototype was not complete, as Donahue acknowledged.  Donahue Email – SS00404 (Ziegler Exh. 46); PerkinElmer Email – SS00240 (Ziegler Exh. 22).  Just to complete the prototype, technical issues needed to be addressed and resolved in many areas, including electronics, software, platen, the front-end opto/mechanical system, the material handling system, the optic box, UL and laser certification, manuals and packaging.  Sonoran Pre-Acquisition Disclosures - SS01539 (Ziegler Exh. 14); Sonoran Business Plan – SS03321 (Ziegler Exh. 13). **Response: Objection—this statement of "fact" does not include a date.  Of course, it is true that as of the date of the Business Plan, 1998, three years before PerkinElmer bought the company, the prototype was not complete. This is denied in so far as this statement is claimed as of the closing in May, 2001. The CactusSetter was ready for sale by October, 2000, ten months before the closing. Z 17, SS 01360, ¶ 5.  What happened was that Greg Baxter of PerkinElmer mandated a** <u>cosmetic</u> **re-design of the CactusSetter after the closing in May, 2001, to make it look more like the circuit board printing products Lithography sold. This did not change the machine's functionality—it was unnecessary, and it made the product more expensive, heavier, and bulkier. The new product, called the Pro Form Metro CTP to unite it with Lithography's Metro line, took eight months or so to complete.  It is this product, not Sonoran's CactusSetter, which was referred to in the E-mails the defendant has cited. Z 46.**

15. Sonoran had made no product offers, received no purchase orders, achieved no sales and acquired no customers. Donahue Dep. 52:15-16; APA, Disclosure Schedule §§ 2.13(f), 2.17.[4] Sonoran had no patents. APA, Disclosure Schedule §§ 2.13(c)-(d). **Response: Denied. Sonoran had, before the closing, made offers of the CactusSetter to Pennysaver (Hart-Hanke), the Cleveland Plain Dealer, the Los Angeles Times, and the Washington Post, each of whom had asked to be a BETA site and were willing to purchase several machines if the system worked and to allow the machine to be used as references, (Z3, May 24, 2001, PE 001239-46), Bogen Affidavit ¶ 3, but Sonoran, unable to provide the machine to a customer on a BETA basis and then finance the building of a second machine, had received no purchase orders or sales and had acquired no customers. Bogen Aff. ¶ 3. As to patents, Sonoran was in the process of applying for patents which PerkinElmer processed and received. Donahue Aff. ¶ 7.**

16. The target market for the CTP product – major newspapers – was new to PerkinElmer and competition within that market was active and mature. Sonoran Business Plan (July 2000) – SS03308-3310 (Ziegler Exh. 13); Sonoran Pre-Acquisition Disclosures – SS01544 (Ziegler Exh. 14). By nature, major newspapers are conservative, risk averse and budget conscious enterprises. Antley Decl. ¶ 28; Antley Dep. 86:4-13;[5] Iadonisi Dep. 119:2-18.[6] In addition, the economy was entering a downturn. Donahue Emails – SS0424 (Ziegler Exh. 77), SS04035 (Ziegler Exh. 24). **Response: It is admitted that CTP was new to PerkinElmer as of the date of Sonoran's business plan, but it did extensive due diligence before the closing. See, for**

---

[4] A copy of the APA is in the record as Ziegler Exh. 1, and the Bill of Sale is included as part of the APA.

[5] "Antley Dep." refers to the transcript of Guy Antley's deposition, and cited pages are at Ziegler Exh. 4.

[6] "Iadonisi Dep." refers to the transcript of Daniel Iadonisi's deposition, and cited pages are at Ziegler Exh. 12.

11

example, Z 20-23, Z 14, and Z 71. **The market for CTP was not mature; only 100 units had**
**been sold in the US and 500 worldwide as of October, 2000. Z 13, SS 003291. From 2001-**
**2006 at least 3800 CTP machines were sold in America and abroad. The market was ready**
**in 2001 and becoming active. Donahue Aff ¶ 2. The rest of this paragraph is denied, other**
**than it is admitted that Donahue and Baxter wrote each other in late 2001; however,**
**Antley wrote that, although ad revenues were down at newspapers, most newspapers had**
**already budgeted to purchase CTP and that this funding remained in place. Z3 SS 02578-**
**02579.**

17. All of the potential deal structures proposed by Donahue included contingent
payments based on the achievement of specified timing, margin and sales milestones. Donahue
Email – SS03589-3591 (Ziegler Exh. 25). **Response: Denied. PerkinElmer insisted on**
**contingent payments based on CTP sales from the beginning and Donahue acceded to**
**PerkinElmer's terms. Z 71 SS 02172.**

18. In November 2000, the dialogue between Sonoran and PerkinElmer began to focus on
a potential purchase of Sonoran by PerkinElmer. Donahue Dep. 68:7-15. **Response: Admitted.**

19. Sonoran's financial situation became increasingly dire in late 2000 and into early
2001. Donahue Email – SS03580 (Ziegler Exh. 20); Donahue Email – SS01359 (Ziegler Exh.
17); PerkinElmer Email – SS02164 (Ziegler Exh. 21). Its lease was set to expire, remaining
employees were actively seeking other employment, and suppliers were refusing to make
shipments. Donahue Email – SS03580 (Ziegler Exh. 20); Donahue Email – SS00402 (Ziegler
Exh. 26). **Response: "Dire" is too strong a word, because Sonoran had other options (Z 7,**
**p. 62 and 67), so it is denied. It is admitted that by the end of 2000, Sonoran needed to get a**

12

deal done with a buyer or other financial partner in order to stay in business through 2001. As Bogen explained to PerkinElmer, Sonoran's financial situation did not allow it to do a Beta placement, as it could not afford to place a machine for little up-front and then have to build more machines to meet an order and so was stalled until additional funding could be found. **Bogen Aff. ¶ 3.** The lease was expiring, but this was because the building was being sold and the new owner wanted to occupy it. **Z 26.** A few employees sought other employment, but suppliers were providing products—none had shut off Sonoran's credit or refused to ship. **Donahue Aff. ¶ 3.**

20. In January 2001, Sonoran asked PerkinElmer for a loan so that Sonoran could pay some of its expenses. Donahue Email - SS03580 (Ziegler Exh. 20). Donahue referred to this loan as "keep alive" money in an email he sent to PerkinElmer, which stressed the urgency of Sonoran's situation: "I also mentioned the need to get 'keep alive' money to us very fast – 'yesterday is not soon enough'." Donahue Email - SS03580 (Ziegler Exh. 20). **Response: Admitted.**

21. In February 2001, PerkinElmer loaned Sonoran $100,000 so that Sonoran could continue to operate and make limited payments of employee salaries. Donahue Dep. 70:8-19; Donahue Email – SS03602 (Ziegler Exh. 27); Security Agreements and Promissory Note – PE005842-5854 (Ziegler Exh. 28). **Response: Admitted.**

22. In March 2001, Donahue asked PerkinElmer to contact a Sonoran vendor that was owed $138,000 to inform the vendor that payment would be forthcoming once the acquisition closed. Donahue Email – SS02815 (Ziegler Exh. 16). PerkinElmer contacted the vendor, as requested. Donahue Email – SS02815 (Ziegler Exh. 16). **Response: Admitted.**

23. Sonoran, Donahue and PerkinElmer all were represented by experienced counsel throughout the negotiation of the potential purchase of Sonoran's assets by PerkinElmer. Donahue Email – SS03592 (Ziegler Exh. 78). During negotiations, Sonoran made no effort to include in the APA any specific provision obligating PerkinElmer to market or sell CTP products. Donahue Dep. 128:11-129:6. Sonoran believed that because PerkinElmer was buying the company, it would want to sell the product. Donahue Dep. 129:4-6. **Response: Admitted as to the first sentence. As to the second and third sentences, the plaintiffs believed then, as now, that the requirement that PerkinElmer use reasonable efforts to market and sell CTP products was a contract term. 585 F.3d 535, 544-45 (1st Cir. 2009).**

24. Sonoran accepted the proposed purchase by PerkinElmer because that was the most "timely" transaction in light of Sonoran's "difficult financial situation." Donahue Dep. 60:10-15. Because Sonoran had such limited financial resources, Sonoran gave no consideration to not going through with the sale, even after learning that not all of its desired former employees had accepted the employment offers made to them by PerkinElmer. Donahue Dep. 125:5-17. **Response: The first sentence is admitted; the second is denied. As Mr. Donahue testified, he went forward with the closing based on Mr. Baxter's assurance that Mr. Bogen would receive a better offer after the closing. Donahue Dep. pp 115:12-116:23.**

25. On May 2, 2001, PerkinElmer purchased sole control and ownership of the assets and business of Sonoran through the APA, a Bill of Sale and other legal documents. APA.[7] At the same time, Donahue signed an Employment Agreement (the "EA").[8] **Response: admitted.**

---

[7]  A copy of the APA is in the record as Ziegler Exh. 1, and the Bill of Sale is part of the APA.

[8]  A copy of the EA is in the record as Ziegler Exh. 2.

26. The APA stated that PerkinElmer would acquire "substantially all of the assets and business associated with the operations of [Sonoran]." APA, Preliminary Statement. The APA provided that Sonoran sold, and Perkin Elmer bought, "all right, title and interest in and to all of the assets, properties and rights, whether real, personal, tangible or intangible, of every kind, nature and description" that constituted Sonoran's business. APA § 1.1(a). The APA stated that Sonoran relinquished and PerkinElmer acquired, among many other things: all "right, title and interest in and to all intangible property rights used or useful in conducting the Business," APA § 1.1(a)(iii); all books and records "relating to the Acquired Assets or to the operation of the Business," APA § 1.1(a)(iv); all rights to products and products under development, APA § 1.1(a)(v); and all equipment "used or useful in conducting the Business, APA § 1.1(a)(vi). **Response: Admitted.**

27. The APA required Sonoran to do everything PerkinElmer reasonably requested in order "to more effectively transfer, convey and assign to [PerkinElmer], and to confirm [PerkinElmer's] rights to, title in and ownership of, the Business and all of the Acquired Assets, to put [PerkinElmer] (through its ownership of the Acquired Assets) in actual possession and operating control therefore, to assist [PerkinElmer] in exercising all rights with respect thereto and to carry out the purpose and intent of this Agreement." APA § 1.2. **Response: Admitted.**

28. Sonoran represented by executing the APA that from December 31, 2000 to the May 2001 closing date there were no material adverse changes in the business, it had continued to operate the business as it had in the past, and it had not taken any material actions, such as make any loans, incur any debt, enter into any written agreements involving more than $5,000, or make capital expenditures in excess of $10,000 total. APA § 2.6. Sonoran also represented that none of the following types of arrangements had been made: arrangements for the receipt of

15

services or products; arrangements for the performance of any services or delivery of any products; partnership or joint venture arrangements; and arrangements requiring the business to perform services at a loss. APA § 2.9. Sonoran represented that the assets being sold "are, when utilized by a labor force substantially similar to that employed by [Sonoran] on the date hereof, adequate to conduct the Business as currently conducted by [Sonoran]." APA § 2.19. **Response: Admitted, but it should be noted that Donahue was required to assure some of the matters referred to above personally as well and was required to complete his employment contract as an express requirement of the APA. Ziegler 1, the APA Article 2, ¶¶ 5.2 (d), 8.2, 8.3.**

29. PerkinElmer's purchase obligations were made subject to several conditions, including the condition that there be no pending or threatened government enforcement action that would "affect adversely the right of [PerkinElmer] to own, operate or control the Acquired Assets or the Business." APA § 5.1(d)(iii). PerkinElmer's purchase obligations also were contingent upon Donahue's execution of a mutually agreed employment agreement and the execution of employment letters by at least seven (or 85%) of the eight identified Sonoran employees. APA § 5.1(i)-(iii). **Response: Admitted.**

30. The parties' post-closing covenants included a covenant giving Sonoran reasonable access to various business records so that Sonoran could verify PerkinElmer's calculation of any earnout payments, and so that Sonoran could "conclude[] its involvement in the Business prior to the Closing Date." APA § 6.3(a)(ii). The parties also agreed to "cooperate fully with each other to facilitate the transfer of the Acquired Assets from [Sonoran] to [PerkinElmer] and the operation thereof by [PerkinElmer]." APA § 6.3(b). **Response: Admitted.**

31. The APA stated that it "constitutes the entire agreement between the Parties and supersedes any prior understandings, agreements, or representations." APA § 8.4. The APA prohibited amendments, except in writing and signed by both parties, and stated: "The language used in this Agreement shall be deemed to be the language chosen by the Parties hereto to express their mutual intent, and no rule of strict construction shall be applied against any Party." APA §§ 8.13. The APA specified that it would be governed and construed according to Massachusetts law. APA § 8.9. **Response: Admitted.**

32. In exchange for relinquishing all of its assets and its entire CTP business, Sonoran received an up-front purchase price of $3.5 million and contingent payment rights ("earnouts") which, if triggered at all, could yield no more than $3.5 million. APA §§ 1.4, 6.2. **Response: It is denied that Sonoran received $3.5 million dollars up-front. Donahue Affidavit ¶3.**

