UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

|  |  |  |
|---|---|---|
| SONORAN SCANNERS, INC. and JOSEPH P. DONAHUE, *Plaintiffs* | ) ) ) ) | |
| v. | ) ) ) | Civil Action No. 06-12090-WGY |
| PERKINELMER, INC., *Defendant.* | ) ) ) ) | |

**DEFENDANT PERKINELMER, INC.'S MEMORANDUM IN SUPPORT OF ITS
MOTION TO STRIKE THE OPINIONS OF PAUL BAIER REGARDING
PERKINELMER'S CTP EFFORTS**

T. Christopher Donnelly
Adam B. Ziegler
DONNELLY, CONROY & GELHAAR, LLP
One Beacon Street, 33rd Floor
Boston, Massachusetts 02108
(617) 720-2880

*Counsel for Defendant PerkinElmer, Inc.*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

FACTS .............................................................................................................................. 2

      A.    Baier's First Report ................................................................................. 2

      B.    Baier's Second Report ............................................................................ 3

THE GATEKEEPING FUNCTION OF THE COURTS ................................................. 5

ARGUMENT ..................................................................................................................... 6

I.     Baier Is Not Qualified To Offer Opinions About The Sufficiency Of
PerkinElmer's CTP Efforts ..................................................................................... 6

II.    Baier's Opinions Are Unreliable Because They Have No Factual Foundation And
Are Not The Product Of Reliable Methods And Principles ..................................... 8

      A.    Baier's Opinion About PerkinElmer's Sales Efforts is Not Based on
Sufficient Facts and Data ...................................................................... 10

      B.    Baier's Opinion About PerkinElmer's Sales Efforts Is Not The Product of
Reliable Principles and Methods ........................................................... 14

CONCLUSION ................................................................................................................ 20

Defendant PerkinElmer, Inc. respectfully submits this memorandum in support of its motion to strike the opinions of Paul Baier, Sonoran's proffered expert witness, regarding the sufficiency of PerkinElmer's CTP efforts.

## INTRODUCTION

Paul Baier, an ordinary businessman who spent most of his professional life in the field of e-commerce software, now consults on energy efficiency and greenhouse gas emissions. Despite Baier's lack of pertinent expertise, Sonoran has offered his opinions as evidence on two key issues attacked by PerkinElmer's motion for summary judgment: (1) whether PerkinElmer failed to make reasonable efforts and (2) whether an alleged lack of reasonable efforts proximately caused PerkinElmer to lose CTP sales that would have triggered the earnout provisions on which Sonoran's claim is based. This memorandum supports PerkinElmer's motion to strike all of Baier's opinions relating to the first issue.[1]

In opposing PerkinElmer's summary judgment motion, Sonoran has offered Baier's first expert report, which asserts that "effort made by PerkinElmer to market and sell the CactusSetter and ProForm Metro CTP products was unreasonably low and grossly inadequate." Report of Paul Baier ¶ 13 (Dangel Exh. 1) ("First Report"). Baier revealed during his deposition, however, that he arrived at this conclusion by ignoring virtually all evidence of PerkinElmer's actual sales efforts, by assuming a perfect product that uniquely met all customer needs and created no customer concerns, and by making an inquiry he admits is not a recognized methodology for evaluating sales and marketing efforts. Baier's opinions regarding PerkinElmer's efforts come nowhere close to satisfying the admissibility standards of Fed. R. Evid. 702, as construed in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993) and *Kumho Tire Co., Ltd. v.*

---

[1]  By separate motion, PerkinElmer has requested the Court to strike the opinions of Baier and Joseph Donahue regarding the alleged causation of lost sales. Undersigned counsel has made every effort to eliminate duplicative briefing, and PerkinElmer therefore incorporates by reference all of the arguments made in its other motion.

*Carmichael*, 526 U.S. 137, 149 (1999).  The Court therefore should strike Baier's opinions on this issue from the summary judgment record.

## FACTS

Sonoran's opposition to PerkinElmer's summary judgment motion rests in part on two expert reports signed by Baier.[2]

A.      Baier's First Report

On April 10, 2008, Sonoran served its expert disclosures, including Baier's report ("First Report").  *See* Dangel Exh. 1.  The First Report specifies the limits of Baier's engagement:  "I have been retained by plaintiff counsel to provide my opinion on the sales and marketing efforts for the CactusSetter and ProForm Metro CTP products after the acquisition of Sonoran Scanners by PerkinElmer in May 2001."  First Report ¶ 1.

The First Report describes Baier's purported qualifications to offer the opinions within the scope of this engagement.  *Id.* ¶ 2, Exh. A (Curriculum Vitae).  Baier states that he "[had] not evaluated the product and assume[d] for this report that the product performed as specified."  Baier describes the "product" as "an expensive piece of equipment, $400,000 to $500,000 per unit, that is used for mission critical, daily production at large city newspapers (like the Boston Globe), among other applications."  *Id.* ¶ 3.  Baier also states that these prospects "need to know that the manufacturer is fully committed to the product for the long term (the next 5-15 years) and will stand behind it."  *Id.*  According to Baier, "[a] newspaper simply can't afford to have a machine go down when publishing a daily paper and not have technical support from the manufacturer.  Hence, the extended evaluation times during the sales price and the high need for

