UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                            )
SONORAN SCANNERS, INC. and                  )
JOSEPH P. DONAHUE,                          )
            *Plaintiffs*                    )
                                            )   Civil Action No. 06-12090-WGY
      v.                                    )
                                            )
PERKINELMER, INC.,                          )
            *Defendant*.                    )
_____   )

**DEFENDANT PERKINELMER, INC.'S MEMORANDUM IN SUPPORT OF ITS
MOTION TO STRIKE THE OPINIONS OF PAUL BAIER AND JOSEPH DONAHUE
ABOUT WHAT WOULD HAVE HAPPENED IN THE WORLDWIDE CTP MARKET
BUT FOR PERKINELMER'S ALLEGED BREACH**

T. Christopher Donnelly
Adam B. Ziegler
DONNELLY, CONROY & GELHAAR, LLP
One Beacon Street, 33rd Floor
Boston, Massachusetts 02108
(617) 720-2880

*Counsel for Defendant PerkinElmer, Inc.*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................. 1

THE GATEKEEPING FUNCTION OF THE COURTS .............................................................. 1

THE PROPOSED OPINIONS ............................................................................................... 3

        A.    Paul Baier ................................................................................................ 3

        B.    Joseph Donahue ...................................................................................... 4

ARGUMENT ...................................................................................................................... 5

I.     Neither Baier Nor Donahue Performed Any Analysis Based On Recognized Methods For Predicting What Would Have Happened In A "But For" World ...... 5

II.    Baier's Proclamation That PerkinElmer Would Have Sold 473 Units Is Inadmissible Because He Is Unqualified And His Edict Is Unreliable ................. 7

        A.    Baier Is Not Qualified To Proclaim Or Predict What Would Have Happened In The Worldwide Market For CTP Products ........................... 8

        B.    Baier's Newly Disclosed Proclamations About The Market Share And Unit Sales PerkinElmer Would Have Achieved Are Unreliable ................ 8

III.   Donahue's Pre-Acquisition Projection That PerkinElmer Would Sell 300 CTP Units Is Inadmissible ................................................................................. 19

CONCLUSION .................................................................................................................. 20

Defendant PerkinElmer, Inc. respectfully submits this memorandum in support of its motion to strike the proffered expert opinions of Paul Baier and Joseph Donahue relating to CTP sales that allegedly would have occurred if PerkinElmer had made reasonable efforts.

## INTRODUCTION

In opposing PerkinElmer's summary judgment motion, Sonoran has offered the conclusory and divergent speculation of Paul Baier and Joseph Donahue about the percentage market share and total unit sales PerkinElmer "would have" achieved if it had made, in their view, "reasonable efforts" to sell CTP machines. According to Baier, in five short years, PerkinElmer would have rocketed from a 0% share of any market to a 15% share of the worldwide CTP market and a 25% share of the North American CTP market, resulting in 473 units sold. Second Report at 13. According to Donahue, over that same time frame, PerkinElmer would have captured a 10% share of the worldwide CTP market, leaping from zero to 300 units sold. Donahue 2d Aff. ¶ 12.

As shown below, these opinions are outcome-driven assertions made by unqualified witnesses without reliable foundation, data or analysis. They are the *ipse dixit* of non-experts, and they come nowhere close to satisfying the admissibility standards of Fed. R. Evid. 702, as construed in *Daubert v. Merrell Dow Pharm.*, *Inc.*, 509 U.S. 579, 592-93 (1993) and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999). The Court therefore should strike them from the summary judgment record.

## THE GATEKEEPING FUNCTION OF THE COURTS

The proponent of expert testimony bears the burden of establishing that the testimony satisfies the standards of admissibility. *Daubert*, 509 U.S. at 592-93; *McGovern v. Brigham & Women's Hospital*, 584 F. Supp. 2d 418, 422 (D. Mass. 2008). Fed. R. Evid. 702 governs the admissibility of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

This rule imposes a special "gatekeeping" obligation on district courts to ensure that all proposed experts are qualified and all proposed expert testimony is relevant and reliable. *Kumho*, 526 U.S. at 147. This gatekeeping obligation applies at any stage in which a party seeks to rely on proposed expert testimony, including at the summary judgment stage. *See, e.g., General Electric Co. v. Joiner*, 522 U.S. 136, 146-47 (1997) (affirming district court's exclusion of proposed expert testimony in the context of summary judgment); *Magarian v. Hawkins*, 321 F.3d 235, 239-40 (1st Cir. 2003) (affirming district court's grant of summary judgment in negligence case, where plaintiff relied on an expert report that asserted "in a conclusory and perfunctory manner that a reasonable [person in the defendant's position] would have considered" other course of conduct); *Hayes v. Douglas Dynamics,* 8 F.3d 88, 92 (1st Cir. 1993) ("Where an expert presents nothing but conclusions-no facts, no hint of an inferential process, no discussion of hypotheses considered and rejected, such testimony will be insufficient to defeat a motion for summary judgment.") (quotation and citation omitted); *McGovern*, 584 F. Supp. 2d at 422 (excluding proposed expert testimony and granting summary judgment).