33. The $3.5 million purchase price consisted of three components: (1) a cash payment directly to Sonoran of $2,788,562.56; (2) debt cancellation of $101,600; and (3) payments to certain Sonoran creditors totaling $609,837.44. APA § 1.4. Sonoran used its cash payment to pay other creditors and lenders, as well as employees to whom Sonoran owed back wages. APA § 1.9, Disclosure Schedule 1.9(a). Donahue himself received approximately $700,000 in unpaid compensation and interest. APA § 1.9, Disclosure Schedule 1.9(a). **Response: It is denied that Sonoran received anything and that the "debt cancellation" was only $101,600. Z 7, Donahue Aff. ¶ 3.**

34. The contingent earnouts were to be determined according to a specific formula in the APA, with defined triggers. APA §§ 1.6, 6.2. That formula had two components. APA §§ 1.6, 6.2. **Response: Admitted.**

35. Under the first component of the formula, if PerkinElmer completed at least ten sales by May 12, 2003, then Sonoron would receive $1.5 million. APA § 1.6(a)(ii). Sonoran could receive half of this amount – $750,000 – if PerkinElmer completed at least three of the ten sales by May 12, 2002. APA § 1.6(a)(i). Only "Qualifying Product Sales" counted toward these thresholds, and the APA defined that term as a product sale by PerkinElmer "all of the revenues for which have been recognized by [PerkinElmer] in accordance with GAAP applied consistently with the past practice of PerkinElmer." APA § 1.6. **Response: Admitted.**

36. If PerkinElmer made less than three sales by May 12, 2002 and less than ten sales by May 12, 2003, then Sonoran was entitled to none of the $1.5 million provided for in APA § 1.6. APA § 1.6. **Response: Admitted.**

37. Under the second component of the formula, if PerkinElmer achieved specified gross margins during specified periods, Sonoran would receive a specified percentage of product revenues, as follows: Fiscal 2001 – 0.2% to 1.0% of product revenues if PerkinElmer achieved gross margins of at least 26%;

Fiscal 2002 – 0.2% to 1.0% of product revenues if PerkinElmer achieved gross margins of at least 36%;

Fiscal 2003 – 0.2% to 1.0% of product revenues if PerkinElmer achieved gross margins of at least 42%;

Fiscal 2004 through Q1 2005 – 0.2% to 1.0% of product revenues if PerkinElmer achieved gross margins of at least 44%;

18

Q2 2005 through Q1 2006 – 0.2% to 0.6% of product revenues if PerkinElmer achieved gross margins of at least 48%.

APA § 6.2(c). The APA defined "Product Revenues" as "revenues which are recognized by [PerkinElmer] in accordance with GAAP…." APA § 6.2(c)(iv). Under this component of the earnout formula, Sonoran was entitled to no payments unless PerkinElmer achieved the minimum gross margin levels specified for each year. APA § 6.2(c). **Response: Admitted, and it is because of these provisions and those stated in Paragraph 36 above that it can not be argued that the parties were in alignment, let alone "perfect alignment" during the plaintiffs' earnout years. The plaintiffs' payments were due from the gross while PerkinElmer's payments were from net profits. As demonstrated in Z 73 pp. 1-5, PerkinElmer's incentives were to go slow (as Justice Boudin put it in the oral argument) while plaintiffs wanted as many sales as could be generated over the five year period.**

38. The maximum Sonoran could receive under the second component of the formula, if all timing and margin triggers were met, was $2 million. APA § 6.2(d). Donahue estimated that reaching the maximum earnout level under this component of the formula would require 400 unit sales and $200 million in revenues within five years. Donahue Dep. 97:18-98:17. **Response: Admitted as to the number of machines. Otherwise, denied that Donahue so testified.**

39. The maximum Sonoran could receive under both earnout components, if all contingencies were met, was $3.5 million. APA §§ 1.6(a)(ii), 6.2(d). **Response: Admitted.**

40. The Bill of Sale effected Sonoran's transfer of all of its assets and business to PerkinElmer and reaffirmed Sonoran's covenant and agreement to "take such other action, as may reasonably be necessary to effectively sell, transfer, convey, assign and deliver to, and vest

in [PerkinElmer], good, clear and marketable title to the Acquired Assets, and to put [PerkinElmer] in actual possession and operating control thereof, to assist [PerkinElmer] in exercising all rights with respect thereto and to carry out the purpose and intent of the [APA]." Bill of Sale ¶ 2 (APA Exhibit). **Response: Admitted.**

41. As condition to PerkinElmer's purchase of the business, Donahue executed the EA. APA § 5.1(i)(ii). The EA specified, among other things, that PerkinElmer could terminate Donahue's employment with or without cause at any time. EA§ 5(a). It required Donahue to acknowledge that he "understood that all employees may be subject to transfer or reassignment from time to time, as [PerkinElmer] determines appropriate," although it gave Donahue certain rights if PerkinElmer forced him to relocate away from Tucson. EA § 2. It required Donahue to "devote [his] full business time and [his] best professional efforts to the performance of [his] duties and responsibilities…." EA § 2. It stated that it was "currently [PerkinElmer's] intention to establish a Tuscon, AZ based direct laser imaging design center with certain Sonoran Scanner, Inc. personnel." EA § 2. It stated that Donahue's duties would "include those inherent to [his] position and such other duties as may be assigned to [him] from time to time." EA § 2. The EA required Donahue to "devote [his] best efforts to promote the interests and business of PerkinElmer." EA, Exh. 2 ("Employee Patent and Proprietary Information Utilization Agreement"). **Response: Admitted.**

42. The EA did not commit PerkinElmer to establish any design center in Tucson, Arizona, or to run any such design center in any particular way, with any specific employees or for any particular period. EA. **Response: Denied. The EA required PerkinElmer to consult with Donahue over pricing of CTP units and for Donahue, as the General Manager of the Tucson CTP unit, to have general overall control of the CTP operation subject to his**

reporting to Greg Baxter.  **Further, as expressed in the EA, it was the parties' intention that the Tucson center be established, and the APA required that offers of employment be made to all or almost all of Sonoran's Tucson employees when PerkinElmer bought the business.**

43. After closing, PerkinElmer established a CTP design center in Tucson, Arizona and staffed it initially with former Sonoran employees.  PerkinElmer operated its CTP business from May 2001 to October 2004.  APA; Donahue Termination Letter - SS00917-925 (Ziegler Exh. 29).  **Response: Admitted.**

44. After the acquisition, Sonoran had no role in the development, marketing, or selling of any of the products of PerkinElmer's CTP business.  Plaintiff's Interrogatory Response No. 9 (Ziegler Exh. 30).  **Response: Admitted in the corporate sense.  However, as Bogen's affidavit states, he was hired briefly as a consultant and advised PerkinElmer to employ the usual BETA approach used by all industry companies to place the first few machines.  The details of his advice are provided in his affidavit, Bogen Affidavit¶ 3, deposition testimony Bogen Dep. 135-140, and Z3 PE 001239-46.  Mr. Bogen offered to be of service indefinitely, but Antley and Baxter did not avail themselves of his services.  Bogen Dep. 86.  The BETA approach was described by him to Antley on May 24, 2001, (Z3 PE 001240) and was subsequently mentioned 48 times in Antley's Trip Reports, Z 3, and an additional 10 times in the Reports without reference to it by name (using such terms as free machine, trial period and so forth).  Additionally, Mr. Donahue and Mr. Shaver, formerly of Sonoran, participated in efforts to sell machines to MacDermid and, when asked, provided information and assistance to the sales effort,  Donahue Affidavit ¶8; Shaver Affidavit ¶ 1, as did Mr. Bogen with Pennysaver. Bogen Affidavit¶ 3, Z 35, Z 69.**

45. PerkinElmer made the CTP business part of its Lithography Systems division ("Lithography"), which in turn was part was part of PerkinElmer's Optoelectronics Division. Plaintiff's Counter-Statement of Facts, Response to ¶¶ 20-21 (Docket No. 33). **Response: Admitted.**

46. Between May 2001 and October 2004, PerkinElmer experienced operating losses of approximately $6.9 million on the CTP business, as follows: (1) losses from operations in 2001 of $891,000; (2) losses from operations in 2002 of $1.2 million; (3) losses from operations in 2003 of $2.557 million; and (4) losses from operations in 2004 of $2.248 million. Beeh Decl. ¶ 4;[9] Audit Committee Presentation - PE005869 (Ziegler Exh. 32). Including the up-front purchase price of $3.5 million, PerkinElmer's total investment in the CTP business was approximately $10.4 million. **Response: Denied. First, Plaintiffs object to the Declaration of Adam Beeh on the grounds that he is a previously unidentified expert witness and that he has utterly failed to provide any data to support his opinion as to PerkinElmer's alleged loss. Second, the Audit Committee presentation referred to also utterly lacks any data or support. Defendant has not made any effort to provide any back-up to support the numbers. At any rate, the numbers defendant claims in this paragraph are pure fiction in so far as they purport to state the amount PerkinElmer invested to develop, market, and sell CTP products. As Joseph Donahue, who was the General Manager of the CTP division, testifies (Donahue Affidavit ¶6), the total expenditures included approximately $700,000 per year in salaries plus an attribution of $50,000-80,000 for Guy Antley's salary and**

---

[9] "Beeh Decl." refers to the Declaration of Adam Beeh, filed herewith. **Plaintiffs specifically object to this Declaration. Mr. Beeh's testimony is that of an expert. He was not disclosed as an expert. His "evidence" as to what PerkinElmer was justified in charging or did charge as an operating expense contains no back-up or support and, as such, is merely his bald assertion.**

expenses. PerkinElmer also bought the inventory to manufacture two machines and split

with MacDermid the costs of a third machine, an expenditure by PerkinElmer of around

$800,000. During the time period in question, the Lithography division's Azusa facility

experienced a significant slowdown. It had a very large facility, and there were many lay-

offs, and PerkinElmer consistently told Donahue that it would not fund the CTP operation

as previously planned (D 10) and advanced only $50,000 toward the development of the key

DMD technology. How Lithography chose to shift expenses and allocate them to Tucson on

paper could be understood only by careful examination of financial data which has not

been provided. However, it is doubtful that any allocation with numbers like those

suggested in this paragraph could be correct when it is remembered that PerkinElmer was

unwilling to spend any money to advertise, market, or promote the product other than

attendance at NEXPO shows, Donahue, Aff. ¶ 6, and that PerkinElmer's 10-Ks for the

period demonstrate that it was unwilling to invest in R & D in Lithography (or even in

Optoelectronics, with the exception of biotech products). D 7. Indeed as of 2003,

PerkinElmer refused to spend the money to transport a machine for demonstration to the

show. Further, PerkinElmer refused to spend money to promote the DMD technology,

although this was a key part of the technology roadmap—the so-called "Holy Grail"—and

although this would allow the machine to be built more cheaply, without lasers, and make

the machine lighter and less expensive—as competitor BasysPrint was already doing by

2003. It refused to Beta place and price any machines, though it knew this was necessary to

market the product and build sales. In 2002, for instance, the Miami Herald, part of a

large purchasing group, indicated that it wanted to be a Beta site for the machine, but

didn't want to pay for it until 2004. Although this would have given PerkinElmer a perfect

**reference machine in place in a major newspaper which was part of a major American**

**newspaper purchasing group, PerkinElmer refused. Z 76, SS 04722. PerkinElmer reneged**

**on plans to place a BETA at Pennysaver, the Los Angeles Times, the Washington Post and**

**the Cleveland Plain Dealer. Z 3, PE 1239-46. PerkinElmer's only capital expenditure after**

**the closing was a used plate processor. It refused to purchase lab testing equipment,**

**computer work stations and software for the engineers, hard or soft tooling, solid state**

**lasers for the flexo prototype—in fact it required MacDermid to split the costs of**

**production of the machine. It is quite doubtful, given its refusal to spend as outlined**

**above—and given that it told Donahue 3-4 months after the closing that it was unwilling to**

**finance anything but bare-bones operations because of Lithograph's downward spiral and**

**PerkinElmer's unwillingness to bail out divisions in trouble--that anything like the**

**amounts it now claims were spent on Tucson CTP were actually spent. Donahue Aff.¶6.**

47. Just prior to closing, PerkinElmer offered employment to eight of Sonoran's former

employees: Allen Bahr; Norm Bogen; Donahue; Timothy Ellis; William Hart; Norman Shaver;

Terri Varese; and John Watkins. APA, Disclosure Schedule § 6.1. All of the offers included

salaries commensurate with what Sonoran had paid them, together with benefits such as health

insurance. APA, Disclosure Schedule § 2.24. All of the employees except for Bogen accepted

their offers from PerkinElmer. APA, Disclosure Schedule § 6.1. **Response: It is admitted that**