---

[2]   "SRDSOF" refers to Sonoran's Response to Defendant PerkinElmer's Statement of Facts (Doc. No. 75).  "DSOF" refers to Defendant PerkinElmer's Statement of Facts (Doc. No. 64).  In addition, any documents and deposition testimony cited herein, which was not previously part of the record, is attached as an exhibit to the Second Ziegler Declaration.  For convenience, the exhibits submitted by PerkinElmer are numbered consecutively from 1-102.  Exhibits 1-85 were attached to the first Ziegler Declaration (Doc. 67).  Exhibits 86-102 are attached to the Second Ziegler Declaration, filed simultaneously herewith.

reliable products and post sale customer and product support."  *Id.*

The First Report describes Baier's review of "six key elements" he asserts are pertinent to

a conclusion about whether PerkinElmer failed to make a reasonable effort to sell its CTP

products:  (1) Was there a viable market? (2) Did purchaser understand this was a new product?

(3) Was there full corporate involvement and support in securing the first 5 customers? (4) How

well were product and market knowledge shared internally? (5) Were the right skills and

incentives in place? (6) Was there sufficient corporate budget?  *Id.* ¶¶ 4-12.  Finally, the First

Report states Baier's ultimate conclusion:  "[I]t is my conclusion that effort made by

PerkinElmer to market and sell the CactusSetter and ProForm Metro CTP products was

unreasonably low and grossly inadequate."  *Id.* ¶ 13.

B.     Baier's Second Report

In December 2009, Sonoran delivered a new expert report for Baier ("Second Report").[3]

*See* Dangel Exh. 8.  Baier states that he "had received new, additional very reliable information

relating to [his] original opinion," namely (1) "market data for the yearly unit sales of CTP

machines" in the United States between 2001 and 2006, from an entity named State Street

Consultants, and (2) a "lengthy interview with David Costa, a CTP industry veteran who worked

at Agfa, a leading CTP vendor which sold CTP machines in the same market that PKI targeted

and which would have competed directly with PKI."  Second Report at 1-2.

Baier's Second Report, like his First Report, describes PerkinElmer's target customers –

large newspapers – as "large, demanding, very time sensitive, and risk adverse prospects."

---

[3]   Sonoran disclosed the Second Report on December 7, 2009, over 19 months after the disclosure deadline, 17
months after Baier's deposition, and roughly a year after this Court heard and granted PerkinElmer's first summary
judgment motion.  On January 21, 2010, the Court entered an electronic order allowing Baier to testify in
accordance with the Second Report, which Sonoran described as a "supplemental" report.  The Court's Order made
clear that it was expressing no opinion on Baier's qualifications or the substance of his opinions, which were not yet
before the Court.  In light of the Court's Order, PerkinElmer does not argue that Baier's Second Report should be
stricken as untimely; however, the Court should strike Baier's Second Report to the extent the opinions exceed the
scope of the First Report and thus are not in the nature of "supplemental" opinions at all.

Second Report at 2.  *Unlike* the First Report, however, the Second Report also addressed an entirely different set of alleged potential customers:  "larger commercial printers which used rolls of paper."  *Id.* at 4.  For all of these markets, according to Baier, "[c]ustomer needs, market maturity and competitive dynamics differed geographically."  *Id.* at 5.  In addition, Baier states that both "[n]ewspapers and commercial printers were risk adverse companies and typically required at least 2 machines, one for production and for backup."  *Id.*

Baier's Second Report also summarizes a few aspects of his November 24, 2009 interview with Costa, whom Baier describes as having "direct experience with buying patterns and needs of large printers (especially large newspapers and commercial printers), with industry standard practices for sales, marketing, and beta programs, and to other CTP competitors [*sic*]."  *Id.* at 2.  According to Baier, his interview with Costa, "confirms a number of important aspects of my previous opinion report."  *Id.* at 3.  Specifically, Baier states that Costa "confirmed the mission-critical nature of newspaper applications and that high-end CTP machines were also needed at high volume commercial printers;" that Costa's "experience selling CTP machines clearly demonstrates that a very viable market for CTP machines existed;" that Costa "confirmed the importance of a technical pre-sales team working with experienced sales reps and the involvement of senior management to sell CTP machines to large newspapers;" that Costa "confirmed the essential need to make price concessions and to offer additional benefits such as extended warranties;" and that Costa "confirmed the need to spend money on sales and marketing, several million per year, to be successful."  *Id.*[4]

---

[4]  Baier's November 2009 meeting with Costa and his regurgitation of general statements allegedly made by Costa do not transform Baier into a qualified expert or cure the fundamental deficiencies in his proposed testimony regarding PerkinElmer's CTP efforts.

## THE GATEKEEPING FUNCTION OF THE COURTS

The proponent of expert testimony bears the burden of establishing that the testimony satisfies the standards of admissibility.  *Daubert*, 509 U.S. at 592-93; *McGovern v. Brigham & Women's Hospital*, 584 F. Supp. 2d 418, 422 (D. Mass. 2008).  Fed. R. Evid. 702 governs the admissibility of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

This rule imposes a special "gatekeeping" obligation on district courts to ensure that all proposed experts are qualified and all proposed expert testimony is relevant and reliable.  *Kumho*, 526 U.S. at 147.  This gatekeeping obligation applies at any stage in which a party seeks to rely on proposed expert testimony, including at the summary judgment stage.  *See, e.g., General Electric Co. v. Joiner*, 522 U.S. 136, 146-47 (1997) (affirming district court's exclusion of proposed expert testimony in the context of summary judgment); *Magarian v. Hawkins*, 321 F.3d 235, 239-40 (1st Cir. 2003) (affirming summary judgment in negligence case, where plaintiff relied on an expert report that asserted "in a conclusory and perfunctory manner that a reasonable [person in the defendant's position] would have considered" another course of conduct); *McGovern*, 584 F. Supp. 2d at 422 (excluding expert testimony and granting summary judgment).