Expert testimony is admissible only if the proposed expert is qualified by "knowledge, skill, experience, training, or education" to render the opinion at issue. Fed. R. Evid. 702. If a witness qualifies as an expert, the proponent still must demonstrate that the expert's testimony is reliable, which requires that the opinion be based on sufficient facts or data and must be the product of reliable principles and methods that the expert has applied reliably to the facts. Fed. R. Evid. 702. Lastly, a proposed expert opinion must be relevant, meaning it must have "a valid

2

connection … to the pertinent inquiry." *Cipollone v. Yale Indus. Prods.*, 202 F.3d 376, 380 (1st Cir. 2000).

## THE PROPOSED OPINIONS

A.    Paul Baier

Paul Baier is an ordinary businessman who spent most of his professional life working in the field of e-commerce software and, since 2008, has been a consultant on environmental issues such as greenhouse gas emissions.

Baier's April 2008 expert report ("First Report") disclosed no analysis or opinions about market size and no analysis or opinions about either the market share or the number of sales PerkinElmer "would have" achieved had it used "reasonable efforts" to promote its CTP business. First Report (Dangel Exh. 1). Baier confirmed at deposition that his opinions did not include "market size or validity of products." Baier Dep. 65:6-23.[1] When he submitted his First Report, he did not know whether there was a market during the relevant period, what it looked like, or how big it was. Baier Dep. 48:5-15, 50:17-51:8. At the time of his deposition, he did not know whether there was a market specifically "for a machine of some particular size or price or performance," and he had assumed without inquiry that "the advantages [the product] claimed were recognized and valued by the customers" and the product "performed as specified." Baier Dep. 126:12-22, 166:19-24.

In December 2009, Baier submitted a second report, which asserts conclusions about the size of the worldwide market for CTP machines and the market share and volume of unit sales

---

[1] "SRDSOF" refers to Sonoran's Response to Defendant PerkinElmer's Statement of Facts (Doc. No. 75). "DSOF" refers to Defendant PerkinElmer's Statement of Facts (Doc. No. 64). In addition, any documents and deposition testimony cited herein, which was not previously part of the record, is attached as an exhibit to the Second Ziegler Declaration. For convenience, the exhibits submitted by PerkinElmer are numbered consecutively from 1-102. Exhibits 1-85 were attached to the first Ziegler Declaration (Doc. 67). Exhibits 86-102 are attached to the Second Ziegler Declaration, filed simultaneously herewith. Cited portions of the deposition of Paul Baier ("Baier Dep.") are at Ziegler Exh. 87.

PerkinElmer "would have" won had it used what Baier deems reasonable efforts to promote the CTP business.[2]  Specifically, Baier's Second Report states:

- "The customer benefits from the superior technology and the financial strength of [PerkinElmer], coupled with a robust CTP market during the Period would allowed [*sic*] to sell many CTP units had industry standard practices and investments been used in sales, marketing and other areas."

- "[PerkinElmer] would have secured 15% of the worldwide market CTP [*sic*] machines sold to newspapers and 5% of CTP machines sold to large commercial printers, based on my professional experience, understanding of the CTP technology and market, and information I have received from to [*sic*] date."

- "I calculate to a reasonable degree of certainty [PerkinElmer] would have sold 473 units during the [May 2001 to May 2006 period]."

Second Report at 12-13.  In opposition to PerkinElmer's motion for summary judgment, Sonoran has offered Baier's Second Report as evidence on the issues of causation and damages.  *See* Opp. at 18.

    B.    <u>Joseph Donahue</u>

In April 2008, Sonoran's counsel stated in a letter that Donahue would testify that, had PerkinElmer's CTP effort been reasonable, "given the market and the penetration of that market by competitors and MacDermid, he is confident that at least 300 machines would have been sold over the contract period."  Ziegler Exh. 101.  Sonoran did not submit an expert report for Donahue.

During his deposition,  Donahue was asked to describe the basis for his professed belief that at least 300 machines would have sold over the contract period.  Donahue Dep. 491:7-9.  He

---

[2]  Sonoran disclosed the Second Report on December 7, 2009, over 19 months after the disclosure deadline, 17 months after Baier's deposition, and roughly a year after this Court heard and granted PerkinElmer's first summary judgment motion.  On January 21, 2010, the Court entered an Order allowing Sonoran to testify in accordance with the Second Report, which Sonoran described as a "supplemental" report.  The Court's Order made clear that it was expressing no opinion on Baier's qualifications or the substance of his opinions, which were not yet before the Court.  In light of the Court's Order, PerkinElmer does not argue that Baier's Second Report should be stricken as untimely.  However, the Court should strike Baier's Second Report to the extent the opinions exceed the scope of the First Report and thus are not in the nature of "supplemental" opinions at all.

testified that, prior to May 2001, he considered newspapers and commercial printers and "estimated those segments of the market that required or that would be motivated to purchase our machines, because of their demand for sufficient return on investment and satisfactory cost of ownership results." Donahue Dep. 491:13-18. Donahue "felt that selling 300 or 400 machines would be a fairly easy task for a major corporation like PerkinElmer." Donahue Dep. 491:23-122:1. This projected sales goal, according to Donahue, was "supplemented by information from Kodak Polychrome Graphics and other plate companies," who "told [him] that the goals were reasonable based on the markets [he] planned on penetrating." Donahue Dep. 491:6-11.