**in the month before the closing the offerings described above were made and that all of the**

**employees except Bogen accepted the offers. The offer to Bogen was not commensurate. He**

**was not offered his prior bonus arrangement, nor his weekly travel and other expenses**

**paid by Sonoran. Bogen Affidavit ¶ 2.**

48. Bogen's salary at Sonoran had been $100,000, and he expected PerkinElmer to pay him at least $125,000 based on promises made by Donahue. Bogen Dep. 74:16-77:1. PerkinElmer did not accept Bogen's counteroffer demanding both a higher salary and certain perks, but PerkinElmer did enter into a two-month, $25,000 consulting agreement with Bogen to assist the transfer of knowledge from Bogen to PerkinElmer. Consulting Agreement – PE005823 (Ziegler Exh. 33); Bogen Dep. 74:16-77:1. **Response: Admitted, except that the consulting agreement did not provide for any "transfer of knowledge" (whatever that means) and only required Bogen's help in preparation for, and attendance at the 2001 NEXPO trade show. Z 33.**

49. Bogen testified that he was not "irreplaceable." Bogen Dep. 162:17-20. **Response: Objection. What Bogen "testified" to or did not is not subject to admission of fact as to the plaintiffs. According to Donahue and the plaintiff's expert, Bogen was irreplaceable for the first year. Bogen was key to the sales effort in the first few years, and it is well-recognized that retaining sales executives with experience and contacts is key to the success of sales efforts of capital equipment after technology company purchases. Over time, if someone could have been found with his training, experience, and contacts with potential customers, he might have been replaceable. Certainly, as described in paragraphs 51 and others below, Guy Antley was no replacement for him. Donahue Affidavit ¶8.**

50. Donahue declined to offer some of his own incentive compensation to Bogen. Donahue Dep. 159:6-16; Donahue Email - SS00423 (Ziegler Exh. 34). **Response: Denied. Mr. Bogen was offered some of Mr. Donahue's compensation. Z 77 SS 00424. As Mr. Donahue indicated, PerkinElmer was suggesting that he give up some of his "back-end"**

compensation.  What Bogen wanted was a higher "front end", i.e., salary and bonuses from sales, not earnouts. *Id.*

51. In May 2001, PerkinElmer assigned Guy Antley, Lithography's Director of North American Sales, to lead the CTP sales effort.  Antley Decl. ¶ 2;[10] Antley Dep. 16:1-16:5, 20:13-23.  Antley was a seasoned sales professional with relevant experience selling capital equipment. Antley Dep. 8:7-9:15, 16:22-17:18, 20:13-23; Bogen Dep. 129:16-130:10.  Neither Bogen nor Joseph Barrett (another Sonoran sales representative) had specific newspaper or publishing experience before joining Sonoran.  Bogen Dep. 163:14-16; Barrett Dep. 46:21-25.[11]  **Response: Denied.   Mr. Antley was probably assigned before the closing.  See Z 4, Antley Dep., pp. 18-19. He may have had a title as Director, but he was a salesman of relatively unsophisticated circuit board printing machines. The machines he had been selling, to give a rough example, would be the equivalent technology of a copying machine compared to a commercial printer with lasers designed to go 250 times faster and to handle printing requirements fifty times larger.  While he had a pleasant personality, Mr. Antley was completely unequipped to sell CTP equipment and never took the time to educate himself. He never understood the technology from the point of view of being able to explain how the machine worked and he never understood the Cost of Ownership model, which was key to selling the machine.  He did not know, for instance, that depreciation was included as a cost of ownership, nor did he understand how the cost savings worked as between UV plates, thermal technology, and conventional plates. Donahue Aff. ¶8.  As is shown in the affidavits provided by Mr. Shaver ( Shaver Affidavit¶ 3-6) and Mr. Donahue (Donahue**

---

[10]  "Antley Decl." refers to the Declaration of Guy Antley.

[11]  "Barrett Dep." refers to the transcript of Joseph Barrett deposition, and cited pages are at Ziegler Exh. 5.

Affidavit ¶ 8), this was the least of Mr. Antley's problems. Further, when Bogen tried to impart his past experience and knowledge about the sale of CTP products, (Antley) did not seem interested. Bogen Affidavit ¶ 3. Contrary to what PerkinElmer claims in this paragraph, Mr. Barrett had worked in newspapers and the newspaper industry for more than twenty-five years, and by 2001, Mr. Bogen, who was trained by Mr. Barrett, had been involved with CTP product development for three years and had met with more than a hundred newspapers and had established relationships at many of them. Mr. Antley was a history major in college and took no engineering or science courses. Mr. Bogen, by contrast, was a college engineering major and has an MBA. Donahue Affidavit¶ 8. Further, Mr. Bogen spent full-time on CTP, while Mr. Antley's' Activity reports—which Mr. Donahue read but have not been produced by PerkinElmer—reflect that Mr. Antley spent about 80% of his time on CTP after the closing, but by 2003 was spending half his time or less on CTP. Donahue Aff. 6. See Z 3, SS05490-92 and SS 05665 (reports improperly included in Z3 because they mostly concern visits to PCB customers, not CTP).

52. On May 15, 2001 Antley, Greg Baxter (General Manager, Lithography), Thomas Keddy (Director of Sales and Marketing, Lithography) and Bill Huseman (Quality Director, Lithography) hosted executives from a potential CTP customer (Harte-Hanks, distributor of The PennySaver) at its Azusa, California facility. Antley Decl. ¶ 3; Antley Email - SS03040 (Ziegler Exh. 35). On May 29, 2001, PerkinElmer hosted PennySaver executives a second time at PerkinElmer's Azusa facility. PennySaver Email – SS02525 (Ziegler Exh. 36). **Response: Admitted that the meetings occurred; however, PerkinElmer took itself out of the game. As Mr. Bogen's Affidavit (Bogen Affidavit ¶ 3) states, and Mr. Antley's Trip Report for May 24, 2001 states (Z3 PE001240), Pennysaver was in line to receive a prototype for a BETA**

27

placement. The BETA offer was at $300,000-400,000 (not the $400,000 Antley reports),
with a trial period and other, usual, perks for taking an early machine. Mr. Bogen told
Antley that Pennysaver was willing to pay $300,000 and this was an appropriate price—in
fact, a good deal—for a first machine, and that it would give PerkinElmer a reference
machine on the West Coast. Mr. Bogen repeated this to Mr. Antley and Mr. Baxter when
they met at the end of May, 2001, in Los Angeles. However, PerkinElmer refused to
provide the machine for less than its full price, $495,000, and so, it drove Pennysaver away.
Z 31; Bogen Aff.¶ 3.

53. On May 22 and 23, 2001, Antley visited the Tucson site. Antley Decl. ¶ 4; Antley
Trip Report – PE001239-1246 (Ziegler Exh. 3); Antley Email – SS03073-3074 (Exh. 69). While
in Tuscon, Antley saw a product demonstration and met with Donahue, Bogen and others.
Antley Decl. ¶ 4; Antley Trip Report - PE001239-1246 (Ziegler Exh. 3). Antley obtained
information about PennySaver ("PennySaver"). Antley Decl. ¶ 4; Antley Trip Report -
PE001239-1246 (Ziegler Exh. 3). Antley obtained technical information about the prototype unit
and the modifications that would be necessary to meet PennySaver's requirements. Antley Decl.
¶ 4; Antley Trip Report - PE001239-1246 (Ziegler Exh. 3). Antley obtained information about
other potential customers, including *The Cleveland Plain Dealer*, *The Washington Post*, *Chicago
Tribune*, *Los Angeles Times, St. Petersburg Times, Sun Sentinel,* and a Brazilian newspaper.
Antley Decl. ¶ 4; Antley Trip Report - PE001239-1246 (Ziegler Exh. 3). Antley also obtained
contact information for potential customers. Antley Decl. ¶ 4; Antley Trip Report - PE001239-
1246 (Ziegler Exh. 3). Bogen provided Antley with all of the contact information he had for
potential customers. Bogen Dep. 85:2-19, 166:2-4. Antley also obtained industry information,
including information about plate manufacturers, customer sales cycles, industry trade magazines

and organizations, and competition. Antley Decl. ¶ 4; Antley Trip Report - PE001239-1246

(Ziegler Exh. 3). Antley also obtained information about the "cost of ownership model" that had

been used by Sonoran with potential customers. Antley Decl. ¶ 4; Antley Trip Report -

PE001239-1246 (Ziegler Exh. 3). In addition, Antley and Bogen visited at least two potential

customers together. Bogen Dep. 83:2-85:1. **Response: It is admitted that the various**

**references in this paragraph say most of what is written in it, but, see paragraphs 51 and 52**

**above. Mr. Antley did not retain the technical information he was given nor did he**

**understand the cost of ownership model in any detail. Donahue Aff. ¶ 8. Further, in spite**

**of repeated requests by potential customers in this paragraph to receive and tryout a**

**machine first as part of a BETA process, PerkinElmer (inanely) refused to offer the**

**machine in 2001 through 2003 at anything less than full price or a trivial discount. See,**

**various reports in Z3 and Donahue Affidavit ¶ 5. PerkinElmer virtually took itself out of**

**the game, while its competitors reportedly sold multiple machines to all of the above-stated**

**potential customers—almost all of whom had asked to be BETA customers of**

**PerkinElmer. Donahue Aff.¶ 5.**

54. By the end of June 2001, PerkinElmer signed a lease on a new 8,000 square foot

facility and moved the CTP business there. Donahue Dep. 33:7-11; Donahue Email – SS01953-

1957, SS01964 (Ziegler Exhs. 37-38). The new facility was more expensive than Sonoran's

previous facility and had been Donahue's preferred choice among possible new facilities.

Donahue Email - SS03909-3910 (Ziegler Exh. 39). PerkinElmer, in addition to investing in new

facilities and the buildout of those facilities, purchased a valuable inventory of parts, including

high-priced lasers. Sonoran Pre-Acquisition Disclosures - SS00292 (Ziegler Exh. 40).

**Response: Admitted, except that the plaintiffs do not know what is meant by "valuable**

inventory of parts". A great deal of the inventory needed to build units and other necessary materials were not purchased. See Paragraph 44 above.

55. PerkinElmer's marketing and communications groups also shifted into gear shortly after the acquisition, issuing press releases about the acquisition, developing and printing marketing materials, and arranging for a booth, transportation and installation of a demonstration prototype, and attendance at the major industry exposition – the NEXPO – in June 2001. PerkinElmer Email – SS02984 (Ziegler Exh. 41); PerkinElmer email and press release – SS02514 (Ziegler Exh. 42). PerkinElmer also set up a website for the CTP business. Antley Dep. 165:14-23; Antley Email – SS04341-4342 (Ziegler Exh. 70). **Response: Denied. Except for setting up a barebones website, issuing a single press release after the closing, and re-printing Sonoran's product brochure with the PerkinElmer label, the marketing and communications group did nothing while PerkinElmer was involved with CTP. Donahue Aff. ¶ 6. Furthermore, no money was spent to promote or advertise the product except for the amount spent at NEXPO shows. Donahue Aff. ¶ 6.**

56. Donahue stated that he was impressed by the professionalism, enthusiasm and energy of the PerkinElmer marketing and communication team. Donahue Email – SS03072, SS01929, SS01916 (Ziegler Exhs. 43-45). **Response: Denied. The exhibits cited in this paragraph do not say anything of the sort, except that one of them refers to one early meeting with the salesmen in early 2002 and another refers to the single press release at the time of the closing—and marketing and communications were never involved again. PerkinElmer did not assign any marketing professional to CTP, nor spend any money on advertising and promotion, except for sales people, and this was principally Guy Antley. As PerkinElmer is well aware, Donahue was far less than impressed with him and the sales effort. D 3. D 16 is**

a scathing e-mail about that effort written in October, 2002.  Although the e-mail was generated by John Watkins' (Tucson's COO), Greg Baxter testified that he and others suspected that it had been ghost-written by Mr. Donahue. Baxter Dep. pp 180-182.

57. According to Donahue, "[t]he contacts made at NEXPO would take at least three months to visit" and "[t]his first impression will be a much stronger statement than a salesman can make without a machine."  Donahue Email - SS00404 (Ziegler Exh. 46).  **Response:  It is admitted that Donahue predicted that the NEXPO show would have such positive results, but it must be remembered that the statement was made before PerkinElmer had actually attended the NEXPO show.**

58. In June 2001, PerkinElmer attended NEXPO in New Orleans.  Antley Decl. ¶ 5; Antley Trip Report - SS02578-02582 (Ziegler Exh. 3).  PerkinElmer sent at least six employees to the show, including Antley, Baxter, Keddy, Norm Shaver (Product Specialist), Dean Stapleton (Product Specialist), Bill Hart (Senior Electrical Engineer), as well as Bogen, who was under a consulting agreement.  Bogen Dep. 84:18-85:1; Antley Decl. ¶ 5; Antley Trip Report - SS02578-02582 (Ziegler Exh. 3).  At the show, PerkinElmer performed demonstrations of the then-current prototype, which was to be marketed under the name ProForm Metro.  Antley Trip Report - SS02578-02582 (Ziegler Exh. 3).  PerkinElmer also met with representatives from at least six publications or publishing groups, including *The Los Angeles Times, The Milwaukee Journal, The Providence Journal, The Flyer, The Journal Newspapers,* and *La Nacion*, as well as with representatives from at least three plate manufacturers, including American Lithographic, Citiplate, and NAPP (MacDermid).  Antley Decl. ¶ 5; Antley Trip Report - SS02578-02582 (Ziegler Exh. 3).  PerkinElmer also met during the NEXPO with representatives from three significant trade publications:  *Editor and Publisher, Newspapers and Technology,* and *The*

31

*Seybold Report*.  Antley Decl. ¶ 5; Antley Trip Report - SS02578-02582 (Ziegler Exh. 3).