Expert testimony is admissible only if the proposed expert is qualified by "knowledge, skill, experience, training, or education" to render the opinion at issue.  Fed. R. Evid. 702.  If a witness qualifies, the proponent still must demonstrate that the expert's testimony is reliable, which requires the opinion to be based on sufficient facts or data and to be the product of reliable

principles and methods that the expert has applied reliably to the facts.  *See* Fed. R. Evid. 702.

Lastly, a proposed expert opinion must be relevant, meaning it must have "a valid connection …

to the pertinent inquiry."  *Cipollone v. Yale Indus. Prods.*, 202 F.3d 376, 380 (1st Cir. 2000).  As

shown below, Baier's opinions do not satisfy these requirements.

## ARGUMENT

### I.   Baier Is Not Qualified To Offer Opinions About The Sufficiency Of PerkinElmer's CTP Efforts

Baier has no specialized knowledge, skill, experience, training, or education that qualifies

him to evaluate the sufficiency of PerkinElmer's three-plus year attempt to sell large, expensive

equipment to newspapers for use in their critical printing operations.

Baier has never taught, lectured on or published anything in the fields of sales or

marketing.  *See* Baier Dep. at 101:16-18, 101:17-102:3, 91:21-92:6.  His claim to expertise is

based entirely on his *personal business experiences*, but he has no background with the relevant

industry, product type, or potential customers.  None of the businesses for which he worked was

involved in the manufacturing or sale of "hardware" or large pieces of machinery.  *See* Baier

Dep. at 105:11-24.  He has no experience at all with the newspaper industry, much less in selling

large, critical, expensive equipment to the industry.  *See* Baier Dep. at 188:21-24 ("I've not been

in sales deals specifically in the newspaper industry."), 107:2-10 ("I have not worked for a

newspaper, nor have I sold a lot of, or many products to the newspaper industry.")

Since graduating from business school in 1994, Baier has spent nearly his entire

professional life as an e-commerce entrepreneur or working for relatively small, newly

established software businesses.  *See* First Report, Exh. A.  In 1994, Baier founded a short-lived

company called Compare.com, which provided consumers with on-line price comparisons, and

worked as a part-time consultant for America Online.  *See id.*; Baier Dep. at 79:24-80, 80:16-

81:9.  From 1995 to 1999, Baier worked for Open Market, a company that developed e-commerce software.  *See* First Report, Exh. A; Baier Dep. 82:2-6.  In 1999, Baier founded an e-commerce business called PurchasingCenter.com, which was an internet "transaction site" through which buyers could purchase industrial supplies (*e.g.,* lights, fittings, cleaning supplies) from distributors and manufacturers identified by PurchasingCenter.com.  *See* First Report, Exh. A; Baier Dep. 87:12-88:15.  In 2001, with the company failing, Baier shut it down, revamped the business model, and re-opened it as a company called Excara, which focused on enterprise software.  *See* First Report, Exh. A; Baier Dep. 88:20-89:19.  In 2003, Baier worked as director of business development for Charles River Ventures, where he evaluated potential investments and developed outreach programs for chief information officers, i.e. software executives.  *See* First Report, Exh. A; Baier Dep. 94:9-19.  From 2004 to 2008, Baier worked for a company called Authoria, a software vendor for human resources applications, where he was responsible for product management, business development, and engineering.  *See* First Report, Exh. A; Baier Dep. 104:7-12.  Currently, Baier is vice president of consulting for a company called Groom Energy, where he assists companies with environmental and sustainability concerns such as energy efficiency and greenhouse gas emissions.  *See* Baier Dep. 76:16-24, 77:1-15.

Even in the fields of e-commerce, software and environmental consulting, Baier has had very little experience with sales.  Baier has no direct experience as a sales representative.  *See* Baier Dep. 102:8-12.  At Open Market from 1995 to 1999, Baier had no responsibility for the sales team, which reported elsewhere.  *See* Baier Dep. 83:13-84:10.  During Baier's time at the helm of PurchasingCenter.com and Excara from 1999 to 2003, he did not oversee the sales force.  *See* Baier Dep. 91:2-11, 102:23-103:2.  Baier's responsibilities at Charles River Ventures in 2003 did not include sales.  *See* Baier Dep. 94:5-20.  At Authoria from 2004 to 2008, Baier had

7

no responsibility for sales.  *See* Baier Dep. 104:7-14.  Finally, in his current job, Baier has no responsibility for product sales.  *See* Baier Dep. 77:23-78:5.  Thus, although Baier – like many in business – might have participated in some sales calls and attended some sales meetings, he has very little experience with sales generally, even in his chosen fields.