In opposition to PerkinElmer's summary judgment motion, Sonoran has offered Donahue's affidavit ("Donahue 2d Aff."). This affidavit states that Donahue "was somewhat shocked that anyone would believe that I am not qualified to testify about likely sales of the CTP machine." Donahue 2d Aff. ¶ 8. It also asserts the following conclusions:

- "[I]f we had followed the almost universal, time honored approach to new capital product introduction, and if the reasonable resources had been committed to this project, consistent with the usual practices in capital sales introductions like this one, we would have had at least ten percent of the market, and this is very conservative."

- "State Street Consultants' data, which shows sales of almost 4,000 units during the contract period confirms that my calculation of 300 machines is conservative."

Donahue 2d Aff. ¶ 12. Sonoran relies on Donahue's assertions as "evidence" as to causation and damages. *See* Opp. at 18.

## **ARGUMENT**

### I.  **Neither Baier Nor Donahue Performed Any Analysis Based On Recognized Methods For Predicting What Would Have Happened In A "But For" World**

The Court can dispose of Baier's and Donahue's far-fetched "lost sales" conclusions on simple, straightforward grounds. Neither of them even attempted to perform any analysis based

on recognized methods commonly used to produce reliable, testable, and repeatable determinations of what would have happened to a new business seeking to establish itself in a complex, competitive market.  *See, e.g., Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*, 395 F.3d 416, 418-20 (7th Cir. 2005); *Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 415-16 (7th Cir. 1992); *see generally* Federal Judicial Center, *Reference Manual on Scientific Evidence* (2d ed. 2000).

Purchasing decisions of prospective CTP buyers are both complex and multi-faceted, as acknowledged by Baier and Donahue.  Baier testified that selling CTP machines to major newspapers was a "complex sale," "that customers evaluated these products on a variety of features," that it was "hard for customers to distinguish between all of the different vendors out there," and that customers consider a "collage of issues" that makes it very difficult *even for the customers* to decide among potential vendors.  Baier Dep. 137:22-138-8.  According to Baier, PerkinElmer's target customers were "large, demanding, very time sensitive, and risk averse prospects," *see* Second Report at 4, and would consider changing "mission-critical" equipment only "very slowly and with a high risk and a lot of deliberation."  Baier Dep. 139:7-10.  Moreover, "[c]ustomer needs, market maturity and competitive dynamics differ[] geographically."  Second Report at 5.  Donahue has testified that "every company is different" and that, even with respect to cost-of-ownership analysis (which is but one part of the purchase decision), the model needs "to be customized for every customer."  Donahue 2d Aff. ¶ 8.

In these circumstances, the law requires *analysis*.  However, neither Baier nor Donahue make *any* analytical effort to account for the relevant factors that could explain any given sale.  Instead, Baier merely proclaims two market shares (15% worldwide, 25% North American) without any explanation, then applies a rudimentary arithmetic calculation to his flawed estimate

of total market size.  This *ipse dixit* macro approach lacks any analysis.  Likewise, Donahue's

stale pre-acquisition *ipse dixit* also contains no analysis.  *See General Electric*, 522 U.S. at 146.

In short, instead of rigorous, thoughtful analysis that considers the acknowledged complexities of

breaking into a tough market, Baier and Donahue offer nothing but uninformed, unexplained

intuition and thinly veiled guesswork.  As Judge Posner has artfully explained:

> [P]eople who want damages have to prove them, using
> methodologies that need not be intellectually sophisticated but
> must not insult the intelligence. *Post hoc ergo propter hoc* will not
> do; nor the enduing of simplistic extrapolation and childish
> arithmetic with the appearance of authority by hiring a professor to
> mouth damages theories that make a joke of the concept of expert
> knowledge.

*Schiller & Schmidt*, 969 F.2d at 415-16.  Here, Sonoran has not even bothered to cloak these

proposed opinions with the "appearance of authority."  *Id.*  They are connected to existing data,

if at all, "only by the *ipse dixit*" of Baier and Donahue.  *General Electric*, 522 U.S. at 146

("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit

opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").  As

these opinions, on their face, contain absolutely no analysis, the Court should strike them from

the summary judgment record.

## II.     Baier's Proclamation That PerkinElmer Would Have Sold 473 Units Is Inadmissible Because He Is Unqualified And His Edict Is Unreliable

Because it is apparent from the face of Baier's Second Report that he performed no

expert analysis even minimally suited to the task at hand, the Court need not undertake an in-

depth critique of Baier's qualifications or the reliability of his conclusions.  In any event, as

shown below, Baier's opinions about what would have happened in this complex market if

PerkinElmer had used reasonable efforts do not withstand more detailed scrutiny under the

standards set forth in Fed. R. Evid. 702.