**Response: Admitted; however, it is noteworthy that Mr. Antley does not indicate in this trip report or most of the others Defendant relies on that he said or did anything other than listen at a meeting.  It defies the "DNA" or "psyche" of a salesman not to tell those he is reporting to that he said or did something of value in a meeting—if he in fact said or did anything to move a sale forward.**

59. Donahue declined to attend the NEXPO, recognizing that there were budgetary constraints and that PerkinElmer would have sufficient personnel there to represent the product and business.  Donahue Email - SS03901 (Ziegler Exh. 47).  **Response: Admitted that he did not attend the show because he thought he could be more useful if he remained in Tuscson. Z 47.**

60. PerkinElmer assigned additional engineering staff from its Azusa facility and hired additional engineering personnel to support the development effort in Tucson.  Donahue Email – SS02124, SS02135, SS02139, SS02143 (Ziegler Exh. 48).  **Response: Admitted that Dave Hill was hired to replace Randy Cubberly and that two or three engineers from Azusa provided support to Tucson for a brief time to change the machine's design and install Azusa's material handling device rather than the one which Sonoran had purchased and thought was appropriate. Otherwise, denied. Donahue Aff. ¶ 2.**

61. In June 2001, Donahue reported that the original prototype machine was operable "by Tucson engineers only" and that "mod[ifications] need to be made to make [the] machine operable by customer and to resolve outstanding issue[s]."  Donahue Email and Spreadsheet of Tasks – SS02007 (Ziegler Exh. 49).  He provided a detailed list of all of the engineering work

that he and his team needed to do to make the prototype customer-ready. Donahue Email and Spreadsheet of Tasks – SS02005-2019 (Ziegler Exh. 49). He targeted completion of the prototype by September 2001. Donahue Email and Spreadsheet of Tasks – SS02005-2019 (Ziegler Exh. 49). **Response: It is denied that Exhibit 49 refers to the "prototype", meaning the CactusSetter, which <u>was</u> ready for sale by this time. What Exhibit 49 refers to is the new cosmetic changes mandated by Greg Baxter to come up with the Pro Form Metro. Joe Donahue was asked to oversee the conversion of the machine's operation to the new cosmetic design, while Azusa created the external design. Exhibit 49 refers to the process begun in June, 2001, a month after the purchase, to re-design the machine for cosmetic purposes and the prototype for the new machine referred to is for the Pro Form Metro. See, Z 49, SS 02005 ¶ 1.**

62. By July 2001, PerkinElmer's Lithography division was not doing well financially. Donahue testified that he learned within three months of the May 2001 closing that the "Lithography business was in deep trouble." Donahue Dep. 485:8-11. **Response: It was in August, 2001 that Mr. Donahue learned this. Donahue Affidavit ¶ 6, D 10.**

63. In July 2001, PerkinElmer continued discussions with PennySaver. Antley Decl. ¶ 6; Antley Trip Report - SS04137-4140 (Ziegler Exh. 3). In addition, during the week of July 30, 2001, PerkinElmer met with several potential customers or strategic partners, including *St. Louis Post-Dispatch*, *Milwaukee Journal Sentinel*, American Litho, and *The Cleveland Plain Dealer*. Antley Decl. ¶ 6; Antley Trip Report – SS04137-4140 (Ziegler Exh. 3). **Response: Admitted that Mr. Antley's reports say what is written in this paragraph.**

64. In July 2001, Donahue disagreed with a plate manufacturer's suggestion that
PerkinElmer consider discounting the price of the machine in order to place a machine with the
PennySaver: "Please do not be too chummy with American Litho. Their only goal is to sell
plates, and if our machine price comes down, their plate prices can stay high." Donahue Email –
SS04041 (Ziegler Exh. 50). **Response: Denied. There is nothing in Exhibit 50 which suggests
that Donahue disagreed with suggestions by anyone that the price of the first several
machines should be reduced. Defendant has misread the document. What Donahue was
saying was that plate manufacturers want the price of machines to be lowered in part so
that the price of plates can be higher and that CTP manufacturers (except those which also
sell plates) wanted plate prices to be lower, so that machine prices can be justified. Non-
UV plate manufacturers were selling plates that were much more expensive than those
which could be run on the CactusSetter and the Pro Form Metro and it was not in their
interest to promote a machine which could save purchasers significant money by using UV
plates. Donahue was saying, in essence, that Antley should not be naïve. As to the price of
the Pro Form Metro CTP, Donahue consistently advocated for lowering the price of the
first few units so that there were "reference" machines in place to attract other customers.
Z 50, SS 04042.**

65. By August 2001, PerkinElmer had contacted at least 77 potential customers. Antley
Decl. ¶¶ 6-7; Antley Email – SS04165 (Ziegler Exh. 51). These included the following, among
others: *LA Times, Dallas Morning News, Washington Post, Newsday, Philadelphia Enquirer,
Toronto Star, Houston Chronicle, Orange County Register, St. Petersburg Times, USA Today,
Cleveland Plain Dealer, Arizona Republic, Boston Globe, Detroit Free Press, Sun-Sentinel,
Miami Herald, Baltimore Sun, San Jose Mercury News, Forth Worth Star-Telegram, San*

*Francisco Chronicle, Denver Rocky Mountain News, Star Tribune, New York Times, Atlanta Journal Constitution, Chicago Sun Times, Milwaukee Journal Sentinel, Hartford Courant, Kansas City Star, St. Louis Post Dispatch, Tampa Tribune, Cincinnati Enquirer, Charlotte Observer, Boston Herald, Virginian Pilot, Sacramento Bee, Palm Beach Post, Richmond Times-Dispatch, Vancouver Sun, Star Ledger, Florida Times-Union,* Gannett Supply Corporation, *Denver Post, Indianapolis Star News, Columbus Dispatch, San Diego Union Tribune,* PennySaver, Upper Vally Printing, *Knoxville News Sentinel, Nashville Tennessean, Chicago Tribune, Savannah Morning News, Grand Rapids Press, Seattle Times, Austin American Statements,* and *The State.*  Antley Decl. ¶¶ 6-7; Antley Email – SS04166 (Ziegler Exh. 51); Antley Email – SS02680-2682 (Ziegler Exh. 81).  **Response: If by a "contact" defendant means a telephone call as a caller doing a survey might do, asking a few questions and thanking the phone call recipient for her time, this is admitted.  If defendant is trying to claim that the phone calls were meaningful introductions to PerkinElmer's CTP product or sales calls, this is denied. What Antley "accomplished", as Z 3 shows as to the "Trip" reports in 2001 and 2002, was little more than basic market research which confirmed what Bogen had told him in May 2001, namely, that to achieve a placement of the first few machines, the product had to be dramatically reduced in price, the customer must be given substantial discounts of parts and service, a longer warranty, and assurances from high level management that PerkinElmer was in the CTP business for the long haul.  Customers needed to buy more than one machine to meet their needs and satisfy their "redundancy" requirements.  Many of Antley's reports—especially where price and terms were discussed—were sent to Greg Baxter only, and none were sent to higher level PerkinElmer management. Z 3, PE 001239-SS4908.**

66. In September 2001, Donahue reported that the prototype machine was not yet customer-ready. Donahue Email – SS04181-4184 (Ziegler Exh. 52). This first unit, called the ProForm Metro, was intended for customers that used offset plate technology. Donahue Email – SS04181-4184 (Ziegler Exh. 52). Donahue provided a list of over one hundred open items that represented the "bare minimum for a 'complete machine.'" Donahue Email – SS04181-4184 (Ziegler Exh. 52). He estimated an end date in December 2001 for completion of all the items needed to make the ProForm Metro ready for the first customer. Donahue Email – SS04181-4184 (Ziegler Exh. 52) **Response: Denied. As stated in ¶¶ 14 and 61 above, defendant has confused the ProForm Metro and the CactusSetter. The CactusSetter was the first machine, and it was ready for sale in 2000. The ProForm Metro was the result of cosmetic changes to the CactusSetter and it was ready for sale in late 2001. Harte-Hanks (Pennysaver) was ready to accept the CactusSetter at a Beta deal in 2001, before the Pro Form was ready, but PerkinElmer decided that it was unwilling to give Pennysaver a BETA deal and that it would only be willing to sell Harte-Hanks the Pro Form Metro at full price, in spite of being told by Donahue and Bogen that the placement required a Beta price. Bogen Aff. ¶ 3.**

67. In October 2001, during the week of October 10 to October 19, PerkinElmer met with representatives of at least eight potential customers or strategic partners, including *Milwaukee Journal Sentinel, Gary Post Tribune*, American Litho, *Grand Rapids Press, The Washington Post, The Baltimore Sun*, Gannett Newspapers, and Philadelphia Newspapers. Antley Decl. ¶ 8; Antley Trip Report – PE001222-1227 (Ziegler Exh. 3). Meetings with *The Washington Post, The Baltimore Sun*, Gannett Newspapers, and Philadelphia Newspapers included both Antley and Keddy. Antley Decl. ¶ 8; Antley Trip Report - PE001222-1227 (Ziegler Exh. 3).

**Response: It is admitted that the referenced trip reports indicate that Mr. Antley met with the newspapers referenced above and that Mr. Keddy met with the newspapers listed in Antley's trip report for October 19, 2001.**

68. In late October 2001, the *Milwaukee Journal Sentinel* reported to PerkinElmer that it chose a competitor because PerkinElmer did not offer an "end to end solution" including, for example, plate setters, RIPs, and front-end software.  Antley Email – PE001540 (Ziegler Exh, 60).  **Response: Denied.  What the newspaper's representative reportedly said, according to Z 50, was that the competitor's price was "great" and that it had provided the newspaper with an end-to-end solution, meaning that the negotiated price of the machine and of the plates worked for the Journal Sentinel.  In a prior trip report, as to a different newspaper, Antley had reported that with an unproven machine the industry practice was to install a machine for free and to negotiate its sale price on a reduced basis after it had proven itself. He had reported that PerkinElmer had no such policy and that it was unwilling to discount the machine's list price meaningfully. Z 3 SS 04736.  None of Mr. Antley's trip reports indicate that he offered the Milwaukee newspaper any price or other concession nor that he asked American Litho, with whom he was soliciting the end-to-end business, for any price concession or other favorable terms. This was flatly an unreasonably poor effort to obtain the Milwaukee newspaper's business.  It was an example of Antley going through the motions. He knew that the price had to be lowered, but, in light of his perception of the firmness of Corporate's policy against it in the instance of CTP, he never asked that it be lowered. During this period, PerkinElmer ranked the new product introduction of the CTP product as "low". D 3.**

69. In November 2001, PerkinElmer met with representatives of Tucson Newspaper, Inc., which ran operations for the *Tucson Citizen* and the *Arizona Daily Star*, and with *News-Press*, *Miami Herald*, *Knoxville News Sentinel*, and the *Arkansas Democrat Gazette*. Antley Decl. ¶ 9; Antley Trip Reports – PE001219-1221, PE001215-1218 (Ziegler Exh. 3). **Response: It is admitted that Mr. Antley's trip reports state this. However, from reading the reports referenced in this paragraph, the only reason for the trip was basic market research. As with the other reports referred to above, there is not a single reference in the trip reports to a single effort on Mr. Antley's part to actually sell the product.**

70. In December 2001, Antley and Baxter met with PennySaver. Antley Decl. ¶ 10; Antley Trip Report – PE001213-1214 (Ziegler Exh. 3). In addition, in December 2001, PerkinElmer performed a product demonstration for representatives of the *Philadelphia Enquirer*. Antley Decl. ¶ 10. **Response: Admitted.**

71. By February 2002, PerkinElmer had assigned Caroline Winn, Optoelectronics' European Sales Manager, to lead the European sales efforts. Donahue Email - PE000726-728 (Ziegler Exh. 53). Donahue testified that Winn seemed like a "capable person." Donahue Dep. 333:7-334:5. After his first meeting with Winn and Erick Walker, Optoelectronics' Asia Sales Manager, Donahue reported: "I came away with a very, very positive impression of our sales staff." Donahue Email - SS04297 (Ziegler Exh. 54). In February 2002, Donahue also stated: "[Antley] still has a way to go to get up to speed on graphic arts, but regarding his level of effort, I give him an A+." Donahue Email - SS04313 (Ziegler Exh. 55). **Response: It is admitted that Ms. Winn was a capable person. It is denied that she had been assigned to lead any sales effort as to CTP. She was Optoelectronic's sales person in Europe and appeared at a few meetings with European flexo users with Jerry Hall of MacDermid in late 2003 and in**

**2004, as the e-mails referenced in this paragraph indicate. Mr. Walker was**

**Optoelectronic's salesman for the Asian market; however, he never became actively**

**involved in the sale of CTP products. Donahue Aff. ¶ 12 .**

72. By February 2002, Donahue and his Tucson team had not yet completed development

of the first product, the offset plate unit called the ProForm Metro. Donahue Email – SS04308

(Ziegler Exh. 56). Donahue estimated that development of the ProForm Metro would be

complete by April 2002. Donahue Email – SS04308 (Ziegler Exh. 56). The CTP business also

was working on development of a second product, designed to work with users of flexographic

plates, which was called the ProForm Flexo. Donahue Email – SS04308 (Ziegler Exh. 56).