Baier also has no expertise working with businesses that design, manufacture, and sell complex hardware products involving major design and manufacturing challenges and inventory management issues.  *See* Baier Dep. 105:11-106:9.  Moreover, he has no experience working in a large, well-established, publicly traded company with distinct business units, like PerkinElmer. *See* Baier Dep. 118:9-120:5.  To the contrary, Baier's principal experience has been with early stage software companies.  *See* First Report, Exh. A; Baier Dep. 80:16-23-88:15.

In short, Baier's personal business experiences do not qualify him to weigh the sales efforts of a large manufacturing company trying to break into a competitive market for critical, capital-intensive machinery used by the highly "risk averse" newspaper industry in their large-scale production operations.  His views about PerkinElmer's CTP efforts therefore have no more value than those of any other ordinary business person with some tangential relationship to the sale of dissimilar products to dissimilar customers in dissimilar markets.  *See, e.g.*, *Tokio Marine & Fire Ins. Co. v. Grove Mfg. Co.*, 958 F.2d 1169, 1174 (1st Cir. 1992) (concluding that proposed expert was unqualified to testify).  The Court therefore should exclude all of Baier's opinions relating to the sufficiency of PerkinElmer's CTP sales efforts.

## II.  Baier's Opinions Are Unreliable Because They Have No Factual Foundation And Are Not The Product Of Reliable Methods And Principles

Even if Baier had some marginally relevant expertise, his opinions do not satisfy the reliability standards of Fed. R. Evid. 702.  The purpose of the reliability inquiry is to "make certain that an expert, whether basing testimony upon professional studies or personal

experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152.  In evaluating the reliability of proposed expert testimony, courts consider whether the expert's opinion is "based on sufficient facts or data" and is "the product of reliable principles and methods that have been applied reliably to the facts of the case." *Id.* at 148 (internal quotation marks omitted); *Daubert*, 509 U.S. at 590 ("'[K]nowledge' connotes more than subjective belief or unsupported speculation.").

The First Circuit has made clear that "trial judges may evaluate the data offered to support an expert's bottom-line opinions to determine if that data provides adequate support to mark the expert's testimony as reliable. *United States v. 33.92356 Acres of Land*, 585 F.3d 1, 7 (1st Cir. 2009).  Where expert testimony is based on personal knowledge or experience, the expert must "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *McGovern*, 584 F. Supp. 2d at 426 (quoting Fed. R. Evid. 702 advisory committee notes).

In evaluating the methods and principles on which proposed expert testimony rests, courts have broad discretion in deciding how to assess reliability.  *Kumho*, 526 U.S. at 152.  This assessment can include inquiry into: (1) whether a theory or technique can be and has been tested; (2) whether it has been subject to peer review and publication; (3) whether there is a high known or potential error rate and standards controlling the technique's operation; and (4) whether the theory or technique enjoys general acceptance within the relevant expert community. *Id.* at 149-50; *see also Newport Electronics, Inc. v. Newport Corp.*, 157 F. Supp. 2d 202, 211-12 (D. Conn. 2001) (striking marketing expert who could not show that his analytical method had ever been used before by him or that it was accepted by other experts in the field).  Moreover,

"nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  *General Electric*, 522 U.S. at 146.

Here, Baier's proposed opinions have no factual foundation and are not the product of reliable principles and methods.  To the contrary, by his own admission, he arrived at his conclusions by ignoring virtually all evidence of PerkinElmer's actual efforts and by using an analysis that is not a recognized methodology for evaluating sales efforts.

A.   Baier's Opinion About PerkinElmer's Sales Efforts is Not Based on Sufficient Facts and Data

Baier's opinion that PerkinElmer's sales effort was "unreasonably low and grossly inadequate" is not based on sufficient facts and data.  Most importantly, Baier adopted this conclusion *without reviewing* the 37 trip reports prepared by Guy Antley – the primary salesperson in the field.  Baier Dep. 30:7-22.[5]  Baier ignored these unique, critical sources of relevant information because Sonoran's counsel told him they had "not a lot of value."  Baier Dep. 207:6-10 ("I also remember Mr. Dangel telling me that, you know, a lot of them are just, you know, meeting notes and not a lot of value there.")

Collectively, these 37 trip reports span May 2001 to June 2004.  *See* Ziegler Exh. 3. They document many, but not all, aspects of PerkinElmer's sales efforts, including:  numerous in-person meetings with potential customers and strategic partners; PerkinElmer's participation at the major trade shows, including the NEXPO in 2001, 2002, 2003, and 2004, at which multiple PerkinElmer employees and executives interacted with prospects, plate suppliers, and

---

[5]  The 37 trip reports are part of the record submitted by PerkinElmer in support of its motion for summary judgment.  *See* Ziegler Exh. 3.

industry press contacts; the substantial participation of PerkinElmer's executives in key meetings with potential customers; market intelligence gathered by PerkinElmer; and many of the questions, concerns and criticisms expressed to PerkinElmer by potential customers. *Id.* These reports were distributed broadly among the members of PerkinElmer's CTP sales and management team, including to Greg Baxter, Tom Keddy, Jerry Jurkiewicz, Dan Iadonisi, Donahue, Shaver, and Caroline Winn, among others.[6] Sonoran has admitted that all of the meetings, trade shows, and other events cited in these trip reports occurred. *See generally* SRDSOF (admitting that all of the cited meetings and trade shows occurred).