A.    Baier Is Not Qualified To Proclaim Or Predict What Would Have Happened In The Worldwide Market For CTP Products

Baier cannot opine on what "would have" happened in the worldwide market for CTP machines because he does not know the market, the products, the competitors, the potential customers or PerkinElmer itself.  Nothing in his background, training, experience, or knowledge qualifies him to conclude that PerkinElmer, under different circumstances, would have "won" sales – let alone 473 sales – from its entrenched competitors.  *See TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 727-28 (10th Cir. 1993).  Although he claims to have read a smattering of industry articles and press releases, *after completing his Report*, and to have recently interviewed a former employee of a CTP manufacturer, a witness cannot qualify as an industry expert merely by reading a few trade articles and by talking to someone associated with the industry.  *See, e.g., Larson v. Kempker*, 414 F.3d 936, 941 (8th Cir. 2005) ("[A] person does not become an expert simply by reviewing an expert's reports or research."); *United States v. Paul*, 175 F.3d 906, 912 (11th Cir. 1999) (rejecting proposed expert who had merely read articles in the field because "[h]is skill, experience, training and education as a lawyer did not make him any more qualified to testify as an expert on handwriting analysis than a lay person who read the same articles."); *Newton v. Roche Laboratories, Inc.*, 243 F. Supp. 2d 672, 678 (W.D. Tex. 2002) (rejecting proposed causation expert whose claimed knowledge was based "solely on an incomplete review of existing literature" and who had "no relevant expertise … outside of that which he has gleaned from a scant literature review for the purpose of consulting and testifying in this case").  The Court therefore should strike Baier's opinions on the alleged loss of sales due to an alleged lack of effort by PerkinElmer.

B.    Baier's Newly Disclosed Proclamations About The Market Share And Unit Sales PerkinElmer Would Have Achieved Are Unreliable

Even if Baier had some relevant expertise, his opinions are not reliable.  They reflect

nothing but "simplistic extrapolation and childish arithmetic" premised on baseless speculation. *Schiller & Schmidt*, 969 F.2d at 415.

The purpose of the reliability inquiry is to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152.  In determining whether an expert's proposed testimony is reliable, courts consider whether the expert's opinion is based on sufficient facts or data and is the product of reliable principles and methods that have been applied reliably to the facts of the case. *Id.* at 149 (internal quotation marks omitted); *United States v. Monteiro*, 407 F. Supp. 2d 351, 366 (D. Mass. 2006) ("*Daubert* demands that the expert's 'knowledge connote more than subjective belief or unsupported speculation.'") (citation omitted).

Courts have broad discretion in deciding how to assess reliability.  *Kumho*, 526 U.S. at 152.  "Trial judges may evaluate the data offered to support an expert's bottom-line opinions to determine if that data provides adequate support to mark the expert's testimony as reliable. *United States v. 33.92356 Acres of Land*, 585 F.3d 1, 7 (1st Cir. 2009).  In addition, the assessment of reliability can include inquiry into: (1) whether a theory or technique can be and has been tested; (2) whether it has been subject to peer review and publication; (3) whether there is a high known or potential error rate and standards controlling the technique's operation; and (4) whether the theory or technique enjoys general acceptance within the relevant expert community.  *Kumho.,* 526 U.S. at 149-50.

Moreover, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data

and the opinion proffered." *General Electric*, 522 U.S. at 146. Here, Baier's proposed

conclusions do not have a sufficient factual foundation, are not the product of reliable principles

and methods. They are *ipse dixit* and have no connection to any relevant data.

      1.    <u>Baier's Assertion That Sales Would Have Occurred Is Unreliable</u>

Baier's Second Report – submitted in December 2009 – discloses his conclusion that:

> The customer benefits from the superior technology and the
> financial strength of [PerkinElmer], coupled with a robust CTP
> market during the Period would allowed [*sic*] to sell many CTP
> units had industry standard practices and investments been used in
> sales, marketing and other areas. These company and product
> advantages of [PerkinElmer] would have enabled, in all likelihood,
> to win [*sic*] sales when directly competing with the leading CTP
> vendors such as Agfa, Creo, Baysis [*sic*], ECRM, and others.

Second Report at 12. Fundamentally, this is an opinion on causation, and by Baier's own

admission, this conclusion rests on assumptions and has no foundation in facts, methods,

principles, or analysis.

      Baier stated in his original report that he did not evaluate PerkinElmer's product at all

and, rather, assumed it performed exactly as specified. First Report ¶ 3. During his deposition,

Baier testified that he also assumed that PerkinElmer's product was highly valued because it

uniquely met a market need and that potential customers had no reservations about buying it.

Baier Dep. at 126:12-131:6-13, 166:19-24. Thus, to arrive at his causation opinion, Baier simply

assumes a perfect and unique product, unlimited financial resources, a "robust" market eager to

embrace new technology in mission-critical applications, and vulnerable, passive competitors

happy to cede sales. He then speculates that, given these assumptions, he would expect "industry

standard" efforts to have produced sales wins for PerkinElmer. Stated another way, Baier

assumes away all possible reasons why PerkinElmer failed to get market traction *except* an

alleged lack of effort, and then concludes that sales were lost due to the alleged lack of effort.