Donahue estimated in February 2002 that development of the ProForm Flexo could be completed

by September 2002. Donahue Email – SS04308 (Ziegler Exh. 56). **Response: Denied. See ¶¶**

**14 and 66 above.**

73. In February 2002, PerkinElmer also attended the Great Lakes News Conference and

the IFRA Conference and met with at least five potential customers and strategic partners.

Antley Decl. ¶ 11; Antley Trip Reports – SS04295-4296, SS04315-4319 (Ziegler Exh. 3).

PerkinElmer met with representatives of NAPP Systems, Inc. (later known as MacDermid), a

significant supplier of flexographic plates. Antley Decl. ¶ 11; Antley Trip Report – SS04295-

4296 (Ziegler Exh. 3). PerkinElmer also met with representatives of Tucson Newspapers, Inc.,

Wholesale Printing, Inc., *Dallas Morning News*, and American Color Graphics. Antley Decl. ¶

11; Antley Trip Report – SS04315-4319 (Ziegler Exh. 3). During February, Antley also visited

the Tucson site again. Antley Decl. ¶ 11; Antley Trip Report – SS04315-4319 (Ziegler Exh. 3).

**Response: As Mr. Antley's trip reports show, he was a totally passive attendee at the two**

**shows referenced above and his only apparent reason for attending was to gather**

information.  Mr. Antley's meeting with NAPP had no substantive purpose. NAPP had already made contact with Joe Donahue and was in active communication with him.  Mr. Hall had already indicated that NAPP (MacDermid) needed up to 150 machines to satisfy its Flexo customers. D 21.  As a matter of fact, Jerry Hall of MacDermid/NAPP complained to Joe Donahue about Mr. Antley's incompetence after the meeting described above. D 18.

73. In February 2002, a representative of PennySaver informed PerkinElmer by email that PennySaver had decided to purchase a CTP machine from another vendor, not PerkinElmer. PennySaver acknowledged that PerkinElmer's acquisition of the business had "improved financial stability," but explained that it had chosen a competitor for several other reasons, including: (a) there would be "less risk" working with a vendor that had experience in the CTP industry, (b) the competitor's machine was less expensive, which allowed the customer to purchase two machines rather than one, and (c) the competitor's machine was "bundled" with consumable plates, which would ensure ongoing support.  PennySaver Email – SS04320-04321 (Ziegler Exh. 57); Antley Dep. 145:3-146:7. **Response. It is denied that Pennysaver's decision was based on anything other than PerkinElmer's unwillingness to provide a Beta placement or lower its price. Z 31.  Pennysaver later admitted to Jerry Jurkiewicz and Guy Antley that redundancy—i.e., the ability to purchase multiple machines at a reasonable price, the cost of the laser, and the lack of "reference machines", i.e. the unwillingness to allow a trial run of the machine at no cost or a low cost in the absence of other proven trial runs, was the basis for its decision. Z3 SS 04969.**

74. Donahue later acknowledged that PennySaver "was not an optimum target for the ProForm Metro." Donahue Email - PE00929 (Ziegler Exh. 58).  Donahue testified that the ProForm Metro was "overkill" for PennySaver because they did not need high speeds.  Donahue

Dep. 448:20-449:4. Donahue also testified that PennySaver wanted PerkinElmer to supply a solid state laser at the same price as a gas laser. Donahue Dep. 449:14-450:7. **Response: Donahue tried to be team player and to salve the wound. Given how far along Sonoran was toward a Beta placement with Pennysaver, PerkinElmer's change of strategy—its unwillingness to place the machine as a Beta and offer a suitable price under the circumstances—cost PerkinElmer (and, therefore, the plaintiffs) the best hope to get the sales effort off the ground in 2001 and probably doomed the entire CTP project. No amount of trying to twist Mr. Donahue's words can justify PerkinElmer's unwillingness to make the reasonable efforts to place the first key machine with Pennysaver and others who expressed willingness to be first customers as long as they were offered commercially reasonable terms.**

75. By the end of February 2002, PerkinElmer had discussed potential beta site interest with at least 24 newspapers, including the following: *Wall Street Journal, USA Today, New York Times, LA Times, Washington Post, Houston Chronicle, Dallas Morning News,* Philadelphia Newspapers, *Rocky Mountain News, Cleveland Plain Dealer, Atlanta Journal Constitution, Miami Herald, Baltimore Sun, Seattle Times, St. Louis Post Dispatch, San Diego Union Tribune, News-Press, Post and Courier, New Orleans Times-Picayune, Orange County Register,* Knight Ridder, *Quebecor*, Tucson Newspapers, and *San Jose Mercury News*. Antley Decl. ¶ 12; Antley Email – SS04329-4330 (Ziegler Exh. 82). **Response: Admitted that all of these newspapers were interested in the product and were willing to be first customers so long as they were offered commercially reasonable terms. However, even after being told again and again that it must offer substantial discounts and favorable terms to first users, PerkinElmer was unwilling to offer any meaningful discount, extended warranty or free parts and labor to**

41

any customer through 2003.  **In 2004, it placed one machine, a Flexo machine, by selling it to MacDermid for $475,000 after MacDermid had paid half the cost of its manufacture, with the knowledge that MacDermid was reselling the machine to the Manchester Union Leader for much less.**

76. In March 2002, a representative of the New York Times Company informed PerkinElmer by email that "nearly all [of his print sites] agreed that the size of the CTP equipment and the need for separate processing equipment was going to be a problem at most of their sites."  New York Times Company Email – PE001504 (Ziegler Exh. 68).  The New York Times Company representative also reported to PerkinElmer that "pairing up with an established front-end software vendor will probably be a necessary hurdle for you to cross before there will be a lot of interest with [his] group."  New York Times Company Email – PE001504 (Ziegler Exh. 68). **Response: There were many back and forth discussions with the New York Times individually and as the leader of a substantial purchasing group, but the opportunity to place early machines with the Times took an enormous step backward in 2002 when PerkinElmer indicated that its final offer for a Beta placement was to sell the Times a first machine for the list price, $495,000, less $20,000. Z 83, PE000544.**

77. In April 2002, during the weeks of April 1 and April 8, PerkinElmer met with representatives of at least seven potential customers or strategic partners, including *Post & Courier*, *The Record*, Citiplate, *Virginia Pilot*, Gannett Newspapers, *Chicago Sun Times*, Wholesale Printing Products, Inc.  Antley Decl. ¶ 13; Antley Trip Report – PE001275-1279 (Ziegler Exh. 3). **Response: It is admitted that these meetings occurred, but it appears that Mr. Antley was merely present and not saying anything at any of the meetings except for that with Citiplate—a plate manufacturer which might have been willing to co-bid for**

**projects. In fairness to Mr. Antley, WPP was located in El Paso, Texas and across the border in Juarez. Daniel Obregon of PerkinElmer's Tucson unit, who was Spanish-speaking, took the lead and formed a strong relationship with WPP's personnel. As to Mr. Antley's non-participation, the Gannett meetings referred to in this paragraph and other meetings point up the problem. Gannett's representative, a high level executive representing a customer with many newspapers, critiqued PerkinElmer's cost of ownership model, stating that it should take into account depreciation and the cost of money calculations, probably a criticism that PerkinElmer's machine was more expensive than those of others and that it hadn't been upfront about the true relative ROI of its machines versus those of its competitors. Antley said nothing. He should have been aware that depreciation _was_ included in the cost of ownership model and that the cost of money differential was not a significant number. From reading the trip reports, it appears that Mr. Antley never gained another meeting with this Gannett executive again. Z 3. If the defendant's point is that one salesman's activities in setting up and showing up for meetings is all that is required to meet its responsibility to make reasonable efforts to market and sell the CTP product, plaintiffs strenuously disagree.**

78. In June 2002, during the week of June 17, PerkinElmer met with at least five potential customers, including Newspaper Agency Corporation, *Forth Worth Star-Telegram*, *Dallas Morning News*, Trader Publications, and Citiplate. Antley Decl. ¶ 14; Antley Trip Report – SS04538-4540 (Ziegler Exh.3).**Response: See ¶ 77 above.**

79. PerkinElmer also attended the NEXPO show in June 2002 in Orlando. Antley Decl. ¶ 15; Antley Trip Report – SS04541-4542 (Ziegler Exh. 3). At least five PerkinElmer employees participated, including Antley, Kristen Schnittger, Irene Kartikasari (a sales and marketing

employee), Shaver, Stapleton, and Daniel Obregon. Antley Decl. ¶ 15; Antley Trip Report –
SS04541-4542 (Ziegler Exh. 3). Before the show, PerkinElmer sent out approximately 200
invitations to potential customer contacts and made approximately 100 calls to confirm
attendance. Antley Decl. ¶ 15; Antley Trip Report – SS04541-4542 (Ziegler Exh. 3).
PerkinElmer conducted at least 7 pre-arranged product demonstrations for potential customers,
including *San Francisco Chronicle*, *Newsday*, *New York Times*, *Quebecor*, Scripps Howard
Publishing group, the *Orlando Sentinel*, *Los Angeles Times*, *Virginian-Pilot*, *OC Register*, the
Tucson Newspaper Group, and *Charlotte Observer*. Antley Decl. ¶ 15; Antley Trip Report –
SS04541-4542 (Ziegler Exh. 3). PerkinElmer also met representatives from several other
potential customers, including *The Wall Street Journal*, Knight Ridder, Gannett, *Grand Rapids
Press*, and the *Boston Herald*. Antley Decl. ¶ 15; Antley Trip Report – SS04541-4542 (Ziegler
Exh. 3). PerkinElmer also spent time with representatives from plate manufacturers, from
Seybold Publications, an industry consultant, and *Editor & Publisher*. Antley Decl. ¶ 15; Antley
Trip Report – SS04541-4542 (Ziegler Exh. 3). **Response: Admitted, but using the words "met
with" does not fit with the descriptions in the trip reports.**

80. PerkinElmer marketed the ProForm Flexo in Europe and in the United States, with
Winn taking the lead in Europe. Donahue "really took the lead on" and was "heavily involved
in" ProForm Flexo sales efforts in the United States market. Donahue Dep. 264:6-16, 257:3-11.
**Response: It is denied that PerkinElmer marketed the machine in Europe. MacDermid
did. Donahue was, in essence, the sales rep on Flexo, because MacDermid/NAPP
approached him directly about its needs for a Flexo CTP machine to keep its plate
customers who were asking for CTP happy. MacDermid/Flexo was the dominant
manufacturer of flexo plates, and it was MacDermid which was marketing the Flexo**

44

machine in the US and Europe. Ms. Winn did attend a few sales meetings with a large

European newspaper group at which Mr. Hall of MacDermid made the presentation and

she did attend a very successful demonstration to European manufacturers in Tucson at

which Mr. Hall and Mr. Donahue presided.  Z 63.

81. In August 2002, PerkinElmer's ProForm Metro was featured on the cover of an issue

of *Editor & Publisher*, which contained an article that described PerkinElmer's CTP business

and product and quoted Antley discussing the PerkinElmer, its products, and the industry. *Editor*

*& Publisher* Cover and Excerpt – SS04644-04651 (Ziegler Exh. 61); Antley Decl. ¶ 16.