Baier's failure to review the trip reports means that his opinion on the *adequacy* of PerkinElmer's efforts takes no account of what those efforts actually entailed and, instead, rests on a host of undisputedly wrong factual assertions. For example, Baier relies heavily on the assertion that PerkinElmer "only attended one [trade] show" during its entire time conducting the CTP business. Second Report at 9. This statement is false. Even a cursory reading of the trip reports makes clear that PerkinElmer attended the NEXPO show four times (2001, 2002, 2003, and 2004), as well as the Graph Expo (2002 and 2003), the Great Lakes News Conference (2002), the Computer-to-Plate Symposium (2003), and the IFRA conference in Europe (2002 and 2003). Baier also states that "it appears that very little senior management commitment by PerkinElmer was demonstrated to early prospects." First Report ¶ 7. In fact, if Baier had read the trip reports, not to mention any of the hundreds of emails involving senior management, he would have seen evidence that several PerkinElmer executives (including Baxter, Keddy, Jurkiewicz, and Iadonisi) joined Antley for meetings with target customers, that multiple

---

[6]  Sonoran asserts that "[m]any of Antley's reports ... were sent to Greg Baxter only." SRDSOF ¶ 65. Yet Donahue's affidavit says "I saw Antley's activity reports" and even makes specific claims about what portion of Antley's time was being spent on CTP efforts. Donahue 2d Aff. ¶ 6. Lest there be any doubt, PerkinElmer has submitted a collection of the transmittal emails by which Antley sent the trip reports to Donahue and numerous others. *See* Ziegler Exh. 96.

employees and at least one executive joined Antley each year for the NEXPO show, and that

several senior executives were actively involved in PerkinElmer's overall CTP effort.

Baier also read neither the deposition of Baxter, the manager of PerkinElmer's

Lithography Systems division, who oversaw the business from May 2001 to early 2003, nor

Donahue's deposition, although they were two key players in PerkinElmer's early CTP activities.

Baier Dep. 31:24-32:19.  Baier ignored Baxter's deposition on the basis of Sonoran's counsel's

representation that it was not important:

> Q:  Do you know whether or not Mr. Baxter's deposition was,
> would have been available for you to look at before you wrote your
> report?
>
> A:  I don't know when his deposition was.  I was going by Mr.
> Dangel's suggestion that I should stay focused on the material I
> had in front of me, so if [Mr. Baxter] was deposed, I assumed it
> wasn't relevant or it was just a short deposition.
>
> MR. DANGEL:  Or maybe that Mr. Baxter was so entirely
> dishonest during it I didn't consider it worthy of credit.  Let's go
> on to the next.
>
> Q:  Is it fair to say, sir, that you relied on Mr. Dangel's
> representation to you as to whether or not it was important to read
> Mr. Baxter's deposition?
>
> A:  That is correct.
>
> MR. DANGEL:  And I stand on it.

Baier Dep. 211:5-20.  In fact, prior to arriving at his ultimate opinion, Baier read just *one*

deposition transcript (but not the exhibits) -- that of Antley.[7]  Baier Dep. 27:9-11; 55:3-4.  And

even with respect to that *one* deposition, Sonoran's counsel instructed Baier to read only selected

pages (and no exhibits):

---

[7]   The fact that Baier had not received or read any other deposition transcripts did not stop him from asserting:  "It is also notable that in the depositions of PerkinElmer executives, they admitted there was a strong demand for this machine and that competitors like Creo were successfully selling units in the market."  First Report ¶ 5 (Dangel Exh. 1).

> We received today the deposition transcript for Guy Antley, PerkinElmer's only salesman for the CTP machine.  While it is certainly too long for you to read in a brief period of time, there are certain portions that are more important than others, based on our conversations yesterday and your viewpoint on new product introduction techniques, particular the first 75 pages, pages 85-90, 120, 129-133, 140-46, 158-160, 175-180, 188-218.[8]

Letter to Baier (Apr. 3, 2008) (Ziegler Exh. 102).  Likewise, Baier wholly ignored thousands of emails and other documents in the discovery record, all of which provide direct evidence about the nature and substance of the sales efforts Baier purportedly was engaged to evaluate.[9]

More broadly, Baier made clear that he had no involvement in selecting the information relevant to his opinions and instead relied wholly on the office of Sonoran's counsel to determine what might be important:

> Q:  Do you know how Mr. Dangel's office selected the documents that they provided you to review?
>
> A:  I do not.  I was told that they were the ones that were most relevant to the sales effort and the marketing effort, but I wasn't involved in the process and didn't know anything more than what I was told.

Baier Dep. 30:23-31:4.

Baier's total abdication of responsibility for selecting relevant information produced a report littered with unsubstantiated and flawed conclusions.  For instance, Baier asserted that there was a "viable market" in general for CTP technology.  First Report ¶ 5.  Yet Baier revealed in his deposition that when he completed his First Report he did not know if there was a market,

---

[8]  Among the Antley deposition exhibits Baier did not receive was the roughly 30-page PowerPoint presentation that Antley testified he made to every single major metro customer with which he met.  *See* PowerPoint presentation (Ziegler Exh. 91); Antley Dep. 134:10-136:9, 164:2-17.  The relevant pages of Antley's deposition testimony, in which he described the pitch he made to potential customers, are among those Sonoran's counsel described as unimportant.