*See Polaino v. Bayer Corp.*, 122 F. Supp. 2d 63, 69 (D.Mass. 2000) (excluding expert's causation opinion where expert failed to investigate the facts upon which his hypothesis was based and his "ultimate conclusion … rest[ed] on unverified assumptions, speculation and guesswork.").

Baier's flawed opinion is akin to that of a tire expert who concludes that a tire defect caused an accident by assuming excellent driving conditions, a skilled driver, no punctures by foreign substances, no wear and tear on the tire, and no abuse of the tire prior to the accident. *Cf. Kumho*, 526 U.S. at 154-55. In medical terms, Baier's causation opinion is like a differential diagnosis gone terribly wrong; instead of using rigorous, expert analysis to *rule out* alternative explanations, Baier merely supposes that known alternative causes were not at work, leaving the alleged cause as the only remaining explanation. This is causation-by-assumption, nothing more.

Baier's flawed approach is made even worse by his acknowledgment that, in the real world, PerkinElmer faced an extremely challenging sales environment, in which sales were not simple, competition was fierce, the market was in the midst of a recession, and the target customers were unwilling to risk their critical operations on the expensive, unproven technology PerkinElmer offered. Baier Dep. 137:22-139:10; Second Report at 5, 11. These challenges admitted by Baier are not merely hypothetical. As detailed in the trip reports ignored by Baier,[3] many prospects expressed a host of these and other concerns to PerkinElmer, including: poor business conditions; budgetary constraints; reservations about adopting unproven technology; desire for an "end-to-end" solution, which PerkinElmer could not provide; the size and weight of PerkinElmer's machine; and the cost of PerkinElmer's machine, including the cost of

---

[3]   During his deposition, Baier confessed that he had not reviewed any the trip reports because Sonoran's counsel told him they had "not a lot of value." Baier Dep. 207:6-10 ("I also remember Mr. Dangel telling me that, you know, a lot of them are just, you know, meeting notes and not a lot of value there.").

replacement parts (such as lasers).[4]  All of these market complexities underscore the enormous obstacles PerkinElmer encountered during its three-plus year effort to get traction in the newspaper CTP market.  Baier has no reliable basis for asserting a causation opinion premised on a fundamentally different reality.

Nor did Baier analyze any of PerkinElmer's competitors, their product offerings, the deals they made with their customers, their positions and tenure in the market or their relationships with PerkinElmer's target customers, despite admitting that there "clearly" were entrenched competitors in the market.  Baier Dep. 132:20-133:4; Second Report at 7, 8; *see also* DSOF ¶ 106 (and Sonoran admissions cited therein).  For instance, Baier did not consider the fact that many competitors had *existing* relationships with PerkinElmer's target customers, which would have given them an advantage PerkinElmer could not claim.  DSOF ¶ 107.  He did not consider the fact that many competitors had established track records manufacturing *conventional* plate-imaging equipment or related products, which gave them credibility PerkinElmer could not obtain.  *Id.*  Baier analyzed none of these and other key variables; instead he just assumed they did not exist, contrary to admitted facts and common sense.  On the basis of those assumptions, he speculated that PerkinElmer "would have" wrested substantial market share away from the established competitors who, in the real world, won all of these sales.  *See Zenith Electronics Corp.*, 395 F.3d at 419-20 ("An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process."; "reliable inferences depend on more than say-so, whether the person doing the saying is a corporate manager or a putative expert.")

Just two specific examples illustrate the problems caused by premising conclusions about causation and damages on assumptions rather than analysis.  First, in an effort to defend his opinion as "realistic," Baier cites the fact that "Dallas Morning News invested in CTP machines

---

[4]  *See* DSOF ¶¶ 68, 74, 77, 89, 113-119 and the exhibits cited therein.

from Western Litho in 2003," based on a July 2003 report in the publication *Newspapers & Technology*.  But what the July 2003 article actually says is that the *Dallas Morning News* "said it would add [Western Litho's CTP product] to its *existing* line."  Ziegler Exh. 100 (emphasis added).  And if Baier had read the trip reports, he would know that PerkinElmer met in-person with *Dallas Morning News* in February 2002 and June 2002 and learned that the newspaper was already using Western Litho equipment and plates and naturally was likely to remain with Western Litho.  *See* Trip Reports (Feb. 25, 2002 and Jun. 28, 2002) (Ziegler Exh. 3).[5]

Second, the July 2003 article from *Newspapers & Technology*, on which Baier puts so much emphasis, also reveals that as of July 2003, there were "[f]ewer than 300 CTP systems [installed at] North American newspapers, *and a single daily, USA Today [has] almost a third of those*."  Ziegler Exh. 100 (emphasis added).  Whether due to his fundamental lack of knowledge about the market or the unreliability of his analysis, Baier's opinion takes no account of critical market circumstances like these.