PerkinElmer also met with several potential customers or strategic partners during August 2002,

including New York Times Company, *New York Times*, *Virginian Pilot, Baltimore Sun*, and

Citiplate.  Antley Decl. ¶ 17; Antley Trip Report – SS04630-4634 (Ziegler Exh. 3).  Both Antley

and Baxter attended the meeting with Citiplate.  Antley Decl. ¶ 17; Antley Trip Report –

SS04630-4634  (Ziegler Exh. 3). **Response:  It is admitted that the Pro Form Metro was**

**mentioned in one article involving several competitors, and that Mr. Antley was quoted in**

**the article, but it is denied that either the product or Mr. Antley were featured or the**

**subject of the cover story in that one issue of the magazine.  It is a measure of the**

**inadequacy of PerkinElmer's marketing and promotional effort that it has put so much**

**emphasis on this article.  As to the New York Times and Virginia Pilot, part of the same**

**purchasing group, see ¶ 76 above.  As to the Baltimore Sun and Citiplate, it is admitted that**

**the meetings occurred.**

82. In September 2002, PerkinElmer met with at least four potential customers or

strategic partners, including Anocoil, Dow Jones Company, *Los Angeles Times*, *Miami*

*Herald*/Knight Ridder.  Antley Decl. ¶ 18; Antley Trip Reports – SS04684-4685, SS04735-4736

(Ziegler Exh. 3).  In September 2002, PerkinElmer performed a product demonstration for representatives of MacDermid.  Antley Decl. ¶ 18.  **Response: Admitted.**

83. In September 2002, Donahue stated in an email:  "If times were better we'd have sales now.  And if times were better and we had a better sales dept., we'd have even more sales." Donahue Email - SS04722 (Ziegler Exh. 76).  **Response: Admitted that Mr. Donahue wrote this, but it is out of context. The e-mail was principally about Mr. Antley's incompetence, but Mr. Donahue chose to be diplomatic. Putting the sentences in this paragraph in context, it states, "Guy is not the most competent CTP sales guy around and a number of customers can see this…. (but) if times were better we'd have sales now.  And if times were better and we had a better sales dept, we'd have even more sales." A month later, the Tucson unit's COO was less diplomatic about Mr. Antley and wrote to top management at PerkinElmer that Mr. Antley was grossly incompetent and that PerkinElmer was in breach of contract for making him the CTP sales person. D 5.  Mr. Antley's incompetence had already been noted by Donahue and Shaver in e-mails (D4).**

84. In October 2002, PerkinElmer attended two and a half days of the Graph Expo Trade Show and met with at least six potential customers or strategic partners, including Anocoil, American Litho, *New York Times*, Citiplate, *Chicago Sun Times*, and *Chicago Tribune*.  Antley Decl. ¶ 19; Antley Trip Report – SS04738-4741 (Ziegler Exh. 3).  **Response: It is admitted that Mr. Antley attended the Trade Show, but it is noteworthy, first, that PerkinElmer did not exhibit or participate in the show. As Mr. Antley reported at the time, he "paid our respects" at the MacDermid booth, "walked the floor", and spoke with representatives of the companies mentioned in this paragraph.  Given that all of the other manufacturers of CTP  products took booths, actively exhibited and marketed their machines at the show, it**

**can hardly be said that Mr. Antley's attendance created any benefit for PerkinElmer, nor did Mr. Antley claim there was any. Second, as the report for September 25, 2002, indicates, Knight-Ridder, representing a consortium of newspapers including the NY Times and its group, was hot to obtain a machine from PerkinElmer as a Beta and wanted it free on a trial basis, which, Mr. Antley admits, is the prevailing industry practice. Z3 SS 04735-36. In October, PerkinElmer responded with its lowest offer—a 4% (!) discount. Its BETA offer, in other words, was that Knight-Ridder and the Times group could have the prototype to try-out only if they paid $470,000!**

85. In October 2002, PerkinElmer performed a product demonstration for representatives of the *Gary Post Tribune*. Antley Decl. ¶ 20. In December 2002, PerkinElmer performed another product demonstration for representatives of the *Gary Post Tribune.* Antley Decl. ¶ 20. **Response: Admitted; however, Mr. Antley later reported later that the Gary newspaper chose a competitor, although it really liked the Pro Form Metro, because the competitor offered a better price, and because of the lack of reference machines in the field. Z 3.**

86. In February 2003, PerkinElmer met with representatives of the *Los Angeles Times*, K&F International, *Post Tribune*, and *Chicago Tribune*. Antley Decl. ¶ 21; Antley Trip Reports – SS04904-4908, SS04927-4931 (Ziegler Exh. 3). **Response: Denied that the documents in this paragraph state that the meetings occurred except for the press demonstration arranged by the LA Times.**

87. In March 2003, PerkinElmer met with representatives of San Francisco Chronicle, PennySaver, Los Angeles Times, Wholesale Printing Products, El Paso Times, Fort Worth Star Telegram, Virginian Pilot, New York Times, Washington Post, Baltimore Sun, Metroland,

Toronto Star.   Antley Decl. ¶ 21; Antley Trip Reports – SS04968-4972, SS04995-4998 (Ziegler

Exh. 3).   Jerry Jurkiewicz, Optoelectronics' Vice President of Operations, joined Antley for at

least four of these meetings, and Dan Iadonisi, Optoelectronics' Global Sales Director, joined

Antley for at least three meetings.   Antley Decl. ¶ 21; Antley Trip Report – SS04968-4972,

SS04995-4998 (Ziegler Exh. 3).   In March 2003, PerkinElmer performed a product

demonstration for representatives of Wholesale Printing Products.   Antley Decl. ¶ 21;

PerkinElmer Email – PE001370-1373 (Ziegler Exh. 62).   In April 2003, PerkinElmer met with

representatives of San Jose Mercury News.   Antley Decl. ¶ 21; Antley Trip Report – SS05086-

5087 (Ziegler Exh. 3).   **Response: The first sentence is admitted. As to Mr. Jurkiewicz, the**

**meetings he attended at PennySaver and others came after the decision had been made not**

**to proceed with PerkinElmer.  Z 3, SS4968-72.  They were meetings for information only.**

**It is admitted that Mr. Iadonisi attended 3 meetings and that the demonstration at WPP**

**occurred.  As to the San Jose Mercury News, see Paragraph 89 below.**

88. In March 2003, PerkinElmer learned that Wholesale Printing Products ("Wholesale")

was "not willing to bet [its] plate production and site success on 'untested' technology" offered

by PerkinElmer.  PerkinElmer Email – PE001370-1373 (Ziegler Exh. 62).  Donahue testified that

Wholesale had cancelled its purchase order due to "internal Wholesale issues," including the

firing of the general manager of the facility and the decision not to do "massive capital

expenditures at the time."  Donahue Dep. 455:22-456:11. **Response: Admitted.**

89. In May 2003, PerkinElmer participated in the Computer to Plate Technology

Symposium and met with representatives of Knight Ridder, *San Jose Mercury News*, *Plain*

*Dealer, Chicago Tribune,* and *St. Louis Post-Dispatch.*  Antley Decl. ¶ 22; Antley Trip Report –

PE001301-1305 (Ziegler Exh. 3). **Response: It is denied that PerkinElmer participated.  In**

fact, it remarkable that it did not. **Mr. Antley sat in the audience at the Symposium and listened as all of the competitors presented their products' virtues, but he did not speak at all. Z3 PE 1301-04. It is admitted that, as the document says, he attended the meetings, although some of them occurred in April, 2003, according to the documents. The San Jose Mercury News meeting, SS5086-87 is significant. The newspaper indicated it was willing to become a BETA site, noting the lack of reference sites. Apparently, PerkinElmer did not ever respond. Z 3 SS5086-87.**

90. In June 2003, PerkinElmer met with representatives of *Miami Herald* and attended the NEXPO show in Las Vegas. Antley Decl. ¶ 23; Antley Trip Reports – PE001299-1300, PE001297-1298 (Ziegler Exh. 3). During the NEXPO show, PerkinElmer met with representatives from *New York Times, Los Angeles Times, St. Petersburg Times*, Knight Ridder, *San Jose Mercury News, Forth Worth Star Telegram*, Denver Newspaper Agency, *Standard Examiner, Metroland, Plain Dealer, Toronto Star*, and *Orlando Sentinel*. Antley Decl. ¶ 23; Antley Trip Report – PE001297-1298 (Ziegler Exh. 3). PerkinElmer also met with representatives of several plate manufacturers, including American Litho, Citiplate, Kodak Polychrome Graphics, Agfa, Anocoil, and IBF. Both Jurkiewicz and Iadonisi attended the show in addition to Antley. Antley Decl. ¶ 23; Antley Trip Report - PE001297-1298 (Ziegler Exh. 3). **Response: Admitted that these events occurred and that Mr. Iadonisi and Mr. Jurkiewicz attended the show, but it should be noted that PerkinElmer refused to bring a machine to the show because it refused to pay for the transportation and installation cost (D 9 ) and, as such, it was utterly uncompetitive. In contrast to the report of the successful demonstrations of the Pro Form Metro and their value at the 2002 show, no live demonstrations could occur at this show, while the demonstrations of PerkinElmer's**

49

**competitors glowed over the new product features of their current machines. Paragraph 79 above. From the trip report for the 2003 show, it appears that no new contacts were developed, nor does it appear that Mr. Jurkiewicz or Mr. Iadonisi talked with any potential customers. Further, Mr. Shaver observed Mr. Antley's performance at the Miami Herald and states that he was embarrassed to be present and an employee of the CTP division. Mr. Antley demonstrated that, two years after being assigned to CTP sales, he still did not know how to turn on or operate the machine, explain how anything other than how the material handling system operated, or explain the cost of ownership model correctly. Shaver Aff. ¶ 2-4.**

91. In July 2003, PerkinElmer met with representatives of several potential customers or strategic partners, including *Newsday*, *Manchester Union Leader*, *Boston Herald*, *Brockton Enterprise*, *Miami Herald, St. Louis Post-Dispatch*, and Median Supply, which handled purchasing for at least four newspapers, including the *Plain Dealer*, *Star Ledger*, *Times-Picayune*, and the *Oregonian*. Antley Decl. ¶ 24; Antley Trip Report – SS05285-5287 (Ziegler Exh. 3). In July 2003, PerkinElmer performed a product demonstration for representatives of the *Miami Herald*. Antley Decl. ¶ 24. **Response: It is admitted that the documents referred to in this paragraph say that the meetings and demonstration occurred. As to the Miami Herald demonstration, it should be noted that Mr. Antley completely messed up the demo by providing Tucson with wrong plate sizes and dimensions. Shaver Aff. ¶3.**

92. In September 2003, during the week of September 28, PerkinElmer met with representatives of *St. Petersburg Times* and *Kansas City Star* and attended the Graph Expo in Chicago. Antley Decl. ¶ 25; Antley Trip Report – PE001289-1290 (Ziegler Exh. 3). **Response: Admitted that Mr. Antley attended these meetings, but not that he participated in them.**

93. In October 2003, during the week of October 13, PerkinElmer met with representatives from Knight Ridder. Antley Decl. ¶ 25; Antley Trip Report – SS05380-5381 (Ziegler Exh. 3). PerkinElmer also attended the IFRA, the leading international trade show, during October 2003. PerkinElmer Email - PE00726-728 (Ziegler Exh. 53). PerkinElmer met with MacDermid's European sales team at the IFRA. PerkinElmer Email - PE00726-728 (Ziegler Exh. 53). **Response: Admitted that the meetings occurred and were attended.**

94. In January 2004, PerkinElmer met with representatives of the *Miami Herald*. Antley Decl. ¶ 26; Antley Trip Report – SS05490-5493 (Ziegler Exh.3). **Response: Admitted, however, see the report concerning the Miami Herald in paragraphs 90 and 91 and the paragraph below.**

95. In February 2004, PerkinElmer met with representatives of MacDermid and MacDermid's customer, the *Manchester Union Leader*, about possible installation of the first ProForm Flexo unit at the *Manchester Union Leader*. Antley Decl. ¶ 26; Antley Trip Report – SS05664-5665 (Ziegler Exh. 3). PerkinElmer also met with representatives of the *Miami Herald*, and both Jurkiewicz and Antley attended the meeting. Antley Decl. ¶ 26; Antley Trip Report – SS05543-5545 (Ziegler Exh. 3); Jurkiewicz Trip Report – SS05547-5548. PerkinElmer also met with plate manufacturer Anocoil. Antley Decl. ¶ 26; Antley Trip Report – SS05543-5545 (Ziegler Exh. 3). PerkinElmer also hosted representatives of *La Republica* and MacDermid for a presentation and demonstration of the ProForm Flexo product. PerkinElmer Email and Meeting Report – SS05685-5688 (Ziegler Exh. 63) At least four PerkinElmer employees participated, including Joe Donahue, Norm Shaver, and Caroline Winn. PerkinElmer Email and Meeting Report – SS05685-5688 (Ziegler Exh. 63). **Response: Although PerkinElmer met with the Miami Herald and there was a very successful press run and demonstration, the**

51

**Miami Herald, which had wanted a BETA machine to try-out for no upfront payment in**

**2002, now wished to purchase two machines at $375, 000 and $400,000. PerkinElmer**

**refused to come below $425,000, and so, although PerkinElmer hoped for a BETA**

**placement in the 2d quarter of '04, after mention of a BETA machine and site for the time**

**period described in the trip reports above, PerkinElmer failed to provide a commercially**

**reasonable BETA price, and the purchaser would not proceed. Z 3 SS 0547. As to the rest**

**of the paragraph, while PerkinElmer sales people were in attendance at the meetings, it**

**was MacDermid which made the presentations. It should be noted that after Tucson CTP**

**demonstrated its Flexo machine, the salesperson reported that Jerry Hall was jubilant and**

**that the customer, La Republicca, Italy's largest newspaper, termed it "perfecto". Z 63 SS**

**05688.**

96. As of March 2004, PerkinElmer's Tucson staff was busy preparing the prototype
ProForm Flexo unit for shipment to and installation at the *Manchester Union Leader*. Donahue
Email - SS05725-5733 (Ziegler Exh. 72). **Response: The exhibit does not say this; however,**
**it is admitted that, according Z 3 SS 05839-40, the machine was installed and operated**
**successfully at the Union Leader by April, 2004.**

97. In April 2004, PerkinElmer met with representatives of several potential customers or
strategic partners, including the *Baltimore Sun*, the *Los Angeles Times*, Quebecor World,
Citiplate, and R.R. Donnelly. Antley Decl. ¶ 27; Antley Trip Reports – SS05819-5824,
SS05839-5840 (Ziegler Exh. 3). Also, in April 2004, PerkinElmer met with representatives of
the *Manchester Union Leader* to discuss the status of installation and testing of the first ProForm
Flexo unit. Antley Decl. ¶ 27. **Response: Admitted that PerkinElmer met with the above**

companies, but denied that PerkinElmer said or did anything of consequence at any of the meetings, except for tweaking the machine installed at the Union Leader.