[9]  As disclosed to PerkinElmer, Baier's First Report stated that he had consulted a grand total of 16 emails selected for him by Sonoran's counsel.  *See* Schedule of Materials Consulted (Ziegler Exh. 97).  Sonoran, in offering Baier's First Report as evidence, did not submit the original schedule that reflected the entirety of the materials on which Bair based the conclusions stated in the First Report.  Instead, Sonoran submitted a new schedule that reflected additional materials that Baier did not rely upon in adopting the conclusions stated in the First Report.  *See* Dangel Exh. 1.  Even the revised schedule, however, includes less than 25 emails.  *Id.*

how big it was, or what it looked like:

> I was not fully happy – one of the big questions I had in my mind
> was is there or was there a market during this period and what did
> it look like, how big it was, and I certainly wasn't satisfied that I
> had found enough information about that at that time [I submitted
> my Report].

Baier Dep. 48:5-15. Baier even admitted that the scope of his engagement *did not* encompass

any consideration of "market size or validity of product." Baier Dep. 65:6-23. Baier also

admitted that he did not know the positions and identities of many participants in PerkinElmer's

sales effort, which made it impossible for him to verify his asserted conclusion that executives

were not involved in PerkinElmer's sales effort. Baier Dep. 196:3-199:18. Lastly, while Baier

stated in his Report that Donahue "was clearly involved [in] the sales process," at deposition

Baier testified that he did not know if Donahue had made any visits to prospective customers.

Baier Dep. 213:13-23.

Thus, in concluding that PerkinElmer's efforts were "unreasonably low and grossly

inadequate," Baier ignored virtually all evidence of PerkinElmer's actual sales efforts. By his

own admission, his opinions rest instead on unsubstantiated assertions and the instructions of

Sonoran's counsel about what was important to the conclusion Baier was hired to express.

> B.    Baier's Opinion About PerkinElmer's Sales Efforts Is Not The Product of
>       Reliable Principles and Methods

Nor is Baier's opinion about PerkinElmer's efforts the product of reliable principles and

methods. Baier states that "a number of key activities are essential for success." First Report ¶

4. Then, without elaborating on what these "key activities" might be, Baier asserts that his

analysis consisted of an evaluation of what he termed the "six key elements."[10] First Report ¶ 4.

---

[10] Baier's six "elements," as noted above, are:  (1) Was there a viable market?  (2) Did [PerkinElmer] understand
this was a new product?  (3) Was there full corporate involvement and support in securing the first 5 customers?  (4)

During deposition, Baier confessed that these six elements are not a recognized framework or methodology for evaluating sales and marketing efforts; instead, Baier made them up for purposes of testifying, based on instructions from Sonoran's counsel:

> Q:  Where did you come up with those six key questions, what are they derived from?
>
> A:  These are from my experience and, you know, education after, you know, we talked earlier about, I was trying to narrow down what exactly I should focus on, so after understanding what I should focus on and some assumptions made earlier and thinking through the case a variety of times, these were the ones that seemed the most salient for me, so they were a function of my experience and the way this case has been set up in terms of what I should comment on and what I shouldn't comment on.
>
> Q:  Set up by whom?
>
> A:  I guess the instructions I got from Mr. Dangel.
>
> Q:  But just to be clear, these are six questions that you came up with on your own, right?
>
> A:  Yes, they're not from an article … they're not from a recognized framework of something.
>
> Q:  Right, so this is not some recognized methodology for analyzing –
>
> A:  Correct.
>
> Q:  sales and marketing?
>
> A:  Correct, correct.

Baier Dep. 146:11-147:12.

Moreover, Baier also revealed during his deposition that there were three fundamental "pillars" he normally would consider even *before* evaluating a sales and marketing strategy and *before* considering any of the so-called "six key elements":  (1) Was there an unmet need in the

---

How well were product and market knowledge shared internally?  (5) Were the right skills and incentives in place? (6) Was there sufficient corporate budget?

market? (2) Did the company have a product that uniquely met this need? (3) Did the company actually deliver on what it claimed?  Baier Dep. 128:7-130:7, 149:2-8.  Remarkably, Baier did not satisfy himself that any of these three fundamental "pillars" actually existed in this case.  As to the first pillar, whether a market existed, Baier testified that at the time that he submitted his report and opinions, he did not know what the market looked like.  Baier Dep. 48:5-9.  As to the second and third "pillars" – whether the product uniquely met a market need and delivered on its promised capability – Baier testified that he did no analysis and simply assumed both to be true.  Baier Dep. 131:6-13.  Baier thus completely sidestepped the factors he believes are the fundamental prerequisites of sales success and, instead, relied on a six-part inquiry conceived solely for purposes of this case based on instructions given by Sonoran's counsel.  By his own admission, Baier's analysis does not reflect "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kumho*, 526 U.S. at 152.[11]  It plainly does not satisfy any of the more specific measures identified in *Kumho*, *id.* at 149-50, including whether a method has been used before and is accepted by experts in the field.  *See also Newport Electronics*, 157 F. Supp. 2d at 211-12 (striking marketing expert who failed to show he had used the analysis before or that it was accepted by other experts in the field).