  2. <u>Baier's Assertion As To The Number of Sales That Likely Would Have Occurred is Unreliable</u>

Baier's Second Report also discloses his new opinions that:

> [PerkinElmer] would have secured 15% of the worldwide market CTP [*sic*] machines sold to newspapers and 5% of CTP machines sold to large commercial printers, based on my professional experience, understanding of the CTP technology and market, and information I have received from to [*sic*] date.

and

> I calculate to a reasonable degree of certainty [PerkinElmer] would have sold 473 units during the [May 2001 to May 2006 period].

Second Report at 13.  These opinions suffer from the same fundamental "causation by

---

[5]   Baier himself admitted that analyzing particular customers would be important and that he did not attempt it: "I'd agree analysis of those prospects [including the *Dallas Morning News*] and what happened to them is an important piece of information.  It's going to take a while to get that information, you may not get it necessarily from newspaper clippings, but I did not go down that road."  Baier Dep. Vol. II, 337:13-18.

assumption" flaw identified above, which Baier magnifies many times over by speculating that PerkinElmer, in just five short years, "would have" secured a huge share of the worldwide CTP market and "sold 473 units." *Id.* Both opinions rest entirely on a series of counterfactual, implausible assumptions related to causation: that PerkinElmer had a perfect, unique product; that the market was robust; that established competitors would willingly hand over their existing customers and hard-earned market share; and that customers had no reservations about jettisoning their current vendors and purchasing new technology from a new entrant in the field.

But even erroneous assumptions do not explain how Baier arrived at his specific figures: a 15% share of the worldwide newspaper CTP market; a 5% share of the worldwide large commercial printing CTP market; and a total of 473 individual unit sales. Although Baier makes no effort to explain these figures, especially his speculation about market share, a step-by-step understanding of his "calculation" makes plain the unreliability of his opinion.

Step One – Obtain North American telephone survey data. The baseline data Baier says he relied upon was supplied by State Street Consultants ("SSC"), which conducted a telephone survey of those unidentified newspapers and commercial printers willing to participate and reveal their sensitive internal data. Second Report at 6. SSC's rudimentary spreadsheet, as disclosed in Baier's Second Report, is replicated below:

**Installations - CTP Units by Year**
Prepared by State Street Consultants, Inc. December 2009

|  | 5/1/01-12/31/01 | 2002 | 2003 | 2004 | 2005 | through 9/30/2006 | Total |
|---|---|---|---|---|---|---|---|
| Newspaper | 25 | 76 | 114 | 152 | 182 | 164 | 713 |
| Commercial Printers >100 employees with web press | 45 | 112 | 156 | 112 | 82 | 67 | 574 |
| Commercial Printers 50-99 employees with web press | 20 | 49 | 68 | 49 | 36 | 29 | 251 |
| Total | 90 | 237 | 338 | 313 | 300 | 260 | 1538 |

This first step corrupts Baier's entire opinion, because the limited data he obtained is far too generic to supply a reliable foundation for his conclusion. As Baier repeatedly admits, CTP sales

are "complex sales" in which potential customers evaluate a "collage" of issues and a range of product features over a very long period of time before opting to purchase. That lengthy, complex and deliberative process cannot be reduced to naked statistics about whether an installation occurred during a given year. Every one of the 1,538 installations reported by SSC resulted from a unique set of unknown variables and circumstances. A reliable market study would to have *begin* with a detailed dataset that included, at a minimum, the specifications of the CTP product(s) purchased (e.g., price, speed, size, volume, plate manufacturer, software, and other compatibility requirements), the timing of the purchase decision, the other systems considered and rejected by the customer, the number of machines installed, any pre-existing relationship between customer and vendor, and the reasons for the ultimate purchase. Without this data, Baier has no foundation for reaching conclusions about whether PerkinElmer could have won any of these installations, let alone 473 of them.

Step Two – Extrapolate North American data to the world. As Baier concedes, the SSC telephone survey data relates only to North America.[6] Second Report at 6. Nevertheless, Baier uses it as a springboard to estimate the size of the *worldwide* newspaper and large commercial printing CTP markets.[7] His purported methodology: multiplication. Baier simply multiplies the generic North American figures obtained from SSC by 2.5, a factor Baier speculates will approximate the proportional relationship between worldwide and North American markets for

---

[6]   In addition, while the SSC telephone survey data reports *installations* rather than *sales*, Baier nevertheless used this date to determine sales figures. That the fact that a machine was installed in a particular year does not mean that it was sold that year. For example, a series of installations between 2001 and 2006 may result from a long-term contract entered into in 2000.

[7]   Baier's – and Sonoran's – attempt to expand this case to include "worldwide" markets, in general, and the large commercial printing market should be rejected out-of-hand. Apart from Baier's obvious lack of expertise in worldwide CTP markets or in any commercial printing markets, Baier neither conducted nor disclosed any analysis relating to these markets. To the contrary, Baier testified clearly during his deposition that his work was focused on the U.S. major metropolitan newspaper market. Baier Dep. 151:8-12.

the entire period between 2001 and 2006.[8]  The result:  "estimates" of 1,783 total installations in

the worldwide newspaper CTP market (713 x 2.5) and 2,063 total installations in the worldwide

large commercial printing CTP market (825 x 2.5).