98. In May 2004, PerkinElmer met with representatives of the *Los Angeles Times* and *San Jose Mercury News*. Antley Decl. ¶ 27; Antley Trip Report – SS05865 (Ziegler Exh.3). **Response: Admitted.**

99. In June 2004, PerkinElmer met with representatives of the Los Angeles Times and attended the 2004 NEXPO trade show in Washington, D.C. Antley Trip Report – SS05900-5904 (Ziegler Exh. 3). During the show, PerkinElmer met with representatives of several potential customers or strategic partners, including the *New York Times, Baltimore Sun*, and Citiplate. Antley Trip Report – SS05900-5904 (Ziegler Exh. 3). PerkinElmer also met with representatives of the Manchester Union Leader during June 2004 to discuss the performance of the ProForm Flexo unit in place there. Antley Trip Report – SS05900-5904 (Ziegler Exh. 3). **Response: Admitted that the reports describe the meetings mentioned in this paragraph.**

100. Donahue testified: "[m]y opinion of [Antley's] effort varied over time;" "[a]t times [Antley] appeared to be diligent and interested;" "[a]t times I was very pleased with the effort [Antley] put forward;" "[a]t that time I was very pleased with how [Antley] worked on that particular presentation, and how willingly he accepted my input." Donahue Dep. 422:20-24, 423:19-20, 424:22-24. In March 2003, Shaver told Antley by email that he had done "[a] very nice job yesterday" with a quote to a potential customer. Shaver Email - PE000953 (Ziegler Exh. 73). **Response: The page references are wrong and the quotes are taken completely out-of-context and when fully stated, they mean the opposite of what is suggested in this paragraph. The full Donahue quote in context (using the correct pages and lines) is:**

Q: Did you at any time, Mr. Donahue, talk directly to a potential customer about Mr. Antley's sales and marketing abilities?

Mr. Dangel: To a customer?

A: I talked to MacDermid.

Q: Okay. Let's leave MacDermid aside for a moment.

A: Okay.

Q: I'm talking about a potential customer, purchaser of one of the machines at a newspaper.

A: I don't recall speaking to a potential customer, other than MacDermid, about Mr. Antley.

Q: Did you think that Mr. Antley was not trying hard to sell?

Mr. Dangel: Object.

A: My opinion of his effort varied over time. At times he appeared to be diligent and interested; other times disinterested, or focused on other applications, other sales, in particular the Azusa sales.

Q: How did you know that?

A: There was a status report that was produced that showed his activities, and I—there were times—there were occasions when I saw it.

Q: But again, you never accompanied him on a sales call, right?

A: To the Pennysaver, I did.

Q: Okay. Anybody other than Pennysaver?

A: Not that I recall, no.

Q: Okay. And other than MacDermid, you never talked to any prospective customer about Mr. Antley's abilities, right?

A: I don't recall, no.

Q: And certainly at one point you thought that his effort level was very high, right?

A: At times I was very pleased with the effort that he put forward. And then shortly thereafter, I'd be very disappointed.

Q: At one point, didn't you even write that you gave him an A-plus for effort?

**A: I definitely encouraged him.  There were times that I felt it was better to praise rather than criticize when I saw some improvement.  (Donahue Deposition, Vol. III, pp 423:9-425:2)**

101. Donahue testified that Antley had made contact with "many, many newspapers" that were potential customers.  Donahue Dep. 427:5-11.  Donahue testified that PerkinElmer executives, including Jerry Jurkiewicz and Dan Iadonisi, sometimes accompanied Antley on visits to potential customers.  Donahue Dep. 389:22-390:2, 443:13-444:5.  **Response: Mr. Donahue did not so testify.  He testified that there were major metropolitan newspapers that were not effectively contacted but that "he contacted a number of them".  The reference to many, many newspapers is ambiguous.  Donahue Dep. 427, lines 8-10.  As to the second sentence, Mr. Donahue testified that he had an understanding that Jurkiewicz and Iadonisi visited some potential customers with Antley.  However, the trip reports show that Mr. Jurkiewicz visited only one potential customer, and that the other two printers he visited had already decided not to proceed and, in one instance, had already decided to buy a competitor's product, so the reference to a potential customer is probably incorrect. Z 3.**

102. Donahue acknowledged, before the May 2, 2001 sale of Sonoran's assets to PerkinElmer, that PerkinElmer had a desire to keep expenses under control.  Donahue Email - SS03580 (Ziegler Exh. 20).  In addition, before the May 2, 2001 sale, Donahue and Baxter discussed the difficult financial conditions facing PerkinElmer.  Donahue Email – SS03887 (Ziegler Exh. 79).  **Response: Denied as to the first sentence.  Z 20 does not say this and is not susceptible of this interpretation.  As to the second sentence: Denied.  The e-mail in question was written after the closing and makes no reference to "difficult financial conditions facing PerkinElmer. The e-mail refers to staffing of engineers.**

103. PerkinElmer did not bring a machine to either the 2003 or 2004 NEXPO trade shows. Donahue testified that this decision was due to the fact that: "They were under severe budget constraints because of the tanking of the Lithography business, and they didn't – did not want to spend the money." Donahue Dep. 504:15-21. Donahue understood at least by 2001 that "uniformly [] business was off in the entire electronic substrate business." Donahue Dep. 509:12-21. Donahue testified that this industry-wide financial downturn continued through 2004. Donahue Dep. 509:22-24. Donahue testified that the fact that the Lithography division was doing poorly led directly to a reduction of resources available for the CTP business. Donahue Dep. 499:10-14. **Response: It is admitted that PerkinElmer was unwilling to expend the funds to bring a machine to either the 2003 or 2004 NEXPO show and that this severely limited PerkinElmer's effectiveness at the shows. Donahue tied this to Lithography's poor results. He did not believe PerkinElmer's decision was correct—he was upset with it. Donahue Dep. p. 504, lines 11-14. Donahue did not testify that there was an industry-wide financial downturn—he testified that Lithography's PCB business was off because of the telecom industry's problems—and he prefaced his comment by saying he didn't "follow that business very closely." Donahue dep. 509, lines 14-17.**

104. Donahue testified that PerkinElmer laid off "more than a few people" from its Lithography division over a several year period. Donahue Dep. 407:24-408:7. During this same time, no one was laid off from the CTP business in Tucson. Donahue Dep. 408:8-13. As late as March 2004, PerkinElmer's Tucson staff included at least 10 full-time engineering employees. Donahue Email - SS05725 (Ziegler Exh. 72). **Response: Admitted that Donahue testified that more than a few people were laid off over a period of years; however, in the same context, Mr. Donahue testified that PerkinElmer was "starving" the CTP business and that**

56

PerkinElmer was not providing the appropriate resources to market and sell the product. Donahue Dep. p. 407, lines 12-23.  Further, he testified that there were plans to layoff people in Tucson but that he successfully argued against it. Donahue Dep. 408, lines 8-13.

105. Donahue testified that he has "no firsthand information from anyone at a major Metropolitan newspaper in the United States that they did not purchase a machine from PerkinElmer because of the abilities of PerkinElmer's sales personnel."  Donahue Dep. 527:17-528:3. **Response: Denied. What Donahue testified to is that he had first-hand knowledge as to MacDermid, a company which was involved with providing flexo plates and wanted to supply Flexo CTP machines to several American newspapers (and has so done to the Providence Journal, the Manchester Union Leader and the Portland Press Herald in this part of the country. Shaver Aff. ¶ 6. After mentioning MacDermid, the questioner asked Mr. Donahue to ignore it and list others, Donahue Dep. 527 lines 1-12.**

106. The CTP market was occupied by many competitors, including:  Agfa, Anitec, Autologic Information International ("Autologic"), Barco Graphics ("Barco"), CreoScitex ("Creo"), Cymbolic Sciences, ECRM, K&F Printing Systems ("K&F"), Krause, Monotype Systems, Purup-Eskofot, and Western Litho.  Sonoran Business Plan (July 2000) – SS03308-3310 (Ziegler Exh. 13).  **Response: It is admitted that AGFA, Anitec, Autologic, Creo, and Western Litho had machines which were competitors of PerkinElmer's CTP product. However, none of those machines had the attributes of PerkinElmer's CTP machine and none of the competitors listed were capable of manufacturing a Flexo CTP product until 2006.**

107. Many of PerkinElmer's potential customers had vendor-vendee relationships with PerkinElmer's competitors, pursuant to which they purchased plates, machines and processing equipment. Antley Decl. ¶ 29. These potential customers including the following: New York Times Co. (Western Litho, Agfa); *Washington Post* (K&F); *Miami Herald* (Purup-Eskofot, Autologic, Western Litho); *LA Times* (Western Litho); *Virginian Pilot* (Autologic, Agfa, K&F); *Baltimore Sun* (Western Litho); Metroland (Anitec); *News-Press* (Barco, Agfa, Western Litho, Autologic); *Arkansas Democrat Gazette* (Agfa); *Dallas Morning News* (Western Litho, Agfa); American Color Graphics (Creo); *The Record* (Agfa, Purup-Eskofot); Newspaper Agency Corporation (Barco, Agfa); *Fort Worth Star-Telegram* (Creo, Western Litho, Purup Eskofot); Trader Publications (Agfa); Dow Jones Company (Western Litho); *Chicago Tribune* (Autologic, Western Litho); Median Supply Co. (Western Litho, Agfa). Antley Decl. ¶ 29; Antley Trip Reports (various) (Ziegler Exh. 3). **Response: Denied. See Donahue Aff. 9. Further, the trip reports do not mention a single relationship of any competitor to any newspaper which stood in the way of PerkinElmer selling <u>CTP</u> machines to them. In fact, the opposite is true.**

108. The $495,000 list price used by PerkinElmer was set by Sonoran and Donahue prior to closing. Donahue Dep. 222:9-223:20. Donahue did not ever tell anyone at PerkinElmer that a particular potential customer needed a particular discount to purchase a machine. Donahue Dep. 224:8-225:5. Donahue does not know what price PerkinElmer should have used or what level of discount would have been appropriate for particular customers. Donahue Dep. 225:18-227:9. **Response: Denied. Donahue did not testify that the plaintiffs "set" the price of PerkinElmer's machine. The above referenced pages from Mr. Donahue's deposition do not support this conclusion. PerkinElmer generally refused to discuss pricing with the**

**plaintiffs.  Donahue did tell PerkinElmer over and over again that the first machines had to be BETA priced to seed the market.  Donahue Aff. ¶ 5.  He told PerkinElmer this in reference to potential first purchasers such as Pennysaver, the Miami Herald, the New York Times and several other newspapers. Donahue Aff. ¶ 5.**

109. As of July 2000, established competitors' reported prices for CactusSetter Class and CactusSetter Lite Class units ranged from $140,000 to $500,000.  Sonoran Business Plan (July 2000) – SS03308-3310 (Ziegler Exh. 13).  Donahue testified that most of the Metro class competitors had machines in the $300,000 to $450,000 range.  Donahue Dep. 222:21-223:2. **Response: Admitted.**

110. PerkinElmer did offer potential customers prices that reflected discounts off the $495,000 list price, including the following:  $420,000 (approximately 15% discount) to PennySaver; $425,000 (approximately 14% discount) to *Miami Herald*; $450,000 (approximately 9% discount) to Wholesale Printing Products; $895,000 for two units (approximately 9.5% discount) to the *Post and Courier*; and $475,000 (approximately 4% discount) to the New York Times Co.  PerkinElmer Email – SS04357-4359 (Ziegler Exh. 31); Antley Dep. 66:16-23; PerkinElmer Proposal – PE000544 (Ziegler Exh. 83); PerkinElmer Email – SS04367-4369 (Ziegler Exh. 85); PerkinElmer Email – PE000828-829 (Ziegler Exh. 84).  In addition, Antley had authority on his own to offer discounts of up to 10% off list price.  Antley Dep. 110:14-111:4.  **Response: Admitted.  However, these offers were ridiculously inadequate in light of market conditions and the fact that PerkinElmer had not taken the steps to obtain market acceptance of its CTP product through BETA pricing and placing the first few machines. See Z3, SS 05064.  This is the offer Mr. Hall made to the Union Leader on February 18, 2004: Drop the price from the list price of $535,000 to $385,000;**

59

offer the BETA system for a year (meaning if the Union Leader is satisfied it pays in a year); provide a processor and a punch, free during the BETA period; 100% trade-in toward two units; ship by March 15th. This offer, which was successful in placing the first Flexo machine—in a market in which this was the only Flexo product available-- should be compared to the trivial discounts offered by PerkinElmer in the Offset business, which had a number of competitors who were selling hundreds of systems. Z 3 SS 055564.