Even if Baier had not admitted that his analysis was custom-made for Sonoran's benefit, it clearly is inadequate to the task at hand:  evaluating whether PerkinElmer's CTP sales activities reflect a lack of reasonable efforts.  The first two elements –whether there was a viable market and whether PerkinElmer understood this was new product – do not involve any assessment of PerkinElmer's sales efforts.  Also, as noted above, Baier admitted that he did not know, when he issued his First Report, whether there was a market, how big it was or what it

---

[11]   Baier also testified that there are other key activities relevant to a successful launch, which he did not bother to consider.  Baier Dep. 147:18-148:23.

looked like, and that the scope of his engagement *did not* encompass any consideration of "market size."  Baier Dep. 48:5-9, 65:6-23.  The most that can be said for Baier's "assessment" of market viability is that he reviewed a handful of internal sales *projections* from over 6 months *before* PerkinElmer even acquired the business in May 2001.[12]  *See* First Report ¶ 5; *Zenith*, 395 F.3d at 420 ("Like many other internal projections, these represent hopes rather than the results of scientific analysis.")  The upshot is that Baier's purported assessment of market viability – which he admits did not satisfy him that a market actually existed – rests on pre-acquisition projections used to pitch PerkinElmer only the deal and on a request by MacDermid for a long term quote on a flexo machine that did not even exist.

Baier's third element – whether there was full corporate involvement and support – is no more than a collection of unsubstantiated criticisms.  For example, Baier flatly states that "[t]he sales rep, Guy Antley, did not have a technical pre-sales person helping him."  First Report ¶ 8.  But in the very next sentence, Baier says that Antley was "trying to close deals by himself with help from Joe Donahue, the *technical founder* of Sonoran Scanners."  *Id.* (emphasis added).[13]  Baier also surmises that Antley "was perhaps a competent sales rep for a mature product, but did not inspire confidence of the customer for an early purchase of a new product."  First Report ¶ 8.  Baier's speculation about customers' views of Antley is plainly inadmissible.  *See Highlands Capital Mgmt, L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005) (excluding expert's

---

[12]   The main projection Baier cites is from the "business plan" Donahue sent to PerkinElmer in October 2000 in an effort to persuade PerkinElmer to buy the collapsing business, and Donahue himself described the projection at the time as "very ambitious" and "requir[ing] significant funding in order to ramp up to achieve projected sales." Ziegler Exh. 13.  Another projection Baier cites is a "rough sales projection" PerkinElmer used in November 2000 based on the numbers supplied by Donahue in his pitch.  Ziegler Exh. 98.  The last projection Baier cites is from a December 2002 letter from MacDermid requesting *a quote* from PerkinElmer for a possible deal involving 24 flexo machines.  First Report ¶ 5.  But in this very document, MacDermid says that most of the contemplated machines would be not be delivered until "late 2004, early 2005" and, most remarkably, that MacDermid "recognize[s] the difficulties and risks of quoting a system we do not yet have available."  Ziegler Exh. 93.

[13]   Baier also ignored the fact that Antley had access to Norm Shaver, one of the primary engineers, who was available by phone for consultation whenever Antley visited with a potential customer.  Shaver Dep. 96:23-97:1.

"speculation regarding the state of mind and motivations of certain parties who were involved in the relevant transaction"); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004).  Even if reading minds were a proper subject of expert testimony, Baier acknowledged he had no information from prospects about their views of Antley.  Baier Dep. 283:5-16.  With respect to his "third element," Baier also asserts that "[t]he organizational response by PerkinElmer to the MacDermid sales opportunity appears to be especially weak." First Report ¶ 8.  At deposition, however, he confessed he was unaware of documents supporting this assertion and, instead, based it on claims by Sonoran's counsel about what happened with the MacDermid opportunity.  Baier Dep. 289:6-290:23.[14]  In sum, like so much of his other work, Baier's approach to concluding "there was very little evidence" as to this element was simply to ignore the actual evidence and rely instead on speculation and claims made by Sonoran's counsel.

Baier's fourth element – how product and market knowledge were shared – relates entirely to PerkinElmer's decision, in May 2001, not to employ Bogen on the terms he was demanding.  First Report ¶ 10.  This initial hiring decision has nothing to do with PerkinElmer's efforts for the three-plus years *after* Bogen decided to reject PerkinElmer's employment offer.[15] In any event, Baier admitted that PerkinElmer had engaged Bogen as a consultant for two months, and that he knew of no information Bogen failed to impart during this period.  Baier Dep. 234:22-235:12, 237:1-18; *see also* Bogen Dep. 85:2-24, 166:2-4.

Baier's fifth element – whether the right skills and incentives were in place – consists entirely of Baier's musings about Antley's compensation scheme, which Baier describes as a

---

[14]   Had Baier read more than one deposition or looked at any relevant documents before committing to an opinion, he would have seen clear evidence that many employees and executives were involved with the potential MacDermid opportunity.  *See*, *e.g.* Donahue Dep. 284:2-285:4 (testifying to Donahue's, Jurkiewicz's and Murphy's dealings with MacDermid); Ziegler Exh. 99 (Email thread between senior PerkinElmer executives and MacDermid).
[15]   Baier's emphasis on the Bogen employment issue is disingenuous, given the firm position taken by Sonoran's counsel that Baier was not even retained to talk about Bogen and any such testimony would be speculation, because Baier had not read the relevant depositions.  Baier Dep. 232:6-234:10 (attached as Appendix A).

base salary of $85,000 and a bonus of "perhaps 5%, or at most 10%, of his base salary."  First

Report ¶ 11.  Again, this element has nothing to do with an assessment of the efforts actually

made by PerkinElmer.[16]  What apparently "troubles" Baier about Antley's compensation

structure is that it was not more contingent.  *Id.*  Baier offers no analysis of how Antley's

compensation compared to the market or whether salespersons in this field would be highly

incentivized by a substantial contingent salary, especially when asked to introduce an unproven

product into a difficult market.  And his criticism of Antley's compensation is especially curious

given his conjecture that customers typically do not trust sales representatives working for

commission and, as a result, "discount" what those representatives say.  Baier Dep. 202:4-6.