This second step only magnifies the problem with using generic data to draw conclusions

about lost sales.  As a result of his extrapolation, Baier assumes away all relevant distinctions

among manufacturers, products and customers on a worldwide scale, across all geographical and

national differences.[9]  *See TK-7 Corp.*, 993 F.2d at 727-28 (rejecting a purported expert's attempt

to project future sales in a foreign market when the expert had no "knowledge of the particular

variables that would affect sales or profitability" in that market).  Moreover, Baier's multiplier –

2.5 – appears to have been plucked out of thin air.  Even if Baier's factor were tolerable as a

loose approximation of the size of these diverse markets, it is not a reliable basis from which to

derive the highly specific calculation Baier claims to have made about the size of these

worldwide markets.  Lastly, even if it were precisely correct that the worldwide markets (for

both newspapers and commercial printers) are 2.5 times larger than the North American

segments of those markets, the issue Baier purports to address is the number of *sales* during the

period, not *market size*.  By no means can Baier simply assume that the relative number of *sales*

in these markets can be accurately predicted by an estimate of the relative *size* of those markets.

Step Three – Apply market share percentages assigned to PerkinElmer.  After

"estimating" the number of worldwide installations between 2001 to 2006, Baier then assigns a

percentage market share he believes PerkinElmer, in his fictional world, "would have" secured in

its first five years in these new markets.  For the newspaper CTP market, Baier assigns

---

[8]   Baier apparently does not distinguish between the worldwide newspaper CTP market and the worldwide
commercial printing CTP markets, in that he asserts that both worldwide markets are 2.5 times bigger than the North
American segments of those markets.
[9]   The nature of this assumption directly contradicts Baier's statement that "[c]ustomer needs, market maturity and
competitive dynamics differed geographically."  Second Report at 5.

PerkinElmer a 15% market share; for the large commercial printing CTP market, Baier assigns

PerkinElmer a 5% market share.  Baier then applies his chosen market share percentages to his

worldwide "estimates."  The approximate result of this arithmetic:  Baier's claim that

PerkinElmer would have sold 269 units within the worldwide newspaper CTP market and 104

units within the worldwide large commercial printer CTP market, for a total of 373 unit sales.

This third step is the most disturbing, and it vividly illustrates the speculative nature of

Baier's opinion.  With no expertise and no foundation or analysis at all, Baier simply guesses

that so-called "industry standard" efforts would have allowed PerkinElmer to seize 15% of the

worldwide newspaper CTP market and 5% of the worldwide large commercial printer CTP

market between 2001 and 2006.  Most alarming, embedded within Baier's speculation about a

15% worldwide market share is his assertion that PerkinElmer "would have" secured an

extraordinary 25% of the U.S. market, in just five years.  *See* Second Report at 13.  These

guesses are not rooted in any analysis.  They are bare speculation, and patently illogical.  *Zenith*

*Electronics Corp.*, 395 F.3d at 419 ("An expert must offer good reason to think that his approach

produces an accurate estimate using professional methods, and this estimate must be testable.

Someone else using the same data and methods must be able to replicate the result.")

Step Four – Add assumed number of worldwide sales in the flexo market.  To the total

number of sales Baier speculates PerkinElmer "would have" achieved in the markets

encompassed by the generic SSC data, Baier then adds an additional 100 unit sales he asserts

would have been made in the worldwide "flexo" market through a hypothesized relationship

with MacDermid.  Baier's ultimate total:  473 unit sales.

This fourth step rests on no firmer foundation than the previous three.  Presumably,

Baier's speculation of 100 worldwide flexo sales is based on an optimistic *projection* of possible

flexo sales made by MacDermid, but projections are no substitute for actual market data and analysis.  *See Zenith Electronics Corp.*, 395 F.3d at 420 ("Like many other internal projections, these represent hopes rather than the results of scientific analysis."); *Fisherman Surgical Instruments, LLC v. Tri-Anim Health Servs., Inc.*, 502 F. Supp. 2d 1170, 1189 (D. Kan. 2007) (rejecting expert's lost profits opinion, which relied on "sales forecasts, projections and goals, all of which were based on limited information and devoid of valid market analysis").  This Court previously rejected these very projections as a basis from which to infer the loss of sales.  *See Sonoran Scanners, Inc. v. PerkinElmer, Inc.*, 590 F. Supp. 2d 196, 211-12 (D. Mass. 2008).  In any event, because PerkinElmer did not even have a flexo product completed for MacDermid until 2004, Baier's guess that PerkinElmer "would have" achieved 15 unit sales before 2004 is bogus on its face.