110. By 2003 or 2004, all of PerkinElmer's competitors had machines that offered through-put speeds of at least 250-plates-per-hour, which was equivalent to the through-put speed of the PerkinElmer machine.  Shaver Dep. 76:21-78:18.  **Response: Denied. 250 plates per hour was the standard set by PerkinElmer's CTP unit, formerly the CactusSetter, alone until 2005. The machines defendant is thinking about did not expose UV plates, and they were not competitive because the plates they used were much more expensive and a larger number were required annually. Donahue Aff ¶ 8.**

`111. At least six potential customers expressed to PerkinElmer industry-related concerns about diminishing advertising revenues or soft business conditions, including the following: *Washington Post*, Gannett, NAPP Systems, Inc. (MacDermid), *Dallas Morning News, Arkansas Democrat Gazette*, Dow Jones Co..  Antley Decl. ¶ 30; Antley Trip Reports – PE01225, PE001226, SS04295, SS04317, PE001218, SS04685 (Ziegler Exh. 3). **Response: Denied that the references say that. None of the references refer to a sales impediment sufficient to be called a concern. Further, all of the above mentioned potential customers did purchase CTP, although they did so—except for NAPP (MacDermid) from other suppliers.**

112. At least nine potential customers expressed concern about adopting unproven technology, including the following: *Grand Rapids Press*, Tucson Newspapers, Inc., *Knoxville News Sentinel*, PennySaver, Wholesale Printing Products, Trader Publications, *San Jose Mercury News*, Metroland, and Knight Ridder. Antley Decl. ¶ 31; Antley Trip Reports - PE001224, PE001219, PE001217, SS04969, SS04972, SS04540, SS05086, SS05381, SS04998 (Ziegler Exh. 3). **Response: Plaintiffs genuinely do not know what is meant by a concern. If defendant means that all of the above customers (except WPP) wanted a BETA price and were willing to take first machines in order to establish references for it, this is admitted. Of course, one of the primary reasons for providing first machines on a BETA basis is so that the machine can prove itself in the field and serve as a reference for other machines. That PerkinElmer was unwilling to follow this common approach--which Antley termed a universal industry practice in one of his Miami Herald trip reports—was inane.**

113. At least six potential customers expressed concern that PerkinElmer did not offer an end-to-end solution, including the following: New York Times Co., *Virginian Pilot*, Gannett, *Knoxville News Sentinel, Post Courier, Milwaukee Journal Sentinel.* Antley Decl. ¶ 32; Antley Trip Reports – SS04633, SS04995, PE001226, PE001217, PE001275 (Ziegler Exh. 3); Antley Email – PE001540 (Ziegler Exh. 60). **Response: Denied. First, PerkinElmer did potentially offer an end-to-end solution because of its potential partnership with Anocoil and other plate manufacturers. Shaver Aff. ¶...Second, there is no indication in the record that any of the newspapers in this paragraph refused to do business with PerkinElmer on this basis.**

114. At least eight potential customers expressed a need for the redundancy made possible by a back-up machine, including the following: Metroland, PennySaver, Tucson Newspapers, Inc., *Post Courier*, Trader Publications, *San Francisco Chronicle, San Jose*

*Mercury News*, Median Supply Co.  Antley Decl. ¶ 33; Antley Trip Reports – SS04997,

SS04969, PE001219, PE001275, SS04540, SS04968, SS05087, SS05285 (Ziegler Exh. 3).

**Response: Admitted, but redundancy was merely a surrogate for concern with price.**

**Newspapers and other commercial printers have strict deadlines. They must be able to**

**print; therefore, they purchase more than one machine.**

116. At least seven potential customers expressed concerns about the cost of replacement

lasers, including the following:  Metroland, PennySaver, *Miami Herald*, New York Times Co.,

Philadelphia Newspapers, *Post Courier*, and *San Jose Mercury News*.  Antley Decl. ¶ 34; Antley

Trip Reports – SS04998, SS04969, PE001300, SS04630, PE001275, PE001227, SS05087

(Ziegler Exh. 3).  **Response: Denied that the record references support this conclusion.  But,**

**the cost of replacement lasers was an issue for every CTP purchaser from every**

**manufacturer until the DMD technology, which the technology roadmap supported but**

**PerkinElmer refused to fund, took hold. That technology did away with lasers and used UV**

**light-bulbs.  BasysPrint, for instance, sold several hundred machines employing this**

**technology. Donahue Aff. ¶ 4.**

117. Donahue heard "dozens" of times that potential customers had said that the ProForm

Metro, at 10,000 pounds and approximately five and a half feet by twelve feet, was "too large for

them to accommodate."  Donahue Dep. 217:7-218:5. **Response: Denied.  The reference**

**provided has nothing to do with this.  However, it is admitted that a few customers were**

**unable to purchase the Pro Form Metro because of its size or weight due to the limitations**

**of their physical plants.  It should be noted that the cosmetic changes required by Mr.**

**Baxter increased the size of the machine and its weight by 3,000 pounds. Baxter Dep. pp…**

118. Donahue testified that the *Miami Herald* based its decision not to buy a PerkinElmer machine on a number of factors, including the size and weight of the machine and PerkinElmer's unwillingness to accede to the request for "a very extremely discounted machine." Donahue Dep. 444:6-20. Donahue testified that PerkinElmer had "tried to accommodate [their discount demands] up to a certain point." Donahue Dep. 444:6-20. **Response: Denied that the basis was anything other than price. See Donahue Dep. p. 446, lines 7-18 and the response to Paragraph 95 above. The Miami Herald was willing to pay $375,000-$400,000 for a first, BETA machine in 2003, and PerkinElmer was unwilling to deal with them at that price.**

119. PerkinElmer ultimately sold no ProForm Metro units, and it sold just one ProForm Flexo unit to MacDermid in 2004. Complaint ¶ 30 (Docket No. 1) (filed Nov. 20, 2006). MacDermid placed this one unit temporarily with its customer, the *Manchester Union Leader*. Shaver Dep. 159:5-13.[12] **Response: Admitted as to the first sentence, otherwise see Paragraph 110 above. What happened at the end of the trial period was that the Union Leader traded in the BETA machine for two new machines, and the BETA machine was sold to the Providence Journal. Shaver Dep. pp.**

120. In late July 2004, PerkinElmer evaluated its options for the CTP business. CTP Stragic Review – PE000251-259 (Ziegler Exh. 64). In approximately August 2004, PerkinElmer decided to shut down its CTP business. Falcone Dep. 9:12-14; 117:18-118:19; Jurkiewicz Dep. 164:18-166:2.[13] **Response: Denied. PerkinElmer began the process in late 2003 or early**

---

[12] "Shaver Dep." refers to the transcript of the deposition of Norm Shaver, and cited pages are at Ziegler Exh. 11.

[13] "Falcone Dep." and "Jurkiewicz Dep." refer, respectively, to the transcripts of the depositions of Joel Falcone and Jerry Jurkiewicz. Cited pages are included in the record as Ziegler Exhs. 8 and 10.

2004, and while it might have been formalized in August, the decision was made sooner. **Falcone Dep. pp. 54-55.**

121. Shortly thereafter, PerkinElmer informed Donahue that the company had decided to close the CTP Business and lay off the Tucson personnel, including Donahue. Donahue Dep. 457:5-12. **Response: According to the citation referenced, Donahue was informed in mid-July to early August, 2004.**

122. On October 15, 2004, PerkinElmer shut down the Tucson site. Termination Letter to Donahue – SS00917-925 (Ziegler Exh. 29). On October 21, 2004, PerkinElmer's audit committee was informed of the decision to close the CTP Business. Audit Committee Presentation – PE005864-5871 (Ziegler Exh. 32); Healy Dep. 47:7-49:22.[14] **Response: Admitted. What the Audit committee was told by PerkinElmer is that it was unwilling to make the investment to be competitive in the CTP business. D 2.**

123. By October 2004, PerkinElmer had experienced operating losses of approximately $6.9 million on the CTP business, as follows: (1) losses from operations in 2001 of $891,000; (2) losses from operations in 2002 of $1.2 million; (3) losses from operations in 2003 of $2.557 million; and (4) losses from operations in 2004 of $2.248 million. Beeh Decl. ¶ 4; Audit Committee Presentation - PE005869 (Ziegler Exh. 32). **Response: Denied. This is the same assertion made in Paragraph 46 above, and it is denied for the same reasons and with the same record citations stated in response to Paragraph 46 which are incorporated herein.**

---

[14] "Healy Dep." refers to the transcript of the deposition of John Healy. Cited pages are included in the record as Ziegler Exh. 9.

124. On November 30, 2004, PerkinElmer and MacDermid entered into a Licensing Agreement pursuant to which MacDermid obtained the intellectual property for PerkinElmer's ProForm Flexo machinery. License Agreement (Ziegler Exh. 65). **Response: A license agreement provides for a license of technology. It is possible that MacDermid also bought intellectual property, but plaintiffs are unaware of it. They are aware of only the Licensing Agreement provided in Z 65.**

125. As of April 2008, MacDermid had no more than 15 worldwide installations of machines incorporating some of the former PerkinElmer technology, and these installations resulted from sales made on a bundled basis in conjunction with sales of flexographic plates to customers in MacDermid's installed base. Shaver Dep. 165:16-172:21. **Response: Denied. As of now, more than 40 machines have been installed, although some of the machines have been manufactured by BasysPrint due to limitations of MacDermid's San Marcos facility. Shaver Affidavit¶ 7.**

126. During the relevant period, PerkinElmer's fiscal year end was the Sunday closest to December 31, as follows: Fiscal 2001 ended on December 30, 2001; Fiscal 2002 ended on December 29, 2002; Fiscal 2003 ended on December 28, 2003; Fiscal 2004 ended on January 2, 2005. *See* Annual Reports, SEC Forms 10-K, available at www.perkinelmer.com or www.sec.gov. **Response: Plaintiffs have no information with which to admit or deny this paragraph and none was provided in discovery.**

127. Sonoran has argued that PerkinElmer had an "obligation to make a reasonable go of the business." Plaintiffs-Appellants Reply Br. at 8 (Ziegler Exh. 74). Donahue stated that PerkinElmer enjoyed "wide latitude to run its business." Plaintiff-Appellant Donahue's Reply in

Support of His Motion for Reconsideration, at 3 (Ziegler Exh. 75). **Response: Objection. This is legal argument, not a request that plaintiffs admit or deny facts. As to the first sentence, the defendant's attention is respectfully drawn to the Court's decision, 585 F.3d 535, 544-45 and to Plaintiffs' definition of the Reasonable Efforts in the memorandum filed in connection with the defendant's instant motion. As to the question of Reasonable Efforts, Justice Boudin asked Plaintiffs' counsel at the oral argument, paraphrasing, weren't the plaintiffs arguing in Count I, reasonable efforts, meaning an objective standard? Plaintiffs responded, consistent with all of their briefs, yes. The defendant has purposely ignored this exchange and instead argued a subjective standard—good faith based and minimal efforts—in its brief, which plaintiffs deny. Plaintiffs argued consistently on appeal—and before this court on summary judgment, as well as in the Plaintiffs' complaint—that the objective, reasonable efforts standard applied and that this required PerkinElmer to try hard, using reasonable, diligent efforts to market and sell CTP products. In Black's Law Dictionary, 9th Ed. 2009, it states that the word reasonable in the context of the law of obligations, concerns intelligent behavior—i.e., the use of powers of reason appropriate under all of the circumstances, p. 1379, and that the phrase reasonable efforts is the equivalent of due diligence: "the diligence reasonably expected from and ordinarily exercised by a person who seeks to satisfy (plaintiffs would prefer "fulfill") a legal requirement or to discharge an obligation"—p. 523. Defendant has admitted that it was unwilling to make the necessary investment to compete in CTP, D2. As Plaintiffs' expert has opined, D1, and it is uncontroverted, the defendant had no marketing plan, it made no marketing or promotional effort, and its sales effort was for the most part put into the hands of one part-time salesman. As to the second sentence, in Z 75, page 3, the defendant**

has misquoted the plaintiffs, who argued that, while defendant "**might, as it argues**" have

wide latitude to run its business ( it had the right to let Mr. Donahue go without cause

under his Employment Agreement).  Plaintiffs have never argued that the Defendant was

not free to ignore or breach its duty to use reasonable efforts to market and sell CTP

products and thereby to refuse to give plaintiffs a reasonable opportunity to achieve the

earnouts.

THE PLAINTIFFS

By their counsel,

/s/ Edward T. Dangel, III
_____   _____
Edward T. Dangel, III (BBO No. 113580)
DANGEL & MATTCHEN LLP
Ten Derne Street
Boston, Massachusetts 02108
(617) 557-4800

## CERTIFICATE OF SERVICE

I hereby certify that on January 22, 2010, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to all counsel.

/s/ Edward T. Dangel, III