Baier's assessment of his final element – whether there was sufficient corporate budget –

is absurd on its face.  He admits that "the information on the sales and marketing budget is

limited," but nevertheless concludes that there "appears not to have been" sufficient resources

dedicated to the effort.  First Report ¶ 12.  Even more problematic, he asserts – without reference

to source – that "[f]or new product introductions, firms commonly need to invest $30-70% [*sic*]

of their sales in the early years as they develop the market."  First Report ¶ 12.  Yet PerkinElmer

had no sales in the first two-plus years, and neither did Sonoran when it operated the business

from 1997 to 2001.  When confronted with this obvious fact, Baier tried to revise his opinion by

saying that a new company typically should spend 30-70% of *projected* revenues on a sales and

marketing budget.  Baier Dep. 317:4-322:7.  Even if Baier had some basis for this view, which

he does not, he makes no assessment of whether such a strategy would have made business sense

for PerkinElmer given its economic circumstances and market conditions more broadly.  The

---

[16]   Antley's financial incentives would be pertinent, in theory, only if Baier had some reason to believe that Antley had made no effort.  Clearly this is not the case.  Apart from the trip reports and other materials documenting Antley's considerable efforts, even Donahue admitted that Antley had made contact with "many, many newspapers" and, at one point, gave Antley an "A+" for "his level for effort."  Donahue Dep. 427:5-11; Ziegler Exh. 55; SRDSOF ¶ 71.

troubling implications are that Baier has no idea how large a *loss* his asserted range would have

caused PerkinElmer to suffer, especially if revenue projections proved unrealistic.

In short, while Baier's proposed opinions are characteristic of Sonoran's attempt to make

this entire case an exercise in misinformed armchair quarterbacking, they do not satisfy the

admissibility requirements of Fed. R. Evid. 702.

## CONCLUSION

For the foregoing reasons, the Court should strike Paul Baier's opinions regarding

PerkinElmer's CTP efforts.

PERKINELMER, INC.

 /s/ T. Christopher Donnelly
T. Christopher Donnelly (BBO No. 129930)
Adam B. Ziegler (BBO No. 654244)
DONNELLY, CONROY & GELHAAR, LLP
One Beacon Street, 33rd Floor
Boston, Massachusetts 02108
(617) 720-2880

January 29, 2010


## CERTIFICATE OF SERVICE

I hereby certify that on January 29, 2010, I electronically filed the foregoing paper with
the Clerk of the Court using the ECF system which will send notification of such filing to all
counsel.

/s/ T. Christopher Donnelly

Appendix A:  Deposition Excerpt Regarding Baier's Ability to Testify about Norm Bogen

Q:  And do you know whether or not Mr. Bogen was offered a position with PerkinElmer?

A:  My understanding was he was offered a position at the same salary he was looking to get, my understanding he was offered –

MR. DANGEL:  I'm going to object to this.  This is now going beyond anything that has to do with his expert –

MR. HANDLER:  It's right here in his report, I'm just asking him about what's in his report.

MR. DANGEL:  He wasn't retained, was he?

MR. HANDLER:  I'm asking him what was in his report –

MR. DANGEL:  No, no, you keep -- let me just say something.

MR. HANDLER:  No, look, we've got about seven minutes left, I'd like to ask my remaining questions.  Unless you're going to instruct him not to answer, if you want to object to the question, object to the question.  I'd like to get my last seven minutes of questions.

MR. DANGEL:  Do you doubt that he wasn't retained?

MR. HANDLER:  I'd like to get my last seven minutes of questions.

MR. DANGEL:  I'm not going to have somebody who wasn't involved in reading the depositions and involved with this particular thing giving opinions about it, so –

MR. HANDLER:  Are you going to instruct him not to answer the question?

MR. DANGEL:  Yes.

MR. HANDLER:  Can you read the question back for me, Michelle?

MR. DANGEL:  Unless he feels that he has that knowledge, go ahead.

(Reporter read the record as requested).

MR. DANGEL:  When?  Object to the -- there's no foundation.

Q.  Do you know –

MR. DANGEL:  Be more specific, please.

Q.  Do you know whether Mr. Bogen was offered a position to be an employee at PerkinElmer?

MR. DANGEL:  When?

A.  My understanding is that –

MR. DANGEL:  Object, first of all, object to the form of the question.  Object to this as an area of inquiry in this deposition.  Please do not speculate, sir.  If you have definite information, fine, from something you've read, fine, and indicate that you are relying on it, fine, but I don't want you testifying about Mr. Bogen's offers unless you have definite information about it.

Baier Dep. 232:6-234:10.