Step Five – Allocate total unit sales among relevant years.  Lastly, because the *timing* of sales is critical to Sonoran's claim that earnout payments would have been triggered, Baier distributes the 473 unit sales among the five years between 2001 and 2006.  This fifth and final step is also severely flawed.  Baier discloses no methodology or underlying data that would allow him reliably to conclude, for example, that PerkinElmer "would have" completed 21 worldwide sales in 2002, as his results table indicates.[10]  Moreover, because the underlying SSC data reflects *installations*, not sales, it provides no meaningful basis for him to draw conclusions about when sales would have occurred.

End Result.  Through this pseudo-mathematical exercise, Baier reached the following

---

[10]   Baier's allocation of hypothetical sales among the relevant years is not even consistent with his conjecture about the market share percentages PerkinElmer "would have" obtained.  For example, embedded within Baier's guess that PerkinElmer "would have" secured a 15% share of the worldwide newspaper CTP market is his guess that PerkinElmer "would have" secured an extraordinary *25% share* of the North American newspaper CTP market (see chart above).  But the hypothetical per-year market shares, according to Baier, are the following:  2001 – 8% (2 out of 25 sales); 2002 – 13% (10 out of 76 sales); 2003 – 22% (25 out of 114 sales); 2004 – 20% (30 out of 152 sales); 2005 – 27% (50 out of 182 sales); 2006 – 37% (60 out of 164 sales).  Baier offers no explanation why PerkinElmer "would have" had a down year between 2003 and 2004 and then swung to a huge increase in 2005 and 2006.

conclusion, replicated from the Second Report:

**Estimated CTP Machines (unit sales) for PKI in Units**
*\* partial years only. May-Dec for 2001; Jan-May 2006*

| | 2001* | 2002 | 2003 | 2004 | 2005 | 2006* | Total | NA Share | WW Share | Notes and Assumptions |
|---|---|---|---|---|---|---|---|---|---|---|
| **A. Offset** | | | | | | | | | | |
| US Newspapers | 2 | 10 | 25 | 30 | 50 | 60 | 177 | 25% | | |
| EU Newspapers | 0 | 2 | 4 | 6 | 10 | 15 | 37 | | | |
| Asia Newspapers | 0 | 0 | 0 | 10 | 20 | 25 | 55 | | | |
| Total newspapers (worldwide) | 2 | 12 | 29 | 46 | 80 | 100 | 269 | | 15% | |
| Commercial Printers (ww) | 0 | 4 | 10 | 20 | 30 | 40 | 104 | | | 5% assume 65% of units sold in US |
| **B. Flexo** | | | | | | | | | | |
| Flexo Units (worldwide) | 0 | 5 | 10 | 20 | 30 | 35 | 100 | | | through MacDermid; assume all units outside North America unit growth based on forecasts by MacDermid, PKI, and Norm Shaver |
| Total | 2 | 21 | 49 | 86 | 140 | 175 | 473 | | | |
| year/year growth - units | | | 28 | 37 | 54 | 35 | | | | |
| year/year growth - % | | | 133% | 76% | 63% | 25% | | | | |
| North America - units | 2 | 13 | 32 | 43 | 70 | 86 | 245 | | | assumes 65% of commercial printer units are North America |

Second Report at 13. While each of the steps that led Baier to these results is deeply flawed and renders Baier's opinion unreliable and inadmissible, Baier ultimately fails to identify a single actual customer that PerkinElmer "would have secured" or a single actual sale that PerkinElmer "would have" completed. Indeed, Baier cannot even identify a prospective customer that PerkinElmer failed to contact during its substantial effort to generate sales. Baier Dep. 341:19-342:1.

## III.   Donahue's Pre-Acquisition Projection That PerkinElmer Would Sell 300 CTP Units Is Inadmissible

Donahue's asserted conclusion – that PerkinElmer would have sold 300 CTP machines – is even flimsier than Baier's. Donahue's deposition testimony makes clear that his estimate of 300 unit sales is a *projection* he developed sometime *before* May 2001 based on his "[feeling] that selling 300 or 400 machines would be a fairly easy task for a major corporation like PerkinElmer." Donahue Dep. Vol. III, 121:23-122:1. Internal sales projections are not competent evidence of either the causation or quantification of lost sales. In any event, this Court has already rejected Donahue's pre-acquisition projection as competent evidence to prove

causation or damages. *Sonoran Scanners*, 590 F. Supp. 2d at 212 (describing Donahue's projection as "simply too speculative to form any reasonable conclusion"). That Donahue has since looked at a high-level summary of the results of SSC's telephone survey relating to the number of CTP installations in North America does not change the fact that his estimate is nothing more than what he "felt" PerkinElmer could sell.

## CONCLUSION

For the foregoing reasons, the Court should strike the opinions of Paul Baier and Joseph Donahue about what would have happened in the worldwide CTP market.

PERKINELMER, INC.

 /s/ T. Christopher Donnelly
T. Christopher Donnelly (BBO No. 129930)
Adam B. Ziegler (BBO No. 654244)
DONNELLY, CONROY & GELHAAR, LLP
One Beacon Street, 33rd Floor
Boston, Massachusetts 02108
(617) 720-2880

## CERTIFICATE OF SERVICE

I hereby certify that on January 29, 2010, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to all counsel.

 /s/ T. Christopher Donnelly